**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | | |
|---|---|---|
| LISA A. WOLFF, | ) | |
| Plaintiff, | ) | |
| v. | ) | CA No. L02-3932 |
| LITTON ADVANCED SYSTEMS, INC. | ) | |
| and | ) | |
| NORTHROP GRUMMAN SYSTEMS CORPORATION | ) | |
| Defendants. | ) | |

## DEFENDANT NORTHROP GRUMMAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 105 of the Local Rules of the District of Maryland, Defendant Northrop Grumman Corp. ("Northrop Grumman" or "Defendant"), through its undersigned counsel, hereby moves for summary judgment in its favor on all remaining Counts contained in the Amended Complaint, filed by Lisa A. Wolff ("Plaintiff"). In this action, Plaintiff, a former Northrop Grumman employee, alleges sexual harassment, retaliation and gender discrimination under both Title VII of the Civil Rights Act, as amended, 42 U.S.C. §2000e et seq. (2003) and the Prince George's County Human Rights Act, and a state law claim of breach of contract. The other Counts in the Complaint were voluntarily dismissed.

As detailed in the attached Memorandum in support of this motion, Plaintiff's claims for sexual harassment, retaliation, gender discrimination and breach of contract fail as a matter of

fact and law.  Plaintiff's allegation of sexual harassment is premised on one telephone

conference call in which a manager was rude and used profanity in the presence of a number of

individuals, male and female, including Plaintiff, as a result of his frustration over the work that

had been done by those individuals.  Nothing that was said by this manager had any sexual

meaning whatsoever – it was purely an unseemly venting of frustration and anger over the work

issues being discussed.  This language was not used because of Plaintiff's gender and, as such, it

does not constitute sexual harassment.

 As for her contract and retaliation claims, in fall 2001, Plaintiff's employer, Litton

Advanced Systems ("LAS"), was in the process of being acquired by and integrated into

Northrop Grumman.  There simply is no evidence that the decision concerning which position

and duties to offer Plaintiff at Northrop Grumman was related, in any way, to Plaintiff's internal

complaint filed at LAS about this alleged sexual harassment, nor was it motivated by any gender-

based animus.

 For all of the foregoing reasons, as stated more fully in the accompanying Memorandum

of Law, this Court should enter summary judgment in Northrop Grumman's favor and dismiss

the remaining Counts of Plaintiff's Complaint, with prejudice.

Dated:  September 25, 2003    Respectfully submitted,


        _____/s/_____
        James J. Kelley (Bar No. 06669)
        Christine B. Cox (Bar No. 14878)
        MORGAN, LEWIS & BOCKIUS LLP
        1111 Pennsylvania Ave., NW
        Washington, D.C.  20036
        202.739.3000
        202.739.3001 (facsimile)

        Counsel for Defendant
        NORTHROP GRUMMAN CORP.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

| | |
|---|---|
| LISA A. WOLFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CA No. L02-3932 |
| | ) |
| LITTON ADVANCED SYSTEMS, INC. | ) |
| and | ) |
| | ) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION | ) |
| | ) |
| Defendants. | ) |

## <u>ORDER</u>

Upon consideration of Defendant Northrop Grumman Corporation's Motion for

Summary Judgment and Memorandum of Law in support thereof, Plaintiff's response thereto,

and the entire record herein, it is this _____ day of _____, 2003, hereby

**ORDERED**:

      1.      That Defendant's Motion for Summary Judgment is **GRANTED**; and

      2.      That this Court will **ENTER JUDGMENT** for Defendant and **DISMISS** all

remaining Counts of Plaintiff's Complaint, **WITH PREJUDICE**.


                                            _____
                                           Judge William D. Quarles, Jr.
                                           United States District Judge
                                           in the United States District Court
                                           for the District of Maryland, Baltimore Div.

copies to:

James J. Kelley (Bar No. 06669)
Christine B. Cox (Bar No. 14878)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C.  20036
202.739.3000
202.739.3001 (facsimile)

Counsel for Defendant
NORTHROP GRUMMAN CORP.

and

Ronald M. Cherry, Esq.
214 Washington Ave.
Towson, MD  21204
301.494.4954
301.494.4952 (facsimile)

Counsel for Plaintiff
LISA A. WOLFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

|  |  |  |
|---|---|---|
| LISA A. WOLFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CA No. L02-3932 |
| | ) | |
| LITTON ADVANCED SYSTEMS, INC. | ) | |
| and | ) | |
| | ) | |
| NORTHROP GRUMMAN SYSTEMS CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT NORTHROP GRUMMAN CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

James J. Kelley (Bar No. 06669)
Christine B. Cox (Bar No. 14878)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C.  20036
202.739.3000
202.739.3001 (facsimile)

Counsel for Defendant
NORTHROP GRUMMAN CORP.

Dated:  September 25, 2003

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION ...........................................................................................................1

STATEMENT OF UNDISPUTED FACTS ............................................................................2

    I. NORTHROP GRUMMAN AND THE ACQUISITION OF LITTON
    INDUSTRIES, INC. .................................................................................................2

    II. PLAINTIFF'S EMPLOYMENT WITH NORTHROP GRUMMAN OR ITS
    PREDECESSORS ...................................................................................................3

    III. AUGUST 29, 2001 TELEPHONE CONFERENCE...................................................3

    IV. PLAINTIFF'S GRIEVANCE AND NORTHROP GRUMMAN'S
    INVESTIGATION....................................................................................................5

    V. NOVEMBER 30, 2001 MEETING BETWEEN PLAINTIFF AND MR.
    MAZZO ...............................................................................................................8

    VI. OFFER OF EMPLOYMENT WITH NORTHROP GRUMMAN............................10

    VII. PLAINTIFF'S REJECTION OF THE OFFER OF EMPLOYMENT WITH
    NORTHROP GRUMMAN.......................................................................................12

    VIII. NORTHROP GRUMMAN TOOK NO ADVERSE EMPLOYMENT
    ACTIONS AGAINST PLAINTIFF BECAUSE OF HER GENDER............................13

    IX. PLAINTIFF'S NEW EMPLOYMENT.................................................................13

    X. MISCELLANEOUS ALLEGATIONS ....................................................................14

    XI. PROCEDURAL HISTORY .................................................................................15

ARGUMENT....................................................................................................................15

I. LEGAL STANDARD FOR SUMMARY JUDGMENT ........................................................15

II. PLAINTIFF'S CLAIM OF HOSTILE WORK ENVIRONMENT SEXUAL
    HARASSMENT IN VIOLATION OF TITLE VII MUST BE DISMISSED
    BECAUSE PLAINTIFF'S ALLEGATIONS ARE INSUFFICIENT TO
    ESTABLISH THE ELEMENTS OF A COGNIZABLE CLAIM...................................17

    A. Plaintiff Cannot Sustain her Claim of Sexual Harassment Because the
    Allegedly Harassing Action Did Not Occur Because of Plaintiff's Sex.............18

    B. Mr. Mazzo's Conduct Does Not Approach the Level of "Severe and Pervasive"
    Harassment Required to Create an Abusive Work Environment ........................22

    C. Liability Cannot Be Imputed to Northrop Grumman...................................26

III. PLAINTIFF CANNOT SUSTAIN HER CLAIMS OF INTENTIONAL GENDER
    DISCRIMINATION UNDER TITLE VII AND PRINCE GEORGE'S COUNTY
    HUMAN RIGHTS ACT...........................................................................................27

# TABLE OF CONTENTS
(continued)

**Page**

A. Plaintiff Cannot Sustain Prima Facie Claims of Discriminatory Failure to Hire or Constructive Discharge..................................................................29

B. Northrop Grumman Has Legitimate, Non-Discriminatory Reasons for its Employment Actions.......................................................................................34

C. Plaintiff Makes No Showing That Northrop Grumman's Stated Reasons Are a Pretext for Discrimination......................................................................35

IV. PLAINTIFF CANNOT PREVAIL ON HER CLAIM OF RETALIATION UNDER TITLE VII......................................................................................................36

A. Plaintiff Cannot Make a Showing of a Prima Facie Case of Retaliation....................36

B. Plaintiff Is Unable to Rebut Northrop Grumman's Legitimate, Non-Discriminatory Reasons for the Employment Actions She Challenges................39

V. PLAINTIFF CANNOT PREVAIL ON THE MERITS OF HER BREACH OF CONTRACT CLAIM ......................................................................................41

CONCLUSION.............................................................................................................41

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Adams v. Giant Food, Inc.*, 225 F. Supp. 2d 600, 606 (D. Md. 2002) ..............................37

*Anderson v. G.D.C., Inc.*, 281 F.3d 452 (4th Cir. 2002) .............................................16, 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .....................................................16

*Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir. 1995) ..........................23

*Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985) ...................................................................16

*Beall v. Abbott Labs*, 130 F.3d 614 (4th Cir. 1997) .....................................................35, 40

*Bennett v. New York City Department of Corr.*,
  705 F. Supp. 979 (S.D.N.Y. 1989) ..............................................................................23

*Brinkley v. Harbour Recreation Club*, 180 F.3d 598 (4th Cir. 1999) ..............................28

*Brown v. McLean*, 159 F.3d 898 (4th Cir.1998) ...............................................................30

*Burlington Industrial, Inc. v. Ellerth*, 524 U.S. 742 (1998) .......................................26, 27

*Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) .....................................................................31

*Causey v. Balog*, 162 F.3d 795 (4th Cir. 1998) ...........................................................30, 40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................15

*Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000) .............................................35

*Clark County Sch. District v. Breeden*, 532 U.S. 268 (2001) .....................................20, 39

*Dachman v. Shalala*, 46 F. Supp. 2d 419 (D. Md.), *appeal dismissed*,
  191 F.3d 447 (4th Cir. 1999) .......................................................................................16

*Dea v. Washington Suburban Sanitary Commn*,
  11 Fed. Appx. 352, 357-58 (4th Cir. 2001) ................................................................37

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) ...................................28, 30

*Evans v. Techs. Applications & Service Co.*,
  80 F.3d 954 (4th Cir. 1996) ............................................................................16, 30, 34

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ......................................... 17, 24-25

*Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 (4th Cir. 1987) .....................................16

*Franklin v. King Lincoln-Mercury-Suzuki, Inc.*,
    51 F. Supp. 2d 661, (D. Md. 1999) ...........................................................................24

*Gazda v. Pioneer Chlor Alkali Co.*, 10 F. Supp. 2d 656 (S.D. Tex. 1997).......................23

*Gross v. Burggraf Construction Co.*, 53 F.3d 1531 (10th Cir. 1995) ..............................20

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ................................................................22

*Hartsell v. Duplex Product, Inc.*, 123 F.3d 766 (4th Cir. 1997) ...........................17-19, 23

*Henson v. Liggett Group, Inc.*, 61 F.3d 270 (4th Cir. 1995) .............................................35

*Hocevar v. Purdue Frederick Co.*, 223 F.3d 721 (8th Cir. 2000) ....................................19

*Holmes v. Bevilacqua*, 794 F.2d 142 (4th Cir. 1986) .................................................29-30

*Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745 (4th Cir. 1996) .............. 23, 36-37

*Karpel v. Inova Health System Services*, 134 F.3d 1222 (4th Cir. 1998) ........................28

*Kolstad v. American Dental Association*, 527 U.S. 526 (1999) ........................................27

*Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 244 (4th Cir. 2001) ....................................17, 18

*Langerman v. Thompson*, 155 F. Supp. 2d 490 (D. Md. 2001) ........................................30

*Lewis v. Forest Pharms., Inc.*, 217 F. Supp. 2d 638 (D. Md. 2002) ................................16

*Lissau v. Southern Food Service, Inc.*, 159 F.3d 177 (4th Cir. 1998). ........................... 26

*Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261 (4th Cir. 2001) ........................31

*McDonnell Douglas Corp. v. Green.*, 411 U.S. 792 (1973) ..............................................28

*Mitchell v. Data General Corp.*, 12 F.3d 1310 (4th Cir. 1993) .......................................16

*Moore v. Reese*, 817 F. Supp. 1290 (D. Md. 1993) .........................................................25

*Munday v. Waste Mgmt. of N. America, Inc.*,
    126 F.3d 239 (4th Cir. 1997) ....................................................................................36

*Ocheltree v. Scollon Products, Inc.*,
   335 F.3d 325 (4th Cir. 2003) .............................................................................17, 24

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ...........18, 19, 20, 22, 25

*Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir. 1989),.......................................24, 31, 32

*Rachel-Smith v. FTDATA, Inc.*, 247 F. Supp. 2d 734,
   (D. Md. 2003) ...........................................................................................................27

*Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133 (2000) ..............................35

*Smith v. Virginia Commonwealth University*, 84 F.3d 672 (4th Cir. 1996) ....................16

*Southard v. Texas Board of Criminal Justice*, 114 F.3d 539 (5th Cir. 1997) ..................32

*Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355 (10th Cir. 1997) .................................29

*Spriggs v. Diamond Automobile Glass*, 242 F.3d 179 (4th Cir. 2001) ................36, 38, 39

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ...........................................28, 34, 35

*Taylor v. Virginia Union University*, 193 F.3d 219 (4th Cir. 1999) ..........................31, 32

*Texas Department of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) .............................34

*Waite v. Blair, Inc.*, 937 F. Supp. 460 (W.D. Pa. 1995) .................................................23

*Wascura v. City of South Miami*, 257 F.3d 1238 (11th Cir. 2001) ..................................39

*Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir. 1989) .........................................28

*Wise v. Gallagher Basset Servs., Inc.*, 228 F. Supp. 2d 671, 674 (D. Md. 2002) .............27

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rules of Civil Procedure and Rule 105 ..................................................................1

## DOCKETED CASES

*Preston v. Bell Atl. Network Servs.*, No. 96-3107,
    1997 WL 20853, 2, 3, 7 (E.D. Pa. Jan. 16, 1997) .......................................................23

*Walk v. Rubbermaid, Inc.*,
    No. 94-4306, 1996 WL 56203, at **1, 2 (6th Cir. Feb. 8, 1996)

*Williams v. Dynatech Communications, Inc.*,
    No. 97-1861, 1998 WL 637418 (4th Cir. Sept. 11, 1998) ..........................................35

## FEDERAL STATUTES AND RULES

Title VII of the 1964 Civil Rights Act,
    <u>as amended</u>, 42 U.S.C. §2000e <u>et seq.</u> (2003) ............................................................1

Federal Rule of Civil Procedure 56(c) ......................................................................15, 16

## MISCELLANEOUS

<u>Websters Collegiate Dictionary</u>, <u>The Voice of Authority</u> (10th ed. 1994) .......................21

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 105 of the Local

Rules of the District of Maryland, Defendant Northrop Grumman Corp. ("Northrop Grumman"

or "Defendant"),[1]/ through its undersigned counsel, hereby respectfully submits this

Memorandum of Law in support of its Motion for Summary Judgment.

### INTRODUCTION

In this action, Plaintiff, Lisa A. Wolff ("Wolff") alleges sexual harassment, gender

discrimination and retaliation in violation of Title VII of the 1964 Civil Rights Act, as amended,

42 U.S.C. §2000e et seq. (2003) ("Title VII" or the "Act") and the Prince George's County

Human Rights Act, and breach of contract.[2]/

In April 2001, Northrop Grumman acquired Litton Industries, Inc. ("Litton").  As a part

of this acquisition, a business unit of Litton known as Litton Advanced Systems ("LAS") was

subsequently merged into a business unit of Northrop Grumman known as  Electronics Systems

("ES") Sector.

Plaintiff, a former LAS employee, alleges that she was subjected to sexual harassment by

a  LAS manager during a telephone conference call in August 2001, and also during a meeting

held three months later between the two individuals, which Plaintiff had requested.  In addition,

Plaintiff alleges that, in late November 2001, Northrop Grumman failed to offer her a

"comparable" position in connection with the integration of LAS into the ES Sector and it made

---

1/    Plaintiff named "Northrop Grumman Systems Corporation" as a defendant in its
       Complaint.  The correct corporate entity is "Northrop Grumman Corporation."  Litton
       Advanced Systems was a former business unit of Litton Industries, Inc., which was
       acquired by and merged into Northrop Grumman. The two defendants named in the
       Complaint are referred to jointly as "Northrop Grumman" unless otherwise stated.

2/    On September 17, 2003, Plaintiff voluntarily dismissed Counts IV and V of her
       complaint, for Sex Discrimination in Violation of Maryland Annotated Code and
(continued).

this decision both in retaliation for her having filed an internal grievance with LAS and based on gender discrimination.  Plaintiff also contends that the failure to offer her a comparable position constituted constructive discharge.  Finally, Plaintiff asserts that Northrop Grumman breached her "Agreement to Stay," executed with LAS, by not paying her six months of pay and benefits when Northrop Grumman did not offer her a "comparable" position.

For the reasons described below, Plaintiff has failed to establish any one of her claims, either factually or as a matter of law and, thus, summary judgment in Defendant's favor is appropriate.

## STATEMENT OF UNDISPUTED FACTS

### I.  Northrop Grumman and the Acquisition of Litton Industries, Inc.

1.    In April 2001, Northrop Grumman acquired Litton Industries, Inc. ("Litton"). Lisa A. Wolff Deposition ("Wolff Dep.") at 166-67; Gloria Flach Declaration ("Flach Decl.") ¶ 3; Doug Norton Declaration ("Norton Decl.") ¶ 2.  Litton Advanced Systems, located in College Park, Maryland, performed generally the same type of work performed by Northrop Grumman's Engineering Design Automation ("EDA") group at the Electronics Systems Sector ("ES"), located at the Baltimore-Washington International ("BWI") facility.  Wolff Dep. at 166-70; Norton Decl. ¶¶ 3, 4.  Because the same type of work was performed both at LAS and ES, as part of the acquisition, LAS was merged into ES.  Wolff Dep. at 168; Flach Decl. ¶ 3; Norton Decl. ¶ 4.

2.    Northrop Grumman and LAS each have equal employment opportunity ("EEO") policies and procedures.  Timothy Edwards Declaration ("Edwards Decl.") ¶ 3; Timothy

---

Violation of Maryland's Wage Payment and Collection Law, with prejudice.  This voluntary dismissal was approved by the Court on September 18, 2003.

Edwards Declaration Exhibits ("Edwards Ex.") 1 to 4; Thomas Shaffer Declaration ("Shaffer Decl.") ¶ 2; Thomas Shaffer Declaration Exhibits ("Shaffer Ex.") 1, 2.  Through these policies and procedures, Northrop Grumman and LAS prohibit business decisions based on gender or other protected categories, prohibit harassment of any type, including sexual harassment, and establish a process for filing internal discrimination or harassment complaints.  Edwards Decl. ¶ 3; Edwards Decl. 1 to 4; Shaffer Decl. ¶ 2; Shaffer Exs. 1, 2.

## II.    **Plaintiff's Employment with Northrop Grumman or its Predecessors**

3.      Plaintiff was employed by LAS from 1988 until she separated from Northrop Grumman (post-acquisition) in February 2002.  Summary Judgment Exhibit ("SJ Ex.") 1; Wolff Dep. at 8.  Plaintiff's last position with LAS was Manager of Engineering Design Automation ("EDA") (Wolff Dep. at 170) and her final annual salary was approximately $102,000 (Wolff Dep. at 149).  In this position, Plaintiff had 10 or 11 direct reports (Wolff Dep. at 228) and responsibility for a budget of approximately $3 million (Wolff Dep. at 236).

## III.   **August 29, 2001 Telephone Conference**

4.      On August 29, 2001, Plaintiff participated in a telephone conference call concerning problems with a server that was used by both the College Park, Maryland and San Jose, California facilities.  Wolff Dep. at 28, 33; Edwards Ex. 7 at 2; Mazzo Dep. at 69-74.  At the time, Stephen Mazzo was the Executive Vice President and General Manager for LAS and was assigned to and responsible for running the San Jose, California site.  Mazzo Dep. at 12-13.  Organizationally, Plaintiff was subordinate to Mr. Mazzo.  Edwards Ex. 5; Mazzo Dep. at 87-88.  Before the telephone conference on August 29, Plaintiff was aware that Mr. Mazzo was displeased with the status of the server project that was the subject of the telephone conference call.  Wolff Dep. at 47, 53-54.

5.      In College Park, the individuals on the telephone call were John Roth, Mike Peters and Plaintiff, while Mr. Mazzo, Ken Peters, Bob Ossentjuk, Larry Ashby and Lynn Gahagan were on the call in San Jose.  Wolff Dep. at 40-41; Wolff Dep. at 71-74.  Many factors contributed to the tension leading up to this telephone conference, but the principal topic of this telephone conference was a dispute concerning work done on a server or database that impacted productivity and efficiency in the San Jose office.  Mazzo Dep. at 83-87, 91-92, 97-100, 158-59; Edwards Exs. 8-14.  Plaintiff was responsible for putting together a schedule for resolving this problem.  Mazzo Dep. at 87.

6.      During the latter part of the telephone conference, Mr. Mazzo spoke in a raised voice and repeatedly used profanity, specifically, various permutations of the word "fuck," not just with Plaintiff, but also with the males on the call.  Wolff Dep. at 33-40; Mazzo Dep. at 90, 93-94, 100; Edwards Ex. 11.  It is undisputed that Mr. Mazzo used the word "fuck" to describe "the affect [Plaintiff's], or [Plaintiff's] department's, actions had on the people and programs managed in [San Jose]."  Mazzo Dep. at 105.  Plaintiff claims that Mazzo also made statements such as that her work, and the work of her organization, had "'fucked over [or all of] San Jose,'" "I won't give you one fucking for what you have done," "Its not enough that you fucked me. Now you have to fuck every one of these guys." and "You really fucked me on this one.  You like fucking me?"  Edwards Ex. 7 at 3; Wolff Dep. at 33-37.  Mr. Mazzo does not admit these particular examples recited by Plaintiff and they are not confirmed by any other participant on the call, although the other six participants provided written statements about the call.  Edwards Exs. 8-10, 12-14.  There is no dispute that Mr. Mazzo was angry, frustrated and repeatedly used the word fuck when berating people on this call, including Plaintiff and the male participants. Wolff Dep. at 33-36; Mazzo Dep. at 93-94, 100, 105-06, 109-10, 150; Edwards Ex. 11.

7.      Plaintiff interpreted Mazzo's statements "as a personalize [sic] assault on [her] character;" she believed that his comments were "disgusting and degrading," were "sexual analogies" and that they constituted "verbal rape." Wolff Dep. at 29, 42; Mazzo Dep. at 132, 135; Edwards Ex. 7 at 3-4. Plaintiff objected to the "sexually profane terminology" used by Mr. Mazzo, and she "consider[ed] his behavior inappropriate in a business setting." Edwards Ex. 7 at 3-4; Wolff Dep. at 42. By contrast, Plaintiff considered the profanity Mr. Mazzo used towards the males on the call, which included statements such as "I don't give a fuck" or "you fucked up" or "[t]his is all fucked," as "normal profanity." Wolff Dep. at 35. It was not uncommon for Mr. Mazzo to use profanity in everyday business discussions. Mazzo Dep. at 101; Edwards Ex. 11; Bob W. Ossentjuk Deposition ("Ossentjuk Dep.") at 43.

## IV.    Plaintiff's Grievance and Northrop Grumman's Investigation

8.      Shortly after the telephone conference, Plaintiff contacted Timothy Edwards, who was then the Human Resources Executive Director of LAS to complain about Mr. Mazzo's use of profanity during the telephone conference. Wolff Dep. at 29, 40, 47-50, 55-58; Edwards Decl. ¶¶ 1, 5; Edwards Ex. 7 at 3-4. Mr. Edwards and Plaintiff discussed the grievance process that was available to Plaintiff and Mr. Edwards informed her of the necessary paperwork if she wanted to proceed with a complaint. Edwards Decl. ¶ 5; Wolff Dep. at 58. Mr. Edwards immediately commenced an informal investigation into Mr. Mazzo's behavior on the call by conferring with one of the individuals on the call, Mike Peters. Edwards Decl. ¶ 5. On September 4, 2001, Plaintiff filed an employee grievance alleging sexual harassment during the August 29 telephone conference. Edwards Ex. 7; Wolff Dep. Ex. 60-61.

9.      After receiving Plaintiff's grievance, Mr. Edwards conducted a formal investigation into her allegation of harassment. Edwards Decl. ¶¶ 5, 7. During this

investigation, Mr. Edwards obtained statements from all individuals who participated in the telephone conference including the Plaintiff. Edwards Decl. ¶ 7; Edwards Exs. 8 to 14. The individuals on the call confirmed that Mr. Mazzo had used profanity, including the word "fuck," or permutations of that word, during this call in conveying his anger and frustration with all of the College Park employees about the status of the server related project. Edwards Decl. ¶ 7; Edwards Exs. 8 to 14; Mazzo Dep. at 90, 93-94, 100; Ossentjuk Dep. at 38, 42. One of the men on the call in College Park found Mr. Mazzo's profanity to be objectionable. Edwards Ex. 9 (referring to Mr. Mazzo's language as "abusive").

10.    As part of the investigation, on September 6, Plaintiff and Mr. Edwards met with John Roth, to whom Plaintiff reported, and Charlie Kohnstam, Plaintiff's direct supervisor, to discuss Plaintiff's complaint and the relief requested, namely, to be notified when Mr. Mazzo was present at her facility and to be excused from working directly with him in the future. Edwards Decl. ¶ 8; Edwards Ex. 7 at 4. Plaintiff was assured that her requests would be met. Wolff Dep. at 66-68; Edwards Decl. ¶ 8. Specifically, Plaintiff was informed that she would be notified whenever Mr. Mazzo was present in College Park, and would be relieved of any direct contact with him. Edwards Decl. ¶ 8; Edwards Ex. 15. Future EDA work that interfaced with the San Jose facility and required communications with Mr. Mazzo would be handled by Mr. Kohnstam, Mr. Roth or their designee. Wolff Dep. at 54-55; Edwards Decl. ¶ 8; Edwards Ex. 15, 16; Mazzo Dep. at 123, 128, 157, 159-61.

11.    Thereafter, Plaintiff sent a letter to Michael S. Gering, President of LAS, dated September 10, 2001, in which she further described Mr. Mazzo's "uncontrolled anger and outbursts" during the call, stating that she believed there was a "subtle difference" between Mr. Mazzo's various uses of the "same terms" – the word "fuck" – as he stated it to her, compared to

how he stated it to the men on the call, and that his "'action-oriented use of the "f" word, as stated to her, was intentional to cause embarrassment, create an environment with which [Plaintiff] would be uncomfortable and to cause [Plaintiff] to leave the meeting.'"  Edwards Decl. ¶ 9 (quoting Edwards Ex. 17).  As an example of the difference, Plaintiff stated that although Mr. Mazzo told a male employee on the call that he "fucked up," he told her she "fucked all of San Jose."  Edwards Ex. 7 at 3.

12.    On September 14, 2001, a conclusory meeting was held with Mr. Gering, Plaintiff and Mr. Edwards, pursuant to the grievance process.  Wolff Dep. at 104-05; Edwards Decl. ¶ 10; Edwards Exs. 3, 18; Michael S. Gering Deposition ("Gering Dep.") at 53-62.

13.    At the conclusion of his investigation, Mr. Edwards submitted to Mr. Gering a recommendation of what action should be taken against Mr. Mazzo.  Edwards Decl. ¶ 11; Edwards Ex. 19.  Mr. Edwards recommended a two week suspension, harassment training, a formal letter of reprimand, and a written apology to Plaintiff.  Id.

14.    After meeting with Plaintiff and Mr. Edwards as part of the grievance process, reviewing Mr. Edwards' recommendation, and conferring with Northrop Grumman's legal counsel, Mr. Gering submitted a disciplinary recommendation to Northrop Grumman.  Gering Dep. at 27-32, 42-43, 67-69; SJ Ex. 2.  Mr. Gering recommended that Mr. Mazzo be suspended for one week, that he be required to attend anger management counseling, that a formal letter of reprimand be placed in his personnel file and that he write an apology to Plaintiff.  Gering Dep. at 28, 67-68; SJ Ex. 2.  Mr. Gering retired the same day that he tendered his recommendation.  SJ Ex. 2; Gering Dep. at 42-43.  (His retirement was unrelated to this case.)

15.    Northrop Grumman decided that, in order to retain employment, Mr. Mazzo would have to agree to attend anger management counseling and to accept a formal letter of

reprimand in his personnel file.  Edwards Decl. ¶ 12.  Northrop Grumman informed Mr. Mazzo, in writing, that his behavior was offensive, unprofessional, inappropriate and a violation of Company policy.  Edwards Ex. 20.  He was placed on notice that any recurrence of such behavior would not be tolerated and could result in immediate discharge.  Edwards Ex. 20.  On October 15, 2001, Mr. Edwards initiated a telephone conference with Mr. Mazzo and Jack Kuenzel, Human Resources Manager for the San Jose facility, during which Mr. Mazzo was informed that he was required to accept and acknowledge a formal letter of reprimand for his actions on August 29, and to promptly attend anger management counseling as a condition of continued employment.  Edwards Decl. ¶ 12; Edwards Ex. 20; Mazzo Dep. at 114-16, 118-19.  Mr. Mazzo acknowledged and signed the letter of reprimand and subsequently attended anger management counseling sessions.  Mazzo Dep. at 114-15, 118-19, 124-25; Edwards Ex. 20.

**V.      November 30, 2001 Meeting Between Plaintiff and Mr. Mazzo**

16.      In approximately mid- to late-November 2001, Plaintiff asked Mr. Edwards to facilitate a meeting between her and Mr. Mazzo so they could reestablish a working relationship.  Wolff Dep. at 80-81; Edwards Decl. ¶ 13.  Mr. Mazzo had been offered a position as a Director with Northrop Grumman.  Mazzo Dep. at 25-26.

17.      Mr. Edwards, Plaintiff and Mr. Mazzo met on November 30 in College Park.  Edwards Decl. ¶ 14; Mazzo Dep. at 125-27.  During the meeting, Mr. Mazzo and Plaintiff appeared to resolve their differences.  Wolff Dep. at 81-83.  It is undisputed that Mr. Mazzo was cooperative and apologetic to Plaintiff for his behavior on the August call, and that Plaintiff agreed that the communication restrictions and notification requirements (concerning when Mr. Mazzo was present in College Park) could be stopped at that time.  Wolff Dep. at 81-83, 94; Edwards Decl. ¶ 14; Mazzo Dep. at 127-29, 134.  After approximately fifteen minutes, Mr.

Edwards left the meeting, leaving Plaintiff and Mr. Mazzo to wait for Mike Peters to join them for a work session.  Wolff Dep. at 83-84; Edwards Decl. ¶ 14; Edwards Ex. 21.

18.    Plaintiff testified that after Mr. Edwards left, she again brought up with Mr. Mazzo the August 29 telephone conference and explained she felt she had been "gang raped." Wolff Dep. at 85-87; Mazzo Dep. at 132-37 ("verbally raped").  Plaintiff testified that Mr. Mazzo listened to Plaintiff's statements, apologized again and said that he was sorry she felt the way she did and that he had not intended to make her feel that way.  Wolff Dep. at 87; Mazzo Dep. at 130, 137-38.

19.    Plaintiff testified that towards the end of this private meeting, Mr. Mazzo said "you're not the only one that got fucked."  Wolff Dep. at 88.  Plaintiff states that she was offended by Mazzo's statement and came to believe that it was directed personally at her.  Wolff Dep. at 88-89.  Plaintiff testified that, initially, she considered the possibility that what Mr. Mazzo meant by his statement was that his career had been negatively impacted by this incident, but concluded, in the end, that if that had been his intention, he would have used the word "screwed" instead of "fucked."  Wolff Dep. at 89.  Mr. Mazzo testified that he does not believe he used the word "fuck" during this meeting.  Mazzo Dep. at 141, 148, 152-53, 160.  When Mike Peters joined them, Mr. Mazzo and Plaintiff showed no sign of disagreement and acted professionally throughout the business meeting that ensued.  Edwards Decl. ¶ 15; Edwards Decl. Ex. 21; Mazzo Dep. at 139-40.

20.    On December 3, Plaintiff informed Mr. Edwards that both parties got emotional after Mr. Edwards left and that Mr. Mazzo had again used the word "fuck."  Wolff Dep. at 93-97; Edwards Decl. ¶ 16; Edwards Ex. 21.  Mr. Mazzo believed this meeting had gone as well as could be expected and he called Mr. Edwards to let him know this.  Mazzo Dep. at 138-40.  Mr.

Mazzo denies using the word "fuck" or any profanity during the November 30 meeting.  Mazzo

Dep. at 141; Edwards Ex. 22; Edwards Decl. ¶ 17; Edwards Ex. 22.

**VI.    Offer of Employment with Northrop Grumman**

21.    In fall 2001, Gloria Flach, the Director of Software Engineering and Design

Automation, had oversight and managerial responsibility for software engineering and design

automation disciplines in Northrop Grumman's ES Sector.  Flach Decl. ¶¶ 1, 2.  Doug Norton

was the Manager of Process and Tool Development Support ("P&TDS") for the ES Sector,

which performs engineering design automation ("EDA") work.  Flach Decl. ¶ 2; Norton Decl. ¶

1.  P&TDS's EDA work includes, but is not limited to, electrical computer aided design

("electrical CAD or ECAD") and mechanical computer aided design ("mechanical CAD or

MCAD").  Flach ¶ 2; Norton ¶ 3.  Together, Ms. Flach and Mr. Norton were responsible for

integrating Litton's LAS business unit into the ES Sector.  Flach Decl. ¶ 3; Norton Decl. ¶ 5.

22.    In October 2001, Ms. Flach met with Plaintiff to discuss Plaintiff's

responsibilities as the EDA Manager at LAS, the business of the P&TDS organization within the

ES Sector and the opportunities that might be available to her.  Wolff Dep. at 170-73; Flach

Decl. ¶ 4.  Ms. Flach informed Plaintiff that she would be offered a Band 3 Manager position,

that her salary would remain the same as it had been at LAS, and that she would report to Mr.

Norton, who reported to Ms. Flach.  Wolff Dep. at 149, 173, 175; Flach Decl. ¶ 4; Norton Decl.

¶¶ 4, 9.  Mr. Norton was also a Band 3 Manager.  Norton Decl. ¶ 1.

23.    Throughout the remainder of 2001, Plaintiff had a series of meetings with Mr.

Norton to discuss and determine what her specific responsibilities and duties would be in ES.

Wolff Dep. at 174-84; Flach Decl. ¶ 5; Norton Decl. ¶¶ 7-10.  Plaintiff and Mr. Norton discussed

the possibility that Plaintiff would be assigned the management responsibility for electrical

computer aided design ("ECAD"), as well as the possibility that she also could be assigned responsibility for mechanical computer aided design ("MCAD").  Wolff Dep. at 175-83, 200-01; Norton Decl. ¶ 10.  Mr. Norton told Plaintiff he had a candidate for the MCAD position, but that he did not have anyone to manage the ECAD work.  Wolff Dep. at 180-81; Norton Decl. ¶ 10. Ms. Wolff understood that, due to Northrop Grumman's organizational structure, other areas under her management at LAS, such as product data management ("PDM"), would not be part of her responsibilities at Northrop Grumman.  Wolff Dep. at 200-01.  Plaintiff's preference was that she maintain at least two components of the EDA function, such as ECAD and MCAD or MCAD and PDM.  Wolff Dep. at 178.

24.    Mr. Norton ultimately decided to appoint separate managers for the electrical and MCAD fields and, in late-November, he offered Plaintiff the Manager position responsible for ECAD work, which had approximately 10 direct reports and a budget of approximately $4 to 5 million.  Wolff Dep. at 187-90; Norton Decl. ¶¶ 3, 11-12.

25.    Mr. Norton's decision regarding the structure of the P&TDS organization following the integration of LAS and specifically, regarding the position offered to Plaintiff, was based on his evaluation of the business needs of the ES Sector.  Wolff Dep. at 262-63 (admitting Northrop Grumman was not lying when it informed her it needed to fill this position); Norton Decl. ¶ 15.  Plaintiff previously had informed Mr. Norton of the complaint she filed at LAS. Norton Decl. ¶ 14.  Mr. Norton, however, did not consider this fact, nor the fact that Plaintiff is a female, when he made his decision about what duties and responsibilities to offer to Plaintiff. Norton Decl. ¶¶ 14, 15.  Plaintiff testified that she believed that being female "somehow . . . played a part in" Northrop Grumman's decision, but admits that she bases her claim of discrimination in the job structuring solely on a "rumor" that an individual doing mechanical

work said he did not want to work for a woman.  Wolff Dep. at 124-26, 162-63, 258.  Mr. Norton

had no knowledge that Raphael Krigman, or any other employee doing mechanical design

automation work, allegedly preferred not to work for a woman.  Wolff Dep. at 258; Norton Decl.

¶ 15.  Likewise, although Plaintiff had informed her of the LAS complaint, Ms. Flach did not

consider this fact or Plaintiff's gender (the same as hers) in approving the offer of a management

position with Northrop Grumman to Plaintiff.  Flach Decl. ¶ 9.

## VII.    Plaintiff's Rejection of the Offer of Employment with Northrop Grumman

26.    Shortly after receiving the offer of employment from Mr. Norton, Plaintiff

provided a memorandum to Ms. Flach dated December 5, 2001, stating that the position that she

was offered by Mr. Norton was "not comparable" to the one that she held at LAS and that she

wanted to meet with Ms. Flach to discuss this matter.  Wolff Dep. at 192-93; Flach Decl. ¶ 6;

Flach Ex. 1.

27.    On December 11, 2001, Plaintiff, Mr. Norton, Thomas Shaffer (a Northrop

Grumman Human Resources Manager), and Ms. Flach met at Plaintiff's request to discuss her

concerns about the Northrop Grumman position.  Wolff Dep. at 194-97; Flach Decl. ¶ 7; Norton

Decl. ¶ 17.  During this meeting, Plaintiff presented a copy of the LAS "Stay Agreement," and

stated that because the position offered by Northrop Grumman was "not comparable" to her LAS

position, she believed she was entitled to six months of pay and benefits under that agreement.

Wolff Dep. at 145-46, 197-98; Flach Decl. ¶ 7; Flach Ex. 2; Norton Decl. ¶ 17-18.  On

December 12, Plaintiff provided a letter to Mr. Edwards similarly stating that the position she

had been offered was "not comparable" and she expected to be paid pursuant to the Stay

Agreement.  Wolff Dep. at 197-98.  Northrop Grumman declined to pay Plaintiff separation

payments under the Stay Agreement because Northrop Grumman believed that the position

Plaintiff was offered was comparable to the one she held at LAS.  Flach Decl. ¶ 8.

28.    The position offered to Plaintiff was responsible for a significant depth of work in

the ECAD field, with an extensive user and client base and a large budget, and is of critical

importance to the ES Sector.  Norton Decl. ¶ 19; Flach Decl. ¶¶ 5, 7.  Both Ms. Flach and Mr.

Norton believe that it was comparable to Plaintiff's position of Manager, EDA for LAS.  Norton

Decl. ¶ 19; Flach Decl. ¶¶ 5, 7.  In addition, both Ms. Flach and Mr. Norton thought highly of

Plaintiff's skills and abilities and tried to persuade her to accept the offer of what they considered

to be a strategic position in the ES Sector.  Norton Decl. ¶ 20; Flach Decl. ¶ 7.

29.    Plaintiff resigned in February, 2002, rather than accept the position offered by

Northrop Grumman.  Wolff Dep. at 8, 146-47.  She explained that she was not willing to accept a

position she felt was not challenging, and which she regarded to be equivalent to a position she

had held earlier in her career.  Wolff Dep. at 146-47.  Plaintiff concluded that Northrop

Grumman's failure to make her the manager of the MCAD work in addition to the ECAD work

was intolerable and, while the position offered her was admittedly a "*wonderful job*" and a "*good*

*position*," it was not comparable to her position at LAS.  Wolff Dep. at 254-57 (emphasis added).

## VIII.  Northrop Grumman Took No Adverse Employment Actions Against Plaintiff Because of her Gender

30.    Plaintiff testified that she did not believe any job actions were taken against here

because of her gender.  Wolff Dep. at 122-23.

## IX.  Plaintiff's New Employment

31.    Plaintiff had begun conducting a job search in October 2001 and spoke with

Space Telescope Science Institute about an offer around Thanksgiving 2001.  SJ Ex. 3 at 11;

Wolff Dep. at 8-15.  She had received an offer of employment from that company, around

Christmas 2001.  Wolff Dep. at 8-15.  The starting salary for that position was $135,000 – a salary increase for Plaintiff.  Wolff Dep. at 161.  Her current salary with that company is approximately $143,000.  Wolff Dep. at 161.

32.     By January 15, 2002, Plaintiff accepted Space Telescope's offer to be their Chief Information Officer.  SJ Ex. 4.  Plaintiff claims to have been constructively discharged by Northrop Grumman on Friday, February 8, 2002.  Wolff Dep. at 8; William White Declaration ("White Decl.") ¶ 2.  Her first day of employment with Space Telescope was Monday, February 11, 2002.  Wolff Dep. at 8; White Decl. ¶ 2.

**X.     Miscellaneous Allegations**

33.     Plaintiff's daughter, Christine Wolff, worked part time for Litton in the electrical engineering area while attending college.  Wolff Dep. at 133-35; White Decl. ¶ 3.  In March or April 2002, Northrop Grumman informed Christine Wolff that she would not be hired as a full time employee.  Wolff Dep. at 135-36.

34.     Plaintiff's nephew, David DeMay, worked in P&TDS at LAS.  Wolff Dep. at 137-38; Norton Decl. ¶ 21.  Following the merger with Northrop Grumman, Mr. DeMay, who received his assignments from Mr. Norton, was assigned to the Electrical Design Automation team supporting former Litton web based tools and new work efforts at Northrop Grumman. Wolff Dep. at 138; Norton Decl. ¶ 21.  Mr. Norton had no knowledge that Mr. DeMay was Plaintiff's nephew.  Norton Decl. ¶ 21.  To the extent Mr. DeMay's duties at Northrop Grumman ES differed from those he had at LAS, it was solely because of the LAS integration into Northrop Grumman and the additional systems being used at Northrop Grumman.  Norton ¶ 21. Plaintiff testified that Mr. DeMay was happy that he had a job following the merger and that he voluntarily resigned from Northrop Grumman.  Wolff Dep. at 138-41.

## XI.    Procedural History

35.    On January 10, 2002, Plaintiff filed a charge with the Prince George's County Human Relations Commission ("PG County HRC") alleging that Northrop Grumman retaliated against her for filing an internal sexual harassment complaint by offering her a position that was not comparable to her then-current position.  SJ Ex. 5. On June 29, 2002, the PG County HRC found "insufficient evidence to support Complainant's allegation that she was subjected to retaliation."  SJ Ex. 6 at 9.  On August 28, 2002, the U.S. Equal Employment Opportunity Commission issued a Notice of Right to Sue to Plaintiff based on her EEOC charge.  On December 3, 2002, Plaintiff filed a Complaint against Northrop Grumman in the United States District Court for the District of Maryland.  Plaintiff subsequently filed her First Amended Complaint in this Court and served the Amended Complaint ("Complaint") on Northrop Grumman.[3/]  Defendant filed its Answer and Defenses in due course and discovery ensued. Discovery closed in this matter on August 25, 2003.

### ARGUMENT

## I.    Legal Standard for Summary Judgment

To prevail on a motion for summary judgment, a movant must show that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).  A

---

[3/]    Plaintiff seeks damages for amounts attributed to medical treatment, mostly for counseling in the amount of $3,425.  SJ Ex. 7.  Plaintiff consulted a medical professional on September 15, 2001, which was after she sought and retained an attorney.  Wolff Dep. at 275-76

"genuine issue of fact" exists only where there is a factual dispute between the parties, the resolution of which might, under the governing law, affect the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For summary judgment purposes, the evidence presented must be viewed "in the light most favorable to the nonmoving party." Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996).

A non-movant must present "specific facts showing there is a genuine issue for trial" for every element of their claim in order to prevent the court from granting the motion for summary judgment. Anderson, 477 U.S. at 248; see also Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993); Fed. R. Civ. P. 56(e). "A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation." Dachman v. Shalala, 46 F. Supp. 2d 419, 433 (D. Md.), appeal dismissed, 191 F.3d 447 (4th Cir. 1999) (citations omitted). To preclude a finding of summary judgment, the evidence must be "'such that a reasonable jury could return a verdict for the non-moving party.'" Lewis v. Forest Pharms., Inc., 217 F. Supp. 2d 638, 645 (D. Md. 2002); see also Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002)).

The Fourth Circuit has emphasized that district courts have an "affirmative obligation . . . to prevent 'factually unsupported claims' . . . from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting Celotex, 477 U.S. at 323-24). To that end, the non-movant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another," Beale v. Hardy, 769 F. 2d 213, 214 (4th Cir. 1985) but rather, "must set forth specific facts showing that there is a genuine issue for trial" (Fed. R. Civ. P. 56(e)).

**II.    Plaintiff's Claim of Hostile Work Environment Sexual Harassment in Violation of Title VII Must be Dismissed Because Plaintiff's Allegations are Insufficient To Establish the Elements of a Cognizable Claim**

Plaintiff claims hostile work environment sexual harassment based on hostile work environment on the basis of a single telephone conference call attended by seven men and one female (Plaintiff) during which an angry manager repeatedly used the word "fuck" or one of its permutations.  See Complaint ¶¶ 1, 62.

"Title VII is violated '[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is *sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment*.'"  Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (emphasis added) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  "'[S]imple teasing,' off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citation omitted).

In order to prove a claim for sexual harassment based on hostile work environment, a plaintiff must show (1) the conduct to which she was subjected was unwelcome, (2) the harassment was based on plaintiff's sex, (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) there is some basis for imposing liability on the employer.  See Ocheltree, 335 F.3d at 331 (citing Spicer v. Virginia Dep't of Corr., 66 F.3d 705, 710 (4th Cir. 1995) (en banc); G.D.C., 281 F.3d at 458); Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001) (citations omitted); Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 772 (4th Cir. 1997); Lewis, 217 F. Supp. 2d at 652

(citations omitted).  The Court must grant summary judgment on this Count because Plaintiff
cannot establish any element other than the first.

> **A.    Plaintiff Cannot Sustain her Claim of Sexual Harassment Because the Allegedly Harassing Action Did Not Occur *Because of* Plaintiff's Sex**

The Supreme Court has recognized that Title VII cannot be permitted to "expand[] into a general civility code."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  In Oncale, the Court held that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex.'  We have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations.  'The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Id. at 80 (quoting Harris v. Forklift, 510 U.S. at 25 (Ginsburg, J., concurring)) (alterations and emphasis in original).  Rather, "only harassment that occurs because of the victim's gender is actionable."  Hartsell, 123 F.3d at 772 (citations omitted); see also Lack v. Wal-Mart Stores, Inc., 240 F.3d 244, 261-62 (4th Cir. 2001).  Under Title VII, "[a]n insulting or demeaning remark does not create a federal cause of action for sexual harassment merely because the 'victim' of the remark happens to belong to a [protected] class."  Hartsell, 123 F.3d at 772.

In Lack, the Fourth Circuit found that inappropriate, demeaning language of a sexual nature by an "indiscriminately vulgar and offensive supervisor, that was obnoxious to men and women alike," provided no evidence that the statements made were 'because of' plaintiff's sex and so, there was no violation of Title VII.  Lack, 240 F.3d at 261-62.  There, the supervisor's language included the use of the word "fuck," as well as sexual comments, such as "fucking the cashiers," referring to "the small bag between [plaintiff's] legs," making sexual wordplays, and,

when commenting that both plaintiff and supervisor were on a break, unzipping his pants and motioning towards a closet. Id. at 258-59.

Similarly, in Hocevar v. Purdue Frederick Co., 223 F.3d 721 (8th Cir. 2000), the court stated that "[o]ffensive language was used in front of both men and women . . . and [offensive conduct was engaged in] in front of both men and women. *The use of foul language in front of both men and women is not discrimination based on sex*." Id. at 737 (emphasis added). In Hocevar, the offensive language identified by plaintiff included being called "bitch" and "fat fucking bitch." Id. There, the court declined to find that the pervasive use of the word "bitch" was engaged in "because of" plaintiff's sex, holding instead that the "mere use of the word 'bitch,' without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude." Id. (citing Kriss v. Sprint Communications Co., 58 F.3d 1276, 1281 (8th Cir. 1995) (finding rude comments, use of the word "bitch," and characterizing individuals by use of unflattering epithets insufficient to support claim of sexual harassment)).

The "because of sex" prong is established only where, "but for" that individual's gender, they would not have been subjected to the allegedly offensive actions. Hartsell, 123 F.3d at 772 (citation omitted) (demeaning language and comments referring to Plaintiff's gender did not establish that "but for" her sex, she would not have been subjected to these comments; stating "'vulgarity and insensitivity and meanness of spirit'" alone are insufficient to establish that conduct occurred "because of" a plaintiff's sex)). These cases confirm the prevailing rule that, where vulgar and offensive language forms the basis for a complaint, courts will not find a violation of Title VII, unless it is proven to have been used *because of* plaintiff's gender. See, e.g., Oncale, 523 U.S. at 81 (stating that "the plaintiff must always prove that the conduct at issue was not merely *tinged with offensive sexual connotations*, but actually constituted

*discriminat[ion] because of sex*") (internal quotations omitted)); <u>Walk v. Rubbermaid, Inc.</u>, No. 94-4306, 1996 WL 56203, at **1, 2 (6th Cir. Feb. 8, 1996) (unpub. table decision).  In <u>Walk</u>, the Court found that repeated use of vulgarity, including "fucking stupid" and "fucking manager," and where similarly inappropriate language was used with both males and females, was insufficient to show anything more than animosity between individuals, and was deemed not to have been engaged in *because of* plaintiff's gender.  <u>Id.</u>; <u>see also</u> <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 271 (2001) (citation and internal quotation marks omitted) (derogatory anatomical comments about "making love" during a single meeting failed to qualify as actionable behavior because it was "isolated inciden[t]"); <u>Gross v. Burggraf Constr. Co.</u>, 53 F.3d 1531, 1542-47 (10th Cir. 1995) (supervisor's statements to a female plaintiff, telling plaintiff "to get her 'ass' back in the truck, acknowledging he had hired her to meet a federal requirement to hire women, asking her to tell a co-worker to "go fuck himself," and humiliating her in front of co-workers were insufficient to establish that harassment was "because of" sex); <u>Gazda v. Pioneer Chlor Alkali Co.</u>, 10 F. Supp. 2d 656, 661-62, 667 (S.D. Tex. 1997) (use of the word "fuck" by co-worker, manager's saying that plaintiff's high heeled shoes were "fuck me" pumps and similar language constituted "rude" and "boorish" behavior, but not actionable sexual harassment).

The undisputed facts in this case establish that Mr. Mazzo used profanity, and specifically, permutations on the word "fuck," during one angry telephone call and that men on that call, as well as Plaintiff, were part of the conversation when Mr. Mazzo used profanity. Facts ¶¶ 5-7, 9.  The many cases cited above conclude that such language, although obnoxious is simply not legally actionable.

Plaintiff tries to circumvent the controlling case law by unrealistically parsing the form of the word used by Mr. Mazzo. Thus, Plaintiff argues that there was a "subtle difference" in Mr. Mazzo's use of the "*same terms*" – the word "fuck" – when he directed this word at her compared to when he used it with the men on the call, contending that he used it in an "action-oriented" way with her. Facts ¶ 11. As an example of this "distinction," Plaintiff claims, for example, that Mr. Mazzo told the men on the call that they "fucked up," but told Plaintiff that she "fucked over San Jose" or "fucked over San Jose." Facts ¶ 11.

Accepting as true the allegation about subtle differences in the terms used by Mr. Mazzo (as we must for purposes of this motion), no fact-finder would conclude that "but for" her gender, Mr. Mazzo would not have used these same particular profanities Plaintiff describes as directed towards her during this telephone conference. It is undisputed that Mr. Mazzo was angry at the failure of the College Park LAS conference call participants to get the computer server on line and that this situation had compromised the productivity of the San Jose facility. Facts ¶ 5-7. It is also undisputed that Plaintiff was responsible for managing the resolution of the server project at College Park. Facts ¶ 5-7. These undisputed facts – not Plaintiff's gender - explain the different verb forms identified by Plaintiff as being used by Mr. Mazzo. Mr. Mazzo's language was unprofessional, but there is no evidence whatsoever that any of Mr. Mazzo's expressions were said *because of* Plaintiff's sex. As in Hocevar, Mr. Mazzo directed profanity at both the men and the woman on the call. Facts ¶ 5-7. The "subtle difference" asserted by Plaintiff is insufficient to establish that "but for" her gender, she would not have been similarly harassed by Mr. Mazzo.[4/]

---

[4/]    Plaintiff also identifies an additional incident in November 2001 when Mr. Mazzo allegedly made one statement using a version of the word "fuck." Facts ¶ 19. Mr. Mazzo (continued).

**B.    Mr. Mazzo's Conduct Does Not Approach the Level of "Severe and Pervasive" Harassment Required to Create an Abusive Work Environment**

The Supreme Court has established that the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' . . . does not sufficiently affect the conditions of employment to implicate Title VII.  Conduct that is not *severe or pervasive* enough to create an *objectively hostile or abusive work environment* – an environment that a *reasonable person* would find hostile or abusive – is beyond Title VII's purview."  Harris, 510 U.S. 17, 21 (1993) (emphasis added) (quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986)).  The Supreme Court "emphasize[s] . . . that the objective severity of harassment should be judged from the perspective of a *reasonable person* in the plaintiff's position."  Oncale, 523 U.S. at 81-82 (citing Harris, 510 U.S. at 23) (holding actionable only that "conduct which a reasonable person in the plaintiff's position would find <u>severely</u> hostile or abusive").  Determining whether conduct is severely "hostile" or "abusive" requires that the totality of the circumstances be considered, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.

---

denies using this profanity (Facts ¶ 19), but this disputed fact is not material because there is no evidence that, if it was said, it was said because of Plaintiff's gender.  The statement described by Plaintiff applied solely to Mazzo himself, and was not directed at her.  As is already established, Mr. Mazzo had a habit of using profanity, including the word "fuck," in everyday business conversation.  Facts ¶ 5-7.  Although coarse, the use of the word colloquially is not uncommon.  Webster's Collegiate Dictionary, The Voice of Authority (10th ed. 1994), records four common variations, each of which is characterized as vulgar or obscene, but none of which is defined as sexually derisive.  In fact, Webster's acknowledges that the past tense of the word is used as Mr. Mazzo used it during the August conference call – ". . . to express anger, contempt or disgust."  Accordingly, Plaintiff cannot establish that any conduct by Mr. Mazzo during either the August call or the November meeting was engaged in "because of" her sex.

The Fourth Circuit has held that "[*n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable*. The Court recognizes that Title VII does not attempt 'to purge the workplace of vulgarity,'" rather, only action that actually creates an abusive or hostile environment is actionable. Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (emphasis added), cert. denied 519 U.S. 818 (1996) (affirming summary judgment for employer) (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).  In Hopkins, the Court stated that ". . . [w]hile we do not approve of [the employer's] apparent willingness to offend and provoke employees with *ambiguously sexual innuendos*, Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace."  Id. at 754 (emphasis added) (citing Baskerville, 50 F.3d at 430 ("[Title VII] is not designed to purge the workplace of vulgarity")); see also Hartsell, 123 F.3d at 773 (conduct "falls well short of [the] mark" of being sufficiently severe and pervasive as to violate Title VII).

Thus, even in cases where harassing conduct has occurred often, it does not rise to the *extreme* level required for a finding of severe and pervasive harassment.  See also, Walk, 1996 WL 56203, at **1, 2 (two or three occasions of saying "I have no time for your fucking menopausal bitches," were not deemed sufficiently severe or pervasive); Preston v. Bell Atl. Network Servs., 96-3107, 1997 WL 20853, **2, 3, 7 (E.D. Pa. Jan. 16, 1997) (summary judgment granted despite requested references to "black son of a bitch," talking about shooting a black man, remarking that it was a "black day in bedrock," and engaging in harassing conduct around plaintiff while she worked); Waite v. Blair, Inc. 937 F. Supp. 460 (W.D. Pa. 1995) (granting summary judgment despite numerous derogatory references by co-workers concerning national origin); Gazda, 10 F. Supp. 2d at 661-62 (handful of incidents of use of the word "fuck" insufficient to establish "severe and pervasive" harassment); Bennett v. New York City Dep't of

Corr., 705 F. Supp. 979, 983 (S.D.N.Y. 1989) (one incident where officer yelled at another officer "hey black bitch, open the … gate" insufficient for hostile environment).

Courts require an environment where "conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788 (citations omitted); see, e.g., Ocheltree, 335 F.3d at 328-29 (finding extreme sexual comments and conduct over 18 month period was sufficiently severe and pervasive to alter conditions of employment); G.D.C., 281 F.3d at 456, (daily vulgar comments concerning plaintiff's body parts, stating they wanted to "fuck" her, and other extreme off-color comments were sufficiently severe and pervasive to establish prima facie case of sexual harassment); Paroline v. Unisys Corp., 879 F.2d 100, 103 (4th Cir. 1989) (denying summary judgment on claim of sexual harassment where alleged harasser repeatedly engaged in sexually suggestive remarks and innuendos and unwelcome touchings of plaintiff and other females, despite plaintiff's requests for him to stop, culminating in an assault and battery), aff'd in relevant part, 900 F.2d 27 (4th Cir. 1990); Lewis, 217 F. Supp. 2d at 653-54 (finding language and actions were "graphically sexual" and egregious and so sufficiently severe for prima facie case where, in 10 meetings over 8 months, supervisor repeatedly discussed anal and fecal matters, his and other peoples' penises, "pussies," erections and masturbation, told plaintiff he found her attractive and beautiful, called her a prostitute and rubbed her thigh); Franklin v. King Lincoln-Mercury-Suzuki, Inc., 51 F. Supp. 2d 661, (D. Md. 1999) ("incessant barrage" of sexual harassment over month, sexually suggestive actions, comments and notes, simulating sexual acts with objects, making "grinding body gestures," verbally threatening and harassing plaintiff, referencing masturbation, and exposing self sufficiently severe and pervasive to violate Title VII).

In addition, conduct must not just offend a particular individual to be actionable, but rather, it must be so severe and pervasive that it is not only *subjectively*, but also *objectively*, hostile and abusive.  See, e.g., Oncale, 523 at 81-82.[5/]  This Court specifically recognizes that in employment discrimination cases such as Plaintiff's, "'a subjective belief of discrimination, however genuine, cannot be the basis of judicial relief.'"  Moore v. Reese, 817 F. Supp. 1290, 1295 (D. Md. 1993) (quoting Elliot v. Group Hosp. Serv., Inc., 714 F.2d 556, 557 (5th Cir. 1983)).  In Faragher, 524 U.S. at 787, the Supreme Court explained this rule, stating that the "reasonable person" standard requires that an "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive."  Id.  The Court went on to explain that this did not reach "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex."  Id. at 788 (quoting Oncale, 523 U.S. at 81).

The undisputed facts here show that Plaintiff's allegations of sexual harassment arise from one incident, the August telephone conference call, followed, arguably, by one isolated and undirected use of the word "fuck."  Facts ¶¶ 5-7, 18-19.  Although Plaintiff has established that she was bothered by Mr. Mazzo's use of the word and sought counseling following the initial incident (Facts ¶ 35 n.3), she has otherwise provided no evidence of how these actions created an "abusive work environment" for her.  At Plaintiff's request, she was notified whenever Mr. Mazzo visited her facility, and she was relieved of any obligation to communicate directly with him.  Facts ¶ 10.  After emotions had calmed, these steps were discontinued, with her agreement. Facts ¶ 17.  Following the November 30, 2001 meeting (at which Mr. Mazzo allegedly said

---

5/    It is worth noting that Plaintiff informed Mr. Gering that the reason Mr. Mazzo's language was particularly upsetting to her was because of her husband's impotency. (continued).

"you're not the only one that got fucked"), Plaintiff neither amended her grievance nor requested that these protective actions be reinstated.

Mr. Mazzo's words constituted isolated incidents that, at best, are both insufficiently severe and insufficiently pervasive to support a finding of sexual harassment. These facts also preclude a finding that the "reasonable person" could determine that this environment was so severely and pervasively sexually harassing as to alter the terms and conditions of employment. Considering the evidence in the light most favorable to Plaintiff, these actions simply do not rise to the level of harassment experienced by plaintiffs in Ocheltree, G.D.C., Paroline, Lewis and Franklin. No fact-finder could justifiably determine that Mr. Mazzo's conduct during these two incidents was so severe or pervasive to create an objectively hostile or abusive work environment at LAS. Because Plaintiff cannot establish three of the four elements of her sexual harassment claim, this claim must be dismissed, with prejudice.

### C.    Liability Cannot Be Imputed to Northrop Grumman

Even assuming, arguendo, that all elements of a sexual harassment claim could be established, Plaintiff still could not succeed on this claim because liability cannot be imputed to Northrop Grumman. To establish a defense against liability, the employer must show by a preponderance of the evidence that (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective measures. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998).

Promulgation of an effective sexual harassment policy is sufficient to satisfy the first prong of this defense, and is met by the policies and procedures in place at both Northrop

---

Gering Dep. at 63.

Grumman and LAS.  Facts ¶ 2.  The effectiveness of these policies is evidenced by the fact that

Plaintiff availed herself of them (Facts ¶¶ 8-15) and the corrective action taken by the employer

prevented the recurrence of the August complaint, i.e., directing the word "fuck" at her

personally because of her sex.  The August 29 incident was thoroughly investigated, the

investigation solicited Plaintiff's version of the facts and her requested remedy, and the

Company took appropriate disciplinary and corrective action against the alleged harasser.  Facts

¶ 9-15.  Northrop Grumman's compliance with its policies immunizes the Company of liability

for environmental sexual harassment.[6/]  See Ellerth, 524 U.S. at 765-66 (employer avoids

liability by showing it exercised reasonable care to prevent and promptly correct any sexually

harassing behavior).

### III.    Plaintiff Cannot Sustain Her Claims of Intentional Gender Discrimination Under Title VII and Prince George's County Human Rights Act

Title VII states that it is unlawful for an employer to discriminate against an employee

"with respect to compensation, terms, conditions, or privileges of employment" on the basis of

their sex.  42 U.S.C. § 2000e-2(a)(1).[7/]  In order to survive a motion for summary judgment on an

employment discrimination claim, the plaintiff bears the ultimate burden of proving that the

---

[6/]    It should be noted that even if Plaintiff could establish a claim for sexual harassment, she would be due no front pay or back pay, because she had no gap in employment between the time that she resigned from Northrop Grumman and the time that she began her employment with Space Telescope Science Institute, and her salary at Space Telescope is higher than it was at Northrop Grumman.  Facts ¶¶ 3, 31-32.  Moreover, the promulgation and enforcement of the harassment policy also relieves the employer of any claim for punitive damages.  See Kolstad v. American Dental Ass'n, 527 U.S. 526, 544-46 (1999).

[7/]    A discrimination claim under PG County's HRA is analyzed in the same manner as a discrimination claim brought under Title VII of the Civil Rights Act.  See Rachel-Smith v. FTDATA, Inc., 247 F. Supp. 2d 734, (D. Md. 2003) (Prince George's County is authorized to provide a private right of action by Maryland Code, Art. 49B § 42(a)); Wise v. Gallagher Basset Servs., Inc., 228 F. Supp. 2d 671, 674 (D. Md. 2002) (citations (continued).

employer intentionally discriminated against her.  See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998). A plaintiff may meet this requirement by presenting direct evidence of discrimination or by raising an inference of discrimination under the analysis set forth in the McDonnell Douglas proof scheme.  Williams v. Cerberonics, Inc., 871 F.2d 452, 458 (4th Cir. 1989).

There is no direct evidence of gender discrimination here, so Plaintiff must attempt to prove her gender discrimination claim based on the three step analytical framework set forth in McDonnell Douglas Corp. v. Green  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607-08 (4th Cir. 1999) (affirming summary judgment, finding statement by future subordinate that they would have difficulty working with a woman was not direct or indirect evidence of gender discrimination and, where uttered only once, was found to be "isolated event").  Under this analysis, Plaintiff must prove a prima facie case of employment discrimination and, if rebutted by Northrop Grumman's articulation of a legitimate, non-discriminatory reason for the challenged actions, plaintiff must show that the stated reason is a pretext for intentional discrimination.  McDonnell Douglas, 411 U.S. at 802-05; EEOC v. Sears Roebuck & Co., 243 F.3d 846, 852 (4th Cir. 2001).

In Counts I and III, Plaintiff alleges that Northrop Grumman discriminated against her based on her gender by failing to hire her in a position with certain duties, and also claims that she was constructively discharged.  Complaint ¶¶ 62, 70.  Each of these claims fail as a matter of fact and law.

---

omitted) (private cause of action brought pursuant to Maryland Code is subject to McDonnell-Douglas analysis).

**A.    Plaintiff Cannot Sustain <u>Prima Facie</u> Claims of Discriminatory Failure to Hire or Constructive Discharge**

1.    <u>Plaintiff's Failure to Hire Claim is Unsupported by the Facts or Law</u>

In the typical failure to hire or failure to promote claim, Plaintiff protests a discriminatory failure to offer an existing position.  In this case, Northrop Grumman offered Plaintiff a management position that maintained her salary and managerial status and gave her more budget responsibility.  Facts ¶ 3, 22, 24.  Plaintiff admits that it was a "good" and "wonderful" position, and it is undisputed that the number of direct reports and amount of budget responsibility were virtually the same or better as in her LAS position.  Facts ¶ 24, 29.  Plaintiff's putative managers at Northrop Grumman also point out that her career potential at Northrop Grumman ES would have been enhanced by the size and visibility of her new position.  Facts ¶ 28.

Plaintiff essentially complains not about the job that was offered her, but that Northrop Grumman would not structure its organization to create the particular job she would have preferred.  Facts ¶ 29.  No employer, however, is required to do that (<u>see, e.g.</u>, <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1362 (10th Cir. 1997) (no <u>prima facie</u> case where desired position did not exist); <u>Holmes v. Bevilacqua</u>, 794 F.2d 142, 146 (4th Cir. 1986) (no discrimination where failure to hire or promote is because position was not available)) and Plaintiff has adduced no evidence that Northrop Grumman did that for any other LAS transferee.  Without such evidence, Plaintiff can not make out a case of disparate treatment discrimination.

A <u>prima facie</u> claim of discriminatory failure to hire requires that a plaintiff show:

i.   she is a member of a protected class;
ii.  she applied and was qualified for a job for which the employer was seeking applicants;
iii. despite her qualifications, she was rejected; and
iv.  that after she was rejected, the position remained open and the employer continued to seek applications from similarly qualified individuals.

EEOC v. Sears Roebuck and Co., 243 F.3d 846, 851 (4th Cir. 2001) (citing McDonnell Douglas, 411 U.S. at 802) (4th Cir. 1998); Langerman v. Thompson, 155 F. Supp. 2d 490, 495 (D. Md. 2001) (citations omitted); see also Causey v. Balog, 162 F.3d 795, 801 (setting forth failure to promote factors); Evans, 80 F.3d at 959-60 (same); and see Brown v. McLean, 159 F.3d 898, 902 (4th Cir.1998) (prima facie case is the same for failure to hire and failure to promote claims).

Plaintiff cannot make out a prima facie case. The Defendant concedes that Plaintiff is a qualified female, but it is undisputed that the job she sought did not exist, that she was never rejected (in fact, she was *offered* a position), and the Company never sought any other applicants for the nonexistent position that Plaintiff wanted Northrop Grumman to create and no such job was ever established or filled. Facts ¶¶ 23-24. Despite these unassailable facts, Plaintiff only asserts that she believes that being female "somehow . . . played a part in" Northrop Grumman's decision not to assign her managerial responsibilities for the MCAD work, notwithstanding the fact that Northrop Grumman did not have, and still does not have, a position that combined the management of electrical and mechanical functions. Facts ¶ 25. Plaintiff admits that she has no evidence that the structuring of the organization by Mr. Norton was influenced by her gender and that she based her speculations on a rumor that an individual doing mechanical work said he did not want to work for a woman. Facts ¶¶ 25, 30. The undisputed evidence shows this was not the basis for Mr. Norton's decisions. Facts ¶¶ 25, 30. In addition, the law is clear that unsubstantiated rumors and personal speculation by a plaintiff will not defeat a motion for summary judgment. See, e.g., Causey, 162 F.3d at 801.

The Fourth Circuit has held that absence of an open position is one of the "two most common legitimate reasons on which an employer might rely" in defending against an alleged discriminatory failure to hire. Holmes, 794 F.2d at 146. See also Causey, 162 F.3d at 802

(failure to establish <u>prima facie</u> case where there was no evidence position was ever filled or that employer sought applications to fill this position); <u>Sprague</u>, 129 F.3d at 1362 (rejecting discrimination claim when the position to which plaintiff sought promotion did not even exist).

        2.        <u>There is No Evidence that Plaintiff Was Constructively Discharged</u>

Although Plaintiff admits that she declined Northrop Grumman's offer of what she admitted was a "good" and "wonderful" position, she asserts that she was constructively discharged.  Facts ¶ 29; Complaint ¶¶ 1, 66.  Plaintiff cannot establish the elements of a constructive discharge in this case.

"A constructive discharge occurs when an employer creates intolerable working conditions in a deliberate effort to force the employee to resign." <u>Carter v. Ball</u>, 33 F.3d 450, 459 (4th Cir. 1994) (citing <u>Johnson v. Shalala</u>, 991 F.2d 126, 131 (4th Cir. 1993)).  Claims of constructive discharge must be "carefully cabined" to avoid abuse by employees who leave their companies voluntarily.  <u>Paroline</u>, 879 F.2d at 114 (Wilkerson, J., dissenting).  To establish constructive discharge based on gender discrimination, a plaintiff must prove three elements; first, that her working conditions were "intolerable;" second, that these actions were taken because of her gender; and third, that this was "deliberately done" with the intent to force her to resign.  <u>Taylor v. Virginia Union Univ.</u>, 193 F.3d 219 (4th Cir. 1999) (quoting <u>Martin v. Cavalier Hotel Corp.</u>, 48 F.3d 1343, 1353-54 (4th Cir. 1995)); <u>see also</u> <u>Matvia v. Bald Head Island Mgmt., Inc.</u>, 259 F.3d 261, 272-73 (4th Cir. 2001) (no constructive discharge where no evidence of deliberate intent to make working conditions intolerable or that conditions were actually intolerable); <u>Paroline</u>, 879 F.2d at 114 (asking plaintiff not to quit, taking steps to improve working conditions based on plaintiff's request and taking steps against alleged harasser defeated claim of constructive discharge).

Plaintiff here does not even allege that her working conditions were intolerable because of gender discrimination, but rather, she only alleges that she was constructively discharged because she was offered a position that she did not want.  Facts ¶¶ 29-30.

> a.    *Offering a "Good" Management Position Without Reduction in Salary, Managerial Status or Pay, Did Not Create "Intolerable" Working Conditions*

In order to determine whether working conditions are sufficiently intolerable to rise to the level of a constructive discharge, the Court applies an objective standard of "whether a reasonable person in the plaintiff's position would have felt compelled to resign."  Taylor, 193 F.3d at 237 (citing Bristow v. The Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).  The Fourth Circuit has explicitly held that "'[d]issatisfaction with work assignments . . . or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'"  Id. (quoting Carter, 33 F.3d at 459); see also Southard v. Texas Bd. of Criminal Justice, 114 F.3d 539, 555 (5th Cir. 1997) (subjectively undesirable work assignments are not adverse actions).  In contrast, actions such as explicit sexual overtures and attack would be intolerable to the reasonable person.  See, e.g., Paroline, 879 F.2d at 108.

Plaintiff testified that the position she was offered was a "*wonderful job*" and a "*good position*."  Facts ¶¶ 29 (emphasis added).  Her LAS salary and benefits were to be maintained and she would have had the same number of direct reports and, in fact, a larger budget responsibility.  Facts ¶ 3, 17, 20.  In support of her claim that offering her a position as the Manager of ECAD in ES made her working conditions intolerable, Plaintiff states only that she did not find the position challenging, and believed it was equivalent to a position she held earlier in her career.  Facts ¶ 29.

> ### b. *There is No Evidence that Plaintiff Was Not Offered the MCAD Managerial Responsibilities Either With the Intent to Force her to Resign or Because of her Gender*

There is no factual support for Plaintiff's argument that Northrop Grumman sought to force Plaintiff out of the Company.  To the contrary, the undisputed facts show that Ms. Flach and Mr. Norton repeatedly met with Plaintiff in fall 2001 to determine an appropriate position for her and, upon learning of Plaintiff's dissatisfaction with the position offered to her, Ms. Flach and Mr. Norton met with Plaintiff in an attempt to convince her to accept the position.  Facts ¶¶ 21-23, 27-29.

In addition, Plaintiff has no evidence that Mr. Norton offered her the position managing ECAD only and not MCAD *because of* her gender.  Facts ¶ 30.  She has also put forward no evidence that any male received preferential treatment to her.  As discussed above, mere speculation concerning this motivation is plainly insufficient.

> ### c. *Plaintiff's Search For Employment Before Northrop Grumman Made its Offer to her Belies her Claim of Constructive Discharge*

Plaintiff began conducting her job search as early as October 2001.  Facts ¶ 31.  She did not learn that she would not be offered a position managing the MCAD work until late-November.  Facts ¶ 24.  Plaintiff cannot credibly assert that on December 11, when she met with Ms. Flach and Mr. Norton to discuss the position they offered her, that she had a genuine desire to remain at Northrop Grumman.  The fact that she spoke with her now-current employer about a position beginning around Thanksgiving (Facts ¶ 31) further undermines her claim of constructive discharge.  Finally, and most telling, Ms. Wolff claims she was constructively discharged when she was forced to resign in mid-February, 2002.  Facts ¶ 32.  However, she had actually received an offer for employment from her now-current employer around Christmas 2001 and accepted it by January 15, 2002.  Facts ¶¶ 31-32.  She scheduled her start date with her

new employer to coincide with her last day of employment at Northrop Grumman, more than three weeks later.  Facts ¶ 32.

Because Plaintiff failed to establish either that the position offered to her was objectively intolerable or that the offer was made to cause her to resign, and that these actions were taken because of her gender, Plaintiff has failed to establish a prima facie case of constructive discharge and this claim must be dismissed.

### B. Northrop Grumman Has Legitimate, Non-Discriminatory Reasons for its Employment Actions

Assuming that Plaintiff were able to establish a prima facie case of intentional gender based discrimination, there still can be no question that Northrop Grumman has satisfied its burden to set forth a legitimate, non-discriminatory reason for its employment decisions.  Facts ¶¶ 21-25, 30.  At this point, the burden, which is one of production and not persuasion, to defeat the presumption created by establishing a prima facie case of discrimination shifts to the employer to set forth a legitimate, non-discriminatory reason for its employment actions.  See St. Mary's, 509 U.S. at 506-07; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Evans, 80 F.3d at 962-63.

Mr. Norton offered Plaintiff the position of managing all ECAD work in the P&TDS Department of the ES Sector because he made the business decision that there needed to be two separate managers for the ECAD and MCAD areas of work; Mr. Norton had a need to fill the ECAD Manager role and Plaintiff had the skills to fill that position. Facts ¶¶ 23-25.  Plaintiff's gender was not a factor in this decision.  Facts ¶ 25.  Accordingly, Northrop Grumman has met its burden at this stage, and the burden shifts back to the Plaintiff, this time requiring her to make a showing of actual discrimination.

**C.    Plaintiff Makes No Showing That Northrop Grumman's Stated Reasons Are a Pretext for Discrimination**

Defendant is entitled to summary judgment unless Plaintiff can present facts upon which a reasonable fact-finder could conclude, based on a preponderance of the evidence, that the stated reason for the employment action is pretextual and the real reason was gender-based discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 142-43 (2000); St. Mary's, 509 U.S. at 507; Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995). Plaintiff cannot do so.

Courts will not substitute their opinion, or that of the plaintiff, for lawful business decisions reached by a company. See, e.g., Williams v. Dynatech Communications, Inc., No. 97-1861, 1998 WL 637418, at *3 (4th Cir. Sept. 11, 1998) (unpublished table decision) (citing Jiminez v. Mary Washington Coll., 57 F.3d 369, 383 (4th Cir. 1995)). In affirming the district court's grant of summary judgment on a discrimination claim, the Court in Williams declined to opine on "the wisdom or folly of [the company's] business judgment," finding instead that plaintiff's opinions and "bald assertions" alone were insufficient to establish pretext in a discrimination claim. Id. at *3. Courts "'do not sit as a super-personnel department that reexamine an entity's business decisions . . . . [R]ather, [a court's] inquiry is limited to whether the employer gave an *honest* explanation of its behavior.'" Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (emphasis added) (citation omitted); see also Williams v. Dynatech Communications, Inc., No. 97-1861, 1998 WL 637418, *3 (4th Cir. Sept. 11, 1998) (unpub.) (deference given to companies' in making reasonable business decisions); Beall, 130 F.3d at 620 (same).

There are no facts in this record that evidence any motivation other than valid business judgment for the Company's job offer to Plaintiff.  <u>See</u> Facts ¶¶ 21-25, 30.  Plaintiff has not only failed to provide evidence that this reason was a pretext for discrimination, but she has admitted that she does not think the Company was lying when they told her that they needed to fill this critical position.  Facts ¶ 25, 30.  Accordingly, Plaintiff cannot establish that the stated reason for failing to offer her a different position was pretext for discrimination based on her gender and, as such, Plaintiff's claims for gender-based discrimination must be dismissed.

**IV.    Plaintiff Cannot Prevail on her Claim of Retaliation Under Title VII**

Count II of Plaintiff's Complaint alleges retaliation under Title VII.  To defeat a motion for summary judgment on a claim of retaliation, Plaintiff must establish a <u>prima facie</u> case of retaliation and must show that the employer's stated legitimate, non-discriminatory reason for taking the adverse employment action is a pretext for intentional retaliation.  <u>Munday v. Waste Mgmt. of N. Am., Inc.</u>, 126 F.3d 239, 242 (4th Cir. 1997); <u>Hopkins</u>, 77 F.3d at 754-55 (<u>citing McNairn v. Sullivan</u>, 929 F.2d 974, 980 (4th Cir. 1991)).  Based on the undisputed facts in this case, Plaintiff's claim of retaliation fails and must be summarily dismissed.

**A.    Plaintiff Cannot Make a Showing of a Prima Facie Case of Retaliation**

Setting forth a <u>prima facie</u> case of retaliation requires a showing that:

i.    plaintiff engaged in a protected activity; and
ii.   the employer took an adverse employment action against the employee; and
iii.  a sufficient causal connection between the protected activity and the adverse action.

<u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 190 (4th Cir. 2001); <u>Munday</u>, 126 F.3d at 242; <u>Hopkins</u>, 77 F.3d at 754-55.  Plaintiff cannot establish even one of the elements of this test, so her retaliation claim fails at the <u>prima facie</u> stage.

      1.      <u>Plaintiff Did Not Engage in Protected Activity</u>

The "protected activity" prong of the <u>prima facie</u> case for retaliation requires, at a

minimum, that the plaintiff have an objectively "reasonable and good faith belief" that the

employment practice she opposed constituted a violation of Title VII.  <u>Adams v. Giant Food,</u>

<u>Inc.</u>, 225 F. Supp. 2d 600, 606 (D. Md. 2002) (citations omitted); <u>see also</u> <u>Dea v. Washington</u>

<u>Suburban Sanitary Comm'n</u>, 11 Fed. Appx. 352, 357-58 (4th Cir. 2001) ("belief must be

objectively reasonable in light of the facts and record presented) (citing <u>Little v. United Techn.</u>,

103 F.3d 956, 959-60 (11th Cir. 1997).  Mr. Mazzo's language in the August telephone

conference, which used the "same terms" with males as well as with Plaintiff (Facts ¶¶ 5-7, 11),

was not engaged in "because of" Plaintiff's sex.  <u>See supra</u> Section II(A).  No other person on the

August 29 telephone conference regarded Mr. Mazzo's language to be sexual.  Edwards Exs. 8-

14.  Objectively, there can be no "reasonable and good faith" belief that Mr. Mazzo used this

language *because of* Plaintiff's sex, so the first element cannot be shown.

      2.      <u>No Adverse Action Was Taken By Northrop Grumman Against Plaintiff</u>

Plaintiff alleges the following "adverse" actions against her: (1) offering plaintiff a

position that consisted of such reduced duties that she would be forced to resign, essentially

constituting a constructive discharge; and (2) taking adverse employment actions against her

family members, namely, by not hiring her daughter as a full-time employee and by reducing the

duties of her nephew.

As established above, Northrop Grumman did not constructively discharge Plaintiff, so

her claim of retaliation based on constructive discharge must fail.  <u>See supra</u>, Section III(A)(2);

<u>see also</u> <u>Hopkins</u>, 77 F.3d at 754-55 (affirming lower court's grant of summary judgment on a

retaliation claim where plaintiff could have continued his employment if he had not voluntarily

chosen to terminate it in place of accepting one of two alternative positions following a reduction-in-force).

The second alleged adverse employment action identified by Plaintiff for her retaliation claim is factually insufficient to support a claim of retaliation.  As stated above, to make out a prima facie case of retaliation, the plaintiff must identify an adverse employment action that *she* suffered.  Spriggs, 242 F.3d at 190.  It is not disputed that Plaintiff's daughter, Christine Wolff, was not hired as a full-time employee by Northrop Grumman for valid business reasons.  Facts ¶ 33.  Plaintiff's nephew, Mr. DeMay, was employed by Northrop Grumman and although he may have experienced a change in assignment of duties due to the business integration following the acquisition of LAS, he was "happy to have a job."  Facts ¶ 34.  It is undisputed that Mr. DeMay later resigned voluntarily.  Facts ¶ 34.  There is no evidence that Northrop Grumman's actions regarding Christine Wolff were linked in any way to the offer made to the Plaintiff, much less to her internal grievance and there is no evidence whatsoever that any change in Mr. DeMay's job duties was discriminatory or adverse to him in any way, much less to Plaintiff.  In these respects, Plaintiff's claims are wholly frivolous.

> 3.    There is No Causal Nexus Between the Alleged Protected Activity and the Asserted Adverse Employment Actions

Assuming Plaintiff could somehow establish the first two elements of a prima facie case of retaliation, she has totally failed to establish any nexus between her having made her internal complaint and any of the alleged adverse employment actions.

Plaintiff filed her internal grievance on September 4, 2001 and was offered the ECAD Manager position at the end of November – almost 3 months later.  Facts ¶¶ 8, 24.  The other alleged "adverse employment actions" identified by Plaintiff in her retaliation claim – the failure to hire her daughter on a full-time basis and the alleged reduction in duties of her nephew –

occurred even longer after the filing of her internal complaint – approximately 3½ to 4 months and 6 to 7 months, respectively.  Facts ¶¶ 33, 34.  Such long periods of time have repeatedly been found to be insufficient to support a finding of a causal nexus between protected activity and adverse actions.  See, e.g., Clark County, 532 U.S. at 273 (citation omitted) ("The cases that accept mere temporal proximity between . . . protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be 'very close'") (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (3 month period insufficient for retaliation claim); Hughes v. Derwinski, 967  F.2d 1168, 1174-75 (7th Cir. 1992) (4 month period insufficient)); see also Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (3½ months insufficient).  Courts clearly require a much closer nexus between these two elements for this third prong to be met.  See, e.g., Spriggs, 242 F.3d at 191 (finding supervisor's gloating over list of new duties presented one business day after making internal complaint met nexus element of prima facie case).

Further, the undisputed evidence here shows that, although Plaintiff had informed Mr. Norton and Ms. Flach of her internal complaint, this fact was not considered in making the decision to offer her the position as Manager of ECAD.  Facts ¶ 25.  Plaintiff has put forward absolutely no evidence of a nexus between her internal complaint and the decision not to hire her daughter and/or the alleged change in her nephew's duties and responsibilities.  Accordingly, Plaintiff has failed to establish the final element of a prima facie case of retaliation, so this claim must fail.

## B.    Plaintiff Is Unable to Rebut Northrop Grumman's Legitimate, Non-Discriminatory Reasons for the Employment Actions She Challenges

Even if Plaintiff were able to make out a prima facie case of retaliation, the presumption that would result would be rebutted by Northrop Grumman's stated and lawful bases for each

employment decision challenged by Plaintiff.  The reasons for offering Plaintiff the position of
Manager for ECAD work have been discussed earlier in this memorandum, and Plaintiff was not
constructively discharged, but elected to resign.  See supra, Section III(A)(2).  Next, there is no
evidence that Northrop Grumman's decision not to hire Christine Wolff on a full-time basis was
discriminatory.  Facts ¶ 33.  Finally, to the extent that any duties of Mr. DeMay's were changed
when he became a Northrop Grumman employee, that resulted only because of the integration of
the LAS employees into the ES Sector.  Facts ¶ 34.  Northrop Grumman has thus met its burden
of rebutting any prima facie case of discrimination that could be established by Plaintiff.

In response, Plaintiff has provided no evidence of pretext.  On the contrary, Plaintiff
admitted that she had *no reason to believe* that the reason Mr. Norton did not assign her the
management of the mechanical work had anything to do with her filing an internal complaint.
Facts ¶ 25.  In addition, the fact that Ms. Flach and Mr. Norton met with Plaintiff on numerous
occasions to determine the best fit for her in their organization and, once they learned she was
not pleased with the responsibilities assigned to her, tried to persuade her to accept the position is
hardly consistent with the alleged retaliatory intent.  Facts ¶¶ 22-24, 27-28.  Plaintiff's own
unsubstantiated conjecture that retaliation was the "real reason" for the other identified actions is
plainly insufficient to rebut Northrop Grumman's stated legitimate reasons for these actions.
See, e.g., Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).

The Fourth Circuit has held that "[w]ithout evidence of pretext for retaliation, this Court
will not act as a 'super-personnel department that reexamines an entity's business decisions.'"
Beall v. Abbott Labs, 130 F.3d 614, 620 (4th Cir. 1997) (quoting Dale v. Chicago Tribune Co.,
797 F.2d 458, 464 (7th Cir. 1986)).  A reasonable fact-finder could not conclude from this record
that Plaintiff was offered a less-than desirable position with the intent to constructively discharge

her, and/or that actions were taken against her daughter and nephew, all in retaliation for having filed an internal complaint that had long ago been resolved (Facts ¶ 15).  Accordingly, Northrop Grumman is entitled to summary judgment on Plaintiff's retaliation claim.

## V.    Plaintiff Cannot Prevail on the Merits of Her Breach of Contract Claim

Count VI of Plaintiff's Complaint asserts that Northrop Grumman breached the "Stay Agreement" that she had executed with LAS by refusing to pay her six months pay and benefits under that agreement when she declined to accept the position that was offered to her. Complaint ¶ 81.  It is undisputed that Plaintiff resigned rather than accept the position offered to her because she felt that position was not sufficiently challenging and was, essentially, beneath her.  Facts ¶ 29.  It is undisputed that Northrop Grumman offered Plaintiff a position at the *same* salary she was paid at LAS.  Facts ¶¶ 3, 22.  Furthermore, Plaintiff was offered a management position, at the same "Band" level as the manager to whom she would report, with the same number of direct reports and a greater budget responsibility than she had in her LAS position. Facts ¶¶ 3, 22, 24.

Here, Plaintiff was not paid under the Stay Agreement because the position she was offered *was* comparable to the one she held at LAS.  Facts ¶ 27.  Plaintiff has failed to provide any evidence to the contrary.  Northrop Grumman thus has not breached the Stay Agreement by not paying her under that agreement, and her breach of contract claim must be dismissed, with prejudice.

## CONCLUSION

Based on the foregoing reasons, Defendant respectfully requests that this Court grant Defendant Northrop Grumman's Motion for Summary Judgment and dismiss Plaintiff's Complaint, in its entirety, with Prejudice.

Dated:  September 25, 2003                    Respectfully submitted,


                                             ___/s/_____
                                             James J. Kelley (Bar No. 06669)
                                             Christine B. Cox (Bar No. 14878)
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             1111 Pennsylvania Ave., NW
                                             Washington, D.C.  20036
                                             202.739.3000
                                             202.739.3001 (facsimile)
                                             Counsel for Defendant
                                             NORTHROP GRUMMAN CORP.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of Defendant Northrop

Grumman Corporation's Motion for Summary Judgment, Memorandum in support thereof,

accompanying exhibits, and Proposed Order were served this 25th day of September, 2003, by

copy of electronic court filing and by Federal Express on the following counsel of record for

Plaintiff:

> Ronald M. Cherry, Esq.
> 214 Washington Ave.
> Towson, MD  21204
> 301.494.4954
> 301.494.4952 (facsimile)
>
> Counsel for Plaintiff
> LISA A. WOLFF
>
>
> _____/s/_____
> Christine B. Cox