# DECLARATIONS (WITH EXHIBITS)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| LISA A. WOLFF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CA No. L02-3932 |
| ) | |
| LITTON ADVANCED SYSTEMS, ) | |
| INC. ) | |
| and ) | |
| ) | |
| NORTHROP GRUMMAN SYSTEMS ) | |
| CORPORATION ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF TIMOTHY EDWARDS

I, Timothy Edwards, being duly sworn, do hereby declare as follows:

1.    I am currently a Human Resources Director for Lockheed Martin Corporation.

From September 1991 until February 1, 2002, I was the Executive Director of Human Resources

for Litton Advanced Systems ("LAS"), which was then a business unit of Litton Industries, Inc.

("Litton").

2.    In April 2001, Northrop Grumman Corporation ("Northrop Grumman") acquired

Litton.  As a result of this acquisition, LAS was integrated into one of Northrop Grumman's

sectors, Electronic Systems ("ES").

3.    LAS was an equal opportunity employer, with policies and procedures that

prohibited discrimination and harassment, including sexual harassment, and that provided

internal complaint and grievance procedures.  Copies of LAS's Equal Employment Opportunity,

Harassment, and Grievance procedures are attached as Exhibits 1 through 4 to this Declaration. Through these policies, LAS informs its employees that harassment and discrimination based on age, race, sex, etc. are prohibited and establishes the procedures for filing an internal complaint.

  4.  Organization charts of LAS reflecting that business unit in approximately fall 2001 are attached as Exhibit 5 to this Declaration.

  5.  On August 31, 2001, I received a voicemail message from Lisa A. Wolff, Manager of Electronic Design Automation ("EDA") for LAS.[1/]  Later that day, Ms. Wolff and I discussed the fact that she was involved in a telephone conference on August 29, 2001 with Steve Mazzo and others, some of whom were located in the San Jose, CA office and others who were in College Park, MD.  Ms. Wolff told me that Mr. Mazzo had used profanity during the call.  I advised Ms. Wolff that she had the right to file an employee grievance and provided her with the necessary paperwork.  Prior to Ms. Wolff's filing her formal grievance, I immediately began investigating input I had received via telephone from one of the teleconference participant, Michael Peters.

  6.  On September 4, 2001, Ms. Wolff filed an employee grievance concerning the August 29 telephone conference.  A copy of the grievance that she filed is attached as Exhibit 7 to this Declaration.

  7.  I continued conducting a complete and thorough investigation into her allegations, pursuant to Policy and Procedure DV 215 (Exhibit 3).  As part of my investigation, I contacted John Roth and Mike Peters, formally.  Both individuals worked in the College Park, MD office

---

1/  Attached as Exhibit 6 to this Declaration is a position description for the Manager, EDA position held by Ms. Wolff at LAS.

with Ms. Wolff and who had been on the telephone conference with her. Those three individuals had been in Mr. Roth's office for this conference call. Mr. Roth and Mr. Peters each provided me with statements about this incident. Those statements are attached as Exhibits 8 and 9 to this Declaration. Those statements confirmed Ms. Wolff's report that Mr. Mazzo had extensively used the word "fuck," or permutations of that word, during this call to convey his anger and frustration with all of the College Park employees about the status of the work project being discussed, but neither statement indicated that the language used was at all sexual in manner. As the investigation continued, additional statements were obtained from each of the other five individuals who were on the August 29 telephone conference. Those additional statements are attached as Exhibits 10 through 14 to this Declaration. All of these statements further confirm Mr. Mazzo's use of profanity but also make clear that this language was directed equally at the men in College Park as at Ms. Wolff and that it was work-related and not based on Ms. Wolff's being a female.

8.      As part of the investigation into Ms. Wolff's grievance, on September 6, 2001, I met with Ms. Wolff again, along with John Roth, who Ms. Wolff reported to, and Charlie Kohnstam, Ms. Wolff's direct supervisor. Ms. Wolff, Mr. Roth, Mr. Kohnstam and I discussed the requests stated at the end of Ms. Wolff's grievances (namely, that she be notified when Mr. Mazzo was in College Park and not to have to work directly with him in the future (Ex. 7 at 4)), and Ms. Wolff was notified that those requests would be met. Specifically, Ms. Wolff would be notified if Steve was present in College Park, and all further EDA work that related to the San Jose facility that would require communications with Mr. Mazzo would be handled by Mr. Kohnstam, Mr. Roth or their designee. This information was also conveyed to Ms. Wolff in a

3

letter dated September 7, 2001 (attached as <u>Exhibit 15</u>).  Attached as <u>Exhibit 16</u> to this Declaration is a copy of the instructions that were left with the security guards concerning Mr. Mazzo, noted as being received by me on September 6, 2001.  These steps were taken because they were requested by Ms. Wolff in her grievance.  <u>See Exhibit 7</u> at 4.

9.    Ms. Wolff provided an additional statement, dated September 10, 2001 and addressed to Michael Gering, President of LAS, in which she stated that the she believed there was a "subtle difference" between Mr. Mazzo's  use of the word "fuck" or "fucking" to her and his use of the same words to the men on the call, and that his "action-oriented use of the 'f' word, as stated to [her], was intentional to cause embarrassment, create an environment with which [she] would be uncomfortable to work in and hopefully, to cause [her] to leave the meeting."  A copy of that memorandum is attached as <u>Exhibit 17</u> to this Declaration.

10.    I continued with my investigation of Ms. Wolff's grievance and completed all steps of the grievance process, pursuant to the policy.  <u>Exhibit 18</u> (Email from T. Edwards to George Schectel, dated Sept. 13, 2001).  On September 14, 2001, a Step 3 Appeal meeting was held between Mr. Gering, Ms. Wolff and myself.

11.    At the conclusion of the grievance process, it was my opinion that Mr. Mazzo did engage in unprofessional, harassing behavior during the August 29 telephone conference.  It was **not** my opinion that this harassment was sexual.  As a result of my investigation, I recommended that Mr. Mazzo be suspended for two weeks, that he write a formal letter of apology to Ms. Wolff, that he be required to attend harassment prevention training, that he acknowledge that he will not be permitted retaliate against Ms. Wolff or if he did that he would be subject to further discipline up to and including termination, that Mr. Mazzo have no further contact with Ms.

4

Wolff and that he have no input in her future performance appraisals. This recommendation was documented in an email to Mr. Gering, which is attached as Exhibit 19.

12.     Within a few weeks of the Step 3 (final) meeting of the grievance process, I was notified that Northrop Grumman's decision was that Mr. Mazzo would be required to attend anger management counseling and would receive a formal letter of reprimand that would be placed in his personnel file. In connection with this decision, on October 15, 2001, I had a telephone conference with Mr. Mazzo and Jack Kuenzel, Human Resources Manager for the San Jose facility, during which I informed Mr. Mazzo that he was required to acknowledge and sign the formal letter of reprimand and that he was required to attend anger management counseling. A copy of the letter of reprimand is attached to this Declaration as Exhibit 20. Mr. Mazzo signed the letter of reprimand and returned it to me and I was later informed by Mr. Mazzo and, separately, by his counselor that he was complying with the requirement to attend anger management counseling.

13.     In approximately mid- to late-November 2001, Ms. Wolff asked me to facilitate a meeting between herself and Mr. Mazzo so they could reestablish a working relationship. I scheduled this meeting for November 30.

14.     Starting at approximately 11:15 on November 30, I attended the meeting between Ms. Wolff and Mr. Mazzo, which was held in College Park. During this meeting, Mr. Mazzo and Ms. Wolff both acted professionally, appeared to me to understand the issues of behavior and respect that were needed in the working environment, and agreed that they could work together going forward. It was agreed that the communication restrictions and notification requirements (concerning Mr. Mazzo's presence in College Park) could be stopped at that time.

5

After approximately fifteen minutes, Ms. Wolff asked me to leave the meeting so that she could meet privately with Mr. Mazzo. I was asked to contact Mike Peters and ask him to join Mr. Mazzo and Ms. Wolff shortly for business purposes. My notes concerning this meeting are attached as Exhibit 21.

15.    Later on November 30, Mike Peters informed me that both Mr. Mazzo and Ms. Wolff had acted professionally when he joined them. See Exhibit 21. Ms. Wolff also informed me that the remainder of the meeting (after I had left) had gone fine.

16.    On December 3, Ms. Wolff informed me that although the November 30 meeting "went okay" while I was present, that both parties got emotional after I left and that Mr. Mazzo "slipped in the 'f' word," but that it was not directed at her, but that she thought I should know he was still swearing. See Exhibit 21. This seemed to be a significant contradiction to me because during the grievance process concerning the August 29 telephone conference, Ms. Wolff said she had no problem with the use of swears, and only that her problem with Mr. Mazzo's swearing in August was that it had been "directed at her." Exhibit 21.

17.    Because of Ms. Wolff's December 3 statement, I requested a statement from Mr. Mazzo about the November 30 meeting. Mr. Mazzo's response is attached as Exhibit 22 to this Declaration. Mr. Mazzo's email reflected the fact that the meeting between Ms. Wolff and himself had been positive.

Pursuant to 28 U.S.C. § 1756, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on: September 25, 2003

_Timothy Edwards_
Timothy Edwards

6

**NORTHROP GRUMMAN**

| Intranet Home | IIS Help Desk | Phone Book | Autotime | Policies | Forms |

DV 104

Date: 07/23/97
Supersedes: 08/02/93

### EQUAL EMPLOYMENT OPPORTUNITY - AFFIRMATIVE ACTION PROGRAMS

#### 1. STATEMENT OF POLICY

1.1  The Litton Advanced Systems (LAS) EEO Policy Statement, as it appears in the LAS Affirmative Action Plan (AAP), as well as being posted on bulletin boards, reaffirms the policy of LAS to hire employees without discrimination because of race, color, religion, sex, sexual orientation, age, national origin, disability or veteran status, and treat them equally during employment with respect to all employee relations and personnel matters including, but not limited to, recruiting, hiring, training, promotion, compensation, benefits, and termination.

1.2  LAS facilities will not be segregated, and this policy will be observed with respect to any employee programs or activities which are sponsored or supported by LAS.

1.3  Executive management recognizes that the effective application of a policy of merit employment involves more than just a policy statement, and encourages programs of affirmative action within LAS to make equal employment opportunities available on the basis of individual merit, and to encourage all persons to seek employment with LAS and to strive for advancement on this basis.

#### 2. DISSEMINATION OF POLICY

Through the distribution of this policy, as well as the LAS AAP, all employees and applicants are advised of the LAS policy of nondiscrimination and of its interest in actively and affirmatively providing equal employment opportunity.

#### 3. ASSIGNMENT OF RESPONSIBILITIES

The Manager, Human Resources is responsible for the development and implementation of equal employment policies and concepts. He has full responsibility for managing the Human Resources organization, assists the efforts of LAS management in implementing its affirmative action programs, and reports to the President's staff concerning the progress of the programs, with recommendations when appropriate.

#### 4. RECRUITMENT

LAS seeks qualified female and minority-group applicants for all job categories to increase their representation in occupations at the higher levels of skill and responsibility.

#### 5. PLACEMENT AND PROMOTION

5.1  LAS reviews job categories where females and minorities are underutilized and seeks to remedy such underutilization via established goals and timetables.

5.2  Placement, promotion, and transfer activities at all levels are reviewed to insure that full consideration is given to qualified female and minority employees.

NG0308

## 6. TRAINING

6.1 In-plant and on-the-job training programs, as well as all other training and educational programs to which LAS gives support or sponsorship, are regularly reviewed to insure that female and minority-group candidates as well as all other employees are given equal opportunity to participate.

6.2 Appropriate steps are taken to give active encouragement to female and minority-group employees to increase their skills and job potential, through participation in available training and education programs.

## 7. COMPENSATION

7.1 There will be no disparity in the compensation received by females, minorities and all other employees who have equal skills and experience and who perform equally in the same job classification. Opportunities for performing overtime work or otherwise earning increased compensation will be afforded without regard to race, color, religion, sex, age, national origin, handicap or veteran status.

## 8. DISTRIBUTION OF AAP

8.1 The LAS approved Affirmative Action Plan, including its EEO Policy, is distributed to all members of the President's staff and Department Directors, and is available for review by any employees in the individual directorates. The AAP is also available in Human Resources for review by employees and applicants.

8.2 The LAS AAP is revised and updated upon its yearly expiration date.

Contact

Home

© 2001 Northrop Grumman Corporation

NG0309

**Litton**
**Advanced**
**Systems**

● training   ● help desk   ● policies   ● forms   ● VPN   ● phone b(

*NORTHROP GRUMMAN*

**Division Policy & Procedure**

DV 104.4

Date: 11/02/98
Supercedes: 01/12/94

## HARASSMENT

### 1. GENERAL

Various human rights laws, codes, and regulations, as interpreted by Courts and Commissions, prohibit various types of harassment in the workplace. In addition to being contrary to law, certain types of conduct are demeaning and degrading and have no place in Litton Advanced Systems (LAS). Therefore, it is the policy of LAS to provide a work environment free of harassment due to the protected categories of race, religious creed, color, national origin, ancestry, age, physical disability, mental disability, medical condition, marital status, sex, sexual orientation, or veteran status, or harassment of any form that is demeaning or degrading.

### 2. PROHIBITED HARASSMENT DEFINED

**2.1** Types of conduct that are prohibited by this policy are verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of any of the protected categories, or the protected categories of relatives, friends, or associates, and that:

> 1. Has the purpose or effect of creating an intimidating, hostile, or offensive work environment;

> 2. Has the purpose or effect of unreasonably interfering with an individual's work performance; or

> 3. Otherwise adversely affects an individual's employment opportunities.

**2.2** Prohibited harassing conduct includes, but is not limited to, the following:

> 1. Epithets, slurs, jokes, negative stereotyping, or threatening, intimidating, or hostile acts, that relate to any of the protected categories of race, religious creed, color, national origin, ancestry, age, physical disability, mental disability, medical condition, marital status, sex, sexual orientation, or veteran status; and

> 2. Written or graphic material that denigrates or shows hostility or aversion toward an individual or group because of a protected category and that is placed on walls, bulletin boards, or elsewhere on LAS premises, or circulated in the workplace.

### 2.3 Sexual Harassment

In addition to the above prohibited conduct, sexual harassment includes any unwelcome verbal or physical sexual advances, requests for sexual favors and other discriminatory remarks or conduct of a sexual nature, in the workplace, which is offensive or objectionable to the recipient when:

> 1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

> 2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

wysiwyg://6/http://intranet.littonas.com/...nd_Procedures/100s/DV_104_4/dv_104_4.html

3. Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

## 2.4 Examples of Illegal Sexual Harassment and Other Forms of Harassment

Making sexual advances which are not welcome, offering an employment benefit for a sexual favor, taking adverse action against an employee for refusing an unwelcome sexual advance or favor, sexual leering, sexual gestures, making sexual jokes, slurs, or comments, verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, suggestive or obscene letters, notes or invitations, and physical touching or blocking or impeding movements.

In addition, the posting/displaying of pornographic literature or illustrations or other such materials which may be sexually suggestive or otherwise objectionable by reason of their exploitive nature are also examples of sexual harassment. Possession of such materials on LAS facilities, whether they are intended for display or not, is a further example of sexual harassment.

Also, use of the internet to communicate offensive or improper messages, including but not limited to, the viewing downloading, storage, posting, or transmission of defamatory obscene, pornographic, hate speech, offensive, racially, or sexually harassing messages and otherwise objectionable communications are examples of harassment and sexual harassment and are strictly prohibited.

Sexual harassment can be committed by either males or females against either males or females.

## 3. EMPLOYEE RIGHTS

3.1 An employee has the right at any time to complain of harassment prohibited by this policy. Any employee who feels that they have been subjected to prohibited harassment is urged to immediately contact and request assistance from their supervisor, Human Resources, the LAS Counsel, the LAS Hotline at 877-892-9807 or the Corporate Hotline at 1-800-446-3535, in order that all allegations of prohibited harassment may be promptly investigated and resolved.

3.2 Employees are encouraged to report incidents of prohibited harassment and are advised that they may do so free of any fear of reprisal. Employees are further advised that no person has any power or authority from LAS, real or apparent, to engage in prohibited harassment, and that any person doing so is acting contrary to Litton policy, and outside of any authority which that person may have. Any employee who is found to have engaged in prohibited harassment of another employee will be disciplined, up to and including discharge. LAS will also take such steps as are appropriate to halt and remedy prohibited harassment by non-employees of LAS in connection with their work with LAS employees.

## 4. COMPLAINT PROCEDURE

4.1 Any employee who believes that they have been the victim of prohibited harassment is urged to immediately report the incident to their supervisor, Human Resources, the LAS Counsel, the LAS Hotline or the Corporate Hotline.

4.2 The Complainant shall be advised that the incident will be immediately, thoroughly and, insofar as possible, confidentially investigated; that appropriate action will be taken depending upon the outcome of the investigation; and that the Complainant will be advised of the results of the investigation.

4.3 The Complainant shall be assured that the complaint will be held in confidence insofar as is possible, and that no retaliation will be taken for complaining or participating in an investigation.

4.4 LAS will take disciplinary action when required to ensure compliance with this policy. Such action may include the termination of any person found to have violated this policy.

4.5 LAS will not tolerate any form of retaliation against an employee or indivdual who reports harassment, or against any employee who participates in an investigation of a charge of harassment.

## 5. NOTICE PROCEDURE

09/14/2001 10:21 AM

wysiwyg://6/http://intranet.littonas.com/...nd_Procedures/100s/DV_104_4/dv_104_4.h

All employees, including executive, managerial, supervisory and non-supervisory personnel, shall be notified of the LAS anti-harassment policy. As a part of LAS's employment procedures, newly hired employees will also be advised of this policy. All employees will also receive periodic training or communications to assure that they are fully cognizant as to their rights under this policy.

## 6. RESPONSIBILITIES

**Employee:**

To refrain from engaging in prohibited harassment of any employee and to immediately report any violations of this policy to management or Human Resources.

*9/14/01*

**Managers:**

*Mike,*

To refrain from engaging in prohibited harassment of any employee, to ensure the enforcement of this policy and to encourage the immediate report of any alleged violation of this policy.

**Human Resources:**

*Done, &*
*per*
*my*
*judgment,*
*which is*
*w/in the*
*scope of this*
*policy. Lisa's allegation*
*/or is unfounded*

To implement and administer this policy. To investigate any allegations of prohibited harassment in a prompt, fair and discreet manner and to recommend appropriate disciplinary action, if necessary. All investigations are to be coordinated, in advance, with LAS Counsel.

Ensure that <u>all</u> employees are notified of LAS policy regarding prohibited harassment.

To provide, on a regular basis, employee training or communications for all employees, to be given periodically. Also, to provide all employees a copy of LAS anti-harassment policy.

**NOTE:**

° These Policies and Procedures reflect management's current policy on the subject. They provide general guidelines and are subject to change at any time at the discretion of the President. Any exception requires advan approval by the President.

° The forms linked to these Policies and Procedures are al available here on the Intranet in the forms directory.

° WARNING: Paper copies of Litton Advanced Systems (L Policies and Procedures are uncontrolled and should not relied on to contain up to date information.

© Copyright 2000 Northrop Grum
Litton Advanced Systems, I
Please See The Terms Of
All Rights Reserved Worldw

09/14/2001 10:21 AM

NG0351

Edwards Exhibit 3

**Litton**
**Advanced**
**Systems**

✱ training  ✱ help desk  ✱ policies  ✱ forms  ✱ VPN  ✱ phone D(

*NORTHROP GRUMMAN*        **Division Policy & Procedure**

**DV 215**

**Date: 02/24/89**
**Supersedes: 03/01/88**

## EMPLOYEE GRIEVANCES

### 1. GENERAL

1.1 In any organization containing supervisors and their subordinate personnel, conditions will arise under which an employee will believe that there is justifiable cause to complain about some condition of employment such as wages, hours, working conditions, etc. It is preferable for such grievances to be resolved by direct discussions between the employee and the supervisor; when this process fails, the formal three step grievance procedure described in this P&P will be followed by all Litton Advanced System (LAS) employees.

### 2. STEP 1

2.1 If direct discussions between the employee and the supervisor fail to resolve the grievance, the employee shall fill out form AM2137, Statement of Employee Grievance, sign and date it and, after making two copies, present the original to the supervisor. The nature of the grievance should be stated in as much detail as possible in order to minimize any misunderstandings. One of the copies is forwarded to Employee Relations (E.R.) in Human Resources in a sealed envelope, the other is kept by the employee.

2.2 The Supervisor will fill in his/her response to the grievance and return the form to the employee within one working day after the form was submitted. Where necessary, he/she shall consult with his/her superiors and/or E.R. to assure that the response accurately reflects LAS policy. Copies of the form are made for the Department Manager and the Supervisor before returning to the employee, and E.R. is notified by phone of the response to the grievance.

### 3. STEP 2

3.1 If the employee is not satisfied with the response to the grievance, he/she may appeal the decision to the next level of management (the supervisor's manager) after receiving the response. This is done by signing and dating the "Step 2 Appeal" line on the form, making two copies, and giving the original to the cognizant department manager in an envelope marked "Grievance Appeal." One copy will be sent to E.R. and the other kept by the employee.

3.2 The department manager consults with the supervisor, and arranges to meet with the employee for a discussion of the grievance within two working days after receiving the appeal. Within one working day after the meeting, the manager will return the original form, with a Step 2 response attached, to the employee, making copies for the supervisor and the manager's file, and will notify E.R. by phone of the response.

### 4. STEP 3

4.1 If the employee is not satisfied with the results of the Step 2 appeal, he/she may initiate a final Step 3 appeal to Employee Relations, by signing and dating the "Step 3 Appeal" line on the form. After making a copy, he/she then submits the original to E.R. in an envelope marked "E.R. Grievance Appeal."

NG0345

4.2 E.R. will arrange and conduct a meeting with the employee and the applicable member of the President's Staff (or a specifically delegated representative) to settle the grievance at the earliest possible date -- in no case more than one week after receipt of the grievance. E.R. will be responsible for resolution of the problem, and have the resolution approved by the applicable member of the President's Staff.

4.3 E.R. will prepare a written response to the appeal based on the findings of

4.2. This will be attached to the original form and presented to the employee no later than four working days after the meeting, with copies to all concerned.

NOTE: If the employee does not receive a response to the grievance within the time period specified in any of the above steps, he/she may immediately initiate the next step of the appeal procedure, using his/her copy of the form as an original. When doing so, he/she should note "No Reply Received" in the applicable response signature block.

**NOTE:**

- These Policies and Procedures reflect management's current policy on the subject. They provide general guidelines and are subject to change at any time at the discretion of the President. Any exception requires advan approval by the President.

- The forms linked to these Policies and Procedures are al available here on the Intranet in the forms directory.

- WARNING: Paper copies of Litton Advanced Systems (L Policies and Procedures are uncontrolled and should not relied on to contain up to date information.

© Copyright 2000 **Northrop Grum**
**Litton Advanced Systems, I**
Please See The Terms Of
All Rights Reserved Worldw

**Contact The Webma**
This Site Is Optimized For 4.0+ Web Browsers Using A Screen Resolution No Less Than 800 X 600 P

Edwards Exhibit 4

B.28

# Memorandum
Northrop Grumman Corporation

| | | | |
|---|---|---|---|
| **To** | All Employees | **From** | Robert P. Iorizzo |
| | | **Phone** | 765-6801 |
| **Subject** | Sexual Harassment | **MS** | A500 |
| | | **Date** | July 1, 2001 |
| **Copies** | | **Ref** | |

Northrop Grumman recognizes sexual harassment as intolerable and a form of illegal discrimination.  It is company policy to provide a work environment that is free from sexual harassment, and we intend to aggressively adhere to this policy.

By understanding what constitutes sexual harassment, everyone will be able to recognize and avoid sexually harassing behavior.  Sexual harassment is demonstrated by unwelcome sexual advances, requests for sexual favors, and other unwanted verbal or physical conduct of a sexual nature, when:

- Submission to this conduct is either an explicit or implicit term or condition of an individual's employment;
- Submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or,
- The conduct has the purpose or effect of substantially interfering with an individual's work performance or creates an intimidating, hostile, or offensive work environment.

All managers are responsible for the implementation of the company's policy regarding sexual harassment, and must take prompt corrective action to include contacting Human Resources whenever they become aware of allegations of sexual harassment.  Actions taken may include discipline up to and including termination.  Employees who believe they have been subjected to sexual harassment are encouraged to report such conduct as quickly as possible to the Human Resources office in their respective organization or to Tim Edwards, Executive Director, Human Resources.  Employees may lodge complaints without fear of reprisal or retaliation.  A timely investigation and disposition of the complaint will be accomplished.

Our reputation as a good place to work has been built and maintained by employees respecting the rights of others.  We believe every employee has a right to be treated with dignity and respect, and to expect a friendly and supportive working atmosphere.  If you have any questions, please contact Tim Edwards (301-454-9523) in Human Resources.

Robert P. Iorizzo

**NORTHROP GRUMMAN**
Electronic Systems

Edwards Exhibit 5



NG0179



NG0181



NG0183

**Litton**

Amecom

Edwards Exhibit 6

## MANAGER, ENGINEERING DEPARTMENT                    GRADE: 34    CODE: 52700/52710

### FUNCTION:

Responsible for the technical and administrative direction of an Engineering Department, and the performance of those personnel assigned to the department, in a timely and cost effective manner in accordance with Engineering policies and procedures.

### NATURE AND SCOPE:

Delegates and coordinates tasks of an Engineering Department to maximize effective utilization of department personnel within budgetary and time limitations. Defines and analyzes problems, opportunities, needs and resources; plans and establishes objectives, goals, standards, forecasts, budgets and schedules within program limits. Staffs to provide sufficient qualified personnel to efficiently execute plans and meet objectives. Responsible for providing cost estimates of assigned tasks and maintaining cost control of authorized Work Order Budgets. Interfaces with other Departments and organizations in integrating schedule commitments, on IRAD, proposals, and program requirements. Reviews and controls department activities with respect to Division performance standards and establishes corrective actions; and recommends changes required in the standards. Keeps higher management fully informed on status of the organization.

Able to review technical documents for content, accuracy, and quality, either manually and/or using networked computers or PC's. Ability to communicate via telephone and/or verbal presentations to customer, company, industry technical representatives on scientific issues, and to upper level management for coordination of plans and their effective implementation.

Assures proper orientation and training of all assigned employees. Responsible for communicating work standards to assigned employees to meet quality and quantity objectives and providing the necessary direction to ensure schedules are met in a cost effective manner. Approves promotions, pay increases, and other personnel actions. Assures that all personnel functions are handled on an equitable basis, without regard to race, color, creed, age, sex, national origin, handicap, or veteran status; and that all personnel are performing to the high ethical standards established by Division policy.

Promotes and practices continuous improvement techniques in relation to job duties and responsibilities.

The duties of the position may change and the employee is required to perform other duties as assigned.

### EDUCATION:

Bachelor's degree in applicable discipline or equivalent, or equivalent experience.

### MINIMUM EXPERIENCE:

Eleven years directly related experience or nine years specific Amecom experience, including at least two years managerial experience.

EFFECTIVE DATE: 09/18/97
MAR 29 2002 17:03

Edwards Exhibit 7    B.6

**Litton**
Advanced
Systems

# Statement of Employee Grievance

| NAME Lisa Wolff | EMPLOYEE NO. 011927 | DEPARTMENT 6400 | DATE 9/4/2001 |
|---|---|---|---|
| LOCATION College Park, MD | SUPERVISOR Charles Kohnstam and Mike Peters | | |

**NATURE OF GRIEVANCE (DESCRIBE IN DETAIL - SEE DV 215):**

See attached letter which outlines the events of a recent meeting with Steve Mazzo, Executive VP of Electronic Combat

| EMPLOYEE'S SIGNATURE: *Lisa A. Wolff* | DATE 9/4/2001 |
|---|---|

**SUPERVISOR'S RESPONSE:**

See attached memorandum which states my (Mike Peters) recollection of the meeting that took place on Wednesday, August 29, 2001 at approximately 4:10 PM.

| SUPERVISOR'S SIGNATURE: *[signature]* | DATE 9/4/2001 |
|---|---|

| Step 2: | I hereby appeal this grievance to the Department Manager. | SIGNATURE | DATE |
|---|---|---|---|
| | RESPONSE ATTACHED: | SIGNATURE | DATE |
| Step 3: | I hereby appeal this grievance to Human Resources. | SIGNATURE | DATE |
| | RESPONSE ATTACHED: | SIGNATURE | DATE |

AM2137 (09-99)

September 4, 2001

3180 Buffalo Road
New Windsor, MD 21776
Employee No.: 011927

Tim Edwards
Director Human Resources
Northrop Grumman/Litton Advanced Systems
5115 Calvert Road
College Park, MD 20740

Dear Tim,

Per our discussion on Friday, August 31, 2001, please accept this letter as formal documentation
for the employee relations grievance I filed per P&P 215.

**Begin Statement:**

On Wednesday, August 29, 2001, I attended a teleconference in John Roth's office. The topic of
the meeting was splitting a WorkManager database that was joined during an EC consolidation
task. The database was joined to satisfy a request from John Cornish and Bob Maiers to provide
an integrated deployment of the WorkManager system. Attending the meeting was:

Steve Mazzo, Executive VP Electronic Combat
John Roth, VP Electronic Combat
Mike Peters, Executive Director Information Technology and EDA
Ken Peters, Applications Engineer
Lynn Gahagan, Director of SJ Engineering
Bob Ossentjuk, title unknown (SJ)
Larry Ashby, Manager of SJ Mechanical Engineering & Drafting

The meeting began with Steve Mazzo speaking for several minutes in an admonishing tone to all
present. He discussed the lack of progress in consolidating the processes and practices of the
EC units in CP and SJ. It is not clear who in particular Steve was directing his displeasure (in
progress), since none of the parties at the table were to my knowledge, directed to manage the
task of consolidating processes and practices. No one made any comments after Steve finished
speaking. John Roth then took control of the meeting to direct the discussion toward its intended
purpose: Which of the 3 options provided to management would the EDA staff complete to split
the WorkManager database?

When the discussion moved to the options, Steve Mazzo stated he did not want to discuss the
options presented, instead he had a 4th option. (The details of Option 4, as in any options
considered are not pertinent to the grievance, so I have omitted them from this statement.) Ken
Peters and I answered questions related to Option #4. The questions covered either risk to
program schedules, data integrity or re-merge risks. Throughout this portion of the
teleconference, Steve Mazzo was growing increasingly frustrated, however Steve remained
relatively in control of his approach to the meeting.

John Roth brought the meeting back and stated that we thought enough was known to start work.
Ken Peters asked for clarification on exactly which option EDA was to work. Based on the
discussion thus far, I clarified the direction (Option #1 with some minor **and** significant changes
with respect to AIEWS data ownership). More discussion occurred on a data integrity problem
that had the potential to present itself when SJ delivered the AIEWS data.

As the meeting continued, Steve's frustration became more apparent as he dominated the meeting, interrupted other participants and raised his voice. Despite Steve's behavior, the meeting continued on to the related topic of telephony for SJ. Mike Peters attempted to provide some information related to the imminent connection to the Northrop BWI facility, but was abruptly cut off by Steve Mazzo. Mike offered this information because it was pertinent to the discussion on AIEWS data remaining on the CP server and a follow-up to a previous email exchange. Steve made threatening comments to Mike with regard to contacting Mike Gering, and made a statement that was along the lines of the Maryland facilities being shutdown by Northrop. (After Mike was able to complete his statement, Steve stated he thought Mike was referring to a previously denied order for a T1 upgrade between CP and SJ.) Mike Peters attempted to stop the conversation because the attendees were not cleared for this discussion; Steve continued. Mike also asked Steve to approach the meeting more professionally. This request was made because Steve had begun using profanity and speaking in an extremely high volume (not quite yelling).

The conversation was "all over the place", so I asked Steve to make a clear statement on his assessment of the risks discussed (possible impacts to AIEWS data and re-merge). I also proposed that I would document what risks were assessed, as well as the outcome of the assessment. (As a manager, this is part of my job responsibilities and useful for lessons learned analysis.) Steve became extremely agitated and told me, while all attendees listened, that he wasn't concerned with whether I wanted to "cover my fucking ass." During this portion of the discussion, Steve was still speaking very loudly into the phone and using profanity throughout.

After Steve's outburst related to documenting risks, the participants on the east coast clearly wanted to end the meeting. Mike gestured to me with his thumb, an opportunity for me to leave the meeting because the profanity used was explicit and, I assume he could see that I was very uncomfortable with the situation. I felt I could not perform my function as a manager if I left the meeting. My attendance was necessary to provide technical guidance and set direction for my subordinate, Ken Peters. Additionally, Steve Mazzo was pressing Ken for schedule dates, dates which Ken has no authority to set. Considering Steve's attitude toward my employee, coupled with my obligations as a manager, I felt I had no choice but to sit through the meeting despite the embarrassment and humiliation caused by Steve's approach to the meeting.

With all the discussion on risk ending and an option selected, Steve very calmly asked me whether I was now able to task Ken Peters, "in front of witnesses". I began telling Steve that I needed to check with the staff working the task to assess any impact the minor and significant changes to Option #1 would have on the schedule distributed with the meeting request. At this point, Steve began shouting profanities of a sexual nature as he demanded I stop delaying. He yelled for more than 3 or 4 minutes directly to me, using the "f" word to describe the affect my, or my department's, actions had on the people and programs managed in SJ. Any attempts on my part to reply to his statements were thwarted by Steve's constant yelling, as he moved from point to point. Since no one on the east coast could reply (due to how the phone works and being shouted down), I used the time to calm myself and consider his use of profanity throughout this period of the meeting. His use of the "f" word was not rare; during a two minute period, he used the "f" word 18 times.

To really clarify the extent of Steve's behavior, the following is an example of his use of profanity aimed directly towards me. Several times, when referring to me personally in his attack, his use of the "f" word was used in a manner of speech that denotes action. For example, while Steve was describing the affect the WorkManager database merge had on SJ (in a manner that can be described as yelling), his description included a characterization of my work (and my organization's work) as something that "fucked over SJ". I interpret such comments as a very personalize assault on my character. As a woman on a teleconference with seven men, to infer I "f'd over SJ" when I (EDA) implemented the system under discussion, is disgusting and degrading. I object to a person in a supervisory status making such statements, acting in a hostile manner and referring to any actions I take as a manager with sexually profane

terminology. His words give all present a mental picture based in sexual, not business terms, and I consider his behavior inappropriate in a business setting.

In addition to Steve's treatment and use of profanity, he made statements to the affect that I had acted without authority and purposely delayed rectifying the problems resident in SJ that are related to the merge. These statements are unfounded and untrue. His statements were made in a manner one would state a true fact, they were not qualified as his opinion. These statements were made to my peers, supervisors and subordinates. I object to Steve's misstatements of events, especially since these very allegations were discussed through email with Steve several weeks prior and found to have no foundation. Steve's statements have maligned my character as a manager and good standing as an employee of this company. I absolutely will not tolerate false allegations that run contrary to the rating I was given during the recent and all past Performance Reviews. At all times, I have acted ethically, managed all tasks to my best ability and always acted upon authority given to me by the customer's representative(s) and my management charter.

Although this statement is intended to reflect the factual events of the teleconference that prompted my grievance, I must take this opportunity to state how this event has profoundly changed my outlook on my career, the company and my place in the company. Personally it has caused major stress, and to be honest, some extended periods of crying and a lot of lost sleep. At work since this incident, I question many times, every word I send in emails to the SJ facility and have tried to ensure I do not need to make calls to the SJ facility. I fear further attacks or unprofessional behavior from Steve, or worst yet, his subordinates who I am sure, have lowered their opinion of my work and worth to the company. I am embarrassed to even speak with the people that attended the meeting due to the mental picture that's been painted in the minds of my male peers. As a manager of a customer-oriented organization, **customer satisfaction**, a **trusting relationship and a belief in the technical skills** of myself, and my staff, are necessary to ensure high ratings on my Performance Reviews. This incident has served to destroy any relationship all parties concerned have attempted to build during the consolidation. Furthermore, my most basic skills as a manager and engineer have been falsely characterized by Steve, making it very difficult (if not impossible) to rebuild trust and technical competency in the eyes of SJ management. Lastly, I question what affect this publicly false characterization of my abilities, and the investigation of this grievance itself, will have on organizational decisions currently in process at Northrop. Although these feelings are not a matter of fact from the meeting, **they are a matter of fact for me.**

**End Statement**

Tim, in consideration of the events that transpired, I request notification when Steve Mazzo is present in my facility (Aerospace). I absolutely will not be subjected to further contact with this employee and fear his anger will again surface. Additionally, I request that this grievance be given careful deliberation and priority consideration on the part of the company. An Executive Vice President must at all times exude a professional attitude and his behavior should be beyond reproach. A position of such authority is by its very nature, a position that should be heralded as a role model for peers and subordinates. It is clear that Steve Mazzo's behavior does not fit this description, not during my encounter described herein, nor in other situations in which Steve has "stepped over the line". I consider it the company's responsibility to provide a workplace free from the behavior I encountered, where I feel safe to carry out my duties, and to police even its highest-ranking staff.

Sincerely,

*Lisa A. Wolff*

Lisa A. Wolff
Manager, Engineering Design Automation

Sep 12 01 02:09p                                                                                        p.8

B.8

# Litton

## Advanced Systems

### OFFICE CORRESPONDENCE

File:                                                        Date:   September 6, 2001

Subject:   Summary of 8/29 telecon

To:        Tim Edwards                                       Copies to:

From:      John Roth

Per your request, I am summarizing the telecon held on 29 August.  The participants in my office were Mike Peters Lisa Wolff and myself.  Participants in San Jose included Steve Mazzo, Bob Ossentjuk, Lynn Gahagan, Ken Peters and I believe one or two others. The purpose was to discuss options for improving the EDA connectivity/performance for San Jose.

The technical details of the conversation I don't believe are important.  The issue as I understand it was Steve Mazzo's manner during the telecon.  Steve appeared very upset that actions had not been taken already, and seemed to be getting more upset at the answers he was getting during the telecon regarding the difficulties and schedule required in doing what he wanted.  Lisa was providing information in what I would describe as a calm and professional manner. She did not in any way I detected try to anger Steve or try to unnecessarily complicate the issue or suggest she would not do whatever Steve directed her to do to solve the problem. Steve appeared to not be pleased with the information, rather than being upset with Lisa's presentation or manner.  My impression was that he was accusing Lisa of stalling in not solving his problem and trying to make it sound more difficult than it needed to be.  During the call, Steve was yelling and used many curse words, including the "F" word multiple times.  Lisa appeared very upset by that. Mike Peters interrupted Steve at one point to ask that he be more professional in the discussions. Steve reacted by saying that we (Lisa? Mike?) were more unprofessional by not solving his problem by now than he was by yelling and cursing.  Mike made a suggestion that he reinstate the T-1 line from College Park to San Jose to help the problem.  Steve replied that since Maryland operations would be moving to BWI and College Park would not be around long, why would he want to move forward with the expense of a T-1 line.

After the call ended, Lisa broke down into tears. She said that she had asked Steve before not to curse at her and especially not to use the "F" word which she found very offensive. She said she felt he did that on purpose to upset her. She also said she was upset because one of her employees was on the San Jose end and she found it degrading and unprofessional to have Steve chastise her like that in front of her subordinate.

John C. Roth
Vice President, Electronic Combat

Sep 12 01 02:09p

Edwards Exhibit 9      P. 9

B.19

# Litton

## Advanced Systems

### OFFICE CORRESPONDENCE

File:                                          Date:   August 31, 2001

Subject:   Recollection of WorkManager Meeting on August 29, 2001

To:        Tim Edwards                          Copies to:

From:      Mike Peters

This memorandum is a statement of fact from my recollection of a meeting that took place on Wednesday, August 29, 2001 at approximately 4:10 PM. This statement is being given per a request from Tim Edwards, Executive Director of Human Resources. The meeting' purpose was to decide which option of implementation San Jose Engineering would use for their HP WorkManager Server. The meeting was held as a teleconference between two office locations. John Roth, Lisa Wolff, and I participated in the meeting from John Roth's closed office. To the best of my knowledge, Steve Mazzo, Lynn Gahagan, Bob Ossentjuk, Larry Ashby, and Ken Peters participated in the meeting from Steve Mazzo's office.

The meeting began cordially with Steve Mazzo describing his understanding of problem and some of the possible solutions that I assume San Jose Engineering had briefed him on. This appropriately set a baseline for the group to begin a discussion on the merits and pitfalls of the three options Lisa outlined in her request (email) for this meeting August 20, 2001. Given the purpose of this memorandum, I will omit the detailed discussion of how we finally came to a consensus of selecting Option 1 as the solution as it has no bearing on the intent of this statement.

Once the decision to go with Option 1 was determined, Steve Mazzo asked Lisa Wolff how long it would take to implement. Lisa replied that she did not know at this time and that she would need to reevaluate the MS Project schedule that was attached to the email from August 20, 2001 to determine when the project could be completed. It was at this point that Steve Mazzo took on an unprofessional attitude and began to use abusive language and raise his voice in anger. Lisa was visibly shaken from this abrupt change in Steve's manner. Steve seemed to have the impression that promises were made that if Option 1 was selected that the project could be completed within days and that a schedule reevaluation was just another unnecessary delay. Maintaining to keep her composure after Steve's outburst, Lisa attempted to explain that some of the complexities of the project had changed given our discussion and that she wanted to re-verify each of the tasks that were identified in the project schedule. Steve then proceeded to get reassurance from Lisa that this would be her departments number on priority and that every available resource would be used to complete the project as quickly as possible.

During the week of August 6, 2001, I sent a MS PowerPoint presentation (email attachment) addressing the consolidation of LAS to the Executive Staff for review. This presentation originated from NG's Internal Information Systems (IIS) group and outlined the assumptions, options, and costs applicable to IIS for the consolidation of LAS. Steve Mazzo responded to this email essentially enunciating San Jose's need to remain connected to the applicable networks in a manner that did not negatively affect performance. Given this statement and the fact that any WorkManager implementation would require a healthy connection, I felt it was appropriate to update Steve during this meeting that we (IT & IIS) had taken the necessary steps to provide the same or better connectivity

between our Engineering Systems through our 2002 plan.  Before I could finish my statement, Steve reacted in an abusive manner stating that this was irrelevant to the meeting.  Steve concluded that since College Park was going to be shut down, it was pointless to discuss connectivity issues.  Once Steve divulged this proprietary data in front of an audience not cleared to hear it, I informed Steve that I felt the meeting needed to proceed in a more professional manner.  At this point the meeting came to a fairly quick end with short conclusions and answers.

Edwards Exhibit 10

From:          OSSENTJUK, BOB
Sent:          Monday, September 10, 2001 12:52 PM
To:            GAHAGAN, LYNN
Subject:       EDA

Follow Up Flag:    Follow up
Flag Status:       Flagged



EDA907.doc

NG0195

Litton
Advanced Systems

**Memorandum**                                    In reply refer to:

**To:**          L. Gahagan              **Date:**   7 September, 2001

**From:**        B. Ossentjuk           **CC:**

**Subject:**     EDA Substandard Service

--------------------------------------------------------------------------------

I would like to officially report what I consider substandard EDA service and questionable representation of services offered by Lisa Wolff. I would further request that Lisa Wolff be replaced, as the lead EDA representative/manager for San Jose Engineering. My report and request result from a series of incidents involving the migration of our Work Manager System from a local San Jose server to a remote College Park joint/common server.

From the beginning of the Work Manager migration effort up to the present time I've been given a series of false promises, mis-representations, refusals to follow my direction, refusals to follow Steve Mazzo's directions relayed through me, and what appears to be abuses of schedules, and budgets. As I'll identify below there have been numerous events from which I draw my observations. These observations have led me to believe that I can not accept input from Lisa Wolff as being credible nor can I count on her to follow my requests to support my Department's work objectives.

My account of events surrounding the Work Manager migration follows:

After initial reluctance on my part and after lengthy discussion with Lynn Gahagan (Director, Engineering) on or about the 4th of May 2001, at the request of Lisa Wolff, I allowed our local Work Manager database to be merged onto a single Work Manager server located in College Park. My permission was granted with the caveats that if San Jose performance was degraded as a result of the merge we would immediately return to the local un-merged state. Lisa agreed and claimed that if there were any problem she would put everything back on the local server. The implementation phase of our Work Manager movement from local to common remote took only a few days as evidenced by Rick Singer's reported completion on the morning of the 9th of May, 2001. Little or no engineering down time was observed at San Jose during this migration.

By the 11th of May, 2001 I reported that the performance of the common server was not acceptable i.e. The AIEWS chassis drawings that originally took 5 to 10 minutes to load on our local server now took upwards of 75 minutes to load on the merged server.

Per our pre-merge agreement Lisa was instructed to return Work Manager to our local server. This did not happen. My initial requests to return to a local server were met with the comment "it would take someone way above Bob to make that happen". When I inquired as to who that might be I got a list of everyone from the VP of Finance to Mike Gering. I found this rather maddening given the aforementioned promise to return to the local server if problems were encountered.

Thus, in desiring to maintain the SJ database in CP, EDA embarked on a plan to improve performance. EDA claimed to have additional software that would solve the problem. So I allowed the effort to continue but the additional software did not resolve the problem. Next it was determined (possibly already known) that our T1 line was not really a T1 line but rather a Frame Relay and did not offer enough bandwidth to solve our problem. We were going to need a real $50,000 T1 line installed between CP and SJ if we were going to solve the problem. Given that it would probably take 30 days to get a purchase requisition through our NGLAS system and 60 to 90 days to get the vendor to install the line, I then requested that our Work Manager be returned to our local server until such time as the T1 issue could be resolved. This request was refused.

Lisa Wolff proceeded to work to order a T1 line. At this time Steve Mazzo interceded to determine who gave Lisa permission to procure a T1 line since no one had reviewed the matter with him or sought to acquire his approval for such expenditure (Steve was the senior member of Lisa's chain of command with the authority to procure the T1). Steve placed the ordering of the T1 line on hold and I informed Lisa (at Steve's direction) to reinstall Work Manager on the local server. This direction was also refused and I was informed that I no longer had legitimate software licenses to install the Work Manager on the local server. When asked what happened to the San Jose licenses I was informed they were used to acquire the licenses for the merged server. I further asked when and who approved the license exchange and was informed that it had been approved months earlier by executive management. No one in SJ, including Steve Mazzo, was informed that this decision had been made. Given the license exchange situation above the promise Lisa had previously made to me, to return the Work Manager to the local server if problems were encountered, appeared to be less than honest.

When I challenged Lisa on this point she claimed she did not mean without cost. She then claimed the license replacement would cost some $60,000. So I checked on the license myself and found that I could get a license deal for 25 seats for 2 years with maintenance for about $4,300. Another case of what Lisa represented as not being quite right. Even this price difference was met with the comment that you must not have the right license stuff. However, we actually had a loaned copy of the licensed software installed and we knew it was the right software. Our order for the new software was then delayed because NG was entitled to a large discount (77%) and they needed to figure out how to get the discount for our purchase. While waiting Mike Peters finally told us to go ahead and install and use the software because he had a good relationship with the vendor and because we probably already had sufficient license coverage to use the software anyway. So it did not appear to be true that we did not have the license for the required Work Manager software after all.

But even with all of this Lisa still would not re-install our work manager software on our local server. She claimed to need Steve's specific review and approval of her 3 optional methods for the re-installation. This was even after I relayed Steve's direction to move on with the job. So finally a phone meeting between San Jose and College Park was arranged. The meeting included at College Park at least John Roth, Mike Peters, and Lisa Wolff. At San Jose were at least Steve Mazzo, Lynn Gahagan, Larry Ashby, Ken Peters, and Bob Ossentjuk. Lisa presented her case and Steve directed her to re-install in the most expeditious manner possible and to simplify her approach. The meeting got quite heated as members of the meeting kept offering impediments to the restoration and because when Lisa was asked to estimate the time to get it done she refused to provide an estimate. She insisted on saying she would have to update her plan/schedule and get back to Steve the next day. This was unprofessional on her part given the phone call was reviewing a sample plan of Lisa's that required some 22 or so days to complete the installation and some of the work had already been completed. None the less the next day came and went with no plan. Finally at about COB on the following day Lynn Gahagan got a copy of Lisa's plan claiming all work on the re-install would be complete by 13 Sept. It should be noted that no plan was actually provided to either Steve (the senior manager requesting the plan) or me (the manager controlling the local work manger efforts). Lynn's email did not request he share the plan with anyone. Lisa seems to have broken off communications with both Steve and me. This is some 4 months after the initial request to reinstall the work manager.

As stated it was the 11th of May when I requested that the Work Manager software be put back on the local server. At that time San Jose had not performed more than 40 hours worth of engineering work on the local system. If we had simply restored the local Work Manager from the backup and if we had the engineers actually re-perform all of the work done it should have only taken marginally over 40 hours to be back on line. Lisa's approach certainly seems like cost and schedule abuse to me! Its been 4 months and there have been trips from CP to SJ, 2 or 3 EDA engineers working the problem in CP, Ken Peters working the problem in SJ, phone meetings involving Mike Peters, Ken Peters, Lisa Wolff, Byron Kelley, Steve Mazzo, Larry Ashby, and Bob Ossentjuk and numerous support people involved with software and T1 requisition research and processing.

While all of the above was going on I asked Lisa who was in charge of this effort to get engineering onto a common server with a common schema for engineering drawings, who was putting new ISO procedures in place and who was coordinating with the CM group about the changes and procedures they would need. She claimed it was not her and said that the desire for a common document collection system was being driven by Byron Kelley (VP of Product Assurance). She claimed he should have been coordinating with San Jose CM. When I started checking with Rose Green (San Jose CM Manager) she knew nothing about a common work manager or how it would impact CM. Lisa worked with Rose Green and informed both her and myself that CP was already using the common Work Manager to release drawings. When Rose checked with her counterparts at CP they denied any such CM utilization of the Work Manager at that time.

NG0197

Lisa Wolff made a trip to San Jose to talk with the local CM folks and to conduct a phone meeting with San Jose CM and Engineering and CP's Byron Kelley. Kelley was not available for the scheduled phone call and Lisa arranged to have the CP CM person attempt to speak in his place. The CP CM rep did not have any idea what was going on and could not provide San Jose any insight into Byron's plan/procedures for supporting this common Work Manager effort. Byron called me a couple of days later to inform me that he was not the driving force behind this common work manager server/ document center as Lisa had misinformed me about. He did not see Work Manager as being a new CM tool as Lisa had projected and did not have any idea who was developing new ISO procedures.

Based on all of the above I have no confidence that I can rely on what I am told by Lisa Wolff. I also have a difficult time understanding why some 4 months and many dollars later I still have not gotten our Work Manager software properly reinstalled on the local San Jose server.

But given these situations and Lisa's apparent unwillingness to support either myself or my department's objectives, her lack of follow through on promises she made, and her inability to have found a low cost short time period solution to our Work Manager problems, I find I must request that I be provided with an alternate method to obtain EDA support. I must have the cooperation of an EDA manager that understands that EDA is a support organization that is supposed to help Line Organizations (Engineering) get their jobs done in a timely cost effective manner. The EDA manager must be able to establish a strong working relationship with Engineering Management and not one as fraught with hostilities, misgivings, misrepresentations, and questionable motives as the one described above.

From:         OSSENTJUK, BOB
Sent:         Monday, September 10, 2001 2:04 PM
To:           GAHAGAN, LYNN
Subject:     2nd EDA



EDA907.doc

NG0199

Litton
Advanced Systems

**Memorandum**                                    In reply refer to:

To:             **L. Gahagan**                   Date:    **7 September, 2001**

From:           **B. Ossentjuk**                 CC:

Subject:        **EDA Substandard Service**

------------------------------------------------------------------------------------------------

I would like to officially report what I consider substandard EDA service and questionable representation of services offered by Lisa Wolff. I would further request that Lisa Wolff be replaced, as the lead EDA representative/manager for San Jose Engineering. My report and request result from a series of incidents involving the migration of our Work Manager System from a local San Jose server to a remote College Park joint/common server.

From the beginning of the Work Manager migration effort up to the present time I've been given a series of false promises, mis-representations, refusals to follow my direction, refusals to follow Steve Mazzo's directions relayed through me, and what appears to be abuses of schedules, and budgets. As I'll identify below there have been numerous events from which I draw my observations. These observations have led me to believe that I can not accept input from Lisa Wolff as being credible nor can I count on her to follow my requests to support my Department's work objectives.

My account of events surrounding the Work Manager migration follows:

After initial reluctance on my part and after lengthy discussion with Lynn Gahagan (Director, Engineering) on or about the 4th of May 2001, at the request of Lisa Wolff, I allowed our local Work Manager database to be merged onto a single Work Manager server located in College Park. My permission was granted with the caveats that if San Jose performance was degraded as a result of the merge we would immediately return to the local un-merged state. Lisa agreed and claimed that if there were any problem she would put everything back on the local server. The implementation phase of our Work Manager movement from local to common remote took only a few days as evidenced by Rick Singer's reported completion on the morning of the 9th of May, 2001. Little or no engineering down time was observed at San Jose during this migration.

By the 11th of May, 2001 I reported that the performance of the common server was not acceptable i.e. The AIEWS chassis drawings that originally took 5 to 10 minutes to load on our local server now took upwards of 75 minutes to load on the merged server.

Per our pre-merge agreement Lisa was instructed to return Work Manager to our local server. This did not happen. My initial requests to return to a local server were met with the comment "it would take someone way above Bob to make that happen". When I inquired as to who that might be I got a list of everyone from the VP of Finance to Mike Gering. I found this rather maddening given the aforementioned promise to return to the local server if problems were encountered.

Thus, in desiring to maintain the SJ database in CP, EDA embarked on a plan to improve performance. EDA claimed to have additional software that would solve the problem. So I allowed the effort to continue but the additional software did not resolve the problem. Next it was determined (possibly already known) that our T1 line was not really a T1 line but rather a Frame Relay and did not offer enough bandwidth to solve our problem. We were going to need a real $50,000 T1 line installed between CP and SJ if we were going to solve the problem. Given that it would probably take 30 days to get a purchase requisition through our NGLAS system and 60 to 90 days to get the vendor to install the line, I then requested that our Work Manager be returned to our local server until such time as the T1 issue could be resolved. This request was refused.

Lisa Wolff proceeded to work to order a T1 line. At this time Steve Mazzo interceded to determine who gave Lisa permission to procure a T1 line since no one had reviewed the matter with him or sought to acquire his approval for such expenditure (Steve was the senior member of Lisa's chain of command with the authority to procure the T1). Steve placed the ordering of the T1 line on hold and I informed Lisa (at Steve's direction) to reinstall Work Manager on the local server. This direction was also refused and I was informed that I no longer had legitimate software licenses to install the Work Manager on the local server. When asked what happened to the San Jose licenses I was informed they were used to acquire the licenses for the merged server. I further asked when and who approved the license exchange and was informed that it had been approved months earlier by executive management. No one in SJ, including Steve Mazzo, was informed that this decision had been made. Given the license exchange situation above the promise Lisa had previously made to me, to return the Work Manager to the local server if problems were encountered, appeared to be less than honest.

When I challenged Lisa on this point she claimed she did not mean without cost. She then claimed the license replacement would cost some $80,000. So I checked on the license myself and found that I could get a license deal for 25 seats for 2 years with maintenance for about $4,300. Another case of what Lisa represented as not being quite right. Even this price difference was met with the comment that you must not have the right license stuff. However, we actually had a loaned copy of the licensed software installed and we knew it was the right software. Our order for the new software was then delayed because NG was entitled to a large discount (77%) and they needed to figure out how to get the discount for our purchase. While waiting Mike Peters finally told us to go ahead and install and use the software because he had a good relationship with the vendor and because we probably already had sufficient license coverage to use the software anyway. So it did not appear to be true that we did not have the license for the required Work Manager software after all.

But even with all of this Lisa still would not re-install our work manager software on our local server. She claimed to need Steve's specific review and approval of her 3 optional methods for the re-installation. This was even after I relayed Steve's direction to move on with the job. So finally a phone meeting between San Jose and College Park was arranged. The meeting included at College Park at least John Roth, Mike Peters, and Lisa Wolff. At San Jose were at least Steve Mazzo, Lynn Gahagan, Larry Ashby, Ken Peters, and Bob Ossentjuk. Lisa presented her case and Steve directed her to re-install in the most expeditious manner possible and to simplify her approach. The meeting got quite heated as members of the meeting kept offering impediments to the restoration and because when Lisa was asked to estimate the time to get it done she refused to provide an estimate. She insisted on saying she would have to update her plan/schedule and get back to Steve the next day. This was unprofessional on her part given the phone call was reviewing a sample plan of Lisa's that required some 22 or so days to complete the installation and some of the work had already been completed. None the less the next day came and went with no plan. Finally at about COB on the following day Lynn Gahagan got a copy of Lisa's plan claiming all work on the re-install would be complete by 13 Sept. It should be noted that no plan was actually provided to either Steve (the senior manager requesting the plan) or me (the manager controlling the local work manger efforts). Lynn's email did not request he share the plan with anyone. Lisa seems to have broken off communications with both Steve and me. This is some 4 months after the initial request to reinstall the work manager.

As stated it was the 11th of May when I requested that the Work Manager software be put back on the local server. At that time San Jose had not performed more than 40 hours worth of engineering work on the local system. If we had simply restored the local Work Manager from the backup and if we had the engineers actually re-perform all of the work done it should have only taken marginally over 40 hours to be back on line. Lisa's approach certainly seems like cost and schedule abuse to me! Its been 4 months and there have been trips from CP to SJ, 2 or 3 EDA engineers working the problem in CP, Ken Peters working the problem in SJ, phone meetings involving Mike Peters, Ken Peters, Lisa Wolff, Byron Kelley, Steve Mazzo, Larry Ashby, and Bob Ossentjuk and numerous support people involved with software and T1 requisition research and processing.

While all of the above was going on I asked Lisa who was in charge of this effort to get engineering onto a common server with a common schema for engineering drawings, who was putting new ISO procedures in place and who was coordinating with the CM group about the changes and procedures they would need. She claimed it was not her and said that the desire for a common document collection system was being driven by Byron Kelley (VP of Product Assurance). She claimed he should have been coordinating with San Jose CM. When I started checking with Rose Green (San Jose CM Manager) she knew nothing about a common work manager or how it would impact CM. Lisa worked with Rose Green and informed both her and myself that CP was already using the common Work Manager to release drawings. When Rose checked with her counterparts at CP they denied any such CM utilization of the Work Manager at that time.

Lisa Wolff made a trip to San Jose to talk with the local CM folks and to conduct a phone meeting with San Jose CM and Engineering and CP's Byron Kelley. Kelley was not available for the scheduled phone call and Lisa arranged to have the CP CM person attempt to speak in his place. The CP CM rep did not have any idea what was going on and could not provide San Jose any insight into Byron's plan/procedures for supporting this common Work Manager effort. Byron called me a couple of days later to inform me that he was not the driving force behind this common work manager server/ document center as Lisa had misinformed me about. He did not see Work Manager as being a new CM tool as Lisa had projected and did not have any idea who was developing new ISO procedures.

If this were not enough I also believe that Lisa's merge plan left at least one gaping technical flaw. The flaw is that there is no known SJ disaster recovery mechanism in place that facilitates SJ's continued use of Work Manager should the network between CP and SJ fail. We would simply go off line until the network was repaired with no local ability to develop and release drawings. This level of technical omission should have been detected had Lisa actually reviewed her technical plan with the Engineering staff. She did not review the plan with Engineering! I've also been told that there is a leakage problem with the Work Manager software that has led to some level of data corruption. This is a problem where the 2 distinct schemas/databases (CP & SJ) are inadvertently commingling data. Again, a better test plan may have discovered this problem before going on line. These problems merely bring into question the technical competence of the staff executing the implementation plan or the quality of the implementation plan itself. These flaws may have even existed if the plans had been reviewed with Engineering prior to execution but the questions of technical competence probably would be lessened by the more cooperative approach.

Based on all of the above I have no confidence that I can rely on what I am told by Lisa Wolff. I also have a difficult time understanding why some 4 months and many dollars later I still have not gotten our Work Manager software properly reinstalled on the local San Jose server.

But given these situations and Lisa's apparent unwillingness to support either myself or my department's objectives, her lack of follow through on promises she made, and her inability to have found a low cost short time period solution to our Work Manager problems, I find I must request that I be provided with an alternate method to obtain EDA support. I must have the cooperation of an EDA manager that understands that EDA is a support organization that is supposed to help Line Organizations (Engineering) get their jobs done in a timely cost effective manner. The EDA manager must be able to establish a strong working relationship with Engineering Management and not one as fraught with hostilities, misgivings, misrepresentations, and questionable motives as the one described above.

## Edwards, Tim

**From:** OSSENTJUK, BOB
**Sent:** Friday, September 14, 2001 1:46 PM
**To:** Edwards, Tim
**Subject:** Mazzo Work Manager Meeting

A week or so ago I attended a Work Manager meeting in Steve Mazzo's office that included a teleconference with a group of people in College Park. The main College Park participant was Lisa Wolff as the meeting was a discussion regarding the plan to re-instate our Work Manager System on a local server at San Jose. Lisa had a plan with three options that she had wanted to present to Steve and get his approval/direction as to how she was to proceed. The list of people as I remember that were in attendance were:

San Jose:

Bob Ossentjuk
Larry Ashby
Ken Peters
Lynn Gahagan
Steve Mazzo

College Park:

Lisa Wolff
Mike Peters
John Roth

I must first state that I can not speak about the entire meeting because I joined the meeting late and I stepped out of the meeting on at least one occasion for a short interruption.

So as I recall the meeting was centered around Lisa's plan to get San Jose's Work Manager system back on a local server in San Jose. Steve basically wanted to know what it was going to take to get it done. Lisa and Mike Peters appeared to want to offer opinions as to why it shouldn't be done and generally appeared to be resistant to directly answering Steve's questions. Steve became irritated as did some of the folks at College Park and the conversations became heated to include some off-color language (none that I haven't heard said by most all of the members of the meeting). Things were said that questioned the state of the organization and its continued existence or lack thereof (due to NG happenings) with both John Roth and Steve saying that it did not appear that CP was going to remain as an entity. Steve finally asked for an estimate to get the job done and Lisa refused to provide an estimate saying she would go review and update her plan. Lynn Gahagan finally asked (in an attempt to help Steve get an answer) if it was a day, a week, a month, etc. and finally Lisa said it was probably less than a month but she was going to have to review and update her plan.

To the best of my knowledge Lisa never provided Steve with an updated copy of her plan or an estimate to complete the job. I do believe that she sent something to Lynn Gahagan.

I found that the hostilities exhibited in the meeting somewhat embarrassing and remained at the conclusion of the meeting to express my opinion to Steve. I indicated that I (in my opinion) was not used to seeing the level of insubordination that had been demonstrated in this meeting by subordinate personnel in the face of an Executive VP. I wanted to understand why Steve either did not see the same level of insubordination or why if he did see it he tolerated it. Steve indicated he did not understand the attitude but believed that the stress of the CP/SJ and then NG combinations and changes certainly were contributing factors.

It should be noted that this meeting was the culmination of some four months of frustrations over not getting this work done. I have written Gahagan a previous memo on this subject and my concern that I was not properly supported and that I was having difficulty establishing a credible relationship with Lisa.

NG0213

## Edwards, Tim

| | |
|---|---|
| **From:** | Kuenzel, Jack |
| **Sent:** | Friday, September 14, 2001 6:22 PM |
| **To:** | Edwards, Tim |
| **Subject:** | FW: Mazzo Work Manager Meeting |

Hi, Tim!

Bob tells me that he emailed this to you. I do not know if he included Gering or not; check your copy.

As an addendum, I asked if he was present when the "foul" language started. He stated that he did not recall, mainly because he did not consider the language that offensive. And secondly, he is not sure since he and Larry Ashby left during the meeting and missed portions. He did not feel that what he heard was directed to Lisa any more than anyone else. In fact, he seemed to recall that Mazzo came down tougher on Mike Peters than the others.

He feels that the history leading up to this meeting is very important and should be considered. Prior to me talking to him today, Bob forwarded a memo to Lynn Gahagan outlining the background history leading up to the subject meeting and Lynn may want to forward this memo to you. The concern I am hearing on this end is that, by limiting their comments to just what was heard at the meeting, forces them to make out-of-context statements. Hopefully, later when you have more time, you will be able to get the whole story.

Also, Ken Peters stopped in and stated that he feels uncomfortable with copying Gering on his comments. You may want to check each of the emails you receive from these guys to assure your desired distribution takes place.

Jack

-----Original Message-----
| | |
|---|---|
| **From:** | OSSENTJUK, BOB |
| **Sent:** | Friday, September 14, 2001 10:49 AM |
| **To:** | Kuenzel, Jack |
| **Subject:** | FW: Mazzo Work Manager Meeting |

-----Original Message-----
| | |
|---|---|
| **From:** | OSSENTJUK, BOB |
| **Sent:** | Friday, September 14, 2001 10:46 AM |
| **To:** | Edwards, Tim |
| **Subject:** | Mazzo Work Manager Meeting |

A week or so ago I attended a Work Manager meeting in Steve Mazzo's office that included a teleconference with a group of people in College Park. The main College Park participant was Lisa Wolff as the meeting was a discussion regarding the plan to re-instate our Work Manager System on a local server at San Jose. Lisa had a plan with three options that she had wanted to present to Steve and get his approval/direction as to how she was to proceed. The list of people as I remember that were in attendance were:

San Jose:

Bob Ossentjuk
Larry Ashby
Ken Peters
Lynn Gahagan
Steve Mazzo

College Park:

Lisa Wolff
Mike Peters
John Roth

NG0211

I must first state that I can not speak about the entire meeting because I joined the meeting late and I stepped out of the meeting on at least one occasion for a short interruption.

So as I recall the meeting was centered around Lisa's plan to get San Jose's Work Manager system back on a local server in San Jose. Steve basically wanted to know what it was going to take to get it done. Lisa and Mike Peters appeared to want to offer opinions as to why it shouldn't be done and generally appeared to be resistant to directly answering Steve's questions. Steve became irritated as did some of the folks at College Park and the conversations became heated to include some off-color language (none that I haven't heard said by most all of the members of the meeting). Things were said that questioned the state of the organization and its continued existence or lack thereof (due to NG happenings) with both John Roth and Steve saying that it did not appear that CP was going to remain as an entity. Steve finally asked for an estimate to get the job done and Lisa refused to provide an estimate saying she would go review and update her plan. Lynn Gahagan finally asked (in an attempt to help Steve get an answer) if it was a day, a week, a month, etc. and finally Lisa said it was probably less than a month but she was going to have to review and update her plan.

To the best of my knowledge Lisa never provided Steve with an updated copy of her plan or an estimate to complete the job. I do believe that she sent something to Lynn Gahagan.

I found that the hostilities exhibited in the meeting somewhat embarrassing and remained at the conclusion of the meeting to express my opinion to Steve. I indicated that I (in my opinion) was not used to seeing the level of insubordination that had been demonstrated in this meeting by subordinate personnel in the face of an Executive VP. I wanted to understand why Steve either did not see the same level of insubordination or why if he did see it he tolerated it. Steve indicated he did not understand the attitude but believed that the stress of the CP/SJ and then NG combinations and changes certainly were contributing factors.

It should be noted that this meeting was the culmination of some four months of frustrations over not getting this work done. I have written Gahagan a previous memo on this subject and my concern that I was not properly supported and that I was having difficulty establishing a credible relationship with Lisa.

NG0212

Edwards Exhibit 11

Friday, September 14, 2001

Employee No.: 513021

Tim Edwards
Director of Human Resources
Northrop Grumman/Litton Advanced systems
5115 Calvert Road
College Park, MD 20740

Subject:  Response to Employee Grievance dated September 4, 2001

Dear Tim,

I have received a FAX copy of the Grievance submitted by Lisa Wolff as I entered my office this morning at 8AM.  I have read the grievance and have been asked to respond by COB today in written form.  Considering the extent of the issues in the letter and the short time for me to respond, I feel that I can only try to discuss the sense of the telephone conversation, and will not try to provide a defense on a point by point basis.  Considering the requests made at the conclusion of the grievance memo, I am concerned that my hastily prepared response may be as damaging to my future as Ms. Wolff feels my action may be to hers.

In general I feel that the issues and incidence described in the letter have some factual basis. I believe that the context and background may need to be briefly understood if I am to explain my actions.  Before going into the details, I can summarize that at the end of the phone conversation, I realized that I had lost control of my emotions and had said things that I wished I could have taken back, but that can not be done.

Understanding the background leading up to the phone call may be of some help in understanding why I lost control.  I do not intend to use this as an excuse for my behavior but merely serve as background on what had transpired up to that time.  On August 17 my mother passed away, her deterioration was swift and I was not able to be there before she died.  I returned to work a week before the phone call and was immediately inundated with tasks at hand.  I put off this phone call until I was able to understand the facts in the situation.  On Monday August 27 Litton was informed that it had lost the PLAID competition.  This loss was a serious blow to the very existence of San Jose.  Moral was the lowest in over a year, and emotions were high. People were racing to recover from this event. The relationship between San Jose and College Park had deteriorated significantly over the last five months, within my SBU, and with most of the other interfaces required as part of doing business on a day to day basis.  The general tone of the phone call was one of continued slowdown of tasks and challenging every request that I had made prior to and during the phone conversation.

With regards to the phone conversation, I do not deny that I lost control and did in fact use profanity.  I have used such words on other occasions, but in all instances have not

used them to imply any sexual connotation to any individual. I have always treated all employees with equality and, I believe, fairly. While I truly regret my choice of words in this instance, they were in no was intended to create a sexual bias toward any individual. As an example, in the grievance Ms. Wolff describes my asking her to "cover her ass". We had made certain decisions during the phone call and I accepted the risks involved. Ms. Wolff's response was along the lines of " I don't want you coming back to me if this doesn't work, I don't want to be held responsible for what you are asking me to do". I told her that I accepted responsibility for the decisions. She made another similar reply to the one just illustrated, and that's when I said I would write her "a fucking cover your ass memo" if she wanted. The tone of the letter gives a similar feeling that the frustration was unprovoked and that the individuals involved were not responsible for any provocation. I feel the frustration level was raised significantly during the conversation by the Passive Aggressive actions on the part of some of the participants in College Park. I feel that the conversation was deliberately steered in different directions when we were trying to focus on the problem at hand. Within my office in San Jose, the phone conversation was increasingly frustrating the participants, and I took the initiative to cut them off and lead the conversation from this San Jose location. The statement of my comments "being all over the place" are one sided, and I believe are meant to portray my issues and actions as being without foundation.

I regret my use of profanity, and while not professional, was not intended to have the effect on the individual that it has had. I regret the tone of the conversation as it ended. I am truly sorry that I have offended Ms. Wolff. Most people that know me know that even when I have a disagreement with someone, I do not harbor continued ill feelings toward them. I have had disagreements with people in the past, but at no time have I ever allowed my personnel feels to continue to cloud my business decisions. I can promise that my actions in carrying out my responsibility in the future will not be affected as a result of this phone conversation.

In closing, I can understand Ms. Wolff's emotional feelings. But I can not believe that the actions taken during this meeting, as a singular incident, will critically effect the decisions made by this company with regard to her future. I believe that we all judged on our performance in the aggregate, and that digression from the straight and narrow must be considered in light of the entire set of circumstances involved.


Respectfully,



Stephen A. Mazzo
Vice President and General Manager

Edwards Exhibit 12

I attended a meeting on 29 Aug 01 in Steve Mazzo's office with Steve, Bob Ossentjuk who arrived late, Lynn Gahagan and Ken Peters with Lisa Wolff, Mike Peters and John Roth on the speaker phone. As this was an emotional meeting by all due to the touchy subject (East vs. West conflict) I can not remember the exact words by all but do remember why we were there (past inaction) and what the result of this meeting was to be (resolve our differences).

Steve's opening statement was strong and to the point. "The purpose of meeting is to give a direction regarding the San Jose server and that everyone in attendance will get the same direction at the same time eliminating the alleged miscommunication and misinterpretation of the past 5 months of inaction". This was directed as being applicable to everyone in the meeting and to work as a team to solve the problem.

He then wanted to know why his previous direction to College Park was not happening. The emotional level got high due to Lisa's repeated negative responses and refusal to follow direction. As I see it, Steve continued to drive to a resolution rather than ending it abruptly with an insubordination letter. Steve also warned Mike " don't go there" at least twice, but Mike continued to prod about the T1 line. At that point, Mike did ask Steve to be more professional with his responses. The tone of the meeting continued with low and high emotions. During the heated part, profanity was directed at the subject and not personnel at either coast. I'm conscious of the use of profanity and remember Steve used it first. I wondered about how it would be received, but there was no negative response by College Park at that specific time and was followed later by profanity from Lisa.


As a foot note:

I was pulled out of the meeting by Bob Ossentjuk at one point to discuss strategy and returned a few minutes later.

I was disappointed that Lisa's boss did not intervene and take control with a negotiated solution to end the impasse sooner.

Larry Ashby
14 Sept 01
408.365.4590

Details of the 8/29/01 meeting

I used the word "profanity" in reference to the use of any of the four-letter cuss words as profanity. The reason I stated my personal concern was that to some people profanity is offensive where in they leave or state their objection. But, in this case neither was exercised indicating an acceptance and the continuation of its use and consequently my ignoring it. Therefore, due to the length of the meeting, approximately 45 minutes, and amount of profanity used, I can not accurately quote nor paraphrase a specific word's usage within a sentence. However, Steve's statements were something to the effect of (turn the .... server back on) and Lisa's statements were something to the effect of (I'll update the.... Plan).

Larry Ashby
17 Sept 01
408.365.4590

## Edwards, Tim

| | |
|---|---|
| **From:** | Peters, Ken |
| **Sent:** | Monday, September 17, 2001 4:53 PM |
| **To:** | Edwards, Tim |
| **Cc:** | Kuenzel, Jack |
| **Subject:** | RE: Conduct during PDM migration meeting |

My recollections of the events that occurred during the subject PDM migration meeting are provided in a question/answer format below.

QUESTION: Do you recall attending a meeting in Steve Mazzo's office to discuss migration of a WorkManager PDM to a host computer on the West coast?
ANSWER: Yes.

QUESTION: Who were the attendees at this meeting?
ANSWER: To the best of my recollection, the following individuals attended the meeting:
    San Jose:
        Steve Mazzo
        Lynn Gahagan
        Bob Ossentjuk
        Larry Ashby
        Ken Peters

    College Park:
        John Roth
        Mike Peters
        Lisa Wolff

QUESTION: Did people, including Steve Mazzo, display any emotions during this meeting?
ANSWER: Yes. In particular, Steve Mazzo became very angry at several points in the meeting.

QUESTION: Did Steve Mazzo use profanities in the meeting.
ANSWER: Yes.

QUESTION: Do you recall the exact profanities that Steve Mazzo used?
ANSWER: No.

QUESTION: Do you recall how the profanities were used?
ANSWER: No.

QUESTION: Were you made uncomfortable by Steve Mazzo's conduct during the meeting?
ANSWER: Yes.

QUESTION: What made you uncomfortable about Steve Mazzo's conduct during the meeting?
ANSWER: Given that the subject of the meeting was the EDA group's non-responsiveness to Steve Mazzo's directives, I interpreted Mr. Mazzo's anger as an indication that I and/or Lisa Wolff might be formally reprimanded, (if not terminated).

QUESTION: Did you consider any elements of Steve Mazzo's conduct during this meeting to be inappropriate?
ANSWER: Yes. I felt that, as Lisa Wolff's subordinate, it was inappropriate for me to attend a meeting where she was redressed in such a manner. I also did not feel that Mr. Mazzo's displays of anger were in any way conducive to resolving the problems at hand.

QUESTION: Do you personally believe that any of Mr. Mazzo's comments constituted an act of harassment.
ANSWER: Personally, no. However, sometime after the meeting I do recall postulating that, because of the severe degree of anger displayed by Mr. Mazzo, someone might file some form of complaint.

QUESTION: Were you aware that Lisa Wolff considered some of the statements that Steve Mazzo had made to be an act of harassment.
ANSWER: Yes. Although Lisa Wolff gave no indication during the meeting, she did convey her belief that some of

NG0218

Steve Mazzo's comments constituted harassment, (and that she was going to file a complaint), in a telephone conversation a day (or so) after the meeting.

===================================================

Mr. Edwards,

I hope that the statements above provide the additional information that you require. Please feel free to meet with me (in person, or via phone) if you have any additional questions.

Regards,
    Ken Peters

-----Original Message-----
| | |
|---|---|
| From: | Edwards, Tim |
| Sent: | Sunday, September 16, 2001 10:07 AM |
| To: | Peters, Ken |
| Cc: | Kuenzel, Jack |
| Subject: | RE: Conduct during PDM migration meeting |

Hi Ken,

Thanks for your reply. Obviously, during a formal grievance, we'd like the most exact/detailed account we can get. You are free to paraphrase but be sure to preface these accounts with such a reference. I need you to take a minute to once again reflect on this meeting and "flesh-out"/define what and how profanity was used, and by whom. It's also prudent to minimize the amt. of editorializing/assumptions used.

Thanks again for your cooperation. I'll be out Monday, but in order to resolve this incident as quickly as possible, I'm asking that all add'l info be provided to me by Monday, COB. I'll retrieve the info first thing Tuesday.

thanks, -Tim

-----Original Message-----
| | |
|---|---|
| From: | Peters, Ken |
| Sent: | Friday, September 14, 2001 5:33 PM |
| To: | Edwards, Tim |
| Cc: | Kuenzel, Jack |
| Subject: | Conduct during PDM migration meeting |

This email is in response to a request by Jack Kuenzel that I convey my observations on Steve Mazzo's conduct during a recent meeting. The purpose of this meeting was to discuss/resolve issues pertaining to the migration of a product data management system back to a host computer on the West coast. It is my belief that this meeting was motivated by several individuals' concern over an apparent lack of responsiveness by Lisa Wolff's organization to Mr. Mazzo's directives.

To the best of my recollection, the following individuals were in attendance at the teleconference:
San Jose:
    Steve Mazzo
    Lynn Gahagan
    Bob Ossentjuk
    Larry Ashby
    Ken Peters

College Park:
    John Roth
    Mike Peters
    Lisa Wolff

During this meeting, tempers flared on several occasions. Of particular note were several exchanges between Lisa Wolff and Steve Mazzo. During these exchanges Mr. Mazzo did raise his voice, and employ the use of profanities. Although I cannot recall the exact wording of his remarks, (or even the profanities that were used), I did feel extremely uncomfortable about attending a meeting where my direct manager (Lisa Wolff) was being redressed in such a manner. It should also be noted that Mr. Mazzo's fervent remarks were not restricted

NG0219

exclusively to Ms. Wolff (for example, I recall a heated exchange between Steve Mazzo and Mike Peters over the utility of upgrading the network connection between San Jose, and College Park). The majority of Mr. Mazzo's heated remarks were, however, directed at Ms. Wolff. At one point, I even found myself leaning forward in my chair in anticipation of walking out of the meeting, (as Ms. Wolff's subordinate, I simply did not feel that I should be allowed, or required to witness such an event).

Hopefully this email will provide you with the information that you are seeking about the subject meeting. If you require any additional information, please do not hesitate to contact me.

Sincerely,
    Ken Peters

| From: | GAHAGAN, LYNN |
|---|---|
| Sent: | Tuesday, September 18, 2001 9:12 PM |
| To: | Edwards, Tim; Kuenzel, Jack |
| Subject: | My Observations On Work Manager Meeting |
| Importance: | High |

Tim & Jack,

Attached please find two documents. The first is a write-up of my observations on the meeting in question. The second is a memo to me regarding the performance of Lisa Wolff and the EDA group throughout the course of this Work Manager problem. As you will see from the memo, the meeting you asked me to describe cannot be taken out of context of the preceding events.

In an effort to resolve the issues raised by Bob's memo, I will begin working with Charlie Kohnstam immediately. We will keep you advised of our course of action.

Let me know if you need anything else on this issue.

Thanks,

Lynn



Mazzo Wolff
eeting Write-Up.d..



EDA907.doc

NG0221

On 29 August 2001 I attended a meeting called by Steve Mazzo to address the local reactivation of San Jose Engineering's Work Manager database. The meeting was held as a telephone conference between San Jose participants (Steve Mazzo, Bob Ossentjuk, Larry Ashby, Ken Peters and I) and College Park participants (John Roth, Mike Peters and Lisa Wolff). This paper discusses the meeting and relevant issues surrounding the meeting.

### Background

In early May of 2001, Information Technology (IT) and Engineering Design Automation (EDA) migrated San Jose's database for the Work Manager tool to a server in College Park. Problems surfaced immediately and various work-arounds were attempted without successfully correcting the problem. Ultimately, Steve Mazzo directed EDA to restore the database to a San Jose server. As of this meeting some four months after problems were identified, the direction had not yet been accomplished. This meeting was intended as a method of defining management's direction and establishing a near term plan to accomplish said direction.

### The Meeting

Initial discussions in the meeting addressed Lisa Wolff's plan to get the San Jose database up and running again. Three options were presented but none was acceptable, as each had either too much cost or too much schedule associated with implementation. The end goal of the reactivation was discussed at length, as were necessary subsequent actions to address engineering "commonality" between San Jose and College Park. As the discussion progressed, it became clear that there was a relatively straightforward way to reactivate San Jose's database in the near term and that follow-on sharing of database information between San Jose and College Park would require more careful thought.

Given this conclusion, Steve Mazzo asked how long it would take to get San Jose operating locally again. More discussion ensued, with both Lisa Wolff and Mike Peters arguing against the change. As the meeting progressed, the question of how long the transition would take was repeatedly ask by Steve Mazzo, but no answer was provided. Tempers flared and there was shouting from both Steve Mazzo and Lisa Wolff. Steve Mazzo expressed frustration with the lack of an answer to his questions and the long time it was taking to remedy the problem. Lisa Wolff expressed frustration from apparent conflicting priorities and significant pressure to solve the problem. None of the comments made by either individual during this exchange were of a personal nature.

The discussion diverged briefly onto a path that would have, if followed through to completion, revisited the entire history of the problem (dating back to May and

even earlier). Discussion on this path did not progress far, and quickly turned to address the likely future of College Park and San Jose. There was full acknowledgment by both Steve Mazzo and John Roth that it was most probable that College Park would not remain an entity but that San Jose would. Therefore, the problem being discussed must be solved in a way that was satisfactory to San Jose.

Both Steve Mazzo and I then pressed Lisa Wolff for a schedule for the completion of the database reactivation in San Jose. Lisa Wolff would not commit to a completion date, other than to say that it was probably inside a month, but she had to consult with her staff to make sure. Steve Mazzo then directed her to make defining the transition plan and schedule her top priority and to put all necessary individuals to work on the task immediately. He further directed her to provide him a plan and schedule by the end of the next business day (Thursday, 30 August). The meeting was then concluded.

### Follow-Up

The schedule directed by Steve Mazzo was not provided until close of business on Friday, and then it was not sent to Steve Mazzo. Only John Roth and I received copies.

As an attachment to this document, I have included a memorandum written to me from Bob Ossentjuk discussing the full set of events associated with San Jose's Work Manager which, ultimately, created the need for the meeting described above. Bob Ossentjuk discussed the content of this memo with me approximately one week prior to the meeting. It raises some serious questions about the home office EDA support provided to San Jose Engineering and the fiscal responsibility of the decisions made throughout this situation. While these details were not specifically discussed in the meeting, all the participants in San Jose were aware of the events identified in the memo. Given the weight of the issues identified by Bob Ossentjuk, the events of the meeting of the 29th cannot be taken out of context of the overall problem.

*Jim L Gahan   9/21/01*

On 29 August 2001 I attended a meeting called by Steve Mazzo to address the local reactivation of San Jose Engineering's Work Manager database. The meeting was held as a telephone conference between San Jose participants (Steve Mazzo, Bob Ossentjuk, Larry Ashby, Ken Peters and I) and College Park participants (John Roth, Mike Peters and Lisa Wolff). This paper discusses the meeting and relevant issues surrounding the meeting.

**Background**

In early May of 2001, Information Technology (IT) and Engineering Design Automation (EDA) migrated San Jose's database for the Work Manager tool to a server in College Park. Problems surfaced immediately and various work-arounds were attempted without successfully correcting the problem. Ultimately, Steve Mazzo directed EDA to restore the database to a San Jose server. As of this meeting some four months after problems were identified, the direction had not yet been accomplished. This meeting was intended as a method of defining management's direction and establishing a near term plan to accomplish said direction.

**The Meeting**

Initial discussions in the meeting addressed Lisa Wolff's plan to get the San Jose database up and running again. Three options were presented but none was acceptable, as each had either too much cost or too much schedule associated with implementation. The end goal of the reactivation was discussed at length, as were necessary subsequent actions to address engineering "commonality" between San Jose and College Park. As the discussion progressed, it became clear that there was a relatively straightforward way to reactivate San Jose's database in the near term and that follow-on sharing of database information between San Jose and College Park would require more careful thought.

Given this conclusion, Steve Mazzo asked how long it would take to get San Jose operating locally again. More discussion ensued, with both Lisa Wolff and Mike Peters arguing against the change. As the meeting progressed, the question of how long the transition would take was repeatedly ask by Steve Mazzo, but no answer was provided. Tempers flared and there was shouting from both Steve Mazzo and Lisa Wolff. Steve Mazzo expressed frustration with the lack of an answer to his questions and the long time it was taking to remedy the problem. Lisa Wolff expressed frustration from apparent conflicting priorities and significant pressure to solve the problem. None of the comments made by either individual during this exchange were of a personal nature.

The discussion diverged briefly onto a path that would have, if followed through to completion, revisited the entire history of the problem (dating back to May and

even earlier). Discussion on this path did not progress far, and quickly turned to address the likely future of College Park and San Jose. There was full acknowledgment by both Steve Mazzo and John Roth that it was most probable that College Park would not remain an entity but that San Jose would. Therefore, the problem being discussed must be solved in a way that was satisfactory to San Jose.

Both Steve Mazzo and I then pressed Lisa Wolff for a schedule for the completion of the database reactivation in San Jose. Lisa Wolff would not commit to a completion date, other than to say that it was probably inside a month, but she had to consult with her staff to make sure. Steve Mazzo then directed her to make defining the transition plan and schedule her top priority and to put all necessary individuals to work on the task immediately. He further directed her to provide him a plan and schedule by the end of the next business day (Thursday, 30 August). The meeting was then concluded.

### Follow-Up

The schedule directed by Steve Mazzo was not provided until close of business on Friday, and then it was not sent to Steve Mazzo. Only John Roth and I received copies.

As an attachment to this document, I have included a memorandum written to me from Bob Ossentjuk discussing the full set of events associated with San Jose's Work Manager which, ultimately, created the need for the meeting described above. Bob Ossentjuk discussed the content of this memo with me approximately one week prior to the meeting. It raises some serious questions about the home office EDA support provided to San Jose Engineering and the fiscal responsibility of the decisions made throughout this situation. While these details were not specifically discussed in the meeting, all the participants in San Jose were aware of the events identified in the memo. Given the weight of the issues identified by Bob Ossentjuk, the events of the meeting of the 29th cannot be taken out of context of the overall problem.

Edwards Exhibit 15    P.7

B.7

## Litton
## Advanced Systems

September 7, 2001

Dear Lisa,

Per our discussions on your request stated in the end statement portion of your grievance dated 9/4/01 and received by me and presented to you on 9/06/01.  We are implementing the following measures to immediately ensure compliance to this request.

1)   *"Request notification that Steve Mazzo is present in my facility (Aerospace)."*

Effective immediately, If Steve is required to enter the facility. John Roth and I will be notified as to his presence and steps will be taken to ensure no interaction between you and Steve will take place. John, I,  or our designee's will ensure no interaction with you will take place for Steve's duration in the facility.

2)   *"will not be subjected to further contact with this employee.."*

Effective immediately, all EDA interaction with San Jose,  that involves direct communication with Steve Mazzo,  will come through me, John or our designees. All existing EDA functions with San Jose, not requiring Steve Mazzo's involvement, shall be performed per norm with your local San Jose EDA Designees so as not impede any agreed upon EDA goals and objectives or hamper your individual performance.

These measures are agreed upon by John Roth and myself and are taken immediately to recognize your request for "careful deliberation and priority consideration on the part of the company."

We consider this issue of the utmost importance and believe that the immediate measures taken will restore the work environment that is consistent with the company's stated standards of conduct. If our actions are insufficient,  please refer to policy DV-215 and proceed via step 3 of the procedure.

Charles E Kohnstam

Director of Engineering
Electronic Combat

John C.  Roth

Vice President
Electronic Combat

RECEIVED BY
T. R. EDWARDS
DATE 9-6-01

# Security Guards

If Steve Mazzo come into this Building Please Notify John Roth or Charles Kohnst

Capt. Higgins

P/S

this Information is Not To be discssed with No one but the Security Guards

NG0193

September 10, 2001

3180 Buffalo Road
New Windsor, MD 21776
Employee No.: 011927

Mike Gering
President
Northrop Grumman/Litton Advanced Systems
5115 Calvert Road
College Park, MD 20740

Dear Mike,

On September 6, 2001, I met with Tim Edwards, John Roth and Charlie Kohnstam to discuss the grievance I filed on September 4, 2001. It became very clear to me that further written clarification on my part, with respect to the desired outcome of the grievance process, is required. Additionally, I request this information be considered during the Level 3 portion of the grievance process scheduled for September 14, 2001.

The clarification issue centers around two areas: 1) P&P 215 and 2) the intent of the following paragraph taken from my letter to Tim Edwards dated September 4, 2001:

"Tim, in consideration of the events that transpired, I request notification when Steve Mazzo is present in my facility (Aerospace). I absolutely will not be subjected to further contact with this employee and fear his anger will again surface. Additionally, I request that this grievance be given careful deliberation and priority consideration on the part of the company. An Executive Vice President must at all times exude a professional attitude and his behavior should be beyond reproach. A position of such authority is by its very nature, a position that should be heralded as a role model for peers and subordinates. It is clear that Steve Mazzo's behavior does not fit this description, not during my encounter described herein, nor in other situations in which Steve has "stepped over the line". I consider it the company's responsibility to provide a workplace free from the behavior I encountered, where I feel safe to carry out my duties, and to police even its highest-ranking staff."

With regard to conversations during the 9/6/01 meeting, I was given the impression that this above cited paragraph was expected to state the desired outcome of the grievance process. In the contrary, it was intended to document what would make me feel more comfortable during the period of the grievance investigation and to convey some thoughts on the issue at hand.

Based on my understanding of the P&P 215 grievance process, I fully expected the opportunity to be asked what I want to settle the grievance. Even though Tim confirmed this is a correct understanding, in preparation for the Level 3 discussion and considering the gravity of the situation, I believe it appropriate to document the following (even though some of this was discussed in the 9/6/01 meeting):

1) I request that Steve Mazzo's employment be terminated.
2) To be crystal clear, I have not entered into the grievance process because Steve Mazzo used profanity and yelled. Many who know Steve, know this behavior often surfaces when Steve is in stressful situations or is not getting the results he desires.
3) My grievance lies with Steve's marked difference with which he directed profanity toward me, specifically, during the meeting than he did when using the same terms in general to the male participants. The difference, although subtle, took the form of careful crafting of his use of the "f" word in a manner that a woman would interpret most differently from a man. Furthermore,

I believe his action-oriented use of the "f" word was intentional to cause embarrassment, create an environment with which I would be uncomfortable to work in and hopefully, cause me to leave the meeting.

4)  I believe that Steve Mazzo's unchecked history of unprofessional outbursts and common use of offensive language, did *contribute* to the event described in my grievance. The yelling, the anger, the profanity, that defined Steve's outburst became the very basis upon which his attack on me gained momentum, to the point that crafting his words to specifically attack me in a manner extremely offensive to a only woman, me, occurred. (Example: describing a sexual act was performed on San Jose by me, with San Jose in this case, being represented by 5 males on the conference call) Had Steve Mazzo's behavior been tempered many years earlier, by aggressive enforcement of company policies that define appropriate business communication standards, I believe it is very likely that the outbursts of uncontrolled anger and profanity which culminated in the behavior upon which my grievance is made, would not have occurred.

I look forward to the coming opportunity to discuss this matter in detail. As you know I have asked to be represented by an attorney in this matter. With his help, I am documenting my requests to settle this grievance beyond the above stated request to terminate Steve Mazzo's employment. During the Level 3 discussion, I will cooperate to the fullest extent, but must heed the advice of my attorney on topics beyond my request to terminate Steve's employment.

Sincerely,

*Lisa*

Lisa A. Wolff

Edwards Exhibit 18

**Tinker, Diane**

---

| | |
|---|---|
| **From:** | Edwards, Tim |
| **Sent:** | Thursday, September 13, 2001 3:32 PM |
| **To:** | 'George' |
| **Cc:** | Gering, Mike; 'mathedi@mail.northgrum.com'; 'vagt@mail.northgrum.com' |
| **Subject:** | Employee Grievance |

George,

FYI, is follow-up to the conversation that we had re Steve Mazzo. The conversation took place when we were at the HR Conf at BWI late last month. I briefed Donna Davis, Dir. ES Ethics & Business Conduct, as well.

I have attached the grievance procedure for Advanced Systems, the employee's completed form(it has been signed by her supervisor) per step one, the input from all others who were part of the conference on the College Park end, and the step one and two response. You'll see their names in her document and each attachment identifies the input.

Actions immediately were taken(9/6) to assure that her request to have no further contact with Steve. The guards @ Aerspace bldg. were alerted, in confidence, to contact John Roth, VP EC or Charlie Kohnstam, Dir Engr., if Steve was to be in the bldg. In addition, either Charlie, John, or a designee is to have communications with Steve if it is an EDA issue.

She has not, at this time, appealed to Step 3, but I was contacted by a lawyer, Douglas Taylor, Jr. w/ the law firm of Jacobs, Jacobs & Farber, LLC in Rockville, Md. saying he represented her. I had a very brief discussion with this person and he has faxed me a letter today announcing himself.

Ms Wolff says she'll have Step 3 appeal to me today and Mike Gering and I will meet with her within the next few days, hopefully, tomorrow a.m. It is at that pt. that we would communicate the accusation and her statements with Steve, get his (and others) input, and then pursue any additional action/resolution that would be deemed appropriate.

I can be reached on 301 454 9523. thanks, -Tim


Wolff grievance - Wolff input....


Wolff grievance - Roth input.d...


Wolff grievance input - Peters...


dv_215 Grievance Procedure.htm...


Wolff grievance - Step 1 and 2...

1

NG0207

**Edwards, Tim**

| | |
|---|---|
| **From:** | Edwards, Tim |
| **Sent:** | Friday, September 14, 2001 8:50 AM |
| **To:** | Gering, Mike |
| **Subject:** | Mazzo |

Upon the completion of :

1)confronting Steve with the allegation facts
2)gathering the facts from SJ personnel that were present
3)assessing that no contradictions to John Roth, Mike Peters, and Lisa's accounts are evident

I would recommend the following actions be taken.

1. 2 wk suspension
2. formal letter of apology from Steve to Lisa(and all others)
3. Steve be required to attend a Harrassment film session, DV briefing, and sign that he's seen the mat'l and understands that a similar offense in the future or any resemblance of retaliation,  will result in his immediate discharge.
4. Steve agree to have no further contact with Lisa
5. Steve have no input on her future appraisal, rank, or pay.

-Tim

Edwards Exhibit 20

**NORTHROP GRUMMAN**

Northrop Grumman
Litton Advanced Systems
4 Garrett Road
College Park, Maryland
20740 1892

301 864-9900

DATE:      October 15, 2001

TO:        Stephen Mazzo

FROM:      Tim Edwards

SUBJECT:   Violation of Company Policy

The purpose of this memo is to summarize our conference call of October 15, 2001.  During the conference call, with Jack Kuenzel present, you were told that you have violated Company policy by engaging in behavior that is offensive and harassing to other employees.  In addition to constituting a violation of Company policy, your behavior was inappropriate and unprofessional.  As a member of management, you have the responsibility to uphold Company policy, report violations of Company policy, and set an example in the workplace.

This memo also serves as a written warning that your behavior will not be tolerated.  Any future incident of harassing or offensive behavior by you, or violation of any other Company policy, will result in additional discipline, up to and including discharge.

Lastly, this memo confirms that you are required to attend, successfully complete anger management counseling within the next 30 days, and notify me of your completion as a condition of your continued employment.

_____        _____
Steve Mazzo                        Date

NG0234

Edwards Exhibit 21

11/30/01 w. L Wolff

Facilitated meeting requested by L Wolff who
said she needed to work w/ Mazzo "to get her
stuff done"

Had the meeting which I ran from 11:15 -
11:30 a.m. Both parties were professional + understood
the issues of behavior, treatment of each's +
respect for decisions made w/ regs + authority.

Both agreed they could work together + I was to
remove communication restrictions set by grievance
I was asked to leave + contact M Peters
to come down for a follow-up meeting re: issues
w/ ST & EDR/IT.

Later that day I saw M Peters later that
day + he reported that both acted very professionally
and was complimentary of both. He was initially upset
that Lisa request he wait "a few minutes" that turned to 30.

12/3/01
Lisa said the meeting went ok w/ me present
but got emotional on both parties after I left
& that Mazzo had slipped in the "F word"
but it wasn't 4 directed @ her but thought I
should know he still swears

(note, Lisa during grievance said she had no problem w/
swearing it was the fact that it "was directed @ her —

NG0184

**Edwards Exhibit 22**

**From:    MAZZO, STEVE**
Sent:      Monday, December 17, 2001 5:03 PM
To:Edwards, Tim
Subject:   Meeting with Lisa Wolf on Nov 30, 2001

On November 30, 2001 I met with Lisa Wolfe, at her request, to
discuss the matters of our discussion in September.  At the initial part
of that discussions Tim Edwards was in attendance and started the meeting
off.  After about 10 minutes Tim Edwards left the room and Lisa and I
continued our conversation for the better part of 45 minutes.  During that
time I was very careful with the language that I used.  Most of the
conversation was taken up by Lisa.

During the entire time I was very conscious of my words and did not
use any profanity. At no time did Lisa even interject or bring it to my
attention that I had used profanity .   I felt that our meeting was
positive and beneficial to our continued working relationship.

When Mike Peters entered the room to conduct other business between
the three of us, Lisa was extremely upbeat, laughing and showed no signed

of any discomfort. Lisa and I left our private meeting with a resolve to foster better working relations between myself and her as well as between San Jose and College Park.

If there is any discrepancy with this I need to know this immediately.

Steve Mazzo

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division**

| | |
|---|---|
| LISA A. WOLFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CA No. L02-3932 |
| | ) |
| LITTON ADVANCED SYSTEMS, INC. | ) |
| and | ) |
| | ) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF GLORIA FLACH

I, Gloria Flach, being duly sworn, do hereby declare as follows:

1.      I am currently the Program Director of Enterprise Resource Planning (ERP) for the Electronics Systems Sector of Northrop Grumman Corporation ("Northrop Grumman") at its Baltimore-Washington International Airport ("BWI") facility.  I have held this position since January 2003.  From approximately June 2000 through December 2002, I was the Director of Software Engineering and Design Automation.  I have been employed by Northrop Grumman or its predecessors, since approximately September 1981.

2.      In my capacity as the Director of Software Engineering and Design Automation, I had oversight and managerial responsibility for common activities within these disciplines for the Electronics Systems ("ES") Sector.  In the 2000 through  2002 time frame, Doug Norton was the Manager of Process and Tool Development Support ("P&TDS") for the ES sector and

reported directly to me.  P&TDS performs engineering design automation ("EDA") work, which

includes electrical computer-aided design ("ECAD"), mechanical computer-aided design

("MCAD"), computer-aided software design, and other related fields of work.

      3.      In April 2001, Northrop Grumman acquired Litton Industries, Inc. ("Litton").  In

connection with this acquisition, I was informed by my management that Litton Advanced

Systems ("LAS"), one of Litton's business units, would be integrated into the ES sector to

achieve efficiencies.  Mr. Norton and I were responsible for the EDA integration.  As is common

with such integrations, this involved the restructuring and relocation of some positions and the

elimination of others.  While some LAS individuals were offered positions at the BWI facility,

others were not.

      4.      In October 2001, I met with Lisa A. Wolff, the EDA Manager at LAS to discuss

Ms. Wolff's then-current responsibilities as the EDA Manager at LAS, the business of the

P&TDS organization within the ES sector  at Northrop Grumman and the opportunities that

might be available to her.  I explained to Ms. Wolff that because Mr. Norton held the position as

Manager of P&TDS for the ES sector, that she would report to Mr. Norton, who in turn reported

to me.  I referred Ms. Wolff to Mr. Norton to discuss and determine her specific responsibilities

and duties.  Because of Ms. Wolff's skills and abilities, I informed her that she would be offered

a managerial position as a Band 3 Manager, and that her salary would remain what it was at

LAS.

      5.      I delegated to Mr. Norton the responsibility of determining the duties and

responsibilities of Ms. Wolff's position because it was Mr. Norton who ran the P&TDS

organization.  It is my understanding from Mr. Norton that he and Ms. Wolff met on a number of

2

occasions later in fall 2001 to discuss her skills and abilities. I was informed by Mr. Norton that

he had determined that Ms. Wolff would be offered a Manager position, with responsibility for

all ECAD work. Although this meant that she would not be responsible for some areas of work

that she had responsibility for in her position at LAS, such as MCAD work, I believe this was a

valuable and challenging position that was of critical strategic importance to the ES sector.

Given the depth and volume of ECAD work in the ES sector at Northrop Grumman, I believe

that the position offered to Ms. Wolff was comparable to the position she held at LAS.

6.      In early December 2001, I received a memorandum from Ms. Wolff, dated

December 5, 2001, in which she stated that she did not believe that the position she was offered

by Mr. Norton was "comparable" to the one that she held at LAS and that she wanted to meet

with me to discuss this. A copy of this memorandum is attached as <u>Exhibit 1</u> to this Declaration.

7.      Following Ms. Wolff's request, on December 11, 2001, Ms. Wolff, Mr. Norton,

Thomas Shaffer (a Northrop Grumman Human Resources Manager), and I met to discuss Ms.

Wolff's concerns. During this meeting, Ms. Wolff presented what she referred to as a "Stay

Agreement," indicated that she would not accept the position that she had been offered and,

because in her opinion it was "not comparable" to her LAS position, stated that she believed she

was entitled to six months of pay and benefits under the Stay Agreement. A copy of that

agreement is attached as <u>Exhibit 2</u> to this Declaration. The position offered to Ms. Wolff was

comparable  to the position that she held as Manager, EDA for LAS. Because of this, and

because I thought highly of her skills and abilities, along with Mr. Norton, I attempted to

persuade her to accept the position offered by Mr. Norton..

8.      After the December 11, 2001 meeting, Ms. Wolff contacted me to request that I assist her in facilitating the payment to her of the severance to which she felt she was entitled.  I reported this inquiry to Thomas Shaffer.  Ms. Wolff was not paid pursuant to the Stay Agreement because the position she was offered was comparable to the one she held at LAS.

9.      In approximately the October 2001 timeframe, Ms. Wolff  informed me that she had filed an internal grievance at Litton alleging that she had been subjected to sexual harassment while working at LAS .  Although I was aware of this internal complaint, it was in no way a factor in the determination of what position and/or duties would be offered to Ms. Wolff. I do not recall discussing with Mr. Norton the fact that Ms. Wolff had filed an internal grievance.


Pursuant to 28 U.S.C. § 1756, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on:  September 24, 2003

_____
Gloria Flach

Flach Exhibit 1                    **B.2**

# *NORTHROP GRUMMAN*

**Date:**        12/5/01

**To:**          Gloria Flach, Director

**From:**        Lisa Wolff, Manager

**Subject:**     Position Definition


In October, I contacted you regarding my desire to firm up the role I would play in your organization after December 31, 2001. I contacted you because you indicated you have the authority to define my position and to offer employment. After two discussions, you and I agreed on a position within Doug's organization, the position objectives and the compensation. You asked me to begin working closely with Doug and stated you would convey the details of our agreement to him.

The position you offered me included the following:

- Technical and budgetary aspects of the Hardware design flow, defined by you as the electrical and mechanical portion of the EDA environment

- Management of the LAS/NG merged EDA support staff involved with electrical and mechanical design tools and processes

- Vendor relationships for electrical and mechanical tools (usage contract negotiations, support contracts, purchases, etc.)

- Significant involvement with consolidating Litton and future companies into the Northrop processes and tools

- Developing solutions to address issues with the "Design Anywhere - Build Anywhere" concept with respect to the hardware design flow and delivery of product data to the manufacturing floors

Compensation was discussed during our October meetings. After disclosing my current salary, you indicated the position I would be filling would fall within a Band 3 Manager's position and that my current salary would be appropriate.

It was also understood from our discussions, that after December 31, 2001, I would no longer be responsible for managing the support effort and resources associated with: Systems Engineering, Software Engineering, SCM, SQA, CM, Reliability, Components Engineering, PDM (per Doug), CSM, etc., as these tasks were handled by other organizations. To limit breakage, it was agreed that I would assist with transitioning my current responsibilities to the appropriate organizations, including budget inputs, as the LAS environment is integrated into the Northrop structure. It was further understood that my new management responsibility

would be limited to the BWI facility/programs, thereby excluding my current technical and EDA budget oversight of the San Jose and Gaithersburg engineering facilities; no specific decision was made regarding my management of design automation for the Space group.

Within days of our discussions, I met with Doug to make absolutely sure the technical objectives, staffing responsibility, budgetary responsibilities, and compensation associated with my new position were in agreement (from Doug's perspective) with your position definition. My discussions with Doug included:

- Possible organizational structures (included a written chart (white board draft)) that further confirmed per our discussion (yours and mine), an alignment of electrical and mechanical support staff under myself.)
- A quick look at where Northrop and Litton EDA employees would most likely fall within the organization.
- The technical challenges I would encounter in mechanical and electrical design flows.
- The role I would play in helping Doug with processes and tools as they related to acquisitions.
- And an agreement that there would be further discussion on where it makes sense to manage PDM.

The content of my discussion with Doug indicated he agreed completely with the position defined above, with the exception of the inclusion of PDM.

Based on the conversations I had with you and Doug, I was confident that the primary components of my new position had been defined and an offer of employment beyond December 31, 2001 accepted on my part. Specifically, compensation, objectives, management and budget responsibility had been clearly defined and verbally agreed to by all parties. I accepted verbal agreements, since no formal documentation will be supplied to any Litton employee being integrated into the Northrop Grumman organization. I also felt that you and Doug were doing your bests to offer me a comparable position in the Northrop Grumman organization.

On 11/19, Doug and I had a discussion that leaves me with the impression the position I *accepted* is no longer his intention. The 11/19 discussion has prompted this memo and my request to meet with you and Doug immediately. The position changes Doug alluded to would further reduce my responsibilities. As we had discussed in October, I considered the position I accepted a dramatic reduction in the breadth and scope of my current position, but your enthusiasm and promise to challenge me encouraged my acceptance of your offer despite my apprehension. I no longer believe the position I will have in your organization will be one comparable to my current position.

I dealt in good faith with both you and Doug, feeling confident enough to terminate my search for employment outside of Northrop Grumman and to decline an EIT Project Management offer with a local company. I cannot state strongly enough the importance of this situation to me and to my family.

I request that we meet next week on Tuesday morning, as early as possible, to discuss this memo. I desire an explanation of why the position I accepted is no longer a tangible position. I would also like to know whether there is a comparable (or any) position available for me and establish, in written a format, the position responsibilities and compensation for that position. Please let me know whether you and Doug can support this meeting and my requests.

**Flach Exhibit 2**

**ℼℑℕℍ**

dvanced Systems

## OFFICE CORRESPONDENCE

File:                                          Date:    Jan 31, 2001

Subject:    Agreement to Stay

To:    Lisa  Wolff                             Copies to:

From:    Michael S. Gering

The future of Litton Advanced Systems, Inc. (LAS) and its business lies with key programs and key employees for those programs and the organization. As a way of expressing my commitment to you, I am willing to enter into the following agreement.

1.    If your employment with LAS is involuntarily terminated prior to January 1, 2002, LAS agrees to pay you, in addition to any other compensation then due, 1/2 of your then current annual base salary and six (6) months health insurance, provided that:

    a.    You continue to devote your best efforts on behalf of the company's business;

    b.    You have not resigned or been terminated for cause, and

    c.    In the event of a sale, merger or other business combination, you have not been offered by the successor company, a comparable position on similar terms and conditions.

2.    Any payment that is made under this agreement will be subject to normal payroll deductions and withholdings. This lump sum payment will be made in lieu of any and all other severance compensation from LAS. This payment will be made within ten (10) days after the date you are involuntarily terminated or as otherwise mandated by state law.

3.    You understand and agree that this letter agreement is not intended as, nor does it constitute employment for a specified term but rather is an agreement for monetary compensation only if and upon occurrence of conditions in paragraph 1 above.



EXHIBIT NO. 8
1-29-03
C. JARDIM

NG0008

**ton**

**vanced Systems**

Agreement to Stay ( page 2)

4.    You and I agree to keep this letter agreement and its terms in confidence. Accordingly, you agree to make no disclosures other than to your immediate family and attorney and/or advisor provided they are apprised of the need for confidentiality and of your obligations in this regard.

5    This letter contains the sole and entire agreement between you and LAS and supersedes any and all other agreements, understandings, or discussions relating to such matters.

If you concur with the above agreement, please sign and date below and return one (1) copy to me. This offer is valid for a period of thirty (30) days from the date of receipt

Please contact me if you have any questions regarding the above arrangement or if you would like to discuss this matter in greater detail.

ACCEPTED: _Lisa A. Wolff_

NAME: _Lisa A Wolff_

DATE: _2/1/01_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| LISA A. WOLFF,           ) | |
|                        ) | |
|     Plaintiff,          ) | |
|                        ) | |
|       v.              ) | CA No. L02-3932 |
|                        ) | |
| LITTON ADVANCED SYSTEMS,  ) | |
|     INC.                 ) | |
|          and           ) | |
|                        ) | |
| NORTHROP GRUMMAN SYSTEMS  ) | |
| CORPORATION          ) | |
|                        ) | |
|     Defendants.        ) | |

## DECLARATION OF DOUG NORTON

I, Douglas Norton, being duly sworn, do hereby declare as follows:

1.     I am currently the Manager of Process and Tool Development Support (P&TDS) for Northrop Grumman Corporation's ("Northrop Grumman") Electronic Systems ("ES") Sector at its Baltimore-Washington International Airport ("BWI") facility.  This is a Band 3 Manager position.  I have held this position since May 2000 and have been employed by Northrop Grumman in the Electronic Systems Sector, or its predecessors, since approximately July 1987.

2.     In April 2001, Northrop Grumman acquired Litton Industries, Inc. ("Litton").

3.     Northrop Grumman's ES Sector Process & Tool Development Support Department ("P&TDS") is responsible for acquiring, implementing and supporting product design automation technologies and initiatives throughout the Sector.  Included in P&TDS specialties are electrical design automation ("ECAD") and designated analysis tools, mechanical

design and designated analytical tools, ("MCAD"), engineering PC based tools, UNIX system administration, and Microsoft Windows system support for engineering tools. My budget as the ES Sector's Manager of P&TDS for the current fiscal year is approximately $20 million. In 2002, my budget was approximately $17 million and the portion of this budget attributable to Electrical Design Automation ECAD work was approximately $4 to $5 million.

4.    One of Litton's business units, Litton Advanced Systems, located in College Park, MD, performed generally the same type of work conducted by Northrop Grumman's ES Sector. At some time in approximately August 2001, I learned from my then-supervisor, Gloria Flach, who at the time was the Director of Software Engineering and Design Automation for the ES Sector, that as a result of Northrop Grumman's acquisition of Litton, we would be integrating Litton Advanced Systems ("LAS") into the ES Sector to achieve efficiencies between the two operations.

5.    In my position as Manager of P&TDS for Northrop Grumman ES, one of my responsibilities was to assist Ms. Flach in the integration of LAS into the ES Sector. Specifically, integrating Litton's Electronic Design Automation (EDA) department and related engineering tools and systems into Northrop Grumman's ES Sector engineering tools and systems.

6.    Because of her strong skills and abilities, Ms. Flach and I determined that Lisa A. Wolff would retain her management status and her salary and would be offered a management position within the ES Sector. Ms. Flach delegated to me the task of determining precisely what duties and responsibilities would be assigned to Ms. Wolff, based on the needs of the ES Sector.

7.      On numerous occasions starting in approximately October 2001, I met with Ms.

Wolff, who was the Manager of Electronic Design Automation for Litton Advance Systems to

determine what work she did for LAS and what role that she would have in the ES Sector

P&TDS department going forward.  Ms. Wolff's responsibilities at LAS included managing

LAS's Electrical CAD support efforts, Mechanical CAD support efforts, and product data

management ("PDM") support efforts, among other duties.

8.      During our meetings, Ms. Wolff and I discussed the possible areas of

responsibility that she would be assigned as a Manager in ES P&TDS department.  In at least one

of our earlier meetings, I explained to Ms. Wolff that at Northrop Grumman, PDM was not

performed in the ES Sector by Engineering, but instead was performed as part of Information

Technology ("IT") on behalf of Engineering.  Northrop Grumman has an assigned project liaison

lead, Bob Hosier, who oversees IT work efforts for Engineering.  I explained to Ms. Wolff that

because of that, PDM would not be part of her responsibilities as a Manager in P&TDS.  Ms.

Wolff expressed to me that she understood that as an ES Sector Manager, she would not have

responsibility for managing PDM work.

9.      During our conversations in the fall of 2001, Ms. Wolff expressed that she

understood that she would report to me.

10.     During at least one of the conversations between Ms. Wolff and myself, we

discussed the likelihood that she would be assigned the management responsibility for the ECAD

Team, as well as the possibility that she may also be assigned responsibility for the MCAD

Team.  I also told Ms. Wolff that I already had an advisory engineer leading the MCAD team,

but that I did not have anyone who was managing the ECAD team work efforts and future strategies.

11.     As a result of my meetings with Ms. Wolff and of my evaluation of the needs of the ES Sector, I decided that it would be best to have separate managers/team leads for the electrical and mechanical CAD teams.  I made this determination because of the large volume of work involved in each of these two distinct areas, because of the number of individuals working in each of these areas and because of the strategic importance of each of these areas to the ES Sector.  Essentially, because of the competitive importance of Electrical Design Automation to the ES Sector and because of its visibility to top management, it was my opinion that strategically, it would be best to have an individual manager dedicated solely to this portion for ES P&TDS.  Because the ES Sector had an individual who was already performing the MCAD leadership duties, Raphael Krigman, and because Ms. Wolff's significant skills and abilities are favorable in the Electrical Design Automation field, it made most sense to offer her the management position responsible for leadership of the ECAD team.

12.     As a result of this determination, in late-November, I offered Ms. Wolff the position of Manager, CAD/CAM Engineering.  A copy of the position description for this position is attached as Exhibit 1 to this Declaration.  In this capacity, Ms. Wolff was being offered a Band 3 Manager position, with responsibility for managing the Electrical Design Automation work efforts and strategies in the ES Sector.  This position has approximately 10 direct reports and is a core leadership position with strategic importance to the ES Sector.

13.     During this meeting, I explained to Ms. Wolff that there would be two distinct managers for Mechanical Design Automation ("MCAD") and Electrical Design Automation

("ECAD"). At the end of that meeting, it was my impression that Ms. Wolff had accepted the Manager position that I had offered her.

14.     During one of our conversations in fall 2001, Ms. Wolff informed me about the August telephone conference with Mr. Mazzo and that she had a grievance pending concerning that incident. I directed Ms. Wolff to the Human Resources ("HR") department of Northrop Grumman concerning this matter.

15.     My decision on the structure of the P&TDS department following the integration of LAS and specifically, of the position offered to Ms. Wolff and the duties described above, was made solely as the result of my evaluation of the needs of the ES Sector. I did not ever consider the fact that Ms. Wolff had a grievance pending concerning Mr. Mazzo in making my decision about what duties and responsibilities Ms. Wolff would be offered. No one at Northrop Grumman or Litton ever directed me to reduce or otherwise change the duties that I had determined were best suited for this position, as it was offered to Ms. Wolff. In addition, the fact that Ms. Wolff is a female was not a factor that I considered in reaching my decision about what position to offer her. I have no knowledge of Raphael Krigman, or any other employee doing Mechanical Design Automation work, allegedly not wanting to work for a woman or of hearing any rumor to that effect.

16.     In early December, I learned from Ms. Flach that Ms. Wolff did not want to accept the position that I had offered her. Ms. Flach provided me with a copy a memorandum from Ms. Wolff to Ms. Flach, in which Ms. Wolff stated that she did not consider the position that she had been offered to be "comparable" to the position that she held at LAS and that she wanted to meet to discuss whether a "comparable" position was available at Northrop Grumman.

17.    On December 11, 2001, Ms. Flach, Ms. Wolff and I met, along with Thomas Shaffer from Northrop Grumman's HR department, to discuss Ms. Wolff's memorandum and her questions about the position that she had been offered. At that meeting, Ms. Wolff presented a copy of a "Stay Agreement" that was dated January 31, 2001 and signed by Ms. Wolff on February 1, 2001. A copy of this agreement is attached as <u>Exhibit 2</u> to this declaration.

18.    In presenting the Stay Agreement, Ms. Wolff stated that because she believed the position she had been offered was "not comparable" to the one she held at LAS, she did not want to accept it and instead she wanted the six months of severance and benefits that she believed she was entitled to under the Stay Agreement.

19.    Although the position offered to Ms. Wolff did not cover the same range of duties that her position at LAS covered (i.e., she would not have responsibility for management of either PDM or MCAD work efforts), the position Ms. Wolff was offered in the ES Sector was responsible for significant depth of work in the Electrical Design Automation field given the type of work performed at ES and with an extensive user and client base and a large budget. This position was and is important to the strategic plan of the ES Sector, and was comparable to Ms. Wolff's position of Manager, EDA for LAS.

20.    I consider Ms. Wolff to be highly skilled and my opinion at the time that she was offered a position was that she would be a valuable member of the ES Sector and the P&TDS department. Because of this, I tried to convince Ms. Wolff numerous times of the importance of the position that we had offered her in an effort to persuade her to accept this position. After Ms. Wolff declined to accept this position, it was eventually filled by an individual, Bruce Mayer, who previously reported to Ms. Wolff at LAS, with some reduction in managerial duties.

21.    Following the Litton acquisition, David DeMay, who previously was a LAS employee, worked in P&TDS at Northrop Grumman.  During the time that he worked for Northrop Grumman, I never had any knowledge that Mr. DeMay was Ms. Wolff's nephew.  I was responsible for the assignments of Mr. DeMay as he transitioned to Northrop Grumman.  During his brief stay with Northrop Grumman, he was assigned to the Electrical Design Automation team supporting Litton legacy Web based tools and new work efforts at Northrop Grumman.  While at Northrop Grumman, he was taking day-to-day direction from Bruce Mayer.  To the extent that Mr. DeMay's duties differed at Northrop Grumman ES from those duties he had at LAS, that was solely because of the LAS integration into Northrop Grumman and the additional systems being used at Northrop Grumman.

Pursuant to 28 U.S.C. § 1756, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on:  September **25**, 2003

_____
Douglas Norton

# Exempt Position Description

**NORTHROP GRUMMAN**

| | |
|---|---|
| Position Code: S430M3 | Position Title: MANAGER, CAD/CAM ENGINEERING |
| Band Level:    3 | Division / Sector  Electronic Systems |
| Revision Date:  October 1, 1999 | Org. / Home Room  Design Engineering |

### Job Description

Conducts or participates in multidisciplinary research and collaborates with circuit designers and/or product line engineers in the design, development, and utilization of software to simulate the characteristics and parameters of integrated systems (IS) components, modules, or complete products under operating environment. Determines user needs; advises hardware designers on characteristics that affect software systems such as storage capacity, processing speed, and input/output requirements; designs and develops compilers and assemblers, utility programs, and operating systems including integrated graphic analysis.

### Job Scope

Typically 1st (technical or major program) or 2nd level (mgr. of mgrs). Major element, sub-discipline, several sub-elements or Product component/subsystem IPT.

### Knowledge and Technical

Advanced level of understanding in a specialized field or general understanding of several diverse disciplines. Involves a broad grasp of involved practices and procedures.

### Decision Making

Regularly requires analysis of alternative courses of action. May provide input to decision-making process on matters of larger scope. May integrate input from sub-ordinates and other functions. Makes decisions that directly affect a discipline/area.

Exercise of judgment is limited by policies affecting a specific department.

### Direct Work Involvement

Responsible for all projects assigned to the organizational unit. Advisor to primarily exempt employees. Helps meet established schedules or resolve technical or operational problems. Typically accomplishes results through subordinate level(s) of management.

### Policy Involvement

Establishes operating procedures that affect organization unit(s). Interprets, executes, and recommends modification to organizational policies.

### Financial Accountability

Administers budget, schedules and performance standards.

### Strategic Responsibility

Recommend changes and processes that affect business outcomes.

### Education and/or Experience Requirement

BS degree or equivalent experience in related field. Advanced degree preferred.

| *Bruce C. Weir* | · October 1, 1999 |
|---|---|
| *Manager, Total Compensation* | *Date Approved* |

12/13/2001  09:43  410-7653802          ENG MFG                PAGE  02

**ттол**

dvanced Systems

## OFFICE CORRESPONDENCE

File:                                        Date:     Jan 31, 2001

Subject:    Agreement to Stay

To:      Lisa Wolff                    Copies to:

From:    Michael S. Gering    G

The future of Litton Advanced Systems, Inc. (LAS) and its business lies with key programs and key employees for those programs and the organization. As a way of expressing my commitment to you, I am willing to enter into the following agreement.

1.  If your employment with LAS is involuntarily terminated prior to January 4, 2002, LAS agrees to pay you, in addition to any other compensation then due, 1/2 of your then current annual base salary and six (6) months health insurance, provided that:

    a.   You continue to devote your best efforts on behalf of the company's business;
    b.   You have not resigned or been terminated for cause, and
    c.   In the event of a sale, merger or other business combination, you have not been offered by the successor company, a comparable position on similar terms and conditions.

2.  Any payment that is made under this agreement will be subject to normal payroll deductions and withholdings. This lump sum payment will be made in lieu of any and all other severance compensation from LAS. This payment will be made within ten (10) days after the date you are involuntarily terminated or as otherwise mandated by state law.

3.  You understand and agree that this letter agreement is not intended as, nor does it constitute employment for a specified term but rather is an agreement for monetary compensation only if and upon occurrence of conditions in paragraph 1. above.

Wolff

EXHIBIT NO. 8
1-29-03
C. JARDIM

NG0008

FEB 07 '00 18:05                              410 7653802          PAGE.02

**ton**

**vanced Systems**

Agreement to Stay ( page 2)

4.   You and I agree to keep this letter agreement and its terms in confidence.
Accordingly, you agree to make no disclosures other than to your immediate
family and attorney and/or advisor provided they are apprised of the need for
confidentiality and of your obligations in this regard.

5    This letter contains the sole and entire agreement between you and IAS and
supersedes any and all other agreements, understandings, or discussions relating
to such matters.

If you concur with the above agreement, please sign and date below and return one (1)
copy to me. This offer is valid for a period of thirty (30) days from the date of receipt

Please contact me if you have any questions regarding the above arrangement or if you
would like to discuss this matter in greater detail.

ACCEPTED: _Lisa A. Wolff_

NAME: _Lisa A Wolff_

DATE: _2/1/01_

NG0009

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore Division

| | |
|---|---|
| LISA A. WOLFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CA No. L02-3932 |
| | ) |
| LITTON ADVANCED SYSTEMS, INC. | ) |
| and | ) |
| | ) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF THOMAS SHAFFER

I, Thomas Shaffer, being duly sworn, do hereby declare as follows:

1.      I am currently the Director of Human Resources for Engineering and Manufacturing of the Electronic Systems Sector of Northrop Grumman Corporation ("Northrop Grumman") and have served in this position since July 1999.  I have been employed by Northrop Grumman and its predecessors in other capacities since July 1975.

2.      Northrop Grumman is an equal opportunity employer, with policies and procedures that prohibit discrimination and harassment, including sexual harassment, gender discrimination and retaliation.  Copies of Northrop Grumman's Equal Employment Opportunity, and Harassment policies are attached as Exhibits 1 and 2 to this Declaration.  Through these policies, Northrop Grumman notifies its employees that harassment, discrimination of any type, and retaliation are not permitted or tolerated and of the internal process for filing a complaint.

Pursuant to 28 U.S.C. § 1756, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on:  September 22, 2003

_____
Thomas Shaffer

Shaffer Exhibit 1

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| NORTHROP GRUMMAN | Procedure No: H111 |
|---|---|
| **Electronic Sensors and Systems Sector** | Page 1 of 9 |
| **Subject:** *Equal Employment Opportunity Policy - Affirmative Action* | Date: <br> Rev: |

| | |
|---|---|
| **Supersedes:** | Command Media Procedure H111, Equal Employment Opportunity Policy - Affirmative Action, Revision A, dated April 26, 1999 |
| **Process Owner:** | Manager, Affirmative Action/EEO/Diversity |
| **Purpose:** | To describe ES$^3$'s Affirmative Action procedures, including all aspects of the employment relationship, including application and initial employment, promotion and transfer, selection for training opportunities, wage and salary administration, and the application of service, retirement, seniority, and employee benefit plans. |
| **Applicability:** | All Electronic Sensors and Systems Sector (ES$^3$) locations |

## Definitions

ADA - Americans with Disabilities Act

EEOC - Equal Employment Opportunity Commission

MCHR - Maryland Commission on Human Relations

OFCCP - Office of Federal Contact Compliance Programs

## Principles

It is the continuing policy of Northrop Grumman Corporation to afford equal employment opportunity to qualified individuals without regard to their race, color, religion, sex, national origin, age, disability, veteran status, or sexual orientation. This policy of equal opportunity comprehends all aspects of the employment relationship, including but not limited to recruitment, layoffs, hiring, transfers, training, promotions, compensation, and benefits.

Underlying this policy is the recognition by Northrop Grumman Corporation that its continued growth and business success depends on the development and utilization of the full range of the nation's human resources.

| |
|---|
| Procedure No.: H111 |
| Page 2 of 9 |
| Date: August 16, 2000 |
| Rev. B |

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

## Objectives

- To carry out one aspect of the Company's citizenship responsibility by providing equal opportunity for employment to all qualified applicants from all segments of the population.

- To implement the Northrop Grumman Creed by providing equality of opportunity for self-development and advancement to all qualified employees and to treat all employees fairly in all employment relationship decisions.

- To maintain realistic job-related standards in keeping with the efficient and successful operation of the business and, at the same time, affirmatively seek qualified individuals from the full spectrum of human resources available to each employing location.

- To provide all employees with the maximum feasible opportunity for upward movement to utilize their highest skills, aptitudes, and abilities in their work and to encourage them to accept such opportunities as are provided.

- To work with such community, state, and national groups as will help the Company maintain equality of employment opportunities.

- To ensure managers and all other employees at all locations comply with both the spirit and intent of federal, state, and local legislation, government regulations, and executive orders providing for equal employment opportunity.

## Process

The maintenance of the following condition is required at all locations to create a climate that permits the continuing application of this policy on a consistent basis among all applicants for employment and employees.

- Develop and implement written affirmative action plans in conformance with applicable laws and/or regulations.

## State and Federal Enforcement

Charges of alleged discrimination may be filed by Company employees, prior employees, and applicants for employment with outside investigative agencies (EEOC, MCHR, OFCCP); or agency representatives may, of their own accord, initiate discrimination charges. Subsequent to the filing of a charge, the Commission may hold a fact-finding conference as part of its investigative process and issue a determination of cause or no cause, if the case is not settled between the parties prior thereto.

A charge may be administratively closed prior to, or subsequent to, a determination because lack of jurisdiction by the Commission, the employee fails to cooperate after filing the charge, or the employee withdraws the charge.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

Procedure No.: H111
Page 3 of 9
Date: August 16, 2000
Rev. B

After its investigation, the Commission will issue a determination as noted above. Although EEOC and MCHR have subpoena power, none of the agencies have power to require a Company to act on/or refrain from acting on an employment decision. Only a court of law has that power.

Cases filed at the MCHR will proceed to public hearing and then to Circuit Court if not resolved administratively. Those employees who file charges at EEOC will receive a right-to-sue notice that allows them to take the issue directly to Federal District Court if EEOC chooses not to do so.

## Major Employment Discrimination Laws

### Legal Restrictions on the Employment Relationship

Nearly all aspects of employment are restricted in one way or another by federal, state, local laws, or regulations. As a member of Northrop Grumman management, it is necessary to understand that nearly every decision you make about one or more of your employees should be made with the following provisions in mind. The most important statutes involving equal employment opportunity which are federal in nature are *The Civil Rights Act of 1964*, as amended in 1972, establishing the EEOC under Title VII, and Executive Order 11246 which established the OFCCP. It is important to understand that these statutes are of limited jurisdiction and cover only certain forms of discrimination. These are, however, supplemented by numerous other federal, state, and local statutes which may restrict similar as well as different forms of employer action.

### Title VII

When Congress adopted Title VII of *The Civil Rights Act of 1964*, it made the avowed objectives of the Federal Government to eliminate all employment discrimination based on race, color, religion, sex, national origin, age, or physical or mental disability in all industries affecting interstate commerce.

It imposed upon employers, labor unions, and employment agencies a new set of obligations. It gave employees, job applicants, and members of minority groups new rights, and it set up machinery for enforcing those rights. It created complex federal-state relationships in the enforcement of its provisions. Such relationships gave the states an incentive to enact their own fair employment practice laws where they did not already have them.

The key to the administration of Title VII is a five-member EEOC that performs its tasks through a system of formal and informal remedial procedures, with the emphasis on efforts to obtain voluntary compliance.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| Procedure No.: H111 |
| --- |
| Page 4 of 9 |
| Date: August 16, 2000 |
| Rev. B |

### What It Means to Employers

The basic obligations imposed upon employers under the law are set out in section 703a. Under this section, it is an unlawful employment practice for an employer to do any of the following:

- to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his/her compensation, terms, conditions, or privileges of employment because of his/her race, color, religion, sex, national origin, age, or physical or mental disability

- to limit, segregate, or classify employees in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his/her status as an employee because of race, color, religion, sex, national origin, age, or physical or mental disability

### Exceptions

These are the basic unlawful employment practices for employers. There are a number of exceptions. The prohibitions, for example, do not apply where:

- religion, sex, national origin, age, or physical or mental disability is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise

- the employer is subject to a government security program and the persons involved do not have security clearance

- the different standards of compensation or terms and conditions of employment are applied pursuant to a bona fide seniority system, a merit system, or a system that measures earnings by quantity or quality of production, or they result from the fact that the employees work in different locations

- the employer acts upon the results of a professionally developed ability test that is not designed or intended to be used to discriminate

- differentiations in pay based on sex are authorized under the provision of the *Equal Pay Act of 1963*

### Training Programs

It also is an unlawful employment practice to discriminate against any individual because of his/her race, color, religion, sex, national origin, age, or physical or mental disability in admission to or employment in any apprenticeship, training, or retraining program. This applies to employers, labor unions, or joint labor-management committees.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| Procedure No.:  H111 |
|---|
| Page 5 of 9 |
| Date:  August 16, 2000 |
| Rev. B |

### Retaliation, Advertising

There are two other unlawful employment practices applicable to employers, along with employment agencies and unions.  The first relates to retaliation against those who seek to invoke the law's processes.  It is unlawful employment practice to discriminate against any employee or job applicant because he/she has opposed any unlawful practice under the act or because he/she has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing.

It also is unlawful to print or publish any employment notice or advertisement that indicates any preference, limitation, specification, or discrimination based on race, color, religion, sex, national origin, age, or physical or mental disability.  Here again, there is an exception where religion, sex, or national origin, age, or physical or mental disability is a bona fide occupational qualification for employment.

### Employment Imbalance

Although the law forbids employers to discriminate in employment on the basis of race, color, religion, sex, national origin, age, or physical or mental disability, it does not require them to take affirmative steps to rectify an already existing imbalance in the work force.  **Nothing in the law, as it is stated, shall be interpreted to require an employer to grant preferential treatment to any individual or group because of imbalance** that may exist with respect to the total number or percentage of persons of any race, color, religion, sex, national origin, age, or physical or mental disability already employed.  The same is true with regard to apprenticeship and training programs.

### What It Means to Employees

The purpose of Title VII is to protect employees against any discrimination involving the employment relationship that is based on race, color, religion, sex, national origin, age, physical or mental disability, or veteran status.  **The protection extends far beyond the mere act of hiring.**  Subject to the exceptions already noted above, employees and applicants for employment are protected against the following where the action is based on race, color, religion, sex, national origin, age, physical or mental disability, or veteran status.

- A refusal by an employer to hire or a refusal by an employment agency or labor union to refer for employment.

- Discrimination with respect to compensation, terms, conditions, or privileges of employment.

- Limitation, segregation, or classification by an employer in such a way as to deprive or tend to deprive them of employment opportunities or otherwise adversely affect their status as employees.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| | |
|---|---|
| Procedure No.: H111 |
| Page 6 of 9 |
| Date: August 16, 2000 |
| Rev. B |

- Discrimination by employers, labor unions, or joint labor-management committees in admission to or employment in apprenticeship, training, or retraining programs.

- Discriminatory classifications or referrals by employment agencies.

- Exclusion or expulsion from membership or other discriminatory treatment by a labor union.

- Limitation, segregation, classification of membership, or classification or failure or refusal to refer for jobs by a labor union in any way that would deprive or tend to deprive them of employment opportunities, limit their employment opportunities, or otherwise adversely affect their status as employees or applicants for employment.

### Enforcement of Rights

The procedure that an aggrieved employee or job applicant may invoke for the protection of his/her rights under Title VII basically is the filing of a charge of discrimination, but this varies, depending on whether the state in which the alleged violation occurred has a fair employment practice statute of its own. Maryland has such a statute, Article 49B of the *Maryland Annotated Code*, and as such, the procedure would be as designated below:

1. At the outset, an aggrieved individual may not file a charge with the **EEOC until 60 days after the beginning of the proceedings under state or local law**, unless such proceedings already have ended.

2. If a charge is filed by a member of EEOC, the state or local officials must be notified and then afforded a reasonable period of time of not less than 60 days, unless a shorter period is requested, to act on the charge under the state or local law.

3. **The deadline for filing a charge with the EEOC in these cases is 300 days after the alleged unlawful practice occurred or 30 days after receiving notice that the state or local agency has ended its proceedings, whichever is earlier.** Once the charge is submitted, an agency investigation is conducted to determine if, in fact, discrimination did occur. The agency will maintain authority over the charge until it is resolved, either in favor of the complainant or the employer, or until settlement is reached.

### Retaliation, Pattern Cases

There are two other enforcement provisions that affect the rights of employees and job applicants. One makes it unlawful to discriminate against any employee or job applicant because he has opposed any unlawful practice under the Act or has filed a charge, testified, assisted, or participated in an investigation, proceeding, or hearing.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| | |
|---|---|
| Procedure No.: H111 |
| Page 7 of 9 |
| Date: August 16, 2000 |
| Rev. B |

The other provision, Section 707, authorizes the Attorney General to file an injunction action where he/she/ has reasonable cause to believe that any person or group is engaged in a pattern or practice of resistance to full employment of the rights protected by Title VII, and that the pattern or practice is of such a nature, and is intended to deny the full exercise of those rights. There is no deferral to state or local agencies in such cases.

According to Section 709, nothing in Title VII exempts or relieves any person from any liability, duty, penalty, or punishment provided by any present or future state or local law, except where such law purports to require or permit an action that would violate the Federal Act.

## Executive Order 11246

Pursuant to *Executive Order 11246*, the OFCCP was established under the Department of Labor and charged with the responsibility of determining compliance status of government contractors. OFCCP conducts compliance reviews. Compliance reviews by OFCCP are stimulated in several ways

- Prior to the awarding of a Federal contract to a government contractor, the awarding agency/department must contact OFCCP to determine the contractor's compliance status under the Executive Order. OFCCP may then conduct a compliance review. After approval is received from OFCCP, the contract can then be awarded to the contractor.

- A compliance review can be stimulated by an individual charge of discrimination or by a class of employees alleging discrimination.

- A compliance review can be stimulated by direction from the national or regional OFCCP offices. When a company or industry is identified in this manner, they are referred to as a "Targeted Industry or Company". When targeting companies or industries, OFCCP utilizes the following set of criteria:

  * Is the industry a growth industry?

  * Is the company a growing company, or does it anticipate growth?

  * What is the past compliance review history of the company or industry?

Compliance reviews are all encompassing and include review of the Affirmative Action Plan that the Executive Order requires for minorities and females as well as the Affirmative Action Plans for individuals with disabilities and Vietnam Era and Disabled Veterans. The review focuses on all aspects of a company's policies, procedures, and practices. Emphasis is placed on the underutilized areas, deficiencies, and the extent to which good faith efforts have been executed to achieve projected employment goals.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

Procedure No.: H111
Page 8 of 9
Date: August 16, 2000
Rev. B

Copies of the Affirmative Action Plan are available for management review by contacting our Vice President of Human Resources and Administration or the Affirmative Action Office.

Should a deficiency be identified by OFCCP during the compliance review process, OFCCP will attempt to settle the issue with the government contractor through a conciliation agreement. If this effort fails, OFCCP will then enter into administrative or judicial enforcement proceedings to enforce the order, seek appropriate relief, or impose appropriate sanctions. These sanctions can include cancellation or suspension of government contracts and disbarrment from any future government contracts.

### The Age Discrimination in Employment Act

*The Age Discrimination in Employment Act* prohibits discrimination on account of age (ages 40 and older) by employers with twenty or more employees and is enforced by the EEOC. Employees who feel that an employment decision was made taking age into account in violation of the Act could file a discrimination charge at the local EEOC office.

### The Rehabilitation Act of 1973

Section 503 of the *Rehabilitation Act* prohibits discrimination in employment against qualified individuals with disabilities. Similarly, Section 402 of the *Vietnam Era Veterans Readjustment Act of 1974* prohibits discrimination against qualified disabled veterans and veterans of the Vietnam era.

Employment decisions made on the basis of anything other than present ability adequately to perform the job without risk to co-workers and the public are subject to attack. In addition, both federal and state enforcement agencies interpret these regulations as requiring that before a determination is made on whether a particular disabled individual is qualified for a job, *reasonable accommodation* for his or her disability be considered. What is a *reasonable accommodation* depends upon each specific case. Employees who feel that an employment decision was made taking disability into account in violation of one of these statutes could file a discrimination charge at the EEOC or the MCHR.

### Americans with Disabilities Act (ADA)

Title I of the ADA prohibits discrimination in employment against a qualified individual with a disability and took effect on July 26, 1992. The ADA requirements are in addition to those of the *Rehabilitation Act of 1973*, which requires government contractors to agree not to discriminate against, and to undertake affirmative action to employ and advance individuals with disabilities.

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| | |
|---|---|
| Procedure No.: H111 |
| Page 9 of 9 |
| Date:  August 16, 2000 |
| Rev. B |

## Maryland Human Relations Law

Article 49B of the *Annotated Code of Maryland* prohibits employers from discriminating against employees on the basis of race, color, sex, religion or creed, national origin, ancestry, marital status, or physical or mental disability which is unrelated in nature and extent to ability to perform the job.  The statute established the MCHR that enforces the Act and investigates charges of alleged violations.

## Responsibilities

**Corporate Vice President and President, Vice Presidents and General Managers** - responsible for measuring progress and ensuring that effective equal opportunity and affirmative action programs and practices are developed and implemented within their areas of responsibility.

**Management** - Every member of Northrop Grumman management at all levels is held accountable for carrying out this policy within his/her area of responsibility.

**Site** - Each location of the Corporation is responsible for obtaining and utilizing up-to-date information regarding applicable state and local laws, and for designation, in writing, one individual as coordinator of its equal employment opportunity program.

## References

**Corporate Procedure**

H104, *Equal Opportunity and Affirmative Action Plans*

**Other**

*Age Discrimination in Employment Act*

*Americans with Disabilities Act (ADA)*

*Equal Pay Act of 1963*

*Executive Order 11246*

*Annotated Code of Maryland, Article 49B, Discrimination in Employment*

*Rehabilitation Act of 1973*

*The Civil Rights Act of 1964, as amended and Title VII*

Shaffer Exhibit 2

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION.
VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

| NORTHROP GRUMMAN | Procedure No: H113 |
|---|---|
| **Electronic Sensors and Systems Sector** | **Page 1 of 3** |
| **Subject:**  *Sexual Harassment* | **Date:**  **Rev:** |

| **Supersedes:** | Command Media Procedure H113, Sexual Harassment, Revision -, dated December 9, 1998 |
|---|---|
| **Process Owner:** | Manager, Affirmative Action/EEO/Diversity |
| **Purpose:** | To unequivocally state ES$^3$ policy regarding sexual harassment and the requirements that must be implemented to carry out this policy. |
| **Applicability:** | All Electronic Sensors and Systems Sector (ES$^3$) locations |

## Definition

Sexual Harassment - unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:

- submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual

- such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

## Principles

It has been a long-standing policy of Northrop Grumman that every employee will be treated fairly, with consideration and respect. As a result of the increasing recognition by employees of their right to be free from sexual discrimination, their expectation of fair treatment has come more and more to include the absence of sexual harassment.

The Equal Employment Opportunity Commission states in its *Guidelines on Discrimination Because of Sex* that sexual harassment is an unlawful employment practice. The Commission also states that an employer will be held unconditionally responsible for the acts of its supervisors where sexual

ONLY THE ONLINE SYSTEM HAS CURRENT VERSION. VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE.

Procedure No.:  H113
Page 2 of 3
Date:  August 16, 2000
Rev.  A

harassment is proven and can be liable for acts of sexual harassment by other employees and non-employees as well.

Northrop Grumman recognizes sexual harassment as intolerable and a form of illegal discrimination.  It is company policy to provide a work environment that is free from sexual harassment, and we intend to aggressively adhere to this policy. All claims of sexual harassment shall be promptly and thoroughly investigated and corrective action taken as warranted which may include disciplinary action, up to and including immediate termination.

## Process

| Employee | Supervisor | Human Resources | Law Department |
|---|---|---|---|
| Reports Complaint To Supervisor | Listens Carefully And Takes Notes | Investigates The Complaint And Notifies The Law Department | Reviews And Provides Guidance For The Investigation Of The Complaint |

| Human Resources | Law Department/Management | Management | Human Resources |
|---|---|---|---|
| Reviews Results Of Investigation With Law Department And Management | Determines Disciplinary Action, If Complaint Is Substantiated | Implements Disciplinary Action | Notifies Complainant If Complaint Cannot Be Substantiated |

The following process shall be followed at each location within ES$^3$ to create a climate that will ensure the continuing application of this policy on a consistent basis among all employees:

- Communicate to all employees that sexual harassment is prohibited by Corporate as well as ES$^3$ policy, that a complaint procedure exists for reporting sexual harassment, and that management will promptly investigate alleged incidents of sexual harassment and take appropriate corrective action.

- Establish a special complaint procedure, which includes the following principles:

  * Complaints are to be reported to specifically designated members of the Human Resources Department or to line management.  Complaints may be reported in confidence.

  * The Human Resources representatives or line management are to immediately contact the Labor and Employment Law Department for an initial review and guidance concerning the investigation of the complaint. Complaints shall be promptly, thoroughly and fairly investigated. Investigations are to be designed to protect the privacy of all parties concerned.   All investigations shall be fully documented including an indication of what final action was taken.

| ONLY THE ONLINE SYSTEM HAS CURRENT VERSION. VERIFY COPY AGAINST ONLINE SYSTEM BEFORE USE. | Procedure No.: H113<br>Page 3 of 3<br>Date: August 16, 2000<br>Rev. A |
| --- | --- |

* Substantiated claims are to be dealt with decisively by the administration of appropriate corrective action.

- Document all matters related to complaints including contents of meetings, interviews, results of investigations and all other actions attendant to claims of sexual harassment. Assure all documentation is maintained and processed in accordance with the Corporate *Directive H403, Privacy of Employee Information*.

## Responsibilities

**Human Resources Management** - along with other managers with designated personnel administration authority have the responsibility to:

- communicate this policy to all employees and inform them of their rights and responsibilities

- investigate all complaints involving alleged violations of the policy and recommend corrective action

- maintain records of complaints and ensure that all complaints and subsequent investigations and disciplinary actions are treated in a confidential manner and in accordance with corporate policy.

**Management** - All members of management, at all levels, shall be accountable for carrying out this procedure within their area of responsibility.

**Manager, Affirmative Action/EEO** - responsible for procedure implementation throughout ES$^3$.

## References

**Corporate Procedure**

*H403, Privacy of Employee Information*

*H410, Sexual Harassment*

**Other**

*Guidelines on Discrimination Because of Sex,* Equal Employment Opportunity Commission

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| LISA A. WOLFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CA No. L02-3932 |
| | ) |
| LITTON ADVANCED SYSTEMS, | ) |
| INC. | ) |
| and | ) |
| | ) |
| NORTHROP GRUMMAN SYSTEMS | ) |
| CORPORATION | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF WILLIAM WHITE

I, William White, being duly sworn, do hereby declare as follows:

1.     I am currently the Human Resources Manager for Northrop Grumman's Space Technology and Services Division, which is part of its Electronic Systems Sector.  I was previously the Human Resources Manager for Litton Advanced Services ("LAS"), which was a business unit of Litton Industries, Inc. ("Litton")  In this capacity, I have access to employment records of current and former Litton employees.

2.     Lisa A. Wolff previously worked for LAS.  Her last date of employment with Northrop Grumman, which acquired Litton in 2001, was Friday, February 8, 2002.

3.     Christine Wolff was employed by LAS periodically as a part-time employee from Monday, August 19, 1996 until Friday, June 21, 2002.

Pursuant to 28 U.S.C. § 1756, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on:  September 23, 2003

William White