# SUMMARY JUDGMENT EXHIBITS

SJ Exhibit 1

**Litton**
Amecom

5115 Calvert Road
College Park, Maryland
20740-3898

301 864-5600
TWX 710-826-9650
FAX 301-864-5955

20 April 1988

Ms. Lisa A. Wolff
1110 Commanders Way S.
Annapolis, MD 21401

Dear Ms. Wolff:

Thank you for taking the time to visit with us to discuss employment opportunities with Litton Amecom. We hope the people you met were able to impress upon you the technical challenges available within our company. We found your background and qualifications to be compatible with our needs and believe you could make an outstanding contribution to our team.

Therefore, we are pleased to offer you a position as Associate Member, Technical Staff reporting to Mr. Steve Shephard at a salary/rate of $13.95 per hour.

Your annual benefits will include 12 days vacation, 8 days sick leave, 11 paid holidays, employer paid health and dental insurance, plus other benefits as described to you at the time of your interview. Our standard working hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday.

Enclosed is a copy of our Employee Proprietary Information and Invention Agreement which you are required to sign the date you start with Amecom. Additionally, enclosed is an I-9 form required by the Immigration & Naturalization Reform Act of 1986. Please fill in the top portion and bring required proof of citizenship as outlined on the I-9 on your first day of employment. It is essential that we witness the original documents before you can be put on the payroll.

Employment is contingent upon Amecom receiving a negative drug screening certificate with a copy of the applicable test results from your physician prior to the date of hire. During the interview process you signed a Drug Screening Consent form which we have enclosed (in duplicate.) Prior to entering employment with Amecom, you must make arrangements with a licensed physician or Amecom's medical consultant to arrange for a drug screening. You should allow a minimum of ten (10) working days (excluding weekends) for your consent form to reach Amecom. Please call 301-454-9882 to confirm that we have received your consent form four days prior to the start date. Amecom will reimburse up to a maximum of $75.00 after start of employment.

20 April 1988

We are pleased with the prospect of your joining our Company; but, we recognize that a satisfactory employment relationship is one which exists by mutual agreement. While you will retain the right to terminate your employment with our Company at any time for any reason, should you elect to accept our offer, the Company also retains the right to terminate such employment at any time for any reason. This offer is contingent upon verification of current/previous employment.

We believe you will find employment with Litton Amecom to be a challenging and rewarding experience and we look forward to your favorable response. Please indicate your acceptance of this offer by signing the enclosed copy where indicated and return it to Human Resources.

If you have any questions regarding the offer or relating to our policies, please contact me at your convenience.

Very truly yours,

Litton Systems, Inc.
Amecom Division

Matt Ludlow

Matt Ludlow
Senior Employment Representative

Enclosure

I accept your offer of employment and expect to report to work on ____________

______________________ Name

______________________ Date

SJ Exhibit 2

Northrop Grumman
Litton Advanced Systems
5115 Calvert Road
College Park, Maryland
20740-3898

301 864-5600

Depo. Exh. # 10
Steven J. Haight, Notary Public
Date 8-29-03

# OFFICE CORRESPONDENCE

File:

Date: Oct. 1, 2001

Subject: Lisa Wolff

To: For the Record

Copies to: T. Edwards
G. Schechtel

From: Michael S. Gering

Relative to the case of the grievance filed by Lisa Wolff against Steve Mazzo.

After a thorough investigation conducted by Tim Edwards, I ascertained that the facts, as contained in Ms. Wolff's statement, were ratified by Mr.'s Peter's and Roth. I determined a satisfactory action was as follows:

- 1 week off without pay
- mandatory attendance at an anger management course
- A full letter of apology from Mazzo to Wolff
- A letter in Mazzo's personnel file stating that any future event such as this or any retaliation on his part will result in his termination.

At a subsequent telecon with Kathe Vagt, ESS HR Legal Counsel, she concurred with my recommendation, as appropriate. While the Executive Director, HR concurred with this recommendation; his original recommendation was two weeks of suspension without pay.

When I presented this recommendation to John Chino for ratification and action, his reaction changed it to:

- Attendance at an Anger Management Course
- A verbal discussion with Mr. Mazzo

To date, my final date of unemployment at Northrop Grumman, I am unaware of the actions taken by the sector with regards to Mr. Mazzo.

SJ Exhibit 3

# US-MD-Montgomery County-Senior Architect

MIC (www.micinc.com), an e-Business solutions provider with over fifteen years of success in building IT systems has immediate opportunity for a Senior Architect working with Webshpere and UML. This is a local full time position. Our current client base includes Fortune 1000 companies.

Minimum requirements for this position are as follows: 5 years of IT design and architecting experience, client consulting, BA/BS or higher, understanding of e Business and Internet solutions, Designing and Developing Internet, Intranet, and Extranet solutions.

Submit your resumes to Diana Smith at systemswork@micinc.com. Visit our corporate website at http://www.micinc.com/

** Please Note: Currently, MIC is not able to provide H1 sponsorship or transfers. **

## Additional Information

**Position Type:** Full Time
**Ref Code:** Senior Architect

## Contact Information

Diana Smith
systemswork@micinc.com
MIC
2800 South Shirlington Road, Suite #801
Arlington VA 22206
Ph: 703-845-5800 ext 519
Fax: 703-671-4260

Click here to see all "MIC" opportunities

EMAIL THIS JOB TO A FRIEND

Learn more about "MIC"

**APPLY ONLINE**



## Additional Information

**Salary:** $100,000.00 to $140,000.00 per year
**Position Type:** Full Time, Employee
**Ref Code:** Visionary

## Contact Information

Peter Kennedy
pkennedy@betatechinc.com
BetaTech
344 Maple Avenue West, Ste. 182
Vienna VA 22182
Ph: (703)276-0039
Fax: (703)276-1666

Click here to see all "BetaTech" opportunities

EMAIL THIS JOB TO A FRIEND

Learn more about "BetaTech"

**APPLY ONLINE**



Search Agents

- Home
- Job Search
- Search Agents
- Resumes
- Profiles
- Advice
- Communities
- Company Research
- For Employers
- Help
- Logoff

## Summary

| | |
|---|---|
| **Company Name:** | |
| **Job Title:** | CHIEF INFORMATION OFFICER |
| **Job Status:** | Full-time Permanent |
| **Job Code:** | 165277011026 |
| **Industry:** | Other |
| **Job Function:** | Executive / Management |
| **Job Division:** | CHIEF |
| **Education:** | Other |
| **Years Experience Desired:** | Not Listed |
| **Salary:** | Not Listed |
| **Location:** | Baltimore, MD |
| **Contact E-Mail:** | Not Listed |
| **Contact Information:** | Not Listed |
| **Date Posted:** | 11/11/01 |

## Full Text

,14,1 CHIEF INFORMATION OFFICER

The Space Telescope Science Institute is seeking a Chief Information Officer, who will have overall responsibility for the Institute's computing, networking, and information services. The CIO provides leadership for Institute information and computing services and manages a technical staff of approximately 60 people with an annual procurement budget of $1M servicing the needs of 500 staff and 1000 computers. The position is in the Director's Office, and the CIO reports to the Director of the Institute.

The Institute runs the science operations for the Hubble Space Telescope. Located on the Homewood campus of the Johns Hopkins University, it is part of the Associated Universities for Research in Astronomy (AURA), a non-profit corporation to operate national astronomical observatories. It carries out its mission under contract to NASA. As such, the CIO is responsible to keep the Institute compliant with NPG 2810.

The Institute's operational systems currently include those for the Hubble Space Telescope and will include those for the Next Generation Space Telescope, which is under development. The Institute's computers include operational systems for spacecraft, database systems to manage data from several scientific missions, developmental systems for the engineering staff to develop new software, scientific computing systems to support the approximately 100 scientists doing active research, and administrative and business systems. The Internet and the World Wide Web play a critical role in delivery of data and information in the Institute's work.

Candidates for the CIO position should demonstrate an understanding of the special needs of academic researchers in addition to familiarity with standard business and technical systems. A broad knowledge of commercial vendors of custom software is highly desirable. Significant experience managing IT services in a research environment is a plus.

AURA offers an excellent benefits package, including 24 vacation days per year, competitive salaries, and a stimulating work environment.

The Institute is committed to maintaining a diverse atmosphere and strongly encourages applications by women and minorities. Applicants should send a curriculum vitae and names of references to the address below by November 27, 2001.

Space Telescope Science Institute

Attn: Human Resources

3700 San Martin Drive

Baltimore, MD 21218

Visit our website @ www.stsci.edu.

EEO/M/F/D/V

**Return to Agent Inbox**

**About Us** | **Jobs at WPNI** | **Contact Us**
**Legal Disclaimer** | **Privacy Policy**
**©Copyright 2001 The Washington Post Company**

washingtonpost
Home News OnPolitics Entertainment Live Online Camera Works Marketplace
Personalize Your Post | Go to mywashingt...
Washington



## US-MD-Baltimore-Chief Technology Officer

Goucher College invites applications and nominations for the position of Chief Technology Officer. The Chief Technology Officer reports to the President and provides managerial and strategic leadership for the College's information technology services, including academic and administrative computing, campus networking, and instructional services. The successful candidate will supervise and oversee all technology issues on campus and lead an initiative to evaluate and centralize technology at Goucher College.

Founded in 1885, Goucher College is a selective, coeducational liberal arts college located on a beautiful 287-acre wooded campus just north of Baltimore. With an enrollment of more than 1,700 students, Goucher offers undergraduate degrees in eighteen departments and five interdisciplinary areas and has master's degree programs in arts administration, creative nonfiction, historic preservation, education, and teaching.

Primary responsibilities include:
·providing vision and leadership for use of information technology
·interacting effectively with faculty, trustees, staff, students, and external constituencies in a collaborative way
·fostering a collegial and consultative environment
·developing and implementing plans for meeting information technology needs
·allocating information technology resources to achieve a high level of user satisfaction and prudent use of college financial resources
·ensuring the reliable operation of all systems

Requirements for this position include:
·a combination of education and experience that demonstrates a knowledge of the broad issues of information technology
·significant ability in managing complex organizations, strategic planning, fiscal planning, and staff development
·superior administrative and organizational skills
·an open and collaborative style of leadership
·strong decision-making skills
·excellent written and oral communication skills
·outstanding interpersonal skills
·a minimum of five years of relevant management experience
·a substantial knowledge of micro-computing and mainframe hardware, software, operating systems, and program languages
·an advanced degree
·knowledge of higher education and the purpose of a liberal arts education

Review of applications will begin January 7, 2002, and will continue until the position is filled. Candidates should submit a letter of application, a curriculum vitae, and the names and contact information of three references to the address below.

## Additional Information

**Salary:** $0.00 to $0.00 per year
**Position Type:** Full Time

301 296 2362

## Contact Information

Kathy Farnsworth, Chair
kfarnswo@goucher.edu
Goucher College
1021 Dulaney Valley Road
Baltimore MD 21204
Fax: 410-337-6236

EMAIL THIS JOB TO A FRIEND

**APPLY ONLINE**






# US-MD-Rockville-Director, Product Management - Content Products

Publicly traded OTG Software (NASDAQ: OTGS), located in Rockville, MD, is a software company and a leading provider of online storage and content management enterprise software products. OTG is seeking an experienced senior manager who can lead and manage our enterprise content management (ECM) Product Management team. In this highly visible position, you will have the opportunity to be the guiding force in establishing programs that will impact the future of our enterprise market presence. You will guide our existing content product suite, establish new product offerings, manage a staff of professional product managers, and hire additional staff as appropriate to insure continued growth and success of the product line.
This position will be responsible for directing and driving all ECM product management initiatives and coordinating all product launch activities within the company. This is the Product Champion role providing the insight, influence, and leadership to define market requirements (features and functions) based upon an in-depth, practical knowledge of the content management marketplace, and the enterprise application marketplace in general.

Responsibilities:

- Develop product requirements and communicate product vision for ongoing releases and new product opportunities focused in the content management markets. Must analyze competitive landscape and user segmentation to develop a strong product roadmap, and be responsible for the day-to-day management of the ECM product management organization
- Work closely with the development teams to provide strong judgment and direction when making feature/functionality/schedule trade-offs.
- Hire, develop, motivate, retain, and evaluate the ECM product management team
- Apply tools, programs, methodologies and practices for the improvement of the product management process
- Manage the complete product life cycle, providing direction and coordination within cross-functional groups for the delivery of current and future product releases
- Collaborate with product marketing and marketing communications to develop marketing materials, including detailed competitive positioning and analysis
- Provide sales training to our company's sales reps and indirect channels
- Support the company's sales team with both pre and post-sales product opportunities
- Prepare technical customer presentations and white papers
- Contribute strongly to UI design

The ideal candidate will possess these skills and qualifications:

- 7 - 10 years total experience in product management, with experience managing enterprise software products and product managers at an enterprise software product company.
- Strong background in content management, with previous experience managing ECM, ERP, EAI, Web Development, and CRM initiatives
- Strong background in product management with a focus on the technical marketing aspects of the products
- Working knowledge of programming interfaces including Java, XML, and VB.

· Proven ability to develop and deliver high quality products on time and within budget
· Experience in launching successful products in a high tech environment selling to mid-sized and large companies
· Must be intimately familiar with the product development life cycle, beginning with the product concept stage to the product delivery
· Must have proven track record in working closely with R&D to ensure that final deliverables meet the needs of the end-user and marketplace
· Must be a strategic thinker able to understand our business, products, and the competition in order to formulate effective product strategy
· Must be a strong problem solver able to deconstruct complex problems and drive the product team to arrive at effective and actionable solutions
· Excellent Communication Skills - must be able to clearly write documents targeted at various audiences (engineering, customers, analysts, press, executives) as well as make presentations to large/small groups
· Must be a good motivator, dynamic in personality, capable of motivating own team as well as cross-functional teams who are collectively responsible for the delivery of the product line
· Strong analytical abilities - must be able to gather and analyze quantitative and qualitative marketing data and draw well founded conclusions
· Must possess strong interpersonal skills in order to work in a dynamic, fast-paced environment as well as an expert understanding of the product management/marketing/sales relationship
· Must be energetic, enthusiastic and creative
· Must be willing to travel as needed

Education:
Bachelor's degree or equivalent, preferably in Business or Computer Science. Masters of Business Administration or equivalent preferred but not required.

Compensation:
Salary will be commensurate with experience and will include an annual base salary plus bonus and stock options.

PLEASE NO CALLS - Email resume including SALARY HISTORY to jobs@otg.com. Only those submittals with complete information will be considered.

## Additional Information

**Position Type:** Full Time
**Ref Code:** DPM-CM0723

## Contact Information

Shari King
jobs@otg.com
OTG Software
2600 Tower Oaks Blvd. Suite 500
Rockville MD 20852
Ph: 240-747-6400

Click here to see all "OTG Software" opportunities

EMAIL THIS JOB TO A FRIEND

Learn more about "OTG Software"

J.R. Associates 

## US-MD-Baltimore-Chief Information Officer

Job Description & Work:
Very solid research and scientific organization seeks a CIO to provide leadership for their information and computing services. This person will manages a technical staff of approximately 60 people. This group supports a staff of over 500 people handling all operational systems, database systems, engineering developmental systems for new software, and scientific computing systems.

Requirements:
**Proven CIO experience leading technology organizations of 60+ people.
**Must have experience working in a Scientific or Research Based Company or Organization.
**Solid experience leading IT Infrastructure to include: systems engineering, software development, web development, database development / administration, network planning, etc.
**Broad knowledge of commercial vendors of custom software is highly desirable.
**Significant experience managing IT services in a research environment is a plus.
**Excellent strategic planning background.
**Experience handling procurement budgets in excess of $1M.
**Experience with both commercial and federal funded IT Services Projects

## Additional Information

**Salary:** $110,000.00 to $150,000.00 per year
**Position Type:** Full Time
**Ref Code:** 0701

## Contact Information

Ryan Keller
rpkeller@jrassociates.com
J.R. Associates
152 Rollins Ave, Suite 102
Rockville MD 20852
Ph: 301-984-8885
Fax: 301-881-2771

Click here to see all "J.R. Associates" opportunities

EMAIL THIS JOB TO A FRIEND

**APPLY ONLINE**

# BetaTech, Inc.

## US-VA-Arlington-Visionary Solutions Architect

VISIONARY SOLUTIONS ARCHITECT

Well-Funded Venture Catalyst combining strategic investments with technical expertise to partner with innovators at the cutting edge of information technology need Visionary Solutions Architects help accelerate technologies, bring them to market, and at the same time deliver them to one of the most demanding technology users in the world.

Position Description

As the Knowledge Management Solution Architect you will derive, mold and shepherd projects throughout their lifecycle from technology evaluation through solution deployment. Combining keen business acumen with a mastery of technology, you will help develop technology and work to deliver a robust, scalable architecture that will enable this firm to execute its strategic plan.

Responsibilities Include:
- Assessing the competitive landscape of the knowledge management field and then meeting with companies that offer the best products.
- Working with a team to develop strategies and enterprise architectures
- Evaluating technologies and deals for their relevance and impact to the client's mission.
- Preparing technical assessment reports and statements of work.
- Working with partners and potential partners on technical issues
- Working with users
- Planning and supporting solution piloting

Qualifications:
Experience building large-scale enterprise knowledge management that included warehousing large volumes of data and personalizing content delivery for individual users.
Experience/Knowledge of search technologies, data warehousing, fusion of data from disparate sources, visualization technologies and presentation mechanisms, collaborative tools, information organization, information analytics and access management.

Commitment to continued understanding of new technologies and their strategic advantages.

Bachelor's or Master's degree in Computer Science, Engineering or extensive related knowledge management experience.

US Citizenship Required. TS/SCI w/Poly highly preferred.



Updated: October 5, 2001

Managing Partner of Consumer Products
Client Sales Executives
Senior Change Management Consultant
Expert Validation Consultants
SAP Project Manager
SAP ABAP Developer
SAP Functional Consultants

**Managing Partner of Consumer Products**

Clarkston seeks to fill an exciting and new position with our firm - Managing Partner of our Consumer Products vertical. This influential executive will help build our industry strategy, market presence and consulting team. By providing thought leadership, and by leveraging industry relationships, you will develop innovative solutions for our current and future consumer products clients.

- **Location: East Coast**
- Proven senior management experience in a major consumer products organization and prior experience in a consulting leadership capacity for a strategy or Big-Five professional services firm.
- Strong analytical and conceptual skills as they relate to strategic planning, cost and performance management, competitive positioning, reengineering, organization design, general profit improvement and market planning.
- Deep and broad consumer goods industry knowledge.
- Strong understanding of information technology applications that help drive business solutions in the consumer products industry.
- Experience in new business development and client management.
- Outstanding communication, presentation, writing and interpersonal skills.

Apply for this position

[back to top]

Find It | Contact Us | Privacy | Global Sites | Home

Partners | Support | Manugistics University | Investors | Careers

manugistics

Company | Solutions | Industries | News & Events

Career Opportunities

Vice President, Software Product Development

**Location:** Rockville MD

**Email:** jobs@manu.com

Manugistics Group, Inc. (Nasdaq: MANU), the leading provider of Enterprise Profit Optimization™ (EPO) and eMarketplace solutions, helps companies lower operating costs, enhance profitability, and accelerate growth by optimizing the supply-demand network from design and procurement through pricing and delivery. Enterprise Profit Optimization is an emerging business discipline made possible through the combination of the proven cost-reduction power of supply chain management (SCM) solutions and the breakthrough revenue-generating capacity of pricing and revenue optimization (PRO). Manugistics is defining this important new wave in enterprise management and is moving aggressively to dominate it. Manugistics' client list includes industry leaders such as 3Com, Amazon.com, Boeing, BP, Brown & Williamson, Caterpillar, Cisco Systems, Coca-Cola Bottling, Compaq, DuPont, eConnections, Ford, General Electric, Harley-Davidson, Hormel, Levi Strauss & Co., Marriott, Nestle, Texas Instruments, Timberland, Unilever, and United Airlines. For more information, go to www.manugistics.com.

Duties/Responsibilities: Responsible for leading the development and refinement of innovative, competitive supply chain management software products of highest quality, on time constraints and within budget.

Organizational Responsibility: Approximately 150 employees to include software technicians and management. The scope of organizational responsibility includes a remote development lab as well as the main concentration of employees at Gaithersburg, Maryland (EHQ). There would be three-four Business Unit Directors reporting into the VP of Supply Chain Solutions who are responsible for Planning and Scheduling, Demand, and Transportation solution delivery.

Key Organizational Interfaces: Senior executives responsible for Sales, Marketing, Product Management, Marketplace Services and Architecture, Field Engineering, and Customer Support

Travel: 20%

Provide the direction and leadership for the Manugistics Supply Chain Solutions development team. More specifically, ensure the successful delivery of world class Planning and Scheduling, Demand, and Transportation solutions.

Ensure that the Supply Chain Solutions organization, in concert with Marketing, Product Management and Product Support, continues to provide our clients with the best solutions to solve their changing business problems.

Focus on growing the organization through mentoring and the necessary talent to enhance the team going forward.

Assist the Marketing, Sales & Services teams in explaining

Qualifications:

- B.S. degree (computer sciences, engineering, science), ME

- proven experience managing an organization of about 10C environment

- experience managing remote technical sites (preferred)

- technical experience in an Enterprise software organizatio

- at least 10 years of work experience, 5 of which required

- Working knowledge of software development tools: Java, Windows NT, Oracle, SQL Server

Personal

- team player

- strong communication intra-company skills

- proactive, self starter, outgoing, energized, take charge

- results oriented, candid, credible

- entrepreneurial work ethic and mentality

EOE/M/F/D/V

Manugistics Career 2 of 2 wysiwyg://115/http://www.manu.com/careers/ asp?id=132

Find It | Contact Us | Privacy | Global Sites | Home

Partners | Support | Manugistics University | Investors | Careers

manugistics

Company | Solutions | Industries | News & Events

Career Opportunities

Solutions Manager, Supplier Relationship Management
**Location:** Rockville MD
**Email:** jobs@manu.com

**Manugistics Group, Inc. (Nasdaq: MANU), the leading provider of Enterprise Profit Optimization[TM] (EPO) and eMarketplace solutions, helps companies lower operating costs, enhance profitability, and accelerate growth by optimizing the supply-demand network from design and procurement through pricing and delivery. Enterprise Profit Optimization is an emerging business discipline made possible through the combination of the proven cost-reduction power of supply chain management (SCM) solutions and the breakthrough revenue-generating capacity of pricing and revenue optimization (PRO). Manugistics is defining this important new wave in enterprise management and is moving aggressively to dominate it. Manugistics' client list includes industry leaders such as 3Com, Amazon.com, Boeing, BP, Brown & Williamson, Caterpillar, Cisco Systems, Coca-Cola Bottling, Compaq, DuPont, eConnections, Ford, General Electric, Harley-Davidson, Hormel, Levi Strauss & Co., Marriott, Nestle, Texas Instruments, Timberland, Unilever, and United Airlines. For more information, go to www.manugistics.com.**

**Duties/Responsibilities:**

Responsible for the management of all Manugistics Strategic Sourcing products including the creation of requirements for new products and enhancements to existing products, validation of engineering specifications for new product development and existing product enhancement, and definition of tactical and strategic product vision for Manugistics Strategic Sourcing capabilities. The Solutions Manager will also create and deploy standard solution demonstration tools and provide sales cycle support. In addition, the Solutions Manager will collaboratively work with Solutions Marketing to define and target Supplier Relationship Management markets, technologies, partnerships, architectures, new and enhanced capabilities, and targeted solutions.

- Develop product roadmap for new Strategic Sourcing products and enhancements to existing products including product description, target market fit, competitive analysis, technology assessment, make-vs.-buy analysis, resource requirements, critical success factors, milestones, risk assessment, and release timing and content.
- Develop and document requirements for new Strategic Sourcing products and major enhancements to existing products, including a description of the business problem being solved, how the Strategic Sourcing product must function to support the business process, and the benefits to be derived.
- Validate engineering specifications for new Strategic Sourcing products and major enhancements to existing products including support to primary use cases.
- Responsible for working with the Manugistics SRM client base and Manugistics Engineering to ensure that client sponsored enhancements meet client expectations and are implemented in a manner consistent with standard whole product guidelines.
- Responsible for providing product expertise to the Global Consulting Services organization during their implementations of the Manugistics SRM solution.
- Work with Solutions Marketing to identify and qualify potential Strategic Sourcing partners, which may contribute to the advancement of the Manugistics Strategic Sourcing solution and the rapid delivery of whole industry-specific product solutions.
- Act as a liaison between the Manugistics Engineering organization and the Manugistics Supplier Relationship management partner's engineering organizations. Responsible for gaining an in-depth understanding of partner product functionality, understanding partner future product roadmap, determining and managing all product OEM activities and providing the partner's engineering organization major enhancement requirements.

EOE/M/F/D/V

9/30/01 7:11 P

- Develop outbound product whitepapers and standard demonstration tools in collaboration with Demo Solutions. Participate in key sales and marketing activities to reinforce product positioning and positively impact revenue opportunities.
- Develop and maintain a strong working relationship with other Supplier Relationship Management Solution Managers to ensure that product plans are coordinated across the entire Supplier Relationship Management solutions suite.

**Qualifications:**

- Bachelor's degree in Engineering or a quantitative field such as Computer Science or Mathematics. Graduate degree/MBA highly desirable.
- Three to five years of experience with purchasing issues, either as a purchasing practitioner focused on strategic sourcing or as a consultant. Experience in process and discrete manufacturing industries is highly desirable.
- Two to three years of experience using computerized planning systems.
- Two to three years of product management or software development experience.
- Proven strong organizational, analytical, communications and presentation skills.
- Ability to interface with senior management internally and in client organizations.
- Willingness to travel (20%-30%).
- PC literate, particularly Microsoft Word, PowerPoint and Excel.

EOE/M/F/D/V



washingtonpost
Personalize Your Post | Go to mywashingto
Home
News
OnPolitics
Entertainment
Live Online
Camera Works
Marketplace
Washington.
washington
JOBS
.com

Job Details

- Home
- Job Search
- My WashingtonJobs
- Advice
- Communities
- Company Research
- For Employers
- Help
- Logoff

## Summary

| | |
|---|---|
| **Company Name:** | |
| **Job Title:** | VP Technical Operations \| Director |
| **Job Status:** | Full-time Permanent |
| **Job Code:** | 131790011019 |
| **Industry:** | Other |
| **Job Function:** | Executive / Management |
| **Job Division:** | VP |
| **Education:** | Other |
| **Years Experience Desired:** | 10 years |
| **Salary:** | Not Listed |
| **Location:** | Bethesda, MD |
| **Contact E-Mail:** | Not Listed |
| **Contact Information:** | full,8,5 eiStream Government Solutions 7735 Old Georgetown Rd., Suite 1200, Bethesda, MD 20814 or fax to (301) 656-7018 |
| **Date Posted:** | 10/21/01 |

## Full Text

full,10,2

Director/

VP Technical Operations

eiStream Government Solutions, a leading provider of work process automation solutions, seeks Director/VP to lead our delivery organization. Successful candidate must possess 10 years experience in custom development, project management and implementations of complex software systems. Excellent communication, negotiation and customer satisfaction skills are required. Ability to source, train, motivate and manage key personnel mandatory. Experience in imaging, document management and workflow technologies are a must.

eiStream, located in Bethesda, MD, offers an excellent benefits package, competitive compensation (inc./bonus), and a stimulating work environment. Qualified candidates are requested to submit their resume to:

full,8,5

eiStream Government Solutions

7735 Old Georgetown Rd., Suite 1200, Bethesda, MD 20814

or fax to (301) 656-7018

EOE

Return to Search Results

About Us | Jobs at WPNI | Contact Us
Legal Disclaimer | Privacy Policy

# Project Manager

**Job Description:**
Serve as technical leader in a rapidly growing operation to support on-going projects. Provide competent leadership for program direction through successful performance of a variety of detailed, diverse elements on the program. Organize, direct, coordinate, planning and execution of program/technical support activities. Assume leadership role supporting senior customer manager on the activities across multiple projects. Must interface with all levels of customer management, SAIC management, SAIC peers and other contractors as well. Work to be performed at customer and SAIC facilities.
**Education:**
BS + Engineering or equivalent degree and/or experience
**Required Skills:**
Minimum 7 years progressive experience in Information Systems, System Development, Systems Testing and System Integration. Demonstrated Information Technology expertise and management experience. Minimum of 4 years exp. in defining, implementing full life cycle program management processes, methodologies in Government and multi-contractor environment. Good oral and written skills. Ability to build teams and instill teamwork in a rapidly growing organization of diverse projects and technologies.
**Desired Skills:**
Experience working in mainframe and client-server environments transitioning customers to newer, state of the art technologies. Working knowledge of MS Office products. Previous IRS experience a plus.

**Job Category:** Info Tech/Telecommunications **Ref. No:** JDM036247

**Location:** Landover, Maryland US

**Contact:** Beth Delardi

**Part Time or Temporary:** Full-time (1st shift)
**Must be able to obtain Clearance level:** Other

SAIC Applied Through Web 12/3



## US-MD-Rockville-Engineering - Project Manager

Visual Networks is the leading provider of service management solutions for the Internet, IP corporate networks and New World markets. A career at Visual Networks gives you the chance to combine your experience with exciting opportunities!

The Project Manager will have overall responsibility in managing large projects involving hardware, embedded software and application software products. He/She will own the process and implementation issues related to the project. The Project Manager will be well-versed in all areas of embedded firmware and hardware management experience.

Responsibilities:

? Responsible for developing engineering projects and coordinating the activities and driving the project schedule of several globally distributed resources to timely and successful completion of project goals.

? Manage conception-to-birth product development life cycle.

? Conduct project reviews.

? Must be able to lead multiple projects simultaneously

Qualifications:

? BS/MS in Engineering discipline, preferably EE or CS degree

? Minimum 10 years engineering experience, telecommunications industry experience preferred.

? Minimum 5 years direct project management experience.

? Must be well-versed in use of project management and office automation tools.

? Must be detail and process oriented with the ability to make decisions.

? Must have excellent written and oral communication skills.

? Ideal candidate will have the drive, initiative and interpersonal skills to motivate individuals and teams.

### Additional Information

Position Type: Full Time, Employee
Ref Code: PRJMD-001

### Contact Information

Human Resources
jobs@visualnetworks.com
Visual Networks
2092 Gaither Road
Rockville MD 20850
Fax: 301-296-2314

Click here to see all "Visual Networks" opportunities

EMAIL THIS JOB TO A FRIEND

Learn more about "Visual Networks"

**APPLY ONLINE**

strategize mgmt. prod. dev. and all projects

General Motors is undertaking a massive technology refresh program, moving globally to high-end, state-of-the-art technology including HP V and N class servers, NT on the desktop, Cray supercomputing, SGI and Origin high-performance computing environments for CAE, Sun technology, and Gb Ethernet networks. In addition we are implementing a Unigraphics-based engineering design system (CAD) and a PDM system that lead the industry in sophistication, scope, and scale. Planning for deployment of common engineering applications and shared data globally across multiple platforms is a significant technical and operational challenge faced in this position. The changes are exciting and filled with opportunities to contribute leading edge thought at the most senior levels of the EDS and GM organization.

**POSITION**

Chief Technologist for Global Develop Product

**RESPONSIBILITIES AND INITIAL POSITION DESCRIPTION**

The Chief Technologist will provide strategic technical leadership and consultation to GM and its IS&S Develop Product group. Specifically, the individual will provide direction for architecture, infrastructure, and large project implementations in support of GM's engineering environment with over 27,000 designers and engineers globally with the objective of significantly reducing product development cycle time. This is a newly defined and important position on the EDS/GM team and is expected to provide GM with creative and strategic direction. The environment is challenging and dynamic with the opportunity to work with very technologically competent people around the world. The Chief Technologist will be Michigan based and teamed with a Chief Technologist for EDS based in Russelsheim, Germany. Responsibilities include:

- Provide high-level leadership and consultation for GM's Develop Product organization's overall technology direction worldwide with the goals of achieving common engineering applications and globally shared data.

- Steer direction for architecture, infrastructure, global standards, key technical designs, and large project implementations.

- Monitor the overall performance and metrics of the EDS/GM engineering service delivery organizations. Recommend training, certification programs, new processes, and corrective actions where appropriate to stabilize and advance the engineering environment.

- Manage and work through an extensive and global matrixed organization. Lead through expert knowledge and capabilities.
- Consult on over 50 key projects including engineering applications staging and packaging prior to installation.
- Contribute to shared technology directions between engineering and manufacturing areas.
- Up to twenty-five percent travel is likely.

**CANDIDATE BACKGROUND**

Candidate qualifications include:

- In-depth experience in support of the technology infrastructure within the R&D/ engineering or manufacturing environment of a large durable goods manufacturing organization (CAD/CAM, CAE, PDM).
- Skilled in large-scale technical leadership and implementation of new technology for complex engineering environments.
- Excellent technical skills in distributed computing architecture/infrastructure with emphasis on UNIX server environments (HP experience preferred, Sun experience desired). Strength in PC (NT) environments and networks also desired.
- A team player capable of outstanding individual contribution as well as leading in a matrixed environment. Builds relationships and partnerships and instills confidence across organizations.
- "Boardroom presence" with excellent interpersonal communication, facilitation and influencing skills, and the capability to present to the highest levels of management.
- Ability to deal with many points of view enabling agreements to be forged and decisions to be made; brings closure to issues and moves the process forward.
- Able to think through strategic issues and quickly become a trusted technology advisor. Sound business and technical judgment to inform and counsel both GM and EDS on the costs, risks and benefits associated with specific projects.

- Excels in leading and delivering large-scale programs of work, system implementations, and global technology projects.
- Fully understands the process of service and system delivery to achieve reliability, availability, and service excellence.
- An undergraduate degree is required; an advanced degree is preferred.



SJ Exhibit 4

SPACE
TELESCOPE
SCIENCE
INSTITUTE

January 15, 2002

Ms. Lisa Wolff
3180 Buffalo Road
New Windsor, MD 21776

Dear Lisa:

We are pleased you have accepted our offer for a position with the Space Telescope Science Institute. As agreed, you will be working as a Chief Information Officer in the Director's Office, reporting to Steven Beckwith.

Attached you will find Part A of your new hire orientation packet. Your orientation will be held at 9:00 a.m. on February 11 2002 in room 214 in the Muller building. Please review and/or complete all of the enclosed documents prior to your arrival. It is imperative that you bring the completed forms with you to your orientation. During your orientation, there will be ample time for Jennifer Serrano to address any questions you may have. However, should you need assistance prior to your orientation, please feel free to contact her at 410-338-4343.

**Listed below are the contents of Part A for your completion:**

- List of acceptable documents – please review and bring the appropriate documents with you on your first day to verify eligibility to work in the U.S.
- Inventions and Proprietary Property Agreement – an agreement covering Intellectual Property. Signing this document is a condition of employment.
- Relocation Expense Agreement – sign only if applicable
- Federal Withholding Exemption Form
- Maryland Withholding Exemption Form
- Direct Deposit Authorization – attach voided check or deposit slip
- Johns Hopkins University Library Card Application

**Listed below are the contents of Part A for your review:**

- Johns Hopkins University Privileges
- ST ScI Holiday Schedule
- Outside Employment Policy
- Tuition Reimbursement Program
- Inclement Weather Policy
- Equal Employment Opportunity Policy/Affirmative Action Plan
- Sexual Harassment Memo
- Grievance Policy and Procedure
- NGST Information Sheet

Following the first half of your orientation please contact Gene Bryant at 410-338-4389, to arrange an appointment to discuss, in detail, the various benefit plans ST ScI has to offer. Please note, if you participated in a Retirement plan or had Long Term Disability coverage with your previous employer, you will need to provide the following information on company letterhead at this meeting: Termination date, Beginning and end dates of when you participated in each plan, Carrier name for each plan.

We hope that your new position will provide you with the challenge and opportunities you desire. We look forward to working with you in the months ahead.

Sincerely,

Janet Bafford

Janet Bafford
Human Resources Manager

SJ Exhibit 5

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Mr. Tom Shaffer
Human Resource Director
Northrop Grumman
P.O. Box 1693
Mail Stop 1267
Baltimore, MD 21203

PERSON FILING CHARGE
Wolff, Lisa

THIS PERSON (check one)
[X] CLAIMS TO BE AGGRIEVED
[ ] IS FILING ON BEHALF OF ANOTHER

DATE OF ALLEGED VIOLATION
*Earliest* 12/13/2001 *Most Recent* 12/13/2001

PLACE OF ALLEGED VIOLATION
College Park, MD

EEOC CHARGE NUMBER
12HA200075

FEPA CHARGE NUMBER
ds02-11

## NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS

*(See attached information sheet for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act of 1964
[ ] The Age Discrimination in Employment Act of 1967 (ADEA)
[ ] The Americans with Disabilities Act

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to ______________ *(FEP Agency)*.

[X] The Prince George's County, H.R.C. *(FEP Agency)* and sent to the EEOC for dual filing purposes.

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

[X] As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

[ ] An Equal Pay Act investigation (29 U.S.C. 206(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.

[X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[ ] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NAT. ORIGIN [ ] AGE [ ] DISABILITY [X] RETALIATION [ ] OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.

NG0247

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 01/11/2002 | James L. Lee, Director<br>Director | |

EEOC FORM 131-A (Rev. 06/92)

RESPONDENT'S COPY

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

AGENCY: [X] FEPA [ ] EEOC

CHARGE NUMBER: ds02-11 12HA200075

Prince George's County, H.R.C. and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mrs. Lisa Wolff | (410) 875-0483 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 3180 Buffalo Road, New Windsor, MD 21776 | | 01/22/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Northrop Grumman | Cat C (201-500) | (301) 864-5600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 5115 Calvert Road, College Park, MD 20740 | | 033 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[ ] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER *(Specify)*

DATE DISCRIMINATION TOOK PLACE
EARLIEST 12/13/2001 LATEST 12/13/2001
[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I believe that the Respondent has retaliated against me after I filed an internal Title VII based complaint because:

I gained employment with the Respondent in May 1985 as an Assistant Member of Technical Staff. I was later promoted to Manager. I have always demonstrated satisfactory performance.

On September 3, 2001, I filed an internal sexual harassment complaint against one of the Vice Presidents.

On or about December 13, 2001, the Respondent offered me another position that is not comparable to my current position. In the new position, I would retain my current salary but my responsibilities are cut by 75%. This position will cut into my marketability.

After the Respondent and I met for several meetings I decided not to accept the new position and exercise my contract. My contract calls for 6 months of pay with voluntary termination. The Respondent insists that I sign a waiver that forfeits my federal rights of any legal actions. Without signing the waiver, the Respondent will not honor my contract.

I believe that the Respondent has treated me in this manner because I filed an internal Title VII based complaint.

LW I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

1/10/02 Lisa A. Wolff

Date Charging Party *(Signature)*

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year)

EEOC FORM 5 (Rev. 07/99)

RESPONDENT'S COPY

THE PRINCE GEORGE'S COUNTY GOVERNMENT

PRINCE GEORGE'S COUNTY ALL-AMERICA CITY 1986 • 1987

HUMAN RELATIONS COMMISSION

Wayne K. Curry
County Executive

| | | |
|---|---|---|
| **Lisa Wolff** | : | |
| **3180 Buffalo Road** | : | |
| **New Windsor, Maryland 21776** | : | |
| | : | |
| **Complainant** | : | |
| | : | |
| **vs.** | : | **HRC Case No.: ds02-11** |
| | : | **EEOC Case No.: 12HA200075** |
| | : | |
| **Northrop Grumman** | : | |
| **5115 Calvert Road** | : | |
| **College Park, Maryland 20740** | : | |
| | : | |
| **Respondent** | : | |

---

**DETERMINATION**

Under the authority vested in me by Division 12, Subdivision VII, Section 2-222, Prince George's County Code, 1995 edition, as amended, I issue the following determination as to the merits of the subject charge.

The Respondent is an employer within the meaning of Division 12, Subtitle I, Section 2-186(5), Prince George's County Code, 1995 edition, as amended, and the timeliness and all other jurisdictional requirements have been met.

**FACTS AND CONCLUSIONS**

Complainant alleges that the Respondent retaliated against her after she filed an internal Title VII based complaint.

Respondent denies Complainant's allegation of discrimination.

Respondent has a worldwide business that acquired part of its components business as part of a recent merger that had its location in College Park, Maryland. Respondent in May 1985 employed Complainant as a Engineering Design Manager (EDA) in its Greenbelt, Maryland facility.

Complainant alleges that on or about September 3, 2001, she filed an internal sexual harassment complaint against one of Respondent's Vice Presidents. Complainant alleges that on or about December 13, 2001, Respondent offered her another position that was not comparable to her current position. Complainant alleges that in the new position she would retain her current salary but her responsibilities would be cut 75%. Complainant alleges that this new position would cut into her marketability. Complainant alleges that

after she and Respondent met for several meetings she decided not to accept the new position, and instead exercise her contract rights which calls for six months pay with voluntary termination. Complainant alleges that Respondent insisted that she sign a waiver that forfeits her federal rights of any legal actions, or Respondent would not honor her contract.

Respondent denies Complainant's allegations.

Respondent proffers that Complainant's internal complaint is not within the scope of activities protected by Title VII anti-retaliation provision. Respondent proffers that while the behavior she opposed was rude and boorish, it was directed equally at men and women, and could not have been characterized reasonably or in good faith as sexual harassment under Title VII. Respondent proffers that Complainant did not suffer any adverse employment action. Respondent proffers that the position offered to the Complainant retained her management title, paid the same salary as her previous position, and was focused in her area of expertise. Respondent proffers that there was no causal nexus between Complainant's internal complaint and either the undesirable position offered to her or the Respondent's failure to pay her severance benefits after she rejected that position.

Respondent proffers that during its merger process of Complainant's company into Respondent's company Complainant and certain other employees were offered a retention incentive (Stay Agreement) in January 2001. Respondent proffers that the purpose of the agreement was to encourage these employees to remain employed with Respondent until after the merger was completed. Respondent proffers that the Stay Agreement provided that Respondent would pay the participating employees six months of salary and health insurance if 1) they were involuntarily terminated on or before January 4, 2002, and 2) they were not offered a comparable position on similar terms and conditions by a successor company. Respondent proffers that Complainant on February 1, 2001 signed a Stay Agreement.

Respondent proffers that one of its current employees holds the EDA position most analogous to Complainant's position at her former company. Respondent proffers that this EDA employee has been in that position since prior to the merger. Respondent proffers that the EDA function in its electronic systems sector is substantially larger than what Complainant had managed at her former company. Respondent proffers that the EDA employee's responsibilities cover a broader territory than Complainant's former position. Respondent proffers that this EDA employee directly manages the design automation function, which includes not only electrical design, but mechanical and software design as well.

Respondent proffers that this EDA employee supports the design automation requirements of over 5000 engineering employees in the ES sector. Respondent proffers

that this EDA employee reports to the Director of Software Engineering and Design Automation. Respondent proffers that this EDA employee and the Director of Software Engineering and Design Automation were the ES managers responsible for the integration and consolidation of Complainant's former company into Respondent's ES operations.

Respondent proffers that during the merger process employees at Complainant's former company were uneasy about their job security. Respondent proffers that an informational meeting was held in November 2001 to address these concerns. Respondent proffers that in a written Questions and Answers information sheet about the restructuring, Respondent directly addressed the situation of Complainant's former company's employees being offered ES positions with reduced responsibilities and compensation. Respondent proffers that this particular Q&A item stated:

> "Q. Will we have the choice of being laid off with severance instead of accepting a position in Baltimore that we believe is a lessor position, due to either reduced compensation or reduced responsibilities?
>
> A. If an employee is offered a comparable position-one for which the base pay is no less than 10% below the employee's current base pay – and declines the position, then he or she would be considered a quit, not a layoff."

Respondent proffers that Complainant attended this meeting and received the Q&A information sheet.

Respondent proffers that on August 29, 2001, Complainant participated in a telephone conference call involving her former company's personnel in College Park and San Jose, California. Respondent proffers that there were seven other participants (Male). Respondent proffers that the Executive Vice President for Electronic Combat voiced anger, frustration, and impatience over efforts to resolve problems the San Jose location was experiencing. Respondent proffers that the Executive Vice President spoke at a high volume and laced his remarks with profanity. Respondent proffers that at one point one of the participants asked the Executive Vice President to approach the meeting more professionally, but he continued to use profanity, including the f*** word. Respondent proffers that the Executive Vice President used this profanity during the segment of the conversation when he was talking to Complainant about her role in San Jose's problems and efforts to resolve them. Respondent proffers that throughout the call the Executive Vice President directed his anger and profanity, including repeated variations of the f *** word at the men as well.

Respondent proffers that on August 31, 2001, Complainant complained about the Executive Vice President's use of profanity to the Human Resources Executive Director. Respondent proffers that Complainant was urged to use the grievance process and was

provided with the appropriate forms. Respondent proffers that on September 4, 2001, Complainant filed a formal written grievance statement under the company's grievance policy.

Respondent proffers that in her grievance Complainant specifically requested that she not be subjected to further contact with the Executive Vice President, and that she be notified whenever he was present in her facility. Respondent proffers that on September 7, 2001, Respondent notified Complainant of the steps it was taking to insulate her from any further contact with the Executive Vice President. Respondent proffers that it disciplined the Executive Vice President.

Respondent proffers that while the grievance was pending, the Complainant retained an attorney who on September 28, 2001 sent a demand letter to one of the company's Human Resources Managers. Respondent proffers that Complainant's attorney made various demands in exchange for Complainant signing a release. Respondent proffers that its counsel responded with a letter dated November 2, 2001 stating that the matter had been investigated and resolved through Respondent's grievance process, and that effective measures had been taken with respect to preventing a reoccurrence of the incident. Respondent proffers that Complainant's counsel sent a letter dated December 14, 2001, disagreeing with Respondent's position and suggesting that legal action would follow.

Respondent proffers that while counsel were exchanging letters back and forth, Complainant sought out the Director of Software Engineering and Design Automation (DSEDA), and the Manager of Process & Tool Development Support (MP&TD) and requested meetings to discuss her future employment prospects in ES. Respondent proffers that when the DSEDA met with Complainant in October 2001 the DSEDA discussed the opportunities for Complainant in the department at BWI. Respondent proffers that the DSEDA told Complainant that she would report to the MP&TD because he already held the position of MP&TD, and the DSEDA did not want to split the function between multiple managers. Respondent proffer that the DSEDA told Complainant she should meet with the MP&TD to talk through the specifics of her new position in the department. Respondent proffers that Complainant was informed that her salary, and manager level status would remain the same. Respondent proffers that Complainant was informed that she would receive the same classification as a manager as the MP&TD, i.e. as a "Band 3 manager."

Respondent proffers that Complainant requested and met with the MP&TD a few days later. Respondent proffers that during this meeting Complainant was informed of her role in the ES department. Respondent proffers that after the meeting Complainant initially agreed to accept the new position. Respondent proffers that meetings between Complainant and

the MP&TD continued periodically. Respondent proffers that on December 5, 2001, Complainant wrote a memorandum advising the DSEDA that she no longer found the proposed position acceptable or comparable to her current position, and asked for another meeting with the DSEDA and MP&TD.

Respondent proffers that during this meeting Complainant produced the Stay Agreement and requested the six months of salary and benefits instead of accepting the position she was offered. Respondent proffers that the DSEDA and MP&TD tried to convince Complainant to take the new position, and told her that they valued her, did not want her to leave the Company, and that they thought she could make a positive impact in her new position. Respondent proffers that Complainant declined, and demanded the six months severance package. Respondent proffers that Complainant's demand was declined until she agreed to sign a full and effective release of clams.

The focus of the Commission's investigation centers on Complainant's allegation that Respondent subjected her to retaliation.

The first focal point of the Commission's investigation centers on Complainant's allegation that after she filed an internal Title VII based complaint, she was offered a post merger position that was not comparable to her current position.

Investigation disclosed that Respondent has an Equal Employment Opportunity, Affirmative Action Programs Policy. The Policy states that Respondent hires employees without regard to sex, and treats employees equally with respect to all employee relations and personnel matters.

Investigation disclosed that Respondent has an Employee Separation Policy. The Policy states that in cases of involuntary separation, except for termination due to conduct or failure to meet performance requirements, employees will be given minimum notice, severance (pay-in-lieu of notice) or a combination of the two based on years of service. The Policy states that in the event of the sale or spin-off all or part of the Company's business to a purchaser which hires the former employee, the reason for notice or pay-in-lieu-of-notice ceases to exist. The Policy states that in the event of the sale or spin-off of all or part of the business of the division to a purchaser which hires a former employee, no payment of pay-in-lieu-of notice is made or due to such employee.

The Policy states that if the employee is offered a comparable position with the acquiring organization and refuses the offer, the employee will be considered as having resigned voluntarily and the notice requirement will not apply.

The Policy states that the Executive Director, Human Resources, has the discretion to interpret this Policy and Procedure and decide any and all matters and disputes arising hereunder.

A review was conducted of Complainant's personnel file. The file reveals that Complainant filed an internal Title VII based complaint with Respondent on September 4, and 10, 2001.

A review was conducted of a document dated January 31, 2001, from Respondent's President to Complainant and has as its subject "Agreement to Stay." The document states that:

> "If your employment with [Respondent] is involuntarily terminated prior to January 4, 2002, [Respondent] agrees to pay you, in addition to any other compensation then due, ½ of your then current annual base salary and six (6) months health insurance provided that:
>
> a. You continue to devote your best efforts on behalf of the company's business;
> b. You have not resigned or been terminated for cause, and
> c. In the event of a sale, merger or other business combination, you have not been offered by the successor company, a comparable position on similar terms and conditions."

A review was conducted of Respondent's Restructuring Questions and Answers document. The document reveals the following question and answer. "Will we have the choice of being laid off with severance instead of accepting a position in Baltimore that we believe is a lesser position, due to either reduced compensation or reduced responsibilities? If an employee is offered a comparable position-one for which the base pay is no less than 10% below the employee's current base pay-and declines the position, then he or she would be considered a quit, not a layoff."

An interview was conducted with Respondent's Director of Human Resources Engineering and Manufacturing. This witness stated that Complainant's new position was comparable with her pre-merger position or even an expanded job since she would be dealing with more engineers. This witness stated that he did not know Complainant's pre-merger duties and responsibilities.

An interview was conducted with Respondent's Executive Director of Information Technology. This witness stated that prior to the merger he was Complainant's boss. This witness stated that he transferred Complainant's unit to Respondent's Engineering Department. This witness stated that his duties and responsibilities after the merger contracted considerably. This witness stated that his duties and responsibilities reduced by approximately 60 per cent. This witness stated that he told Complainant that her new position was not a growth position, and that she could do better elsewhere. This witness stated that his opinion about Complainant's new position was based on Complainant reading her new position description to him over the telephone. This witness stated that

he was familiar with Complainant's Stay Agreement because he had to sign it on behalf of Respondent. This witness stated that the new position was not consistent with the Stay Agreement.

An interview was conducted with Respondent's Manager of Mechanical Engineering. This witness stated that because he was in the office next to Complainant's, he was familiar with Complainant's job description and duties. This witness stated that he was also familiar because Complainant's job and his job worked closely together. This witness stated that the job offered to Complainant after the merger was a reduction in her duties and responsibilities and was not comparable to her current position. This witness stated that his duties and responsibilities were reduced and were not comparable to his new position after the merger. This witness stated that the amount of autonomy, responsibility, and contribution to the business unit pales compared to what he had pre-merger. This witness stated that his pay remained the same. This witness stated that he knows about the Stay Agreement, but he never received one.

Based on evidentiary findings, there is insufficient evidence to support Complainant's allegation of retaliation.

The second focal point of the Commission's investigation centers on Complainant's allegation that after she filed an internal Title VII based complaint, she was not allowed to exercise the voluntary termination clause of her Stay Agreement without signing a waiver of her federal rights regarding any legal actions.

The Commission adopts and incorporates the relevant findings of the first focal point, herein.

A review was conducted of the Confidential Separation Agreement and General Release document provided to seven of Complainant's former co-employees and Complainant. The document fails to reveal that Complainant was prohibited by the Agreement to file suit against Respondent regarding her Title VII based complaint.

The Agreement reflects that Complainant could not collect monetary proceeds as a result of filing suit. Investigation disclosed that other employees were required to sign the Separation Agreement and General Release, in order to receive compensation for not being offered a comparable position.

The anti-retaliation provisions make it unlawful to discriminate against an individual because s/he has opposed any practice made unlawful under Title VII, the ADA, the ADEA, or the EPA. This protection applies if an individual explicitly or implicitly communicates to his or her employer or other covered entity a belief that its activity constitutes a form of employment discrimination that is covered by any of the statutes covered by the EEOC.

In order to establish unlawful retaliation, there must be proof that the Complainant explicitly or implicitly communicated to the Respondent a belief that its activity constituted unlawful discrimination under Title VII, the ADA, the ADEA, or the EPA. If the protest was broad or ambiguous, it can not reasonably have been interpreted as opposition to such unlawful discrimination.

The Commission in a Title VII Retaliation complaint under Sec. 704(a) must establish that the charging party either opposed an unlawful practice or participated in the investigation of same. The Commission must establish that the Respondent had knowledge that the charging party engaged in the protected activity (this burden was satisfied - Complainant filed an internal Title VII based complaint 09-04 & 10-01). Second, there must have been an adverse action taken against the charging party in close proximity to the time the charging party engaged in the protected activity (this burden was satisfied post merger reduced job description and failure to allow Complainant to exercise the Stay Agreement without signing a release). Finally, there must be proof of a causal connection between the protected activity (filed complaint) and the adverse employment action (reduced Job Description and failure to allow Complainant to exercise the Stay Agreement without signing a release) taken against the charging party (this burden was not satisfied).

In order to establish unlawful retaliation, there must be proof that the Respondent took an adverse action because the charging party engaged in protected activity. Proof of this retaliatory motive can be through direct or circumstantial evidence. A violation is established if there is circumstantial evidence raising an inference of retaliation and if the Respondent fails to produce evidence of a legitimate, non-retaliatory reason for the challenged action, or if the reason advanced by the Respondent is a pretext to hide the retaliatory motive.

An initial inference of retaliation arises where there is proof that the protected activity and the adverse action were related. Typically, the link is demonstrated by evidence that: (1) the adverse action occurred shortly after the protected activity, and (2) the person who undertook the adverse action was aware of the Complainant's protected activity before taking the action. An inference of retaliation may arise even if the time period between the protected activity and the adverse action was long; if there is other evidence that raises an inference of retaliation.

Even if the Respondent produces evidence of a legitimate, nondiscriminatory reason for the challenged action, a violation will still be found if this explanation is a pretext designed to hide the true retaliatory motive. Typically, pretext is proved through evidence that the Respondent treated the Complainant differently from similarly situated employees or that the Respondent's explanation for the adverse action is not believable. Pretext can also be shown if the

Respondent subjected the charging party's work performance to heighten scrutiny after she engaged in the protected activity.

Based on evidentiary findings, there is insufficient evidence to support Complainant's allegation that she was subjected to retaliation in the terms, conditions, and privileges of her employment.

This Determination concludes the staff's processing of the subject charge.

Should the Complainant feel dissatisfied with this decision and have no additional information or evidence to offer, Complainant may in accordance with the Rules of Procedure governing the Prince George's County Human Relations Commission appeal the decision of the Executive Director, within thirty (30) days from the date of this letter by setting forth reasons for said appeal in written request to:

Samuel N. Fontaine
Chairperson
Prince George's County
HUMAN RELATIONS COMMISSION
1400 McCormick Drive, Suite 245
Largo, Maryland 20774

This decision constitutes a **final action** by this Commission concerning your complaint if no appeal is received within thirty (30) days of this date.

William A. Welch, Sr., Ed.D.
Executive Director
Prince George's County
Human Relations Commission

6/24/02
Date

Cc: Complainant



THE PRINCE GEORGE'S COUNTY GOVERNMENT
HUMAN RELATIONS COMMISSION
1400 McCormick Drive, Suite 245
Largo, MD 20774

JAMES MURPHY
NORTHROP GRUMMAN
1000 WILSON BOULEVARD
SUITE 2300
ARLINGTON VIRGINIA 22209-2278

22209+2278 15

# INDEX G.



**Lisa Wolff Bills For Treatment**

1. Pharmacy Bills - $85.41

2. Dr. Robert Dobrusin – optometrist – 9/24/01 – eyes hurting and headaches- $65.00

3. Dr. Elizabeth Pallan – general practitioner
   - 9/15/01 - $85.00
   - 9/27/01 - $60.00
   - 10/24/01 -$60.00
   - 11/19/01-$60.00
   - 1/16/02 - $85.00
   - 1/28/02 – $60.00
   - 5/23/03 – $85.00

   TOTAL $495.00

4. Dr. Nancy Magone – dentist.
   - 10/9/01 – $150.00
   - Mouth guard- $375.00

   TOTAL $520.00

5. Dr. Charmack – Columbia Counseling Center
   - 9/22/01 - $140.00
   - 9/29/01 - $115.00
   - 10/10/01-$115.00
   - 10/13/01-$115.00
   - 10/20/01-$115.00
   - 10/27/01-$115.00
   - 11/10/01-$115.00
   - 11/17/01-$115.00
   - 12/01/01-$ 57.50
   - 12/8/01 - $115.00
   - 12/15/01-$115.00
   - 12/22/01-$115.00
   - 1/19/02 - $115.00
   - 2/2/02 - $115.00
   - 2/16/02 - $115.00
   - 3/2/02 - $115.00
   - 3/9/02 - $ 57.50
   - 3/23/02 - $115.00
   - 4/18/03 - $ 49.66

   TOTAL $2,029.66

LAW OFFICES OF:

RONALD M. CHERRY

Phone: (410) 494-4954
Fax: (410) 494-4952
E-Mail: rmcherry@copper.net

214 Washington Ave. 2nd Floor
Towson, MD 21204

Laura C. Jenifer
Associate

Nicole Dalesio
Administrative Assistant

August 22, 2003

Christine B. Cox
Morgan, Lewis & Bocklus, LLP
1111 Pennsylvanis Avenue NW
Washington, D.C. 20004

RE: Wolff. V. Grumann

Dear Christine,

The purpose of this letter is to amend Plaintiff's Answers to Interrogatories and Responses to Request for Production of Documents. Lisa was seen by Dr. Charmak on two additional dates: August 4 and August 11, 2003. I have enclosed the bill for these two visits.

Thank you for your attention to this matter.

Sincerely,

Ronald M. Cherry

COLUMBIA COUNSELING CENTER,P.A.
5525 TWIN KNOLLS ROAD, SUITE 327
COLUMBIA, MD. 21045
PHONE: 410-992-9149 TIN#52-2052733

Lisa A Wolff
3180 Buffalo Road
New Windsor, MD 21776

Statement Date.....: 08/21/2003
Page Number........: 01
Account Number...: 200300320NOCERT
Patient Name........: Lisa A Wolff

## STATEMENT FOR PROFESSIONAL SERVICES

CHARGES OR PAYMENTS AFTER ABOVE STATEMENT DATE WILL APPEAR ON YOUR NEXT STATEMENT

| | | | |
|---|---|---|---|
| | ---- ID: 200300320NOCERT Lisa A Wolff Dx: 309.81 296.32 | | |
| 08/04/2003 | Ind Psychotherapy 45-50M, 90806, WILLIAM D. CHARMAK, PH.D., charge | 115.00 | |
| 08/04/2003 | (Patient), WILLIAM D. CHARMAK, PH.D. | | 57.50 |
| 08/11/2003 | Ind Psychotherapy 45-50M, 90806, WILLIAM D. CHARMAK, PH.D., charge | 115.00 | |
| 08/11/2003 | (Patient), 90806, WILLIAM D. CHARMAK, PH.D. | | 35.00 |
| 08/14/2003 | (Carefirst BC/BS Preferred) Check# V 8/4/03 E 8/11/03, 90806, WILLIAM D. CHARMAK, PH.D. | | 70.00 |
| 08/14/2003 | (Carefirst BC/BS Preferred) Total Balance RF, 90806, WILLIAM D. CHARMAK, PH.D. | | |

Payment Is Due Upon Receipt Of This Statement.

| | | | | |
|---|---|---|---|---|
| 57.50 | 230.00 | 162.50 | 45.00 | 80.00 |
| | | 80.00 | | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 80.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Return this portion with your payment

| | | | | | |
|---|---|---|---|---|---|
| | 200300320NOCERT | | Lisa A Wolff | | |
| | 08/21/2003 | | 0.00 | | |

Please make check payable to: COLUMBIA COUNSELING CENTER,P.A.
5525 TWIN KNOLLS ROAD, SUITE 327
COLUMBIA, MD. 21045
PHONE: 410-992-9149 TIN#52-2052733

You Are Responsible For The Patient Balance And The 2003 Yearly Deductible.