# **DEPOSITION EXCERPTS**

# In The Matter Of:

*Lisa A. Wolff   v.*
*Litton Advanced Systems, Inc., et al.*

---

*Deposition of Lisa A. Wolff*
*July 29, 2003*

---

*Miller Reporting Company*
*735 8th Street, SE*
*Washington, DC  USA  20003*
*(202) 546-6666*

*Original File 0729WOLF.TXT, 156 Pages*
*Min-U-Script® File ID: 3236159888*

# Word Index included with this Min-U-Script®

Page 6

[1] answer, however you need to.

[2]    A: Okay.

[3]    Q: Is there any reason today that you would

[4] not be able to fully testify?

[5]    A: No.

[6]    Q: Did you meet with counsel before today's

[7] deposition?

[8]    A: Yes, I have.

[9]    Q: And how long did you meet with counsel in

[10] preparation for today's deposition?

[11]    A: A couple of hours, two times.

[12]    Q: And who was that with, was that

[13] Mr. Cherry or —

[14]    A: It was with Laura.

[15]    Q: And when was that?

[16]    A: Last week, I can't remember which day,

[17] but last week, and then yesterday. It was just a

[18] little bit of time each day.

[19]    Q: Throughout today's deposition I will be

[20] referring to Northrop Grumman and if it is not

[21] clear, please let me know, but generally I will be

[22] referring to Northrop Grumman and Litton as

Page 7

[1] Northrop. So if it is not clear which company I am

[2] talking about, please let me know, but generally

[3] speaking, I will be referring to both of them

[4] together as Northrop Grumman; is that correct?

[5]    A: Okay.

[6]    Q: Can you please tell me your educational

[7] background.

[8]    A: I am an electrical engineer and I went to

[9] University of Maryland in College Park.

[10]    Q: When did you graduate?

[11]    A: 1990 or '91.

[12]    Q: Who did you first go to work for after

[13] graduating?

[14]    A: Litton. At that time it was Litton

[15] Amicon.

[16]    Q: And that is what became Litton Advanced

[17] Systems; is that correct?

[18]    A: Yes.

[19]    Q: Did you ever leave Litton at any time

[20] prior to, I guess it would be January of 2002 — or

[21] February of 2002?

[22]    A: No, I had not.

Page 8

[1]    Q: And who are you currently employed by?

[2]    A: Space Telescope Science Institute.

[3]    Q: When did you start to work for them?

[4]    A: In February of 2002.

[5]    Q: Do you remember when in February?

[6]    A: It was either the 14th or the 15th,

[7] whichever is a Monday.

[8]    Q: What was your last date of employment at

[9] Northrop Grumman?

[10]    A: Officially it was the Friday before.

[11] That was the date that I signed out. So the 13th,

[12] February 13.

[13]    Q: And when did you receive your office of

[14] employment with Space Telescope?

[15]    A: It was around Christmastime. We started

[16] talking seriously, and then it was in — it was

[17] early in January, I think, that I got — we started

[18] exchanging the letters. You talk on the phone and

[19] you keep tweaking, so I think it was beginning of

[20] January that it officially came in.

[21]    Q: When did you first have communication

[22] with Space Telescope about possibly going to work

Page 9

[1] for them?

[2]    A: Probably the very beginning of December

[3] or the very end — it was after Thanksgiving and I

[4] am trying to think — I think it was toward the

[5] beginning of December. I should have checked all

[6] these things out.

[7]    Q: That is okay.

[8]    A: All right.

[9]    Q: When you applied for that position, were

[10] you interviewing with other companies or

[11] considering other positions?

[12]    A: I had decided for obvious reasons to

[13] initiate a job search, so at that point I had sent

[14] resumes to other places. This was the first place

[15] that I had an interview with.

[16]    Q: When did you first start sending resumes

[17] to other locations, other companies?

[18]    A: Can you be more specific?

[19]    Q: You said that you decided to start a job

[20] search; is that correct?

[21]    A: Yes.

[22]    Q: When did you make that decision?

Page 10

[1]  **A:** I actually did this twice. I actually
[2] initiated twice. That is why I was asking. This
[3] was the second time I had initiated a job search
[4] and that was in that same time frame. After
[5] Thanksgiving and beginning of December is when I
[6] started to seriously look around.
[7]  **Q:** And that was the second time that you
[8] started a job search after Thanksgiving?
[9]  **A:** I am not allowed to ask you questions. I
[10] am having trouble because I want to know what you
[11] mean specifically by a job search because I think
[12] of things as one way. So I want to know how my
[13] actions map to what you are asking.
[14]  **Q:** Sure. What I am asking about is the time
[15] when you first started looking at other companies
[16] or sent resumes to other companies or looked on job
[17] search boards, any of those actions.
[18]  **A:** That would be in the November time frame.
[19]  **Q:** And had you done that previously — just
[20] a few minutes ago you said you did two different
[21] sorts of job searches?
[22]  **A:** The way I define — after Northrop

Page 11

[1] acquired Litton, this is back in the spring when
[2] they acquired us, I did post a resume because I was
[3] curious to see what was the job market like. I
[4] wasn't looking for a job, I was more testing the
[5] job market, and — but that was it, I didn't
[6] respond to things. It was just more of a what is
[7] out there, how do these search engines worked,
[8] because I had never found a job through the
[9] Internet. I had been working at a place so long,
[10] and the Internet wasn't in existence then. I draw
[11] a difference between seeing what the market is like
[12] and seeing — and actually looking for a job.
[13]  (Wolff Exhibit No. 1 was
[14] marked for identification.)
[15]  **BY MS. COX:**
[16]  **Q:** Ms. Jardim has handed you what has been
[17] marked as Exhibit 1. These documents were just
[18] recently produced to you by your attorney, Ron
[19] Cherry. You can see that fax line at the top.
[20]  If you could, take a moment to review
[21] those.
[22]  **A:** These are the things I found in the

Page 12

[1] folder.
[2]  **Q:** Do those documents look familiar to you?
[3]  **A:** Yes.
[4]  **Q:** Were these documents you retrieved in
[5] part of your job search?
[6]  **A:** Yes. This is when — I don't remember
[7] which once were from which thing.
[8]  **Q:** If you will take a look at the bottom of
[9] these pages, and this might help you refresh your
[10] recollection about when you looked at them, the
[11] first three pages, the bottom line is a little cut
[12] off, but can you make out the dates?
[13]  **A:** They look like they are all October and
[14] November.
[15]  **Q:** Of what year?
[16]  **A:** 2001.
[17]  **Q:** If you go back to — if you look at the
[18] top right, it is marked page 16, from the fax line,
[19] could you take a look at the date on that page?
[20]  **A:** On the bottom one? 10/08/01.
[21]  **Q:** So October —
[22]  **A:** They look like October and November. I

Page 13

[1] am just making sure that none of these are ones my
[2] daughter printed out, but I don't think they are.
[3]  **Q:** On page 16, for example, do you recall
[4] taking a look at that job opportunity at Clarkston,
[5] or do you think that is something your daughter
[6] looked at?
[7]  **A:** This looks like something that I might
[8] have printed out, not my daughter, because this
[9] doesn't look like something she would be interested
[10] in.
[11]  **Q:** So does that refresh your recollection of
[12] when you might have started your job search?
[13]  **A:** Yes. So it was — it looks like it was
[14] as early as October time frame. I am just trying
[15] to remember. From what I remember, I wasn't really
[16] like looking for anything until after Thanksgiving.
[17] So it was — I wish I knew who printed these out,
[18] whether it was my daughter or my husband because
[19] they were helping — if things came in the e-mail,
[20] people would print out stuff for me. The links
[21] don't stay active for long.
[22]  **Q:** Did you provide these documents to your

Page 14

[1] attorney, Ron Cherry?

[2] **A:** Yes, I did.

[3] **Q:** The last three pages, marked page two,

[4] three, and four, but there doesn't appear to be a

[5] page one.

[6] **A:** This is something that was in the folder.

[7] I was instructed by Laura and Ron to give you

[8] anything I had at all when I was setting up trying

[9] to find a job, and this is actually a job

[10] description that somebody had that I thought was —

[11] had some nice wordage that you could use for a

[12] resume, to improve resumes. This wasn't a job that

[13] you could apply for.

[14] **Q:** This was for your resume?

[15] **A:** Yes. Someone said, Hey, this looks like

[16] what you do. So that is what that is from.

[17] I was going to say that I wanted you to

[18] know that because you see something that was

[19] printed out, it doesn't necessarily mean I applied

[20] there. It may mean it was printed and I was going

[21] to research them before I would apply.

[22] **Q:** But in this time frame, you were at least

Page 15

[1] looking for postings for positions?

[2] **A:** Right, but like I said, I don't remember

[3] it being as early as October. I remember it being

[4] after Thanksgiving. I will say that as things were

[5] not getting resolved, I was thinking more and more.

[6] So only thing I can think of is some of these that

[7] were before November, that I was thinking — I am

[8] trying to recollect what I would be thinking. I

[9] can see myself going and actually following up on

[10] something and printing it out, but as far as I am

[11] concerned, my job search didn't start until the

[12] Thanksgiving time frame.

[13] **Q:** On the page marked 22 in the top right

[14] corner there is some handwriting. Do you see

[15] that — toward the bottom of the page?

[16] **A:** Yes.

[17] **Q:** Is that your handwriting?

[18] **A:** No. That is actually my daughter's

[19] handwriting.

[20] **Q:** This is probably not something that was

[21] yours?

[22] **A:** She worked at SAIC.

Page 16

[1] **Q:** So that is not an application that you

[2] made?

[3] **A:** I don't remember ever applying there. It

[4] is definitely her handwriting. That is not my

[5] handwriting.

[6] **Q:** How about on page 24, is that your

[7] handwriting at the top of the page?

[8] **A:** No, no, that is not mine.

[9] **Q:** Do you know whose that is?

[10] **A:** I actually believe it is Tim Edwards at

[11] Litton because this job description was given to

[12] somebody who worked at Litton and I am pretty sure

[13] they said Tim Edwards had seen it, I am pretty sure

[14] they said that, but it is not mine.

[15] **Q:** Getting back to your current position

[16] with Space Telescope, what do you do?

[17] **A:** I am their chief information officer.

[18] **Q:** Have you been involved in anything

[19] related to the recent shuttle crash in February of

[20] this year?

[21] **A:** We have definitely been impacted by it.

[22] **Q:** Were you required to travel out of the

Page 17

[1] country because of that, because of the shuttle

[2] crash?

[3] **A:** Out of the country? We had like

[4] replanning kind of meetings that had to be approved

[5] by our board — no, this year, I haven't been out

[6] of the country this year.

[7] **Q:** Were you traveling for Space Telescope in

[8] connection with the shuttle crash?

[9] **A:** It was connected, but through a corporate

[10] perspective, not through an engineering

[11] perspective. Anyone involved with this whole crash

[12] was affected in some way because budgets were

[13] severely affected, because of moving off when they

[14] would actually have the shuttle available for us to

[15] put the next servicing mission together for the

[16] Hubble.

[17] So that was a lot of things that we had

[18] to go through with this, something called Aura and

[19] Stick, this is oversight, corporate portion of the

[20] institute, or the oversight committees, to complain

[21] to them how we were going to get through this

[22] hiatus until the shuttle mission — we were allowed

Page 26

[1] Maryland that — he spoke to me in an extremely
[2] suggestive, sexual way.

[3]    Q: He being Steve Mazzo?

[4]    A: Yes.

[5]    Q: In addition to those three, is there
[6] anything else that has occurred that you thought
[7] was sexual harassment?

[8]    A: No.

[9]    Q: Just those three incidents?

[10]    A: Yes. Well, besides — well, the other
[11] thing, I don't know what it falls under, but after
[12] the August meeting, I got a phone call from some
[13] woman who works in California, I don't know who she
[14] was. She knew something had happened that involved
[15] me and involved Steve and had said that I had
[16] become the butt of jokes, of cartoons, with me
[17] getting fucked by all of San Jose.

[18]    Q: And this was in a phone call?

[19]    A: It was on my answering machine when I
[20] came into work about a week after the August
[21] meeting, so this would have been beginning of
[22] September, and other thing was just that the men

Page 27

[1] were snickering, so she had an idea, I guess — the
[2] message was very, very brief. It was something
[3] like, I want you to know you are the butt of jokes
[4] out here, and there are cartoons with you having
[5] sex with men and that a lot of men are congregating
[6] around Bob Ossentjuk's office. I didn't know many
[7] of the women out there, so I don't really have an
[8] idea of who it was.

[9]    Q: Anything other than those four instances
[10] you have identified?

[11]    A: I don't know if this is considered sexual
[12] harassment. This is my issue with the law, but the
[13] other thing would be after people found out that
[14] work with me that something had happened, I tried
[15] to keep it as secretive as possible, but the rumors
[16] got out, so men I had worked with for years started
[17] to act differently toward me because they weren't
[18] sure of what really happened, so they pretty much
[19] hardly would talk to me and I think it was because
[20] of being a woman and knowing that I had taken
[21] exception to something. They didn't know what it
[22] was. I feel like I got treated differently because

Page 28

[1] of being a woman. To me, that is my description of
[2] sexual harassment. So that is why I added that in.

[3]    Q: Is that it, just those five, or is there
[4] anything else?

[5]    A: No, I think that is it.

[6]    Q: Let's turn back to the August 29 meeting.
[7] Can you tell me first of all what the meeting was
[8] called for?

[9]    A: It was called because there was a
[10] company-wide project that affected San Jose. The
[11] project was ordered by the president of the company
[12] and I was assigned to it by the president and my
[13] actions were — the people in San Jose didn't want
[14] any of these changes, none of it. So we were
[15] trying to just have a meeting to go over and try
[16] and straighten out the multiple versions of reality
[17] of what was actually happening, and so we thought
[18] it was better to try and do it through a meeting
[19] than to try and continue through e-mails or
[20] whatever, trying to straighten it out.

[21]    Q: Was that a teleconference —

[22]    A: Yes.

Page 29

[1]    Q: Was it a video conference?

[2]    A: A teleconference.

[3]    Q: What happened during that meeting that
[4] made you identify it as one of the instances where
[5] you were sexually harassed?

[6]    A: A little while after the meeting was
[7] going on, Steve started to say things that sounded
[8] to me very — I called it sexual analogies. It
[9] was — the best analogy is like phone sex. You can
[10] be talking about a garden hose and turn it into
[11] something sexual sounding, and the things he was
[12] saying sounded that way to me.

[13]    Q: And these things he was saying, was he
[14] saying it to the whole teleconference?

[15]    A: When he was doing this, he would either
[16] be — we were already talking, so it was a
[17] conversation thing going on, so it was clear we
[18] were talking, not anyone else involved, or he would
[19] call my name out and then he would change the way
[20] he was talking, and the way he would emphasize
[21] words, the way the words took on — it really
[22] sounded like active participation. He would use

**Deposition of Lisa A. Wolff**     Case 1:03-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 7 of 103    **Lisa A. Wolff  v.**

**July 29, 2003**     **Litton Advanced Systems, Inc., et al.**

Page 30

[1] the word you when he was talking to me or me when

[2] he was referring to himself to make it sound like

[3] it was me and him doing what he was saying.

[4] **Q:** What was it that he was saying?

[5] **A:** Can I read my notes that I took? Because

[6] you have to — I don't have it memorized.

[7] **MR. JENIFER:** Can we go off the record?

[8] **MS. COX:** Sure.

[9] (Discussion off the record.)

[10] (Wolff Exhibit No. 3 was

[11] marked for identification.)

[12] **BY MS. COX:**

[13] **Q:** If you could take a look at Exhibit 3

[14] that Ms. Jardim has handed you. You have mentioned

[15] that you had a copy, an original copy of your

[16] notes, and that is what you have pulled out in

[17] front of you — those are the yellow pages in front

[18] of you; is that correct?

[19] **A:** Yes.

[20] **Q:** Can you tell me when you took those notes

[21] on those yellow pages?

[22] **A:** The yellow pages —

Page 31

[1] **Q:** And one white page at the end.

[2] **A:** The yellow pages, they are my notes from

[3] the whole day of work. So they were taken during

[4] that day, and then at the bottom of the first page

[5] is where the notes started from the meeting, and

[6] then on the back side of this one —

[7] **Q:** Is it the one that has the word "keep" at

[8] the top?

[9] **A:** Yes, a couple of them have keep on it.

[10] It is page 5 of the fax. That I wrote after I left

[11] John Roth's office. I went to my office and wrote

[12] that down then, and then on the second page of the

[13] yellow notes where it says 6:30 at the bottom, I

[14] wrote that after I left there. I left John Roth's

[15] office and I wrote that little note to myself.

[16] **Q:** Notes from the meeting is page 4 of the

[17] fax that says "notes from meeting"?

[18] **A:** The order, page 3 is the first page of

[19] my — that is in the order of my day. That was the

[20] notes from the beginning, and page 2 is the

[21] continuation of the work manager meeting, and then

[22] page 5 of the fax is the back of one of my yellow

Page 32

[1] papers which was written right after the meeting,

[2] and then the thing that is part of the Verizon

[3] bill, I wrote that in my office right after the

[4] meeting too. I was trying to — I wrote it right

[5] after the meeting.

[6] **Q:** So the fax copy you have in your left

[7] hand, does that appear to be a correct copy of the

[8] pages you have just described?

[9] **A:** Yes.

[10] **Q:** The yellow pages and the Verizon sheet?

[11] **A:** Yes.

[12] **Q:** Looking at these notes, is your memory

[13] refreshed about the specific language that Steve

[14] used?

[15] **A:** Well, definitely the language, but I

[16] think what is more important here is the words, the

[17] sentences, the way he put them together, yes.

[18] **Q:** Just so we have it in the record, can you

[19] tell us what some of that language is that Steve

[20] said that you considered to be sexual harassment?

[21] **A:** Well, there was a discussion about

[22] something related to this thing called a work

Page 33

[1] manager server, labeled WM server in my notes.

[2] **Q:** Which page are you looking on?

[3] **A:** It would be your page 2. When Steve was

[4] talking about — he was voicing his frustration

[5] with what it was going on with the server. He said

[6] to Mike Peters, because Mike and I were working

[7] together, sort of together on the project, because

[8] he had staff on it, sorry for the language, guys,

[9] he said, to Mike. He said, "I don't give a fuck."

[10] When he was talking about the same thing

[11] with me, he said — what we were talking about here

[12] were all schedule-related things with this server.

[13] When he was talking the same thing, about this to

[14] Mike, he said to Mike, "I don't give a fuck," and

[15] then Mike said, "Well, I am not the one that did

[16] that," or something like that. Mike was yelling at

[17] the wrong person and mid-sentence Steve stopped and

[18] realized it was me and he yelled, "I won't give you

[19] one fucking for what you have done," and it was

[20] that point in the meeting — up to that point, he

[21] was using profanity, but everybody does that. It is

[22] unfortunate, but a lot of people use profanity in

Page 34

[1] meetings. I do. Everybody, unfortunately, does,
[2] but at this point in the meeting I realized he
[3] wasn't cussing, he was making it sound like we were
[4] having sex. It was such a startling difference for
[5] me, so I started keeping track of what he said.
[6] Other things —
[7]    Q: Before we move on, I just want to talk
[8] about that one before we move on. How is it
[9] that — in what way did you understand those words,
[10] "I won't give you one fucking for what you have
[11] done," to be sexual as opposed to related to work
[12] and the server and what had gone wrong with the
[13] server or hadn't or had in his mind, the work-
[14] related side of things?
[15]    A: Two things. First off, I can't imagine a
[16] man in a room of full of other men to say, "I won't
[17] give you a fucking." Second, for a man to say, "I
[18] will give you a fucking" — men say that to women.
[19] Men don't say that to men. I knew it was very
[20] directed, but even at that point I was hoping to
[21] God I was hearing things, and then he said other
[22] things that made me know I am not nuts here.

Page 35

[1]    When he — the more angry he got and the
[2] less I was willing to give in, he knew I was
[3] advising the people in my portion of the meeting to
[4] not do something he wanted, and the more angry he
[5] got, he was saying — I wrote "I'm," but he meant
[6] me covering my ass and, "I won't give you a fuck if
[7] you want to cover your ass."
[8]    When he got really angry, at one point he
[9] yelled out, "Lisa, fuck me, fuck me, fuck me." He
[10] said, "You fucked all of San Jose." A man would
[11] not have said that to a man in that room. In fact,
[12] he never did. He never did. When he was angry at
[13] the other men, he would say, "You fucked up," or,
[14] "This is all fucked," the way I call normal — it
[15] wasn't personalized. He never personalized it to
[16] the men.
[17]    As it got worse, when I wasn't doing what
[18] he wanted, he didn't say that I fucked all of San
[19] Jose until he said something like, and I didn't
[20] write it down because I couldn't get it fast
[21] enough, "It is not enough you fucked me. Now you
[22] have to fuck every one of these guys."

Page 36

[1]    Q: Is there any reason you thought he didn't
[2] just mean that you messed him up with his job?
[3]    A: No.
[4]    Q: That you fucked up his job?
[5]    A: No. That is not — if you look —
[6]    Q: Why is it that you believe that that is
[7] not what he meant?
[8]    A: Two reasons. First off, during that
[9] meeting — I only wrote down what I could get down
[10] as fast as he said these things. When Mike would
[11] try to lower the heat a little bit and he might
[12] mention something, Steve would change it to things
[13] like — "This is all fucked up, You messed this
[14] up." That is the kind of stuff he would say to men
[15] in the room, but whenever he would start to talk to
[16] me again, he would call out my name or I would be
[17] the one where someone would say, "Lisa knows that,"
[18] and it was clear he would have to talk to me and
[19] then he would do this.
[20]    And there was one point in the meeting
[21] where he started to be mad at somebody, or start
[22] soap-boxing and talking about what he was angry

Page 37

[1] about, and he, mid-sentence he almost stumbled over
[2] his tongue he could not stop himself from talking,
[3] and when he was yelling at this person in the
[4] beginning it was, "You messed this up," and then he
[5] was like — "Lisa, you really fucked me on this
[6] one. You like fucking me?"
[7]    Men don't ask men if you like fucking
[8] them and there was no way this was for anyone but
[9] me, and the other reason I know it was meant for me
[10] was in November, when it was clear that Steve was
[11] not going to be let go, that I was going to have to
[12] work with him, and so many things were not going
[13] right for the integration of the two companies I
[14] wanted to go right because I thought it was a
[15] wonderful thing, it would be good for everybody, so
[16] I said, I am going to sit down and talk to Steve
[17] and we are going to figure out a way to say, "Look,
[18] don't come near me. Don't touch me. Get away from
[19] me" and just move on —
[20]    Q: If I could stop you for a second. What
[21] you are talking about now is the November 30
[22] meeting?

Page 38

[1] **A:** Yes.

[2] **Q:** Just so we keep things all together and
[3] we don't miss anything, I want to stay with August
[4] for now and then we will get to November.

[5] **A:** You asked me how I knew. I won't tell
[6] you the details of the meeting, but in that other
[7] meeting when we were left alone for almost 40
[8] minutes, he said right to my face, he did it
[9] because he knew it would make me leave the room and
[10] he knew none of the other guys would pick it up.
[11] So he knew what he was doing.

[12] **Q:** Is there anything else he said in the
[13] August 29 meeting that made you feel that you were
[14] being sexually harassed?

[15] **A:** I don't have it written down, it is more
[16] from memory, but he had this scale that he used of
[17] how many fucks he would give me or not give me as
[18] like a punishment, and if the worst — the more big
[19] was angry or the bigger impact whatever the issue
[20] was he was talking about had, he would say, "I am
[21] not going to give you one fuck for that," or, "I am
[22] not going to give you one fucking for that," or, "I

Page 39

[1] am not giving you three fucks for that."

[2] **Q:** Did you ever hear him say, "I don't give
[3] three fucks" or "I don't give one fuck" to anybody
[4] else?

[5] **A:** No, no, no, never.

[6] **Q:** You never heard him say, "I don't give a
[7] fuck"?

[8] **A:** That is not what I am upset about. He
[9] can do that. It is unprofessional, but if he wants
[10] to run his career that way, that is fine. That is
[11] not what I am here for. I am here because of other
[12] things he said.

[13] **Q:** Other than the statements we have already
[14] gone over, can you think of anything else he said
[15] in that meeting that you considered was sexual
[16] harassment?

[17] **A:** I have tried to remember what I can from
[18] some of these papers. I told you, "You fucked all
[19] San Jose." I told you that. I did tell you he
[20] asked me if I liked fucking him. I think I said
[21] that. So much time has gone by. Let me look at
[22] these. There is the thing about "Do you like it?"

Page 40

[1] He talked about covering my fucking ass.

[2] **Q:** On that comment, why is it that you think
[3] was a sexual reference, instead of something
[4] related to covering you for work?

[5] **A:** Because before he said that, he said, "I
[6] wouldn't give you a fuck if you want to," and then
[7] I can't remember, but I wrote down to take time —
[8] I can't remember what he said exactly, to cover
[9] your fucking ass. I guess he was withholding sex.
[10] It is the fact that he said, "I won't give you a
[11] fuck." Who says that to somebody?

[12] I am telling you there is no way he would
[13] have said to a man, "I won't give you a fuck if you
[14] want to cover your fucking ass." Who is going to
[15] say that? He never said it to men. He said to
[16] men, "Don't cover your fucking ass," but he didn't
[17] tell them he would withhold a fuck. There is a big
[18] difference, especially when you are the only woman
[19] in the room.

[20] **Q:** Just so we have it on the record, I think
[21] I understand from what we discussed, Steve was in
[22] California and you were in Maryland on this

Page 41

[1] teleconference?

[2] **A:** Yes.

[3] **Q:** Who was in the room with you?

[4] **A:** John Roth and Mike Peters.

[5] **Q:** And all of the other individuals were in
[6] San Jose?

[7] **A:** Yes.

[8] **Q:** It was just the two locations?

[9] **A:** Yes. Our business operated on
[10] teleconferencing because we were all spread out.

[11] **Q:** Did you consider any of the language that
[12] you have identified and anything Steve Mazzo said
[13] to you as being threatening to you?

[14] **A:** In what way?

[15] **Q:** You have identified it as being sexual in
[16] nature. I am now asking you if it was threatening
[17] to you?

[18] **A:** Yes.

[19] **Q:** In what way?

[20] **A:** This guy was my boss's boss. Well, I
[21] knew he fired people before for telling him no or
[22] not doing what he said, so I was afraid — I was

Page 42

[1] afraid — I didn't know what to do, I had no idea
[2] what to do. So just the fact that he was my boss's
[3] boss was very threatening. I didn't even know if I
[4] could even say anything —
[5]   Q: And who was your boss?
[6]   A: John Roth, and John reported to Steve. I
[7] knew he couldn't hit me or punch me or anything
[8] like that because he wasn't in the room, but I have
[9] to tell you, his words were like nails going
[10] through me. I thank God he wasn't in the room. I
[11] don't know what I would have done if he was
[12] physically there.
[13]     The words were so unbelievable, and
[14] people looking at me. You know this. It felt like
[15] I was getting raped, that is what it felt like, and
[16] these guys didn't do anything, nothing. They did
[17] nothing. They just sat there. I knew these men
[18] from so long. I think they were afraid to say
[19] anything because Steve was their boss. I guess
[20] they were afraid too, but it was very threatening.
[21]   Q: Did you tell him to stop using the
[22] language?

Page 43

[1]   A: Well, by the time I realized that —
[2] remember, I told you about the point in the meeting
[3] where he started to yell at someone else and then
[4] realized it was me and then started to talk like
[5] the dirty way, the really sexual way, once I
[6] realized — well, let me back up.
[7]     A little bit before that, some things he
[8] had said, I thought, That doesn't sound right, that
[9] kind of came out funny —
[10]   Q: This is in that day's meeting?
[11]   A: Yes, and this was maybe two or three of
[12] his yellings before he stopped mid-sentence, when
[13] he was yelling at one person that was a man and
[14] then started yelling at me, and then once that
[15] happened, it was like two ends of the spectrum for
[16] me and I realized I was in the middle of sexual
[17] harassment, that this is what it is, and I couldn't
[18] talk, I couldn't swallow, I could barely breathe.
[19]     I told Laura, my legs felt like lead and
[20] they were stuck to the ground. I didn't even think
[21] I could stand up because I realized what was
[22] happening and I wasn't even sure what I could do,

Page 44

[1] and then I kept my head down and I was looking at
[2] my paper and he was just yelling and a lot of these
[3] things I was writing as fast as I could, and over
[4] here, I started keeping track — at one point he
[5] must have yelled — he must have had sentences —
[6] however these add up, 16, 17, 18 times, that he was
[7] talking so fast and yelling these things at me
[8] specifically, and so I just kind of sat there, it
[9] went — I sat there trying to calm myself once I
[10] realized what was happening.
[11]     I was watching my second hand go by and
[12] it was almost a minute that went by with these
[13] sexual ways he was saying it, and then I didn't
[14] think I could get up and I have to tell you all,
[15] because you are women, I didn't think I should get
[16] up. I didn't know if I should leave, because that
[17] is what he wanted. I thought I would be strong for
[18] other women and sit there, and then it wasn't
[19] stopping and I looked at Mike Peters, who was
[20] sitting right here at the table next to me, and I
[21] was looking at him, like, Somebody do something,
[22] stop him.

Page 45

[1]     I couldn't talk and I didn't want Steve
[2] to know he had made me so weak. I didn't want the
[3] other men to know, and I did everything — I did
[4] not cry through the whole meeting. I looked at
[5] Mike, and it was like, Do something, so Mike
[6] said — he had to yell practically over Steve to
[7] get him to hear that someone was trying to break
[8] in. He said, "Steve" — Mike raised his voice and
[9] he said, "Look, you know, this is really
[10] unprofessional," or something like that and tried
[11] to stop it, and I looked at Mike. He did what he
[12] could.
[13]     Steve kept going, he just yelled at Mike,
[14] he kept going, and John Roth and I were sitting at
[15] the end of the table and a few more minutes the
[16] meeting went on and John Roth said something like,
[17] "Hey, this is done. We have to stop. I don't
[18] think we are getting anywhere." And he stopped the
[19] meeting.
[20]     During this time, I was just sitting
[21] there collecting myself until the meeting was ready
[22] to stop. But I want you to know the only reason I

Page 46

[1] didn't say it myself was because I could not, I
[2] could not get words out. My heart was racing and I
[3] didn't want him to hear me. I didn't want him to
[4] hear a tremor in my voice. I didn't want him to
[5] know what he had done because I figured that was
[6] his whole point, and I didn't want him to know he
[7] had succeeded in doing what he had done, so I asked
[8] Mike.
[9]   Q: When John Roth said, "I don't think we
[10] are getting anywhere," is that when the meeting,
[11] the teleconference ended?
[12]   A: Some other stuff went on —
[13]   Q: Back-to-work stuff?
[14]   A: John and Mike were talking about — there
[15] was talk about schedules and action items and John
[16] and him were talking and then I can't remember who
[17] did it, if it was John or somebody else on the
[18] other end, I can't remember who, but there was a
[19] list of things I was supposed to check on, and I
[20] uttered, "I will check on it and I will let you
[21] know tomorrow." That was about the most I could
[22] get out, and then I just sat there until Steve was

Page 47

[1] off the phone. Steve had something else that he
[2] was talking to John about, so I had to sit in the
[3] room for a couple of minutes or something, and then
[4] they hung up.
[5]   Q: The beginning of this conversation, the
[6] teleconference, was it your understanding that
[7] Steve was upset with you or angry with you because
[8] of what had happened with the server or work —
[9] whatever the work reason was for the
[10] teleconference?
[11]   A: I knew there were problems, I knew there
[12] were problems, but I was fully prepared to talk
[13] about them and explain things. Steve and I had
[14] been talking about related issues prior to that,
[15] and in those conversations, I hadn't sensed any
[16] animosity or anger or anything, before the meeting.
[17]   Q: Do you believe he used the language he
[18] did because of your sex, because you are female?
[19]   A: The part when he — yes.
[20]   Q: The sections you have identified?
[21]   A: Yes.
[22]   Q: Other than the reasons you have already

Page 48

[1] explained, the differences in the language that you
[2] identified, is there any other reason you think
[3] that he used that language because you are a
[4] female?
[5]   A: When you say the differences, you mean
[6] how I said he talked different to the men versus
[7] me?
[8]   Q: Right.
[9]   A: I don't believe a man would say these
[10] things to another man.
[11]   Q: In addition to that, is there any other
[12] reason he used this language directed at you
[13] because you are a female?
[14]   A: I think that a conversation I had had
[15] with Steve in, I can't remember when it was, it was
[16] prior to this thing, where he would use what I call
[17] regular cussing. Most of the men I work with use
[18] the F-word.
[19]   Q: Do you use it too? You said —
[20]   A: Certainly not in a work meeting and
[21] certainly — I don't really use the F-word. Maybe
[22] 10 times. I said like damn or hell, something like

Page 49

[1] that. But we were in some meeting, and it was more
[2] a passing kind of comment I had made to him, and
[3] there was a lot of cussing going on in the meeting
[4] and I had said to Steve — I am trying to remember
[5] if other people were there or not, but I know I had
[6] said to Steve, "There is a lot of cussing going on
[7] in the meetings and it just kind of delays the
[8] meeting, and I would prefer not to have to sit and
[9] hear it all the time," and he was real nice about
[10] it.
[11]     This was a couple of — it was a while —
[12] way before this thing had ever occurred, so I don't
[13] even know if he would remember the conversation,
[14] but I have wondered, because when we had that
[15] little passing conversation, we had talked a little
[16] bit about the words that were used because he was
[17] trying to — we had talked a little bit about it
[18] and I had — can't remember how it came up, but I
[19] said something like, a for-instance, "The F-word is
[20] a slang word for sex, so why would you go in a
[21] meeting saying sex, sex, sex?" It was a
[22] friendly — it was more of — only because I was

Page 50

[1] saying something to a senior person at a time when
[2] I was pretty junior, so I remember the
[3] conversation, so it was more in — you don't need
[4] to constantly be cussing, and I have wondered to
[5] this day if because I made that connection between
[6] the word sex and the word F, that it makes sense
[7] for a comment he made to me in that November
[8] meeting because he had said at one point, he said,
[9] "I knew you wouldn't like that." So I have always
[10] second-guessed myself. Was it something he did
[11] remember, this comment I made a long time ago? And
[12] I don't know. It is a guess. I have tried to play
[13] it in my head a million times.
[14]    Q: In what way did the August 29
[15] teleconference you have described — first, let me
[16] ask you, is there anything else related to that
[17] teleconference that you haven't yet told me as far
[18] as any aspects of sexual harassment that occurred
[19] against you?
[20]    A: No, I don't think so.
[21]    Q: In what way did what happened in that
[22] meeting — let me start over.

Page 51

[1]    Did this — did what happened in that
[2] meeting interfere with your work at all?
[3]    A: Yes.
[4]    Q: And how did it interfere with your work?
[5]    A: Well, anyone who was there, who knew the
[6] details of what happened, there was definitely a
[7] lot of thick air afterwards, very uncomfortable. I
[8] was, for myself — I just couldn't even imagine
[9] speaking to these men after all this happened. I
[10] just couldn't imagine it. So there was a while
[11] after the meeting that I could not talk to anyone.
[12] I couldn't even look at the people that were in the
[13] meeting and knew what happened. It was just so
[14] embarrassing. I did talk to one of my employees
[15] that was there —
[16]    Q: Who was that?
[17]    A: Ken Peters. But it interfered because it
[18] was just so embarrassing and so humiliating.
[19]    And I can only assume it is related to,
[20] this is up until this point I had had pretty good
[21] e-mail responses — we worked on e-mail and
[22] teleconferences in the company. People would

Page 52

[1] answer my e-mails and that type of thing, from
[2] California and Maryland, and nothing was happening,
[3] responses weren't coming, and so it interfered that
[4] way. I just have to assume it is that because it
[5] started after the meeting.
[6]    Q: And when you —
[7]    A: Well, actually it started after they knew
[8] I filed a grievance. That is when it really
[9] started.
[10]    Q: So the e-mail issues didn't occur
[11] immediately after that meeting?
[12]    A: I can't remember exactly when. I just
[13] remember that as time went on after this event,
[14] that it was taking longer and longer and longer to
[15] resolve anything. Phone calls weren't being
[16] returned, e-mails weren't being returned. I was
[17] not able to get information I need to try to do my
[18] work, so I would have to go to my manager and he
[19] would have to arbitrate and get the information and
[20] bring it back.
[21]    It was the most inefficient nightmare I
[22] have ever been in to try to get my work done

Page 53

[1] because Steve would have — most of the information
[2] I would need would have to come from him, very
[3] technical things and risks associated with those
[4] things, to complain to Steve so he could make a
[5] decision, or it would have to go to Linda Hay
[6] again. I would have to assume, because everything
[7] changed after the meeting, that it related to the
[8] meeting. Getting information was difficult.
[9]    Q: Is there any reason you have to believe
[10] that — when you say it was related to the meeting,
[11] that it wasn't just related to the work
[12] difficulties that were discussed in the meeting?
[13]    A: What they were frustrated about?
[14]    Q: Yes.
[15]    A: Well, the issues that we had the meeting
[16] about had been going on for almost six or nine
[17] months. This had been a very long project. There
[18] was a lot of animosity in the upper staff between
[19] Steve Mazzo and our president because our president
[20] was made president and Steve Mazzo wasn't and there
[21] was a lot of stuff going on.
[22]    So these things had been happening for so

[1] long, and no matter — if I have to compare when
[2] the situation was upsetting for people on both ends
[3] prior to the meeting and after, we were
[4] communicating the whole time even though they were
[5] always feeling they were on the short end of the
[6] stick. It never went their way, and at that time I
[7] never had problems talking with them.
[8]     I just don't think it was different until
[9] after the meeting and I don't think it was related
[10] to that they were mad because they were mad before
[11] we started the meeting and we had constant contact
[12] with each other before the meeting.
[13]     Q: Is there any other way in which you can
[14] identify it, that it interfered with your work?
[15]     A: Well, it was — because of all of the
[16] inefficiencies, I had to do a lot of things on my
[17] own to try to get more information, so it took me a
[18] lot more time to get anything done.
[19]     The other thing is in order to be away
[20] from Steve, kind of a network of communication was
[21] set up, at least in my department, so that if there
[22] was — it wasn't just Steve, it was even the people

[1] in the meetings — more people were introduced in
[2] order to try to isolate me from Steve.
[3]     Q: And what you are referring to now is your
[4] request not to have to deal with him directly?
[5]     A: That never worked. These were things my
[6] immediate supervisor was trying to insulate me, and
[7] then people on my staff were — I had to change
[8] assignments for people, to put them into places so
[9] I could be insulated because it wasn't working —
[10]     Q: Was this so you wouldn't have to interact
[11] with Steve?
[12]     A: Yes, but it wasn't things that they did.
[13] These were things I had control over with my own
[14] staff because what they were supposed to do didn't
[15] work. It just wasn't working out.
[16]     Q: And this was at your request, that you
[17] were to be insulated from Steve?
[18]     A: Yes.
[19]     Q: What did you do to notify the company of
[20] the August 29 incident?
[21]     A: I called Tim Edwards who is our director
[22] of personnel.

[1]     Q: And when was that?
[2]     A: I think it was that night before I went
[3] home, or it might have been the next morning, but
[4] it was right after it happened, real quick after it
[5] happened.
[6]     Q: Anything else other than contacting Tim?
[7]     A: Well, my VP was in the room, so there
[8] wasn't — do you want me to tell you about the
[9] grievance?
[10]     Q: We will get to that. I just wanted to be
[11] sure we have every —
[12]     A: It was late at night. By the time I
[13] left — there was really nothing I could do but
[14] make a phone call.
[15]     Q: So after you contacted Tim — I guess
[16] when you first contacted Tim, was it a voice mail?
[17]     A: Yes. He wasn't in.
[18]     Q: And then did you hear back from him or
[19] did you call him again, what happened next, as far
[20] as notification about this?
[21]     A: I came in and I had a voice message on my
[22] machine where he had returned my call. I had left

[1] him a message that I had been in a meeting with
[2] Steve Mazzo and I said something like, "He is
[3] really over the top" or "I am not ever going to
[4] tolerate this," something like that. I didn't tell
[5] him what happened, and I asked him to call me, so
[6] his message back to me was kind of like a chuckle.
[7] He was like, "Well, doesn't surprise me. Sorry you
[8] had to go through that with Steve," something
[9] about, "Call me," or something like that.
[10]     Q: That was in response to the message you
[11] left where you didn't give him any of the details?
[12]     A: I didn't give him any of the details.
[13]     Q: Just that you had been in the meeting —
[14]     A: I didn't go into the details — I don't
[15] remember if I said he was over the top or this
[16] was — I can't remember. I was way too upset that
[17] night. Anything I could remember is only because I
[18] wrote it down. I do remember though his little
[19] chuckle because it really upset me. Granted he
[20] didn't know, granted, and — he didn't know what
[21] has happened yet, but he alluded to in his message
[22] that something had happened before, so this didn't

Page 58

[1] surprise him with Steve.

[2] Q: After that return voice mail from Tim,
[3] what happened next, as far as communicating with
[4] Tim or somebody else in HR about this?

[5] A: Well, I can't remember all the dates or
[6] anything, but I remember going through the process
[7] of trying to decide whether or not I should
[8] actually file a grievance. I obviously didn't
[9] choose the right thing because everything that
[10] happened was what I was afraid of, but I took some
[11] time to think about it and I told him — I told him
[12] what had happened, I told him I wanted to think
[13] about it and then I filed a grievance — I talked
[14] to my dad and stuff and my husband and then I can't
[15] remember how I went about filing it. Maybe he gave
[16] me a form or it was on the Web, I can't remember,
[17] but somehow I got the form and filled it out.

[18] Q: You said you were trying to decide about
[19] whether to file a grievance. Did Tim tell you
[20] there was a grievance procedure, or you already
[21] knew that?

[22] A: I knew, because right after the meeting

Page 59

[1] ended John Roth and Mike Peters said this was
[2] unbelievable and I should file a grievance, that
[3] what happened here was against the law and they
[4] would back me up. So, I already knew there was
[5] some kind of grievance thing, so when I went back
[6] in my office, I was immediately trying to find out
[7] more about this grievance procedure.

[8] Q: Before that time, you had never heard of
[9] a grievance?

[10] A: I figured there had to be something like
[11] that, but I had never used it. I had some people
[12] that had made a complaint, some of my employees,
[13] but I don't remember them filling out this form.
[14] So other than John Roth and Mike telling me about
[15] it, and me looking, that is how I —

[16] Q: When you say John Roth and Mike told you,
[17] was it in one conversation where you were with both
[18] of them or did you speak to them individually?

[19] A: It was right after the meeting was over,
[20] and they were trying to console me because I had
[21] finally — once Steve was off the phone, I broke
[22] down crying, so they were in there together and

Page 60

[1] just saying — they used words like this is way
[2] over the top and what happened here is not supposed
[3] to be happening in the workplace.

[4] I don't want you to think I am quoting
[5] them, but they made it very clear that I should be
[6] filing a grievance, that I would be — I think John
[7] Roth said — I think I said, "I am afraid to do it
[8] because he is a vice president," and John Roth said
[9] he would back me up, "You have two staff members in
[10] the room. Don't be afraid. You have to bring this
[11] to Mike Aaron's attention. Don't worry, we will
[12] protect you."

[13] Q: Did they say what basis you should bring
[14] a complaint on?

[15] A: Like labeling it sexual harassment? I
[16] don't remember them doing that. They just said —
[17] I think they used words like you were attacked and
[18] they would back me up.

[19] Q: So once you decided to file the grievance
[20] and you completed it, you said there was paperwork,
[21] what happened after that point with the grievance,
[22] as far as follow-up with the grievance was

Page 61

[1] concerned?

[2] A: Well, they started it as a level — there
[3] are three levels and they started it as a level 2,
[4] essentially, and personnel and supervisors started
[5] to do the things that show up in the policy for
[6] what they are supposed to do.

[7] Q: Investigate it and talk to people on the
[8] telephone — who was on the teleconference, or
[9] maybe you don't know —

[10] A: To my knowledge, no investigation was
[11] done. I was asked to give a statement —

[12] Q: So you gave a statement?

[13] A: I gave a statement because that is part
[14] of the process. Mike Peters gave a statement and
[15] John Roth gave a statement.

[16] Q: So statements were taken from them?

[17] A: Yes. If Tim talked to them separately, I
[18] don't know. I was never asked for anything. To me
[19] it was not investigated.

[20] Q: When you say you were not asked for
[21] anything, you were asked for a statement?

[22] A: I was asked for a statement, so I tried

Page 62

[1] to tell them what happened in the meeting.

[2] **Q:** Was there something else that you felt
[3] you could have given them that would have helped in
[4] the investigation?

[5] **A:** I thought they were going to ask me what
[6] actually happened in the meeting.

[7] **Q:** Isn't that what you put in your
[8] statement?

[9] **A:** No, that is not what you are supposed to
[10] put in your statement. The policy is state what
[11] the issue is, so I gave a general accounting of
[12] what the issue is; so then it talks about in the
[13] policy, then they come talk to you and there is an
[14] investigation and all these things go on, so I
[15] waited for that. I did what I was supposed to do
[16] on the first level or whatever, the grievance.

[17] **Q:** Were you ever notified of the results of
[18] the grievance — did you ever learn what happened
[19] because of your grievance?

[20] **A:** Can you be more specific? Do you mean by
[21] level or —

[22] **Q:** At some time were you informed that the

Page 63

[1] grievance procedure was complete?

[2] **A:** Yes, I was.

[3] **Q:** And when was that?

[4] **A:** It was in November.

[5] **Q:** How were you notified?

[6] **A:** I was told by Tim Edwards that he
[7] considered it closed because I agreed to have that
[8] meeting with Steve Mazzo to try to work out some
[9] sort of arrangement, and he verbally told me that
[10] he considered this issue was successfully closed.

[11] **Q:** When did you retain an attorney in
[12] connection with this matter, first retain an
[13] attorney?

[14] **A:** I can't remember the date. You must
[15] know. Don't you have — there is a letter that
[16] came from him.

[17] **Q:** I am looking for it. Didn't know if you
[18] remembered.

[19] **A:** No, I don't remember exactly.

[20] **MS. COX:** Would you mark this.

[21] (Wolff Exhibit No. 4 was
[22] marked for identification.)

Page 64

[1] **BY MS. COX:**

[2] **Q:** Ms. Jardim has handed you Exhibit No. 4.
[3] Have you ever seen that letter before? Take a
[4] moment to review it.

[5] **A:** Yes, I have seen it before.

[6] **Q:** And what is that letter?

[7] **A:** It is from my attorney that I used to
[8] have, to Tim Edwards.

[9] **Q:** And what is the date on that letter?

[10] **A:** September 13.

[11] **Q:** Of?

[12] **A:** 2001. Sorry.

[13] **Q:** Does this letter indicate that you have
[14] retained Mr. Douglas for this litigation we have
[15] been discussing?

[16] **A:** Yes.

[17] **Q:** Does this refresh your recollection about
[18] when you might have retained him?

[19] **A:** Yes.

[20] **Q:** And based on this letter, and your
[21] memory, when did you first meet with Mr. Douglas?

[22] **A:** It must have been before September 13. I

Page 65

[1] still don't know the exact date, I don't know the
[2] date, but it was around this time frame.

[3] **Q:** Obviously before that day or earlier?

[4] **A:** Right.

[5] **MS. COX:** Can you mark this?

[6] (Wolff Exhibit No. 5 was
[7] marked for identification.)

[8] **BY MS. COX:**

[9] **Q:** Can you tell me why you changed lawyers
[10] from Mr. Douglas?

[11] **A:** I really didn't get along with his
[12] personality. I don't know how to describe it. He
[13] was kind of weird. That is the main reason. He
[14] was kind of weird. Not to mention he was a long
[15] drive from home, and I worked in the Baltimore area
[16] and he was down in Rockville. That was the main
[17] reasons.

[18] The other reason was I tried very, very
[19] hard to work out some sort of financial arrangement
[20] that would be acceptable to my husband and I and he
[21] was not willing to make that arrangement and my
[22] husband and I — I wasn't going to choose a lawyer

Page 66

[1] over my husband's wishes, so I found a different
[2] attorney that was wasn't weird and worked out an
[3] arrangement financially that worked, and they are
[4] like 10 minutes from my work now, so it worked out
[5] better.
[6]    Q: How did you come across them?
[7]    A: Somebody that works where I work knows a
[8] person that knows Ron Cherry and recommended him.
[9]    Q: I am handing you what has been marked as
[10] Exhibit 5. Do you recognize that document — have
[11] you ever seen it before?
[12]    A: Yes.
[13]    Q: And what is that?
[14]    A: It is a letter from an attorney at
[15] Northrop that was to my attorney.
[16]    Q: To Doug Taylor?
[17]    A: Yes, to Doug Taylor.
[18]    Q: And was the letter addressing this
[19] lawsuit?
[20]    A: Yes, it is.
[21]    Q: And was it —
[22]    A: What she is saying is — she is talking

Page 67

[1] about in level 2 or 3 of the grievance. They
[2] essentially tell you that we are done, it is
[3] resolved, we are taking whatever actions we are
[4] going to take, and that is done. It says here I
[5] got something in writing, so maybe I did, but I
[6] don't remember it. I don't remember it being done
[7] until after that November meeting where Tim said he
[8] was closing it out.
[9]    Q: And what is the date of this letter?
[10]    A: November 2. I don't know. This one is
[11] November 2. This was the thing. That is something
[12] different they are talking about.
[13]    Q: It indicates that on September 7, you
[14] received what?
[15]    A: As part of level 2 of the grievance, an
[16] employee can ask for some things, and one of the
[17] things I asked for was to be kept away from him,
[18] and on all of his trips when he comes to Maryland,
[19] I needed to be notified a day in advance, I needed
[20] to be sure he was not there. I didn't want to see
[21] this man.
[22]    Q: So you weren't in the same facility?

Page 68

[1]    A: I wanted to be gone. I needed to know
[2] where he was. What she is talking about there is
[3] on the 7th, that is that memo. You would have a
[4] copy of it that comes and says they are going to
[5] abide by my wishes.
[6]    MS. COX: If you could mark this as
[7] Exhibit 6.
[8]    (Wolff Exhibit No. 6 was
[9] marked for identification.)
[10]                  BY MS. COX:
[11]    Q: Ms. Jardim has handed you what has been
[12] marked as Exhibit 6. Is that the September 7 memo
[13] you were just describing?
[14]    A: Yes, it is.
[15]    Q: And again, what was it that you were
[16] notified of in that letter specifically?
[17]    A: That they would notify me whenever Steve
[18] was in the facility and that I would not be
[19] subjected to further contact with him.
[20]    MS. COX: Would you mark this as Exhibit
[21] 7.
[22]    (Wolff Exhibit No. 7 was

Page 69

[1] marked for identification.)
[2]                  BY MS. COX:
[3]    Q: Ms. Jardim has just handed you what has
[4] been marked as Defendant's Exhibit 7. I don't know
[5] if you have ever seen this before.
[6]    A: No, but I know Mr. Higgins. I like this,
[7] "discuss with no one."
[8]    Q: From your — although you haven't seen it
[9] before, from your review of this document, what
[10] does it appear to be?
[11]    A: It looks like it was from Mr. Higgins who
[12] was head of our security guards, and this must have
[13] been a note, I guess, for the guards.
[14]    Q: Instructing the guards in what way?
[15]    A: To let John or Charlie know that Steve
[16] Mazzo had come into the building.
[17]    Q: So this was in connection with your
[18] request at whatever the stage was, stage 2 or 3, to
[19] be notified that Mr. Mazzo was in the building?
[20]    A: I can't say for sure.
[21]    Q: Can you see in the top right corner,
[22] there is a date?

Page 70

[1] **A:** Yes.

[2] **Q:** What date is that?

[3] **A:** 9-6-01.

[4] **Q:** Is there any reason you have to believe

[5] that this note would be referring to anything else?

[6] **A:** I didn't write it and I am also not Tim.

[7] That is why I don't believe I can say for sure —

[8] it is a logical connection, but I don't know that

[9] you can say for sure.

[10] **Q:** Just for the record, let me read the

[11] note. "Security guards. If Steve Mazzo come into

[12] this building please notify John Roth or Charles

[13] Kohnstam," and it is signed "Capt. Higgins." Is

[14] that a correct reading of the note?

[15] **A:** Yes.

[16] **Q:** "P/S, this information is not to be

[17] discussed with no one but the security guards."

[18] This note is dated just after the time

[19] when you filed your grievance; is that correct?

[20] **A:** Yes.

[21] **Q:** And in the — this was previously marked

[22] as Exhibit 5. So when you saw that letter, was it

Page 71

[1] your understanding that the grievance was

[2] completed?

[3] **A:** When I saw —

[4] **Q:** The letter I just handed you, Exhibit 5?

[5] **A:** When I saw this letter?

[6] **Q:** Yes.

[7] **A:** No, I didn't think it was completed.

[8] Say your question again?

[9] **Q:** When you saw this letter, was it your

[10] understanding that the company had completed its

[11] investigation into this grievance and had closed

[12] this grievance?

[13] **A:** Well, that is what this letter said. I

[14] think it stated their feelings, that they had

[15] closed it.

[16] **Q:** So were you aware before that time that

[17] the company had closed the grievance, before

[18] November 2, or before you saw the letter?

[19] **A:** I can't remember when I — I just keep

[20] linking the feeling that it was closed when Tim

[21] told me in the hallway that he had considered it —

[22] the matter had been cleared up or whatever. I

Page 72

[1] can't remember what the date was or anything.

[2] **Q:** But this is before then, because the

[3] meeting that you are talking about with Steve and

[4] Tim was November 30; is that right?

[5] **A:** I looked up the date in order to put it

[6] in the complaint and I can't remember what the date

[7] is.

[8] **Q:** That is the date that you gave at the

[9] beginning of today, and I think that is the date —

[10] **A:** For the meeting?

[11] **Q:** For the meeting with Steve Mazzo —

[12] **A:** That was August 29, 2001.

[13] **Q:** And then there was —

[14] **A:** Then there was a November meeting, I am

[15] pretty sure it was November.

[16] **Q:** I think you gave the date of November 30.

[17] **A:** Whatever the date is in the complaint

[18] because I looked it up one time.

[19] **Q:** We can flip to the section in the

[20] complaint, but it is November 30.

[21] **A:** Okay. I don't remember the date exactly.

[22] **Q:** Going back to the second item that you

Page 73

[1] identified for one of the ways in which you

[2] described being sexually harassed, the second item

[3] I have is the touching in California. You said

[4] earlier you weren't exactly sure when it occurred.

[5] And you have described it already for the court

[6] reporter.

[7] Can you tell me — do you recall where

[8] that occurred?

[9] **A:** It was in a conference room in San Jose.

[10] **Q:** In the Northrop Grumman offices in San

[11] Jose?

[12] **A:** Yes, at that time the Litton ones.

[13] **Q:** And was anyone else in the conference

[14] room at the time?

[15] **A:** No, no. It was after hours, which is

[16] pretty early in San Jose.

[17] **Q:** Had you — what was the reason you were

[18] in the conference room?

[19] **A:** I was like — when I visit, I don't have

[20] an office there, so I would use the conference room

[21] to work in there. So I was just sitting down doing

[22] paperwork.

Page 74

[1] **Q:** And had anybody else been working with
[2] you during the day in the conference room?

[3] **A:** No.

[4] **Q:** Did people come in and out while you were
[5] there?

[6] **A:** I can't remember if that is where we had
[7] some of the meetings, but — at this time I was
[8] just sitting in there by myself working. I want to
[9] say it was like 5:00 or something like that, five
[10] or six.

[11] **Q:** And when Mr. Mazzo came into the room,
[12] did you have a conversation?

[13] **A:** No.

[14] **Q:** Tell me what happened.

[15] **A:** I was sitting at the table working and my
[16] back was to the door. I didn't even hear him come
[17] in. I don't know if he sneaked in, but I didn't
[18] hear him walk up behind me. He put his hand on my
[19] shoulder and he said something, but I can't even
[20] remember what he said. I was so startled.

[21] First off, to have somebody come up
[22] behind you when you don't know anyone is there, so

Page 75

[1] I was very startled, and then at the same time, to
[2] be touched, it icked me out. I wasn't quite sure
[3] and I felt very uncomfortable because I knew there
[4] was probably anybody in the plant and I just
[5] thought it was kind of weird. I just kind of went
[6] like that because it scared the heck out of me and
[7] pulled his hand off and he said something, I think
[8] it was about getting something to eat, and I was
[9] just like, I just want to work. It was real,
[10] "Don't come near me, you are making me icky," and
[11] he never came around me ever again, close, after
[12] that — my body language made it very clear to him
[13] that he had made me very uncomfortable.

[14] **Q:** Did you have any conversation after that
[15] happened as far as work was concerned —

[16] **A:** As far as work —

[17] **Q:** Or any conversation?

[18] **A:** I told him — I was trying not to make a
[19] big deal out of it.

[20] **Q:** Did you actually say anything or did you
[21] pull away and make a face?

[22] **A:** My first thing was a reaction because he

Page 76

[1] scared the heck out of me. Once I realized it was
[2] somebody I knew and that it was Steve — at this
[3] point I think I was — I don't even think I was —
[4] I might have been in a lower position — it was
[5] obvious I needed to be careful what I did as far as
[6] saying anything. So I pulled it away and made it
[7] pretty clear I wasn't doing whatever he mumbled,
[8] and he walked away, and I said I just want to get
[9] done and go home. I think he said something about
[10] food or "Have you eaten?" or "Do you want to get
[11] something to eat?" I didn't even visit it.
[12] Because I didn't want to know if it was, Do you
[13] want to get something — I don't know, it was
[14] weird, it was very weird.

[15] **Q:** How long was he in the conference room?

[16] **A:** It was real fast. He came in, he touched
[17] me. He knew I didn't want it and he walked back
[18] out. It was less than a minute. It was very, very
[19] quick.

[20] **Q:** Do you believe that he did that, he put
[21] his hand on your shoulder as you described, because
[22] you were female?

Page 77

[1] **A:** Yes, because he didn't just touch my
[2] shoulder. He touched far enough down, you know
[3] where the bra strap connects to the cup part, I
[4] could feel him that far down, and if you are not
[5] going to touch that far down, and if it is a woman,
[6] you are certainly not going to put your hand over
[7] the shoulder of a woman. So I assumed it was
[8] because he wanted to see how close he could get to
[9] touching my breast.

[10] **Q:** Why would you make that assumption?

[11] **A:** Because he touched it. He didn't slip or
[12] something. It was — he reached his hand all the
[13] way around, his hand slid around as he did it. It
[14] wasn't like he did like this and lost his balance
[15] or fell or anything I could think of to excuse his
[16] behavior. It was far enough down and a slight
[17] squeeze and his fingers were down here.

[18] **Q:** Did you — did this interfere with your
[19] work at all?

[20] **A:** No, because I just figured I had handled
[21] it. I sent very clear messages that this was not
[22] acceptable, and I just — I would say I did notice

Page 78

[1] that — I don't know, he might have felt

[2] uncomfortable, I don't know — it didn't interfere

[3] in the way this other issue interfered.

[4] It was a weird situation, for me at

[5] least, but I tried to just — I figured as long as

[6] he never did anything again I was fine. We just

[7] need to explain to him we don't touch women's

[8] breasts at work. I tried to keep it in

[9] perspective, so I didn't let it get to me and I

[10] kept working.

[11] Q: And when was the next time that you saw

[12] Mr. Mazzo?

[13] A: We would see each other when I would be

[14] in San Jose, and my trips would be off and on,

[15] depending on when it was going on or when he would

[16] come to Maryland. Do you mean see him since the

[17] time he had done that?

[18] Q: Do you remember the next time you saw

[19] him?

[20] A: The next day. I would usually be there a

[21] week or four days.

[22] Q: How was your work relationship the

Page 79

[1] following day?

[2] A: Not a lot of eye contact going on from

[3] his side.

[4] Q: Does he normally make a lot of contact?

[5] A: Yes. He is very friendly. He talks to

[6] you, buds around, nice guy —

[7] Q: Did he have occasion to be meeting with

[8] you and talking with you a lot the following day?

[9] A: I can't remember enough details about the

[10] trip to know what was going on, to know if he had

[11] been in those meetings. He didn't always attend

[12] meetings for when I was out there. It would

[13] someone at my level and his staff, but I would see

[14] him in the hallways or drop by his office and say

[15] hi, so we would see each other in that capacity.

[16] The only thing I remember about — seeing

[17] him the next day was when he couldn't look me in

[18] the eye, I was pretty sure that he knew he had been

[19] caught red-handed. I was just the feeling I had.

[20] Q: What makes you say he couldn't look you

[21] in the eye?

[22] A: He just didn't. Whenever there was an

Page 80

[1] opportunity to make eye contact with me in the

[2] general setting we were in, which is like — I

[3] think it was like hallways and cafeteria — I

[4] like a long time ago. I am trying to remember.

[5] Maybe this is just a woman's feeling, but he did

[6] not — it was slightly different. He just didn't

[7] look right at me.

[8] Q: And does thinking about this more help

[9] you to place this in time better?

[10] A: No. I am trying to remember what was

[11] going on in the meeting or what we were out there

[12] for, and I can't remember. I wish I could.

[13] Q: Did you do anything to notify the company

[14] about that incident?

[15] A: No. I thought I had handled it quite

[16] successfully.

[17] Q: The next incident that you identified was

[18] the meeting at the end of November, November 30

[19] meeting, and that occurred in Maryland.

[20] A: Yes.

[21] Q: Can you tell me who requested that

[22] meeting?

Page 81

[1] A: I did.

[2] Q: And what was the purpose of that meeting?

[3] A: It was to, with HR as a witness,

[4] essentially lay down the ground rules so that I

[5] could continue working if he was going to be in the

[6] company, that what would make me feel comfortable

[7] if he was not going to be gone, and I wasn't

[8] comfortable talking to him alone, so I asked Tim

[9] Edwards to come.

[10] Q: And can you describe what happened in

[11] that meeting?

[12] A: To me it was two meetings. The meeting

[13] that was originally called, when Tim was there, I

[14] told him what I wanted, how I wanted things to be,

[15] how I wanted him to behave. He said he would —

[16] Q: He meaning —

[17] A: Steve Mazzo, said he would. He

[18] apologized.

[19] Q: When you say you told him how you wanted

[20] him to behave, what sorts of things did you say?

[21] A: I told him I didn't want him to speak to

[22] me in the manner he ever did again. I did not want

Page 82

[1] him to harass me ever again, you know, that kind of
[2] stuff. I made it clear, and that was — that part
[3] of the meeting I think actually went the way I had
[4] expected it would go. What could Steve do? He
[5] knew what had happened. He knew what he did and he
[6] was being very cooperative, and I actually felt at
[7] ease for probably — probably as at ease as I could
[8] possibly feel because Tim was there and it was the
[9] first time I had spent any appreciable time with
[10] him. The other reason for the meeting was to see
[11] could I even be in his presence without having a
[12] panic attack.
[13]    Q: So, was your intent to try to sort of
[14] mend working relationships or bridge a working
[15] relationship?
[16]    A: It was to see if I could be in his
[17] presence without becoming emotional. That was
[18] something for me. It was actually recommended by
[19] the psychologist I was seeing that part of getting
[20] through these things is to let them know exactly
[21] how hard it was for you. So it was — part of it
[22] was for that, to see what I was going to be able to

Page 83

[1] do or not do, and the other was to come up with
[2] rules on how we could work.
[3]    I didn't want him being involved when he
[4] didn't need to be. I expected him to tell his
[5] lieutenants information, get it out of his head so
[6] we could have a very minimal relationship that
[7] could be carried on by e-mail. I tried to lay down
[8] the most sterile relationship in business possible
[9] so that I could be in the company and he could be
[10] in the company, since this is what the decision had
[11] been.
[12]    Q: And you said that part of the meeting,
[13] meaning the part that had Tim Edwards included,
[14] went well?
[15]    A: I think it went like I had expected it to
[16] go. It was very uncomfortable, but it went the way
[17] I expected it.
[18]    Q: And at some time, did Tim Edwards leave
[19] the meeting?
[20]    A: Yes.
[21]    Q: And why did he leave?
[22]    A: He had another meeting that was right

Page 84

[1] back to back to the meeting — we had set up a
[2] certain amount of time for the meeting, for Tim and
[3] I and Steve to be in, and then right back to back
[4] to that time Mike Peters and I — we were trying to
[5] pick up the issues that were really never resolved
[6] from that other meeting, so we were trying to talk
[7] about that back to back and Tim had another
[8] meeting, I don't remember what it was, but he had
[9] to leave at the same time Mike was coming in. So
[10] Tim had to leave a few minutes early to walk to
[11] wherever the other meeting was and he asked me was
[12] it okay to be left alone, and I said, "It is okay,
[13] Mike is coming right in."
[14]    Q: How much later did Mike get there?
[15]    A: Mike got there on time, but he didn't
[16] come in immediately. It was probably 45 minutes or
[17] something. It was a long time before Mike actually
[18] came in the room and stayed.
[19]    Q: So neither — you don't recall asking Tim
[20] Edwards to leave the meeting so the two of you
[21] could have a talk about work on your own?
[22]    A: No, no.

Page 85

[1]    Q: Or that Steve asked for that or anything?
[2]    A: Well, Tim had a meeting to go to. He
[3] asked me was I okay with him leaving. I said sure,
[4] because Mike was coming. Mike tried to join the
[5] meeting at the time when Mike was supposed to come
[6] in, but by then Steve and I were having a private
[7] discussion and Mike tried to come in — he tapped
[8] on the door and came in and I said — either I said
[9] or Steve said, I can't remember which one of us
[10] said, "Can you give us a couple of minutes?" or
[11] something like that, and so, Mike —
[12]    Q: Why was it that you would have asked for
[13] that?
[14]    A: Because we were actually really, really
[15] talking about what had happened that day, and so —
[16] I can't remember which one of us said it, but even
[17] though he had been at the meeting, he was not in
[18] the room for this particular conversation.
[19]    Q: And what happened — tell me about the
[20] conversation between you and Mr. Mazzo while it was
[21] just the two of you in the room.
[22]    A: I can't remember what we were talking

Page 86

[1] about before Tim left because it was just —

[2] Q: To fill in the gap?

[3] A: Because it was two people in the room,

[4] yes. I don't know, I got to the point where I

[5] blurted out to him how he could do what he did

[6] after I had known him for so many years. And he —

[7] I don't know how else to describe it, but very

[8] calmly I told him how he made me feel. I told him

[9] everything, how horrible it was, how it felt, how

[10] it felt to have all these men looking at me and

[11] talking, and they knew all these things were being

[12] said. And he sat there. He said some things back.

[13]     He tried to tell me that his wife thought

[14] it was disgusting, what he had done. He had told

[15] me — I can't remember if he told me when Tim was

[16] in the room or not, that he had gone to counseling,

[17] but when we were alone, he elaborated that he had

[18] gone to counseling —

[19] Q: Steve had elaborated?

[20] A: To be honest with you, I didn't give a

[21] damn what he said. I had no concern whatsoever

[22] because it was like — he was trying to rationalize

Page 87

[1] what he had done, so I continued telling him how he

[2] made me feel in very clear terms, and he started to

[3] look mad. He went from — it was like a light

[4] switch. Literally a light switch flipped, and up

[5] to this point, from the time Tim was in, and up to

[6] this point when we were on our own, he had been

[7] very apologetic. When I would tell him how he had

[8] made me feel, he would try to say he was sorry and

[9] that wasn't what he wanted.

[10]     And I don't know — I can't remember what

[11] it was I said, but all of a sudden he was different

[12] and he sat down in his chair and he started looking

[13] down at his feet and he wouldn't look at me as I

[14] was continuing to tell him what he had done to me

[15] and my family and everything he had done.

[16]     So, he kept looking at his feet and he

[17] started getting beet red, red, so red I thought

[18] something was wrong, I thought he was having a

[19] heart attack. His whole face was as red as an

[20] apple and that is no exaggeration, it was beet red,

[21] and I think the last thing I said was I got gang

[22] raped in this meeting, and he looks up to me — he

Page 88

[1] had been looking down, like I said, the whole time

[2] and then he puts his hands on the table in these

[3] exaggerated moves and he pushes his chair back, and

[4] he had been looking down, and I thought, My God, he

[5] is going to pass out, and he looked up and said,

[6] "You weren't the only one that got fucked," and he

[7] sits back and I thought, My God — I thought this

[8] is what it would have been like if he was in the

[9] room. Now I was scared. When you asked me before

[10] if I was threatened — I don't know what this man

[11] was capable of. I don't know if he was angry, but

[12] he was unbelievable, and —

[13] Q: What did you understand him to be meaning

[14] when he said you weren't the only one to get

[15] fucked?

[16] A: The way he said it it was like inviting

[17] me — I don't know if I can even say it. The words

[18] were like got fucked — it was like an invitation,

[19] that is what it was like, and I said, "Not in your

[20] dreams," or something like that because it made it

[21] sound like it was either an invitation — I don't

[22] know —

Page 89

[1] Q: You didn't understand it to mean that he

[2] got screwed in — by all of this happening to him,

[3] that it impacted him too in a negative way?

[4] A: Well, I have been thinking about that.

[5] You don't know how much I have been thinking about

[6] this, because this is this man's career too, and I

[7] thought a lot about it, and after he went through

[8] what I went through, he heard me for 20 or 30

[9] minutes, if he felt he got screwed, why didn't he

[10] say, "You are not the only one that got screwed."

[11]     He did it again, and I looked at him,

[12] Steve, "How can you do this?" And he says, "You

[13] better get used to it. If you haven't noticed, I

[14] am here. You are the one that is getting fucked."

[15] I got up from the table. I said, "Let's try and

[16] have this meeting, let's try and have the meeting."

[17] I wasn't going to let him get me going. I just

[18] wasn't.

[19]     So, I got Mike. We had the fastest

[20] meeting we could have. Tim Edwards walked up right

[21] after the meeting because he was done, and I said,

[22] "Tim, I don't believe anything Steve said when you

Page 90

[1] were in the meeting. He is not sorry. He did it
[2] again. He told me on his own that he did this on
[3] purpose."
[4]     Q: Let's go back to the part of the meeting
[5] where Mike joined you.
[6]     A: He actually tried to come in the first
[7] time when we were just talking a little bit, and
[8] then again he tried to come in and Steve did get up
[9] at that point — Mike came all the way in the room
[10] and asked me if I was okay because he could hear
[11] something, but he couldn't — nobody was yelling,
[12] it wasn't anything like that. I wasn't talking
[13] louder than I am now, but Mike heard there was a
[14] lot of conversation, so he tried to come in again.
[15]     Q: But you didn't ask him to join you — why
[16] didn't you want him to stay in the room?
[17]     A: Because I was doing what my psychologist
[18] told me to do, to tell him what I felt, and I
[19] didn't want another man hearing what this was like
[20] and Steve had done it, so I figured he is the one
[21] that needs to hear what I felt like, and I didn't
[22] want Mike to hear these details. So I told Mike,

Page 91

[1] "Don't leave me." I said, "Don't leave me, but I
[2] don't want you to come in," so Mike stood right at
[3] the door.
[4]     We were at a table almost as wide as
[5] this, so Mike stayed right at the door and I don't
[6] know what he did, but I said, "I will come get
[7] you," but I was finally doing what the doctor told
[8] me to do and I thought I would never have the
[9] courage again to do it, so I wanted to do it.
[10]     Q: When Mike did come in, were you guys able
[11] to proceed with your business meeting?
[12]     A: Well, after the whole thing with Steve
[13] getting red and stuff, we both — we both kind of
[14] calmed down and I can't remember which one of us
[15] said it, but it was kind of — we have to deal with
[16] this reality that "we are both going to be working
[17] here" kind of talk. I don't remember who initiated
[18] what, but it was kind of like we have to move on —
[19] so we both just sort of took a cool-down and I
[20] said, "Let's just do the meeting," and went and got
[21] Mike and had the meeting. Mike knew something was
[22] going on, he could tell just from whatever he could

Page 92

[1] hear, something was happening. Then we just had
[2] our meeting.
[3]     Q: And the part of the meeting that Mike was
[4] there for, it went fine, or how did it go?
[5]     A: It was very brief, very brief meeting.
[6] Steve, I think we needed to ask Steve a couple of
[7] things. We needed him to give us some input and I
[8] can't remember what the topics were, but it was
[9] very brief, it had to be less than a half an hour.
[10] It could have been less than 15 minutes.
[11]     My head wasn't in the meeting. I was
[12] just sitting there realizing that — I can't
[13] remember the time, but it was brief and we got out
[14] of him information we needed. I remember that, and
[15] went about doing whatever we needed after that.
[16]     Q: After that meeting, did you talk — when
[17] is the next time you remember talking to Tim
[18] Edwards?
[19]     A: Right in the hallway. He walked up in
[20] the hallway as we were leaving — when the meeting
[21] with Mike and Steve and I broke up, Tim was
[22] somewhere in the vicinity. We ran into him in the

Page 93

[1] hallway.
[2]     Q: Did you tell him how the meeting went or
[3] anything?
[4]     A: I told him that Steve had done it again,
[5] and it was like he was in denial. I am saying this
[6] and Tim is saying, "No, he didn't." And I was
[7] like, "You weren't there. Yes, he did it again."
[8]     Q: Did you tell him specifically what he had
[9] done?
[10]     A: No, we were in the hallway and I didn't
[11] want — there is enough rumors going around. I
[12] told him he had done this again, that I didn't
[13] trust him, and Steve was — I did tell Mike a
[14] little bit, I think, before we had walked out of
[15] the room, just a little bit of what had happened,
[16] but when we were walking down the hallway, I told
[17] him like in general terms he had done it again, and
[18] Tim, I swear he threw his arms up and I can't
[19] remember what he said, but he was laughing. He
[20] said, "This is done. This is all settled." I was
[21] like, "It is not settled." That is why I don't
[22] feel this thing was — no matter what the letters

Page 94

[1] say —

[2] **Q:** Do you remember —

[3] **A:** He said he was going to close it or

[4] something, and I said, "It is not over, it is not

[5] done."

[6] **Q:** Do you remember telling Tim that you no

[7] longer needed to be notified when Steve came onto

[8] the premises?

[9] **A:** I told him that in the first part of the

[10] meeting. I think Tim asked me, "Do you feel we

[11] need to tell you each time he comes?" I am not 100

[12] percent when this was, but in the first part of the

[13] meeting when Steve was behaving the way I had

[14] hoped, I thought it was sort of silly if he was

[15] willing to live by these rules that we had to

[16] inconvenience people to keep telling me every time

[17] he was coming in. So I can't say 100 percent I

[18] remember, but it is certainly logical that I would

[19] have done it in the first part of the meeting, not

[20] knowing what was going to happen after Tim left.

[21] **Q:** Do you remember at some point after the

[22] conversation in the hall talking to Tim again and

Page 95

[1] letting him know in more detail about what had

[2] happened in the meeting when it was just you and

[3] Steve?

[4] **A:** I can't remember. I remember feeling he

[5] didn't care. That is what I remembered about Tim

[6] at that point. So I can't remember if I went and

[7] told him more details or not.

[8] **Q:** Do you recall telling him that Steve had

[9] used the F-word again, but that he had not directed

[10] it to you, so it was okay, but you felt Tim should

[11] know he was cussing, he was still cussing or still

[12] using vulgarity, something to that effect?

[13] **A:** I remember talking to him about it, but I

[14] remember it differently than Tim does. But I can't

[15] remember when the conversation was, whether it was

[16] immediately after or not.

[17] **Q:** What is your recollection?

[18] **A:** I remember talking to him about this at

[19] some point, and I think what I was trying to draw

[20] the line with was it was different than in the

[21] August 29 meeting. I don't remember it as what I

[22] call profanity. I don't remember it — saying it

Page 96

[1] was profanity. I don't remember it that way. I

[2] remember trying to explain to Tim it was similar

[3] and I think I remember him bringing up the same

[4] thing you did, did he mean that he was screwed, is

[5] that what he meant. Maybe he made me think — I

[6] can't remember.

[7] **Q:** When you said you didn't think it was

[8] profanity, I am not sure what you are referring to.

[9] **A:** Profanity to me is you just use a cuss

[10] word and it is not —

[11] **Q:** Just swearing?

[12] **A:** You are swearing. You are not saying

[13] anything that has double meanings or anything, or

[14] very straightforward meanings when you put together

[15] sentences. So I told him that — I remembered

[16] saying something to him about — see, I didn't

[17] think this was right after the meeting. I thought

[18] this was later.

[19]      I thought at some point we had talked

[20] about it, but it was more a — that the way he said

[21] it still sounded very sexual, and I kind of

[22] remember it was more of Tim saying, "He just used

Page 97

[1] the F-word. That is not sexual." And I kept — it

[2] is, if you put it with other things and you put

[3] body motions in it, you can take a word that is

[4] profanity and swearing and change its meaning.

[5]      I don't remember it the way Tim remembers

[6] it. He remembers it the way a lot of people wanted

[7] me to interpret it, but that is not the way I

[8] interpreted what Steve did.

[9] **Q:** You don't remember two separate

[10] conversations with Tim, one telling him the meeting

[11] was fine, and then telling him that there was

[12] actually profanity involved — or maybe those are

[13] the two conversations in the hallway where you

[14] didn't specifically mention profanity?

[15] **A:** I didn't say exactly — I don't remember.

[16] This is a long time ago. I unfortunately don't

[17] have the notes that I am sure that Tim might have

[18] kept. It has been a long time to remember details

[19] to that level, exactly when something happened. I

[20] just remember running into him right after the

[21] meeting, and I remember some conversation at some

[22] point about the thing that happened in the meeting,

---

Page 102

[1] would jeopardize her.

[2] I assumed there was only going to be a

[3] few women and it wouldn't take long for the men to

[4] figure it out. To be honest with you, so many

[5] things did not happen the way that I thought. I

[6] certainly did not feel protected after I filed the

[7] grievance and I was not going to jeopardize another

[8] woman over this. It wasn't worth it.

[9] **Q:** Did you ever hear anything else about a

[10] cartoon or jokes or something about people

[11] congregating at Bob Ossentjuk's office again?

[12] **A:** No.

[13] **Q:** Did you ever ask anybody about it?

[14] **A:** I think I remember when I talked to Ken

[15] Peters once after —

[16] **Q:** And Ken is in —

[17] **A:** Ken is in my department, but he worked in

[18] San Jose and I think I remember trying to hint

[19] around to try to find out like what happened after

[20] the meeting, were the guys laughing, or I thought

[21] maybe that is when a woman in that area might have

[22] overhead it, but nothing real overt to try and

---

Page 103

[1] trace down who this person was.

[2] **Q:** And what was Ken's response?

[3] **A:** He said something about the cubicles are

[4] really high and Bob's office isn't like in view of

[5] where he was sitting unless he got up, something

[6] like that, that he hadn't really noticed it.

[7] **Q:** So he didn't have anything to —

[8] **A:** And I wasn't going to keep pushing

[9] because I was afraid he would say, "Why are you

[10] asking?" So I dropped it.

[11] **Q:** You never heard anything else about

[12] cartoons or jokes from anybody else?

[13] **A:** No.

[14] **Q:** Was there anybody else that you talked to

[15] about it?

[16] **A:** My husband —

[17] **Q:** At the company?

[18] **A:** At work?

[19] **Q:** Yes.

[20] **A:** My husband — my husband. I think I told

[21] Mike Gering. I think I told him. I can't remember

[22] if I told Mike Peters. I got to the point where I

---

Page 104

[1] was afraid to talk to anyone, so I doubt I told

[2] anyone other than Mike Gering. I felt I couldn't

[3] trust anyone any more because I didn't know how

[4] this worked. I think the only person was Mike

[5] Gering.

[6] **Q:** And when did you talk to Mike Gering

[7] about this?

[8] **A:** In a grievance procedure, there is at

[9] level 3, you go before the president of the company

[10] and essentially plead your case, and after that

[11] discussion Mike kept me in the room by myself with

[12] him because I was kind of upset after this thing

[13] and I had told him at that point this, how we were

[14] still talking about what we were talking about in

[15] the meeting, and I had mentioned then that this is

[16] what is going on in your company, I said, something

[17] like that, and he was upset through the whole thing

[18] anyway. He was not happy with any of the stuff he

[19] was hearing when I came in to talk to him. So the

[20] response was just as it had been through any of the

[21] other complaints I had made.

[22] **Q:** And what was his response?

---

Page 105

[1] **A:** Unacceptable. He was going to look into

[2] this. He was going to do what was necessary to

[3] protect me. He was not going to let this happen to

[4] me any more. Things like that. He was trying to

[5] be legally correct.

[6] **Q:** When did that happen?

[7] **A:** I can't remember the date, but in the

[8] grievance papers it has for level 3, I can't

[9] remember what the date was.

[10] **Q:** Do you remember approximately? Do you

[11] think it was before or after the November 30

[12] meeting with Steve Mazzo? Can you give a time

[13] frame that way?

[14] **A:** I can't remember for sure. I would have

[15] to look. I would have to try to look in a planner

[16] or something to see if I can reconstruct it.

[17] **Q:** We can put our hands on it later.

[18] **A:** Okay.

[19] **Q:** Who else was at the meeting, that

[20] grievance 3, other than you and —

[21] **A:** Tim Edwards comes to it. So it is three

[22] people, me, Tim and Mike Gering.

Page 122

[1] described to him what I went through and he helped
[2] draft the complaint and put it into legal language.
[3] I am not even — I think in my mind, the way my
[4] whole thing was handled was handled differently
[5] because it was a woman bringing this complaint. So
[6] I have to wonder.
[7]   Q: Maybe it will be easier if I ask you in a
[8] different way.
[9]   A: Okay.
[10]   Q: Are there actions that Northrop Grumman
[11] took that changed your employment status, whether
[12] it be your position or your salary or hiring you or
[13] firing you or those sorts of things? Did Northrop
[14] Grumman — when I say employment action, that is
[15] what I mean by employment action, changing your pay
[16] or changing your position or hiring you or firing
[17] you, those are employment actions, actions related
[18] to your status as an employee.
[19]   A: Okay.
[20]   Q: Are there ways in which you believe
[21] Northrop Grumman discriminated against you based on
[22] your gender, being female, by taking certain

Page 123

[1] actions related to your employment with them?
[2]   A: Based on the job action way you have
[3] asked the question, I would have to say no, because
[4] I think that the job actions that did happen were
[5] done because they didn't want me at the company any
[6] more because I filed a complaint.
[7]   Q: That would be more on the retaliation
[8] side?
[9]   A: Right. The only — I am wondering if —
[10] the only other thing I can think of that is based
[11] more on my gender would be — I don't know how to
[12] describe this. It is very hard to be a manager in
[13] a male aerospace environment when you are a woman,
[14] and you get there with hard work. Unfortunately it
[15] is usually more than some of your male colleagues,
[16] but this is not any surprise. You know that when
[17] you go into the field. But what you don't do is
[18] you try not to stand out too much as a woman in
[19] being very different.
[20]   I had some concerns that placing me in
[21] the company, in the Northrop side, because of the
[22] merger, was going to be more difficult because I

Page 124

[1] have now displayed as a woman that I will not
[2] tolerate sexual harassment, that I will go outside
[3] the company, I will do what I have to do to get my
[4] rights protected, and I think that somehow being a
[5] woman played a part in their decision as to where
[6] they could fit me in the company.
[7]   This is all my feelings, but I think it
[8] played a big part in the decision to remove the
[9] mechanical aspects of the job that had been
[10] arranged for me. I think that the person that was
[11] there was not willing to work directly with a
[12] woman, especially a woman who has already made some
[13] complaints. And I think that the complaints make
[14] it worse, but I think there were people in Doug
[15] Norton's department that did not want a woman
[16] directly working with them, so I think it made it
[17] easier for them somehow to remove further
[18] responsibilities from my job.
[19]   Q: What made you think there were people in
[20] Doug Norton's group that didn't want a woman
[21] working with them?
[22]   A: There was an objection made by a very

Page 125

[1] specific employee, is what I heard through the
[2] rumor mill, and I also heard that this person is
[3] not comfortable working with women as supervisors,
[4] that it is a cultural issue.
[5]   Q: Who did you hear the rumors from?
[6]   A: Somebody that worked at Northrop.
[7]   Q: Who is that?
[8]   A: Rick Singer.
[9]   Q: Is he still at Northrop?
[10]   A: No, he left.
[11]   Q: Did you hear this from him before or
[12] after he left?
[13]   A: Before he left.
[14]   Q: And what was the rumor he told you?
[15]   A: It was kind of like, "I think I figured
[16] out why the mechanical — one other reason that
[17] they don't have the mechanical as part of your job
[18] any more, besides the" — my opinion was it was —
[19] I thought it was to make the job so unfavorable
[20] that nobody would take it. It was a job I had ten
[21] years ago. They knew I wouldn't take it. This
[22] person said besides that, he thinks they didn't

Page 126

[1] want to fight the battle with this one individual
[2] because this individual doesn't seem to be
[3] comfortable having women manage them —
[4]     Q: And who is that person?
[5]     A: His name was Rafi. I don't know anything
[6] else about him. I asked Rick was something said
[7] directly and he said, no, it is just by statements
[8] that he made, or just the way this person acted and
[9] rumors heard — it is a rumor mill.
[10]     Q: Do you know if Rafi works in
[11] mechanical —
[12]     A: He is the mechanical lead.
[13]     Q: Are you sure about that?
[14]     A: That is what Rick told me, that he was
[15] the mechanical lead.
[16]     Q: So one way you feel the company
[17] discriminated against you based on your gender was
[18] in the position they offered you?
[19]     A: In the change in the position they
[20] offered me. They offered me one position and then
[21] they changed it. I think the changed position
[22] might have been influenced by this.

Page 127

[1]     Q: Where did Rick singer work in Northrop
[2] Grumman?
[3]     A: He worked in the same department as Rafi
[4] did.
[5]     Q: Is there any other way, other than the
[6] changed position that was offered you, that you
[7] feel the company discriminated against you based on
[8] your gender?
[9]     A: No.
[10]     Q: You also mentioned in talking about this
[11] position that was offered to you that it also
[12] seemed to you to sort of be — not sort of — but
[13] to be in retaliation for you having made this
[14] internal complaint.
[15]     A: I think the ultimate position was — I
[16] think the first one was a wonderful job offer.
[17]     Q: But at the end of the day, the position
[18] that Northrop was asking you to come and fill, do
[19] you feel that was — part of the reason they made
[20] that offer was in retaliation for your making an
[21] internal complaint?
[22]     A: I think it was made so unattractive at

Page 128

[1] the end that they knew I would leave and that I
[2] wouldn't get the job.
[3]     Q: And why do you believe they made it
[4] unattractive?
[5]     A: Because they didn't want me to stay,
[6] because I had made this complaint.
[7]     Q: Let's address that together. You have
[8] said there is no other way that you feel the
[9] company discriminated against you based on your
[10] gender, but that this, the position they ultimately
[11] offered you, was impacted both by retaliation and
[12] discrimination on your gender?
[13]     A: I think so.
[14]     Q: Is there any other way you feel the
[15] company retaliated against you?
[16]     A: Yes.
[17]     Q: What other way do you feel the company
[18] retaliated against you?
[19]     A: I think the status change from part-time
[20] to full-time for my daughter.
[21]     Q: The question is how the company
[22] retaliated against you.

Page 129

[1]     A: Go after my children and you are going
[2] after me. That is how I felt, and then —
[3]     Q: When you say status change for your
[4] daughter —
[5]     A: She was being moved from part-time to
[6] full-time as of June 4, 2002. The paperwork had
[7] been started and then it was abruptly stopped.
[8]     Q: Do you have that paperwork?
[9]     A: No. The paperwork was signed off — we
[10] asked for the paperwork and I believe that it was
[11] not provided. It is in her personal file and we
[12] were told we could not have it. You don't get a
[13] copy of the paperwork as an employee until the
[14] signatures are — when it finishes going through HR
[15] and then it comes back. So the signatures had been
[16] done in engineering up through the engineering
[17] chain, and Chrissie had signed it before she went
[18] back to school —
[19]     Q: Chrissie is your daughter?
[20]     A: My daughter. She was told when her start
[21] date was, she was told everything.
[22]     Q: Is there any other way that you feel the

Page 130

[1] company retaliated against you?

[2]    A: I believe that my nephew who was working
[3] in Doug Norton's group had his work assignments
[4] changed to the point where he was given — he is a
[5] software developer, a Web developer, and he was
[6] given extremely junior tasks and to the point where
[7] he eventually left the company and found other
[8] work.

[9]    Q: So we have the position that was offered
[10] to you, the status change for your daughter, the
[11] change in assignments for your nephew. Is there
[12] any other way you feel the company retaliated
[13] against you?

[14]    A: I always get confused with the different
[15] legal headings for things.

[16]    Q: I guess the question is whether you feel
[17] the company did anything else to you in retaliation
[18] for your having — because you filed this internal
[19] complaint. Think about it that way. That may be
[20] easier.

[21]    A: That is major ones — my problem is I
[22] have all these things in my head and I am trying to

Page 131

[1] sort them out to answer the questions the way you
[2] are asking them.

[3]    Q: But you can't think of any other way that
[4] the company — any other steps the company took
[5] against you that you feel they took because you
[6] filed this internal complaint?

[7]    A: Well, they wouldn't — this is why I am
[8] not sure if this fits in here, but I had a
[9] contract, this agreement, that Mike Gering had
[10] given maybe 20 people in the whole company, and
[11] after much discussion, when my job had been changed
[12] to this last one, this last version of the job, it
[13] was finally agreed that they would just execute
[14] this contract and I could just go, just to end it,
[15] and at the very end, after I thought this was
[16] settled, they told me — Tom Schaffer is the they
[17] — told me I had to sign a waiver that said that I
[18] would not sue the company for sexual harassment or
[19] anything like that, and I think they withheld my
[20] contract or kind of held it over my head, this
[21] agreement, and my severance and everything, unless
[22] I was willing to do this.

Page 132

[1]    That is like punishment — I am not
[2] getting severance pay after being 16 years, I am
[3] not getting my agreement to stay contract after I
[4] fulfilled it, and as punishment for filing a
[5] grievance, I have to sign away that I am not going
[6] to file a sexual harassment case when that was not
[7] settled. I was making sure that personnel knew
[8] that what had happened with Steve was going to be
[9] handled separately, that I was so ill essentially
[10] from everything, I needed to get away.

[11]    They didn't have a job, so just let me
[12] just separate and we will handle this other thing
[13] separately, but they wouldn't do it unless I signed
[14] that paper, and my lawyer said, "Don't sign that
[15] paper."

[16]    Q: Other than that, are there any other
[17] actions the company took against you because of
[18] your filing a complaint?

[19]    A: I don't think so.

[20]    Q: Turning to the status change for your
[21] daughter that you identified, was your daughter
[22] ever employed by Northrop Grumman on a full-time

Page 133

[1] basis?

[2]    A: No.

[3]    Q: Did she work for Northrop Grumman on a
[4] part-time basis?

[5]    A: Yes. She was permanent part-time.

[6]    Q: Was she a student at the time?

[7]    A: Yes.

[8]    Q: Is it a sort of work-study program or —

[9]    A: She originally started in that capacity,
[10] but her last year of school was transferred to
[11] engineering. She had a title of —

[12]    Q: Transferred to engineering within Litton?

[13]    A: Yes. She had a title of associate member
[14] of technical staff. You can't have that title and
[15] be in the intern program. Then you are an intern 1
[16] or 2. She was in an engineer's position working
[17] permanent part-time. She had part-time benefits.
[18] It is much better to be a permanent part-time
[19] employee than in the intern program. They had
[20] filed for her security clearance and all of this
[21] was done in preparation for your graduation in
[22] April or May, and she was going to come to work

Page 134

[1] June 4. She was going to take off a week.

[2] **Q:** Who was she working for?

[3] **A:** She worked for Isaac Valentin, I S A A C.

[4] **Q:** What department or section did Isaac work

[5] in?

[6] **A:** I can't remember the name of his

[7] group, electrical engineering or electronic — she

[8] is an electrical engineer.

[9] **Q:** And when you say she was offered a

[10] position for full-time, who made that offer?

[11] **A:** Isaac and Charlie Kohnstam who was

[12] director of engineering.

[13] **Q:** Did she receive a written offer?

[14] **A:** That is not part of the procedure for

[15] status change. It is not like a new hire. A

[16] status change is handled verbally. The manager

[17] says, "We are going to do this. Are you okay with

[18] this?" And then you sign these papers that are

[19] like in triplicate or something. She signed the

[20] papers, Isaac signed the papers, Charlie signed the

[21] papers. The papers have places where your salary

[22] is changed and the effective date is filled in.

Page 135

[1] **Q:** Are you familiar with whether anybody had

[2] ever been suggested to be hired out of a part-time

[3] position but then somebody higher up the ranks sort

[4] of overruled that decision?

[5] **A:** Well, that is possible, but by the time

[6] all these signatures that were obtained, any of the

[7] people that could have said no in engineering and

[8] in what was called electronic combat had already

[9] signed off. It needed signature level up through

[10] the director. That had been done and the papers

[11] were sent over to personnel and at that point it is

[12] nothing more than put the stuff in the computer and

[13] send the copies back.

[14] **Q:** How is it that you know that everybody

[15] else had signed off on it?

[16] **A:** I saw the papers where it was signed off

[17] and Chrissie saw them. They had to sign them too.

[18] **Q:** After everybody signed them?

[19] **A:** They had a little signing party, from

[20] what I heard, but I saw the papers signed.

[21] **Q:** And when was it that she learned she

[22] wasn't going to be hired full-time?

Page 136

[1] **A:** Officially it was, I want to say it was

[2] maybe in March or April. She was home on —

[3] **Q:** 2002.

[4] **A:** 2002. She was home on school break until

[5] the third week of January and when all this was

[6] executed and put through and they had told her,

[7] they being Isaac and Charlie, this will turn around

[8] real quick. So she had been checking and it wasn't

[9] coming through. Then I started checking with

[10] Isaac, is there something wrong. He said he would

[11] follow up on it, that kind of thing, and weeks were

[12] going by. Status change notices go through like

[13] this, this is not a big deal. So she didn't know

[14] until she kept trying to call Isaac, until later in

[15] the spring, that nobody was happening.

[16] **Q:** Do you know if Northrop Grumman has a

[17] requirement for a minimum requirement for a GPA?

[18] **A:** I don't know.

[19] **Q:** Do you know what your daughter's GPA was?

[20] **A:** No, I don't know.

[21] **Q:** Do you know if she was above or below a

[22] 3.0?

Page 137

[1] **A:** I don't know. I can't remember it. It

[2] was a year ago. I know. I am bad. Don't ask me

[3] mine.

[4] I would have to wonder — considering she

[5] had been hired there and working since she was 16

[6] in that capacity, that she had already been put

[7] into a position of an associate member of technical

[8] staff, which is an engineer position straight out

[9] of school —

[10] **Q:** As a part-time employee?

[11] **A:** Right.

[12] **Q:** Your nephew's name is David DeMayo?

[13] **A:** Yes.

[14] **Q:** Who did Mr. DeMayo — was he at Litton

[15] before it became Northrop Grumman?

[16] **A:** Yes.

[17] **Q:** And where did he work in Litton?

[18] **A:** He was transferred into Doug Norton's

[19] organization.

[20] **Q:** But —

[21] **A:** In Litton —

[22] **Q:** Was he in information systems or

Page 138

[1] information technology?

[2] **A:** He worked for someone named Will Dauer in
[3] IT and then Mike Peters was the acting manager, and
[4] then — I really don't know how it happened, but he
[5] ends up getting assigned to Doug Norton.

[6] **Q:** When you say he ends up, that was in
[7] the —

[8] **A:** As they were splitting up the people, who
[9] was going where. He did a lot of support for
[10] engineering applications. So I suspect that is why
[11] they — he was not part of Mike Peters'
[12] organization, which he really didn't have an
[13] organization.

[14] **Q:** And is Mr. DeMayo still working for
[15] Northrop Grumman?

[16] **A:** No. He quit.

[17] **Q:** He wasn't terminated?

[18] **A:** Well, you will have to talk to him about
[19] it. He had said there was some kind of layoff
[20] letter or something that had come out, but he was
[21] working months after that and getting paid because
[22] there was some kind of mistake in terminations, but

Page 139

[1] he ultimately resigned on his own.

[2] **Q:** He was working in Doug Norton's group
[3] when he resigned?

[4] **A:** Yes.

[5] **Q:** Do you know whether Doug Norton had any
[6] knowledge that he was your nephew?

[7] **A:** I don't know.

[8] **Q:** You never told him yourself?

[9] **A:** I don't remember ever telling him, but
[10] other people in my department knew he was, so
[11] maybe — I don't know what Doug knew.

[12] **Q:** You mentioned your nephew had — his
[13] responsibilities were reduced or his duties were
[14] minimized or something?

[15] **A:** Yes. Can I add something to my other
[16] answer?

[17] **Q:** Yes.

[18] **A:** I do know Tim Edwards and Suzie Smith in
[19] College Park knew that David was my nephew.

[20] **Q:** Tim Edwards left Northrop Grumman before
[21] you did, in the fall of 2001?

[22] **A:** I don't remember when he left.

Page 140

[1] **Q:** Do you remember whether he was gone by
[2] the time you left?

[3] **A:** No, I can't remember. I know he is gone,
[4] but I can't remember when he left. During the time
[5] I was still doing the grievance thing he was there.

[6] **Q:** But that was September of 2001?

[7] **A:** Right. I can't remember when he left.

[8] **Q:** In what way was your — were your
[9] nephew's responsibilities reduced?

[10] **A:** Instead of doing software development, he
[11] was asked to put CDs into a computer and load
[12] software, make sure the software would come up and
[13] then do the next computer.

[14] **Q:** And was that — did that coincide with
[15] his move over to Northrop Grumman or did that
[16] happen at Litton?

[17] **A:** When he first went to Northrop Grumman,
[18] he was doing software development. The change
[19] coincided with some events in my situation, which
[20] is why I think it is related somehow.

[21] **Q:** When were his duties reduced?

[22] **A:** I can't remember the actual dates.

Page 141

[1] **Q:** What were you tying it to?

[2] **A:** I am tying it to — I had a conversation
[3] with — it must have been before. I wish I could
[4] recall this stuff. Mental note, keep a journal. I
[5] had this conversation with Tom Schaffer when we
[6] were trying to work out that I did not want to sign
[7] this waiver saying that I would drop the case in
[8] order to get my severance and agreement to stay,
[9] and several weeks after that conversation, may have
[10] been longer than that, maybe a month after, David
[11] had mentioned to me that he was doing this and
[12] thought it was kind of odd, that his work had
[13] changed from development to this, but he thought,
[14] Hey, I am happy to have a job, I think that is what
[15] he said —

[16] **Q:** Because some people lost their jobs in
[17] the move over to Northrop?

[18] **A:** He said, "I guess this is temporary
[19] because there is tons of software work I should be
[20] doing." But then it went on for a while. But it
[21] seemed to start, from what I remember him telling
[22] me, right after this, and at the same time, these

**Page 142**

[1] issues with Chrissie were coming up, the papers,
[2] nobody was finishing the papers up in HR —
[3]     Q: Now, the papers with your daughter, I
[4] thought you said, were in March or April of 2002.
[5]     A: No, no. She was — in January those
[6] papers were all put together.
[7]     Q: But she wasn't told that she wasn't being
[8] hired full-time until April?
[9]     A: Yes, or — March or April, I think. We
[10] would have to ask her when it was. It took a long
[11] time to get her manager or someone to say, "You
[12] don't have a job any more."
[13]     Q: And going back to your nephew who was
[14] working for Doug Norton, is there anything else
[15] that you can tie his reduction in responsibilities
[16] to, other than your conversation with Tom Schaffer?
[17]     A: No, just this conversation — he was very
[18] nice during the conversation —
[19]     Q: Tom Schaffer?
[20]     A: Tom Schaffer was, and he said — I can
[21] remember at one point just voicing, "I don't know
[22] what to do." I was crying and upset and he said

**Page 143**

[1] something like, "Well, you know, you really should
[2] do this, you really need to move on," and he said,
[3] "You never know what this is doing" — "how it is
[4] affecting people around you," or something like
[5] that, and I didn't even give it two thoughts. I
[6] thought he was just trying to be compassionate
[7] because I was crying, and then when these things
[8] happened to both of my family members, I started
[9] wondering, What in the hell is going on?
[10]     Q: Do you have any basis to believe that Tom
[11] Schaffer had anything to do with the reduction in
[12] duties your nephew had or your daughter not
[13] receiving an offer?
[14]     A: To me it is the time connection, it is
[15] the timing thing that makes me think this. I am
[16] not naive. There is probably a wonderful paper
[17] trail that is four feet high that says it was
[18] completely above board. But if you ask me what it
[19] was, it was happening to both of my family members
[20] at the same time. Other people in the department
[21] where David works still had work. I had —
[22]     Q: And yet other people had lost their

**Page 144**

[1] employment altogether?
[2]     A: Of course. That was happening all over
[3] the company, but for this particular work other
[4] people were still working. So I don't know — for
[5] me the connection is the timing, and it is also
[6] just — I am a pretty logical person. If you have
[7] somebody who has brought a lawsuit against the
[8] company, would you want the daughter and the nephew
[9] working there, if you were the company? So it all
[10] made sense to me.
[11]     Q: You also mentioned the stay agreement.
[12]     A: Yes.
[13]     (Wolff Exhibit No. 8 was
[14] marked for identification.)
[15]             BY MS. COX:
[16]     Q: Is that document Ms. Jardim has handed
[17] you the stay agreement you were referring to?
[18]     A: Yes.
[19]     Q: And in the middle, I guess it is the
[20] paragraph marked 1, does that indicate that given
[21] one of the three conditions listed below, that you
[22] would be entitled to six months base salary and —

**Page 145**

[1] it says half of your current annual base salary and
[2] six months health insurance; is that correct?
[3]     A: I am trying to find that.
[4]     Q: At the end of the paragraph marked 1,
[5] just before it lists A, B and C?
[6]     A: Yes.
[7]     Q: You mentioned before that you believe you
[8] were entitled to what this agreement would have
[9] given you?
[10]     A: Yes.
[11]     Q: There are three conditions here that are
[12] listed, A, B and C, that you have to meet in order
[13] to have the agreement — make the agreement
[14] effective; is that how you understand it?
[15]     A: Yes.
[16]     Q: And the first one is for you to make your
[17] best efforts on behalf of the company. Second one
[18] is you have not resigned or been terminated for
[19] cause. And the third reads: "In the event of a
[20] sale, merger or other business combination, you
[21] have not been offered by the successor company, a
[22] comparable position on similar terms and

Page 146

[1] conditions"; is that a correct reading?

[2] **A:** Yes.

[3] **Q:** Why is it that you believe you were

[4] entitled to six months pay under this agreement?

[5] **A:** Because I was not offered a comparable

[6] position.

[7] **Q:** Isn't it true that you resigned from your

[8] position?

[9] **A:** I resigned from my position after

[10] attempting to work this out, and my medical

[11] situation had grown so severe that I could not

[12] continue working. I certainly did not resign — I

[13] don't feel I resigned voluntarily. I expected to

[14] be employed by this company and when they couldn't

[15] give me a comparable position, I tried to use this

[16] and I couldn't do it. I would never have resigned

[17] if none of these things had occurred.

[18] **Q:** But in the end, you did resign?

[19] **A:** I had no choice.

[20] **Q:** When you say you had no choice —

[21] **A:** My choice would have been to accept a

[22] position that was ten years — at least ten years

Page 147

[1] in my past, and deal with the marketability for

[2] myself because I certainly wouldn't stay in a

[3] position that was not comparable or challenging,

[4] and so, that coupled with the medical situation, I

[5] don't have any choice.

[6] **MS. COX:** Can you mark this?

[7] (Wolff Exhibit No. 9 was

[8] marked for identification.)

[9] **BY MS. COX:**

[10] **Q:** Ms. Jardim has handed you an exhibit

[11] marked Exhibit 9. Can you review that, please.

[12] **A:** Yes.

[13] **Q:** Do you recognize that document?

[14] **A:** Yes, I do.

[15] **Q:** What is that document?

[16] **A:** It is the document explaining — it is

[17] like a question-and-answer document that was put

[18] out by, I guess, Northrop and Litton together.

[19] **Q:** Does it address something in particular?

[20] **A:** All sorts of questions people had about

[21] what was going to happen with their jobs —

[22] **Q:** As a result of Northrop Grumman's

Page 148

[1] position?

[2] **A:** Yes.

[3] **Q:** Did you receive this document when you

[4] were an employee?

[5] **A:** Yes, I did.

[6] **Q:** And do you recall attending a meeting

[7] presented by Dr. Chino where these questions and

[8] perhaps others were discussed relating to what was

[9] going to happen to people that were working at LAS

[10] following the integration?

[11] **A:** Yes.

[12] **Q:** Do you recall around when that meeting

[13] was held — does beginning of November sound about

[14] right?

[15] **A:** I guess. I remember going. We all joked

[16] about the white tent.

[17] **Q:** Can you take a look at the question and

[18] answer respectively marked number 5 and tell me

[19] when you have reviewed that?

[20] **A:** Yes, I have read that.

[21] **Q:** Does that question and answer address

[22] Northrop Grumman's definition of what a comparable

Page 149

[1] position is?

[2] **A:** I would say, yes, it addresses their

[3] definition of it.

[4] **Q:** And how does Northrop Grumman define a

[5] comparable position?

[6] **A:** One of equal pay — one of which the base

[7] pay is no less than 10 percent below the employee's

[8] current base pay.

[9] **Q:** So for Northrop Grumman's position, as

[10] long as the position is within 10 percent of the

[11] position offered, that is a comparable position?

[12] **A:** I understand those are what the words

[13] mean, yes.

[14] **Q:** In the position you were offered at

[15] Northrop Grumman, what would your salary have been?

[16] **A:** The same. I was told it would be the

[17] same.

[18] **Q:** The same as you had at Litton?

[19] **A:** Yes.

[20] **Q:** What was that?

[21] **A:** One zero two, something like that.

[22] **Q:** And also in this answer, does it explain

# In The Matter Of:

*Lisa A. Wolff   v.*
*Litton Advanced Systems, Inc., et al.*

---

*Deposition of Lisa A. Wolff*
*Vol. 2, July 31, 2003*

---

*Miller Reporting Company*
*735 8th Street, SE*
*Washington, DC  USA  20003*
*(202) 546-6666*

*Original File 0731WOLF.TXT, 165 Pages*
*Min-U-Script® File ID: 3968067146*

# Word Index included with this Min-U-Script®

Page 158

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

BALTIMORE DIVISION

LISA A. WOLFF,                          :

    Plaintiff,                      :

vs.                                     : C.A. No.:

                                    : L02-CV-3932

LITTON ADVANCED SYSTEMS, INC.,   :

    and                             :

    NORTHROP GRUMMAN SYSTEMS, CORP., :

    Defendants.                      :

                                    : VOLUME II

Washington, D.C.

Thursday, July 31, 2003

The continued deposition of LISA A.

WOLFF, called for examination by counsel for

Defendants in the above-entitled matter, pursuant

to Notice, in the offices of Morgan, Lewis &

Bockius, 1111 Pennsylvania Avenue, N.W.,

Washington, D.C., convened at 9:05 a.m., before

Cathy Jardim, a notary public in and for the

District of Columbia, when were present on behalf

of the parties:

Page 159

APPEARANCES:

    On behalf of the Plaintiff:

        Laura C. Jenifer, ESQ.

        214 Washington Avenue

        2nd Floor

        Towson, Maryland  21204

        (410) 494-4954

    On behalf of the Defendants:

        CHRISTINE B. COX, ESQ.

        Morgan, Lewis & Bockius

        1111 Pennsylvania Avenue, N.W.

        Washington, D.C.  20004

        (202) 739-5828

Page 160

CONTENTS

EXAMINATION BY COUNSEL FOR

WITNESS       DEFENDANTS       PLAINTIFF

LISA A. WOLFF       161

EXHIBITS

| Wolff Deposition Exhibit | MARKED |
| --- | --- |
| No. 10 | 193 |
| No. 11 | 197 |
| No. 12 | 203 |
| No. 13 | 204 |
| No. 14 | 241 |
| No. 15 | 272 |
| No. 16 | 278 |
| No. 17 | 293 |
| No. 18 | 296 |
| No. 19 | 304 |
| No. 20 | 309 |
| No. 21 | 311 |

Page 161

[1]                    PROCEEDINGS

[2] Whereupon,

[3] LISA A. WOLFF,

[4] having been previously duly sworn, was further

[5] examined and testified as follows:

[6]     EXAMINATION BY COUNSEL FOR THE DEFENDANTS

[7]                    BY MS. COX:

[8]     Q: Good morning. How are you?

[9]     A: I am fine.

[10]    Q: At Space Telescope, your current

[11] employer, what is your current salary?

[12]    A: It is 143-something. I can't remember

[13] the last three numbers.

[14]    Q: What was your starting salary with them?

[15]    A: One thirty-five, I think. I think it was

[16] 135.

[17]    Q: When we left off on Tuesday, we had

[18] started to talk about the company's final offer to

[19] you for a position of employment. Do you recall

[20] that conversation?

[21]    A: Yes.

[22]    Q: You also mentioned that Northrop Grumman

Page 162

[1] had removed mechanical aspects of the position. Do

[2] you recall that?

[3]     A: That is my understanding.

[4]     Q: Do you believe that the responsibilities

[5] and duties of the position that you were offered

[6] were a reduction in responsibilities and duties

[7] from the position you held at Litton?

[8]     A: Yes.

[9]     Q: And do you believe that that reduction

[10] occurred because you are female?

[11]    A: Well, I think it was for two reasons. I

[12] think it was partially that, but I also think it

[13] was to make the job unattractive, so that I

[14] wouldn't want to stay.

[15]    Q: And why do you believe the second part

[16] that you just added?

[17]    A: Because I had filed this grievance.

[18]    Q: So you believe they made this offer of a

[19] position with reduced responsibilities both because

[20] you were female and because you had filed an

[21] internal complaint?

[22]    A: Yes.

Page 163

[1]  Q: Why do you believe — taking first just
[2] the female part of it, the fact that you are
[3] female, why do you believe that the company made
[4] this offer of reduced responsibilities because you
[5] are female?
[6]  A: Because of that rumor I had heard about
[7] the people that were — the person that was in the
[8] mechanical portion of the department didn't want to
[9] have to work with a female.
[10]  Q: Any other reason?
[11]  A: From the discrimination part, no, that
[12] would be the only reason.
[13]  Q: Did you have any reason to believe that
[14] this particular individual who works in the
[15] mechanical, who does mechanical work, or mechanical
[16] part of the job, had any connection with or
[17] interaction with the person who made you the offer
[18] of this position?
[19]  A: Yes, I do.
[20]  Q: What is that?
[21]  A: He worked for the person that would make
[22] the decision to have me assigned to that position.

Page 164

[1]  Q: So the person you heard the rumor about
[2] reported to the individual who made you the offer?
[3]  A: Right — well, who clarified that it was
[4] not part of the offer anymore, or the assignment,
[5] or whatever you want to call it.
[6]  Q: Of your position?
[7]  A: Right.
[8]  Q: Do you have any reason to believe that
[9] there was any communication between those two
[10] concerning the fact that you are female?
[11]  A: I don't know about the female part of it,
[12] but I would assume that they would be in constant
[13] communication, especially if this person was going
[14] to be told they would be reporting to someone else.
[15] But what they said in the conversation, I don't
[16] know what was actually discussed.
[17]  Q: So to your knowledge, you don't know that
[18] they communicated about the fact that you are
[19] female?
[20]  A: He knew I was a female. I don't know
[21] what they communicated about.
[22]  Q: Turning to the other part of the reason

Page 165

[1] you believe they gave you — they made you this
[2] offer with reduced responsibilities, which was that
[3] you had filed this internal complaint, why do you
[4] believe that they reduced — they gave you an offer
[5] of reduced responsibilities because of your
[6] internal complaint?
[7]  A: Because I think they didn't want me to be
[8] in the company.
[9]  Q: And what do you base that belief on?
[10]  A: The fact that they offered me a job that
[11] I had ten years prior, the fact that they weren't
[12] separating me from this person, just all sorts of
[13] indications. If you want the employee to stay, you
[14] protect them, you make sure that they are given a
[15] job that is comparable to what they were doing —
[16] for whatever you were doing. None of these things
[17] were happening.
[18]  Q: When you say that was a position you held
[19] ten years prior, what company was that with?
[20]  A: At Litton.
[21]  Q: Not at Northrop Grumman?
[22]  A: Right. Litton wasn't bought by Northrop

Page 166

[1] at that point, when I was a CAD manager,
[2] essentially. It may not have been ten years. I
[3] would have to look at my resumes, but it had been a
[4] past job. That was one very small segment of what
[5] I did. So that would be — if I had — the job
[6] that was offered at the end was essentially a job
[7] held by a person that worked for me and was a
[8] component of my overall responsibility.
[9]  Q: When did you first learn that Northrop
[10] Grumman had acquired or planned to acquire Litton?
[11] And I understand that Litton — the portion of
[12] Litton that you worked for was Litton Advanced
[13] Systems which was a subsidiary of Litton.
[14]  A: I actually heard about it three months
[15] before the actual acquisition went through from
[16] people I knew in the industry.
[17]  Q: Approximately what time frame was that?
[18]  A: We were acquired in April of 2001, so
[19] back like in January — may have been before
[20] Christmas, but I heard that this acquisition —
[21] that something was going on and this was rumored.
[22] So it didn't surprise me when it was announced.

Page 167

[1] **Q:** At that time, did you know whether

[2] Northrop Grumman did the same type of work that was

[3] done by LAS, which is EDA work?

[4] **A:** Yes, I did.

[5] **Q:** And knowing that Northrop Grumman did

[6] that same type of work that was done by LAS, what

[7] did you think that might mean for LAS?

[8] **A:** You mean as far as —

[9] **Q:** What would happen to LAS?

[10] **A:** EDA is — every engineering company has

[11] to use EDA to create products. So I saw it as

[12] really exciting because I figured Northrop had a

[13] lot more capital to invest in process improvements,

[14] so a lot of the things I had to do at Litton on a

[15] shoestring, there would be more responsibilities

[16] from that perspective, and I knew a couple of the

[17] people that — at least one for sure that was

[18] working there, so I was pretty familiar with what

[19] Northrop was doing and I knew that there was a lot

[20] of problems that Northrop faced that we had solved

[21] where I was at, so I looked forward to working

[22] with — to try to look at things that we had done

Page 168

[1] to find if they could be applied to what Northrop

[2] had done. So I saw it as pretty neat. It was

[3] pretty exciting to me.

[4] **Q:** Was it your understanding that the EDA

[5] portion — or LAS would be integrated into Northrop

[6] Grumman in some way?

[7] **A:** Absolutely. You can't have two EDA

[8] groups.

[9] **Q:** So you realized that the LAS group would

[10] be integrated into Northrop's EDA group?

[11] **A:** Yes.

[12] **Q:** And you mentioned that Northrop Grumman

[13] had possibly more funds, or you were talking about

[14] something to that effect. Do you know whether

[15] Northrop Grumman's EDA field is larger in scope

[16] than Litton's?

[17] **A:** They have more engineers, so they have to

[18] spend more money on licenses. As far as their

[19] scope as far as technical challenges and

[20] interoperability, which is what really is the

[21] measure of EDA — it is not so much how much money

[22] you spend on it, it is the challenges you try to

Page 169

[1] do. The challenges were equal or even a little

[2] less than what we were facing on the Litton side.

[3] **Q:** That is the type of work that is done, is

[4] that what you are talking about?

[5] **A:** It was the extent of what is called

[6] interoperability in the field, which is how much

[7] data do you want to share between the various parts

[8] of an organization, and Northrop was very much

[9] behind where we were at Litton. So although they

[10] had more employees, the scope that you would

[11] measure for EDA has to do more with what you would

[12] want to integrate, and their scope was actually a

[13] lesser breadth than what we had in Litton.

[14] **Q:** What is that opinion based on?

[15] **A:** Just fact. We were much more integrated

[16] at Litton from an information technology

[17] perspective.

[18] **Q:** What was the basis of your knowledge of

[19] Northrop Grumman's interoperability?

[20] **A:** Northrop was implementing systems we had

[21] implemented three to four years prior. When we

[22] joined Northrop, they were in the process of

Page 170

[1] implementing the systems which would take a year to

[2] a year and a half to implement. We had already

[3] completed that and we were in more of a mature,

[4] refinement stage where Northrop was still fighting

[5] the battle of nobody wanted to use the same systems

[6] and that type of thing.

[7] **Q:** But you mentioned they had more

[8] engineers.

[9] **A:** They had more engineers because they were

[10] a larger company and they were organized

[11] differently, but I just want to emphasize that the

[12] number of engineers that use a design tool don't

[13] dictate the challenge or the technical challenges

[14] at all. They really don't.

[15] **Q:** Are you familiar with the comparison of

[16] the customer base of Northrop Grumman versus

[17] Litton?

[18] **A:** No.

[19] **Q:** When you were at Litton, was your title

[20] manager of EDA?

[21] **A:** Yes.

[22] **Q:** And how did you find out about the

Deposition of Lisa A. Wolff    Case 1:03-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 36 of 103    Lisa A. Wolff v.

Vol. 2, July 31, 2003      Litton Advanced Systems, Inc., et al.

Page 171

[1] responsibilities involved in the position you were
[2] offered at Northrop Grumman?
[3]    **A:** From conversations with Gloria Flach and
[4] Doug Norton.
[5]    **Q:** Approximately how many times did you
[6] speak with Gloria and Doug?
[7]    **A:** Doug, I met him a couple times, two or
[8] three times maybe. Gloria I met because we were
[9] attending the same meetings, so we would talk
[10] sometimes at the meetings and then — that were
[11] related to — I was handling the integration from
[12] the Litton side for engineering, so I was in those
[13] meetings, so I would see her then and I can't
[14] remember how many of those I was at, and then the
[15] other were just discussions we had had two, three
[16] times.
[17]    **Q:** Two or three times you met?
[18]    **A:** Yes.
[19]    **Q:** Talking about the responsibilities you
[20] would have when you came to Northrop?
[21]    **A:** That and how we were going to handle the
[22] integration of the groups and what she was

Page 172

[1] thinking.
[2]    **Q:** Each of those two or three times you met
[3] with Gloria, did you talk about the
[4] responsibilities you may have when you came to
[5] Northrop?
[6]    **A:** I think so. I think it came up or it was
[7] specifically a meeting for that reason. So there
[8] were other — I remember another meeting about
[9] something else, but I can't remember what it was
[10] and I don't remember if it was exactly about that.
[11] It might have been about how we were going to do
[12] integration with the various Litton pieces and what
[13] was going to go into the electronic systems, things
[14] like that. It was a long time ago. I don't
[15] remember 100 percent.
[16]    **Q:** As far as the conversations specifically
[17] concerning what responsibilities you may have when
[18] you came to Northrop, what is the first discussion
[19] about that you recall — was it with Gloria or Doug
[20] or both?
[21]    **A:** It was with Gloria.
[22]    **Q:** Approximately when was that?

Page 173

[1]    **A:** In October, I think. I think it was
[2] around October.
[3]    **Q:** So that was after you filed your internal
[4] complaint?
[5]    **A:** Yes.
[6]    **Q:** And it was after you had retained an
[7] attorney? Remember, we talked about —
[8]    **A:** Whatever the date was. Is it after that
[9] date? Then I will say yes.
[10]    **Q:** I am showing you Exhibit 4.
[11]    **A:** Yes, so it was after I retained an
[12] attorney.
[13]    **Q:** Was the position that you were offered a
[14] manager position in title?
[15]    **A:** From?
[16]    **Q:** At Northrop?
[17]    **A:** Yes.
[18]    **Q:** Was it a band 3 position, do you
[19] remember, in their system?
[20]    **A:** I can't remember.
[21]    **Q:** What do you recall that you were told
[22] about the position in your first meeting with

Page 174

[1] Gloria?
[2]    **A:** Mainly — she didn't really describe — I
[3] don't remember her describing the position. She
[4] mainly — we kind of talked about what she was
[5] thinking about how we would integrate and wanted me
[6] to talk with Doug about the specifics because he
[7] had had some ideas of what he wanted to do with the
[8] department.
[9]    **Q:** So she basically directed you to Doug to
[10] talk about the specifics of the position?
[11]    **A:** And then we were going to come back and
[12] talk to her after Doug and I talked.
[13]    **Q:** So after Gloria, was the next person you
[14] spoke to about the job Doug?
[15]    **A:** Yes.
[16]    **Q:** When was that?
[17]    **A:** It was pretty soon after. I don't
[18] remember, but there wasn't a big gap in time.
[19]    **Q:** What can you recall about that
[20] conversation, as far as your discussion of
[21] responsibilities that were being considered when
[22] you came to Northrop?

Page 175

[1] **A:** We talked about what our people did, like
[2] individuals. We talked about what my — how my
[3] organization was set up within Litton and its
[4] responsibilities. We talked about the overlap
[5] between — I actually had a job that was his job
[6] plus part of Gloria's job. We talked about that to
[7] discuss how we were each organized.
[8]     He drew on a white board plans he was
[9] making for department changes. We started to — he
[10] wrote in names of some of his people on the white
[11] board and kind of showed how on that white board,
[12] like parts of the organization, how they connected
[13] in to other parts of Northrop, and then we talked
[14] about the people that I had and where they would
[15] fit in the organization, and then we talked
[16] specifically about where he saw me fitting because
[17] I was getting the impression that Gloria preferred
[18] I reported to Doug even though I felt that was —
[19] to me it would have been — I would be reporting to
[20] someone who was essentially at my level — I could
[21] tell that is what she wanted, so we talked about
[22] where he saw me fitting in his organization based

Page 176

[1] on this chart, and so he started to kind of draw
[2] other lines on there and connect it up, mechanical
[3] and electrical, and said, "This is where I would
[4] see you managing this area."
[5]     I asked him questions about the people
[6] working on what is called PDM, and he had told me
[7] he had preferred that that not be part of what I
[8] was responsible for. We talked back and forth
[9] about that because I wasn't in agreement and we
[10] talked about experience of keeping it separate,
[11] what issues you can run into —
[12] **Q:** When you say, keeping it separate?
[13] **A:** He didn't want it under me. The way he
[14] was setting up his organization, he had essentially
[15] vertical groups based on functional things he was
[16] responsible for.
[17] **Q:** One mechanical, one electrical, and PDM?
[18] **A:** I can't remember what he called it. He
[19] had part of the IT staff reporting to him. We had
[20] talked about keeping PDM separate, and since we had
[21] implemented a PDM where I came from, I told him
[22] these are the problems you are going to run into,

Page 177

[1] kind of a friendly thing. We kept it as an open
[2] issue.
[3]     In my mind he didn't completely close it
[4] off. He was willing to talk more about whether
[5] that was something we could look into, and so when
[6] I left there, it was very clear to me that he had
[7] drawn things on a board, he had told me what I
[8] would be responsible for. I had emphasized that I
[9] really needed to have multiple engineering
[10] responsibility for EDA, which is — no matter — it
[11] was very, very important, because to me —
[12] **Q:** Let me jump in quickly. Is EDA the
[13] over-arching for all of these areas?
[14] **A:** Yes, and EDA has all sorts of components.
[15] It is really the — it is a fancy name for the
[16] processes and the tools and the agreements on who
[17] is going to own what data at different parts of the
[18] design from the time you think up a design and the
[19] time you deliver it to the customer and all the
[20] manufacturing.
[21]     So, where I came from I had all of that
[22] from tip to tail and in Northrop, they are so big,

Page 178

[1] I would have been surprised if it was all jammed
[2] under one person. So my concern was in fitting
[3] into a larger organization, that I just maintain
[4] two aspects of an EDA function, like electrical and
[5] mechanical or mechanical and PDM, something that
[6] was a combination.
[7]     We talked about that and when he showed
[8] me electrical and mechanical, that is real normal
[9] coupling, when you try to make hardware, it is hard
[10] to separate the thing you stick the electronics in
[11] from the box. That was a natural coupling and he
[12] showed it that way on the chart and I said, "This
[13] is great. I couldn't ask for anything better." I
[14] got what I want, a bigger company to work for, two
[15] aspects of EDA, and I had a lot I was giving up.
[16]     We talked about the people that would be
[17] moved into other areas because of the way they were
[18] organized, wouldn't even be in Doug's organization,
[19] but I was satisfied with having mechanical and
[20] electrical because I thought there was enough
[21] opportunities to make something of that.
[22] **Q:** In that conversation, you mentioned there

Deposition of Lisa A. Wolff
Vol. 2, July 31, 2003

Case 1:02-cv-03932-WDQ     Document 31-5     Filed 09/25/2003     Page 38 of 103 Lisa A. Wolff v.
Litton Advanced Systems, Inc., et al.

Page 179

[1] was some give and take, suggestions from your side
[2] about PDM and it seemed that Doug was listening to
[3] your suggestions and nothing was set in stone yet?
[4]   A: For the PDM. The electrical and
[5] mechanical — throughout the conversation, it was
[6] clear — because we talked about — I had a person
[7] who was a mechanical engineer that was a senior
[8] person and he did too, so we were talking
[9] specifically about mechanical-electrical
[10] combination. But the PDM was kind of left as a
[11] hanging thing and we talked about it later with
[12] Gloria.
[13]   Q: Do you recall Doug telling you — you
[14] mentioned three columns before —
[15]   A: He had three or four columns that he had
[16] on the board.
[17]   Q: And sort of vertically organized?
[18]   A: Yes.
[19]   Q: One was mechanical, one was electrical,
[20] and PDM and IT. As far as mechanical is concerned,
[21] did Doug tell you he had somebody who was managing
[22] that section of the work?

Page 180

[1]   A: He told me he had teams. He had no
[2] formal organization structure, he had teams.
[3]   Q: You don't recall him telling you he had a
[4] manager of mechanical?
[5]   A: No. I am telling you what he told me.
[6] He had teams, that he had no management, no formal
[7] management, and the changes he was discussing were
[8] plans for formal management, and when he made that
[9] formal management, that he had originally thought
[10] he was going to set them up and have them all
[11] separate so they were all separate managers that
[12] reported to him.
[13]   So, he said that once I was joining the
[14] team, he could see that he could split and have it
[15] organized differently so that there would be a
[16] lawyer where I would have two groups under me,
[17] electrical and mechanical, and then the PDM and IT
[18] managers would report to Doug, so he would have
[19] three direct reports. That is the picture he drew
[20] for me.
[21]   So, the questions we discussed was that
[22] he did have someone in mind for mechanical, which

Page 181

[1] was Rafi, and I had told him that I had a person of
[2] equal, pretty much, background who already had
[3] management experience and we talked about that we
[4] may have an issue here, we will have to figure out
[5] what we were going to do because we had two people
[6] that would probably think — would want that job,
[7] and he had told me that he wasn't 100 percent sure
[8] who he thought would take over the electrical, that
[9] he had talked to some of his people and they never
[10] had seemed interested in a real management title,
[11] real management job.
[12]   I had told him that I had the person that
[13] was running my electrical, that with some
[14] mentoring, I could help him if he would be
[15] interested in getting a manager's job.
[16]   Q: But if the person who worked for you who
[17] did electrical took the electrical manager job,
[18] where did you think you were going to fit?
[19]   A: Above.
[20]   Q: You are saying a manager for mechanical
[21] and a manager for electrical and then above those
[22] two and then you — as another level of manager?

Page 182

[1]   A: Yes.
[2]   Q: And then you would be reporting to Doug?
[3]   A: Yes, that is what he drew on the board.
[4]   Q: Whereas for PDM and IT there was just a
[5] manager reporting to Doug?
[6]   A: Yes.
[7]   Q: No second manager?
[8]   A: Because PDM and IT are — for what they
[9] were doing, were very separate functions. There
[10] was no synergy in bringing them under the same
[11] manager, like in the hardware flow — hardware
[12] engineering, and there is absolute value in pulling
[13] those two functions under the same management. I
[14] don't remember what he said the people who would
[15] run the mechanical and the electrical aspects of
[16] it, whether they would be managers. I don't
[17] remember what term he used. They may have been
[18] team leads reporting to a manager. I don't
[19] remember.
[20]   I don't even remember him like writing
[21] titles or anything like that on the board. It was
[22] more like — he first drew the functional things

Page 183

[1] and had names in and what the groups would be doing
[2] and then he went above, and he drew two lines up
[3] and he said, "I can see you here because you can
[4] solve a lot of problems for me," and we kept
[5] focusing on that structure and that was the
[6] structure that we went and talked to Gloria about,
[7] that this was — actually, I think we didn't go
[8] right back to her until there were problems because
[9] I started operating under this thing.
[10]     I was — all the integration stuff,
[11] electrical and mechanical, so I stopped working
[12] with that and other people that were handling that
[13] integration were dealing with that. I can't
[14] remember if we went right back to her afterware.
[15] It was so clear. It was a picture. It was hard to
[16] confuse what it was I was responsible for.
[17]     Q: During that conversation with Doug, did
[18] you discuss anything else that you can recall about
[19] the positions?
[20]     A: We had talked about having a get-to-know-
[21] you session so that our two teams could meet. I
[22] don't remember when it was, but it might have been

Page 184

[1] this conversation, that there were very particular
[2] people that he had — they were pretty well known
[3] in the industry, and I think that was the
[4] conversation he was very happy to know that he was
[5] getting those people. So it might have been during
[6] that conversation.
[7] .   Q: People that were coming over from LAS?
[8]     A: Right.
[9]     Q: Do you recall discussing anything about
[10] your finances with Doug?
[11]     A: You mean as far as my salary?
[12]     Q: No. Do you recall talking with him about
[13] the stay agreement?
[14]     A: I might have. I don't know. If he says
[15] I did, maybe you can give me some hints. I know
[16] later on definitely — I don't remember telling
[17] him — I think I told Gloria about it — or they
[18] may have known. I don't know. I can't remember.
[19]     Q: Do you recall discussing with Doug your
[20] mounting legal fees?
[21]     A: Mounting legal fees — this was
[22] definitely not in the first conversation.

Page 185

[1]     Q: This was October, in the latter
[2] conversations?
[3]     A: This was definitely not in the first
[4] conversation. I had — I don't know. I might have
[5] said this is costing me a lot of money or
[6] something. I don't remember in particular.
[7]     Q: Do you remember discussing your
[8] daughter's tuition with Doug and saying anything
[9] about that?
[10]     A: Yes. I had a problem with that. I had
[11] to do — I don't know if I talked to Doug about it,
[12] but I had to get a vacation pay out because I had
[13] taken money that was supposed to be paid for her
[14] tuition, you know how it is due each semester, and
[15] I would have had to break into something that
[16] wasn't liquid money in order to pay for it, so I
[17] got a vacation request to pay for that. But I
[18] don't remember it going through Doug. I would have
[19] done it through personnel or whatever to do that.
[20] But I was having to pay a lot of money to go
[21] through the HRC process, EEOC HRC thing, and it was
[22] a lot more money than I had ever imagined.

Page 186

[1]     Q: In talking about that, the tuition, at
[2] any time, if you remember talking about that, do
[3] you remember mentioning that that is why you wanted
[4] the money from the stay agreement, so that you
[5] could pay for your daughter's tuition or your legal
[6] fees?
[7]     A: Well, it would be nice to get the money
[8] for that, but I don't remember saying that
[9] specifically. Of course, it would be logical that
[10] if I used any of our liquid savings for lawyers
[11] fees and gone into my vacation for — to pay toward
[12] her tuition, logically I would put it back in the
[13] bank and then pay legal fees because I wasn't
[14] willing to drop the case, so I might have said that
[15] to him, but I don't remember. But it does seem
[16] logical.
[17]     Q: What is the next conversation that you
[18] recall concerning your responsibilities for a
[19] position at Northrop, whether it was with Gloria or
[20] Doug, after the one we just talked about?
[21]     A: I remember a conversation with Gloria at
[22] a meeting that was related to, I guess it was at a

**Page 191**

[1] went to Gloria?

[2]  **A:** No.

[3]  **Q:** When did you talk to Gloria?

[4]  **A:** It was soon afterward. I can't remember

[5] how quickly.

[6]  **Q:** Do you think it was also before

[7] Thanksgiving?

[8]  **A:** No, because I am pretty sure when I had

[9] seen Doug, it was right up against that

[10] Thanksgiving week. That is why I remember it. It

[11] wasn't before Thanksgiving too. I don't think

[12] there was enough time. Then I went to see Gloria

[13] as soon as she could see me.

[14]  **Q:** And what do you recall about that

[15] conversation?

[16]  **A:** She essentially backed up what Doug said.

[17] I was not very happy and wondering what was going

[18] on. Asked them what was going on, why the change.

[19]  **Q:** And what did Gloria tell you?

[20]  **A:** I really can't even remember except I

[21] felt like I was getting a lot of rhetoric. I can't

[22] remember what the words were, but at that point I

**Page 192**

[1] was not hearing what I expected to hear, and I am

[2] pretty clear what it was I was supposed to be doing

[3] and I was trying to find out why the change.

[4]  **Q:** How did that conversation end with

[5] Gloria?

[6]  **A:** I can't even picture the conversation. I

[7] am sure I was unhappy.

[8]  **Q:** Did you tell her that it was your

[9] understanding that you were going to have the

[10] mechanical responsibilities as well?

[11]  **A:** Yes. During that conversation — the

[12] whole conversation was, What is happening? This is

[13] what I was supposed to be doing, reiterating that I

[14] had exactly what I wanted, it was what I asked for,

[15] I had been operating under this idea that this is

[16] what it is, and I can't even remember her responses

[17] except that she was essentially backing up Doug.

[18]  **Q:** So what did you do next after that

[19] meeting with Gloria?

[20]  **A:** I think that was around the time that —

[21] I was like, "Look, this is not a comparable

[22] position, and if you don't have a place, then

**Page 193**

[1] execute my contract and let's be done with this,"

[2] because I wasn't going to take a position that was

[3] below. There was no offer to try to find a

[4] position that was comparable. It was not going

[5] anywhere.

[6]  I tried to get Gloria to help me explain

[7] to personnel that this — it was a wonderful job

[8] that they had, but it wasn't a comparable job to

[9] what I was doing. It was a significant decrease in

[10] technical breadth and depth, all sorts of things,

[11] and I just remember trying to figure out how to try

[12] and make lemonade out of lemons and move on.

[13] I think I did ask Gloria before we left

[14] the meeting to put in writing what she was offering

[15] me. I didn't want to work through Doug any more

[16] and I had asked Gloria to do that.

[17]  **MS. COX:** Would you please mark this as

[18] Exhibit 10.

[19]  (Wolff Exhibit No. 10 was

[20] marked for identification.)

[21]  **BY MS. COX:**

[22]  **Q:** Ms. Jardim has just handed you what has

**Page 194**

[1] been marked as Exhibit 10. On the second page, and

[2] also the first page — what is this document?

[3]  **A:** It looks like a bunch of e-mail headers.

[4]  **Q:** And on the second page, do you see where

[5] it says "Original Message"?

[6]  **A:** Yes.

[7]  **Q:** And who is that original e-mail message

[8] from?

[9]  **A:** Me.

[10]  **Q:** And who is it sent to?

[11]  **A:** Gloria and Doug.

[12]  **Q:** Taking a look at these two pages, what is

[13] it your understanding that these two e-mails are

[14] talking about?

[15]  **A:** New position definition discussion, is

[16] the topic.

[17]  **Q:** And what is the date of the original

[18] message?

[19]  **A:** What do you mean original, on the first

[20] page —

[21]  **Q:** They are all on the same date. What are

[22] the dates of these e-mails?

**Page 195**

[1]  **A:** December 7.

[2]  **Q:** Is that around the time frame you are

[3] thinking of, the discussions we were having about

[4] the conversations with Gloria?

[5]  **A:** To talk about what had changed?

[6]  **Q:** Right.

[7]  **A:** That sounds about right, if it was around

[8] Thanksgiving. This is probably the right time.

[9]  **Q:** I was wondering if this might help your

[10] recollection of the date of when the conversation

[11] happened.

[12]     Based on this, does it look like you were

[13] setting up — was a meeting being set up through

[14] these e-mails?

[15]  **A:** That is what it looks like.

[16]  **Q:** What was the date of that meeting that

[17] was being scheduled?

[18]  **A:** Looks like December 11.

[19]  **Q:** Does that —

[20]  **A:** That is what this meeting thing says,

[21] December 11.

[22]  **Q:** That was in an e-mail from you to Gloria

**Page 196**

[1] and Doug to set up this meeting?

[2]  **A:** It doesn't work that run. They have

[3] Outlook running, so they — these words that you

[4] see that come in here come from a meeting planner

[5] that they initiate and then I get it and that —

[6] the when and the time, that is from their system.

[7] It is an automated e-mail. So when Gloria set this

[8] up or whoever set it up, they send this out.

[9]  **Q:** Underneath, where it says "original

[10] message" —

[11]  **A:** It is not generated by —

[12]  **Q:** It is not yours?

[13]  **A:** What happens is when I get this message

[14] from Gloria — you don't see it in here because the

[15] exchange server does it. Somebody sets up a

[16] meeting for Gloria that date and it asks her the

[17] e-mail address of who is invited. It automatically

[18] generates a message with this when, time, where,

[19] and when I hit return, the message looks like it

[20] came from me directly and then those words

[21] automatically appear.

[22]  **Q:** Were you asking for a meeting and then

**Page 197**

[1] they —

[2]  **A:** They picked the time.

[3]  **Q:** Does that refresh your recollection of

[4] when you met with Gloria?

[5]  **A:** Yes. I don't remember it being a day

[6] different than what the original plan was, so I

[7] don't think it got rescheduled.

[8]     (Wolff Exhibit No. 11 was

[9] marked for identification.)

[10]          **BY MS. COX:**

[11]  **Q:** Ms. Jardim has handed you what has been

[12] marked as Exhibit 11. Can you take a look at that?

[13]  **A:** Yes. I recognize it.

[14]  **Q:** What is that document?

[15]  **A:** It is a letter I sent to Tim Edwards.

[16]  **Q:** What is the date of this letter?

[17]  **A:** December 12.

[18]  **Q:** When you mentioned a few minutes ago that

[19] you let Gloria know that you didn't consider this

[20] position to be comparable, is this what you recall

[21] as your documentation of that — of your opinion

[22] that this was a comparable?

**Page 198**

[1]  **A:** This was not in existence when I talked

[2] to Gloria about the job.

[3]  **Q:** As a follow-up — why did you write this

[4] letter?

[5]  **A:** Because after talking to Gloria and Doug,

[6] I guess on December 11, then this was kind of like

[7] a summary of what had been changed.

[8]  **Q:** So is this the first — your first

[9] documentation where you stated that you didn't

[10] think these positions were comparable?

[11]  **A:** I think so.

[12]  **Q:** You mentioned the stay agreement in the

[13] first paragraph. Do you see that?

[14]  **A:** Yes.

[15]  **Q:** "I have elected to exercise my option to

[16] execute the 'Agreement to Stay' contract and expect

[17] to be involuntarily terminated not later than

[18] December 20, 2001."

[19]  **A:** Yes.

[20]  **Q:** Is that a correct reading of the letter?

[21]  **A:** Yes, it is.

[22]  **Q:** Did you did you leave Northrop Grumman on

**Page 199**

[1] December 20, 2001?

[2] **A:** No, I did not.

[3] **Q:** I think you testified on Tuesday that it

[4] was February 8 —

[5] **A:** Middle of February, I think.

[6] **Q:** Why is it that you said in this letter

[7] here that you expect to be involuntarily —

[8] "involuntary" is in bold in this letter. Why did

[9] you believe it was involuntary?

[10] **A:** Because — well, there is a difference

[11] between voluntary termination and involuntary

[12] termination. I was being terminated because there

[13] was not a position available that was comparable,

[14] and with all of the other terminations for upper

[15] management that were happening for — like if a VP

[16] was offered a job, then they were involuntarily

[17] terminated because there wasn't a place to put

[18] them. I certainly wasn't leaving because I —

[19] **Q:** Now, at this time, the time you wrote

[20] this letter, you had already begun your job search

[21] prior to this based on what you had testified on

[22] Tuesday?

**Page 200**

[1] **A:** Yes. I started to poke around a lot more

[2] after I had that conversation with Doug, around

[3] Thanksgiving.

[4] **Q:** The bottom of the first page of Exhibit

[5] 11, the last sentence begins, "The areas of

[6] responsibility to be transitioned out of my EDA

[7] responsibility include" — that sentence continues

[8] on to describe some responsibilities that would no

[9] longer be your responsibility if were you to take

[10] the position that Northrop Grumman was offering; is

[11] that right?

[12] **A:** Yes.

[13] **Q:** The end of that sentence says, "as these

[14] tasks are handled by other organizations within

[15] Northrop"; is that correct?

[16] **A:** Yes.

[17] **Q:** So, were there some responsibilities that

[18] you had at Litton that you understood were in a

[19] different organization at Northrop and that is why

[20] you weren't being offered those responsibilities?

[21] **A:** Yes.

[22] **Q:** One of those responsibilities was PDM?

**Page 201**

[1] **A:** Yes.

[2] **Q:** If you look at the top of page 2?

[3] **A:** I was smiling before because PDM is

[4] actually part of Doug Norton's organization. I was

[5] also trying to not sound mean. I didn't want to

[6] argue. For whatever reason, they are not in my job

[7] responsibility.

[8] **Q:** What is your experience with a company

[9] the extent of Northrop Grumman? Had you ever

[10] worked in EDA in a company of Northrop's size?

[11] **A:** Yes, I worked for Litton. You have to

[12] separate. Northrop and Litton Industries were

[13] very, very similar in size and the way they

[14] functioned. My division was at the time when we

[15] were acquired by Northrop smaller than the division

[16] of Northrop we were being integrated into. When I

[17] joined Litton, however, there were almost 22 to

[18] 2800 people, I think, in that division, when I

[19] first started.

[20] **Q:** In the EDA division?

[21] **A:** No, the division of Litton I was part of.

[22] **Q:** LAS?

**Page 202**

[1] **A:** I am trying to compare apples to apples

[2] for you.

[3] **Q:** And the comparable —

[4] **A:** Electronic systems — it is the — I am

[5] not 100 percent sure of Northrop's complete setup.

[6] **Q:** What was the size of that comparable

[7] section at Northrop?

[8] **A:** I don't know. I am not sure of how large

[9] it was.

[10] **Q:** You said they were the same size though?

[11] **A:** I think it was in the 2500 to 3,000

[12] range, was my understanding.

[13] **Q:** And that includes the engineers?

[14] **A:** Yes. Depends on how you want to define

[15] engineers, but, yes.

[16] **Q:** In addition to the letter that you wrote

[17] to Tim on December 12, which was marked as Exhibit

[18] 11, is there — did you document the differences in

[19] these two positions any other way, in any other

[20] letter or any other document?

[21] **A:** In the human resources filing, I think

[22] there was something in there that was similar to

**Page 227**

[1] A: No. Some were part-time, and I also had
[2] consultants that worked for me there that don't
[3] really show up as Litton employees, but I had
[4] consultants that worked for me.
[5] Q: And the consultants, are you including
[6] those in the 15 or 16?
[7] A: No.
[8] Q: Fifteen or 16 includes full-time and
[9] part-time?
[10] A: Yes.
[11] Q: Approximately how many of those 15 to 16
[12] do you think were full-time?
[13] A: All but a couple. I think most were
[14] full-time employees.
[15] Q: Did that number, 16 to 16, did that
[16] include the librarians?
[17] A: The component librarians?
[18] Q: Yes.
[19] A: Yes.
[20] Q: And how many of those were there?
[21] A: Well, two where the majority of their
[22] work was librarian work, and one that split his

**Page 228**

[1] work between simulation work and library work, so
[2] it was more of a split.
[3] Q: Were any of those three part-time?
[4] A: Of the librarians?
[5] Q: Right.
[6] A: No, I don't think so. No, they were all
[7] full-time.
[8] Q: Fifteen and 16 you had full-time, and a
[9] couple part-time, and three librarians?
[10] A: Yes, and two to three consultants working
[11] at a time.
[12] Q: That is outside of the 15 or 16?
[13] A: Yes.
[14] Q: In addition to?
[15] A: Right.
[16] Q: So excluding part-time and excluding
[17] librarians, how many full-time direct reports would
[18] you say you had, approximately 10 — three
[19] librarians —
[20] A: Maybe 10 or 11. I can't remember. I
[21] would have to look at the list of names.
[22] Q: And the eight to 10 you have in the

**Page 229**

[1] Northrop job column, is it your understanding that
[2] those people would have been full-time or
[3] part-time?
[4] A: I didn't know that. This number came
[5] from back when Doug had done this little drawing
[6] and we were talking about names and looked at lists
[7] of who was in what. That is where it came from. I
[8] don't know what their job status was.
[9] Q: Is it your understanding that the
[10] component librarians would not have been direct
[11] reports to you?
[12] A: Yes.
[13] Q: So that would have been outside this
[14] eight to 10?
[15] A: Yes.
[16] Could we take a bathroom break?
[17] Q: Absolutely.
[18] (Discussion off the record.)
[19] (Brief recess.)
[20] **BY MS. COX:**
[21] Q: The second category under management is
[22] budget management, and it is my understanding from

**Page 230**

[1] what you have marked in the Litton and Northrop job
[2] columns that you had budget management for
[3] electrical and mechanical and PDM when you were at
[4] Litton; is that correct?
[5] A: Yes.
[6] Q: And that in the position you were offered
[7] at Northrop, you would have only had budget
[8] management for electrical design?
[9] A: That is what I was assuming because
[10] nothing was — I don't remember the word budget
[11] being talked about, so I am just assuming —
[12] Q: Did you ever hear that somebody else was
[13] going to be responsible for the electrical design?
[14] A: No. That is — I assumed that Doug
[15] wasn't going to do the budget for all of them.
[16] Q: And the third category is corporate
[17] representative for product development and
[18] automation. It goes on to a little more
[19] description.
[20] A: Yes.
[21] Q: Is that related to PDM?
[22] A: Just related to — I represented our

Page 235

[1] **A:** No, but when you are coming up with the
[2] 52, I believe that is more at a corporate level for
[3] Northrop. I don't know enough about what they had
[4] there, and like I said there, this X is supposed to
[5] show what I was told the job was, the people were
[6] in BWI.

[7] **Q:** But the four sites that you are referring
[8] to for Litton, they didn't have other sites
[9] reporting in to them — were there other sites that
[10] reported to San Jose or College Park?

[11] **A:** I don't think there were. I know there
[12] were relationships that had been started for places
[13] where things were being manufactured or vendors
[14] that we had to support, and then customer sites
[15] where there would be some kind of project going on
[16] and there would be fingers out from that.

[17] **Q:** Considering all four sites at Litton that
[18] you were responsible for, how many engineers were
[19] there approximately at those four sites?

[20] **A:** Maybe three to 400. I am not sure. You
[21] asked just for engineers.

[22] **Q:** As the manager of EDA at Litton, what was

Page 236

[1] your budget for that whole sector, again,
[2] approximately?

[3] **A:** A little over three million. Maybe
[4] higher. That was direct responsibility, and
[5] depending on projects, there would be other places
[6] of money, I had responsibility to might bring it up
[7] several hundred thousand.

[8] **Q:** But that would be over your regular
[9] annual budget?

[10] **A:** Right, it would be over and above that.

[11] **Q:** Are you familiar with how many engineers
[12] there are working in the EDA field for Northrop
[13] Grumman?

[14] **A:** In the EDA field or the engineering
[15] field?

[16] **Q:** Sorry. Engineering, the number of
[17] engineers?

[18] **A:** They have about 3,000 engineers. I don't
[19] know which sector.

[20] **Q:** When you say 3,000, are you referring to
[21] just the BWI site?

[22] **A:** I don't know, I just remember that number

Page 237

[1] from a presentation, so I don't remember if it was
[2] all or a portion.

[3] **Q:** Do you have any reason to believe — any
[4] reason — any information to the contrary that
[5] there are approximately 2500 engineers at the BWI
[6] site but for all of the Northrop sites there are
[7] approximately 6,000 engineers?

[8] **A:** I don't have anything that tells me that
[9] you are not telling me the truth. I don't have
[10] knowledge.

[11] **Q:** Are you familiar with what the budget is
[12] at Northrop Grumman for EDA including electrical
[13] and mechanical and PDM?

[14] **A:** I would suspect it would be a lot higher
[15] because there were a lot more users, so I don't
[16] know what the actual budget number was.

[17] **Q:** And do you have any sense of how much of
[18] that budget would have been your budget for
[19] electrical?

[20] **A:** No, I do not.

[21] **Q:** If you were to learn that the budget for
[22] electrical was in the range of two to three — if

Page 238

[1] you learned that the electrical section of the
[2] budget for EDA at Northrop was in the two to
[3] $3-million range, do you have any information
[4] contrary to that?

[5] **A:** No.

[6] **Q:** Do you have any reason to believe that
[7] the differences in the position you held at Litton
[8] and the position you were offered at Northrop were,
[9] that these differences existed because you were
[10] female?

[11] **A:** I think that because of what I described
[12] the other day about the mechanical being taken
[13] away, I think is related to that.

[14] **Q:** Do you have any reason to believe that
[15] these differences are related directly to your
[16] having filed an internal complaint?

[17] **A:** Yes.

[18] **Q:** Other than what we have already
[19] discussed?

[20] **A:** Yes — other than what we have already —
[21] no.

[22] **Q:** Do you have any reason to — you

Page 239

[1] mentioned Northrop Grumman's organization, and how
[2] Doug showed you on the white board that he had them
[3] set up as, I believe you described them as vertical
[4] and separate from one another. Do you have a
[5] reason to believe that the difference in these two
[6] jobs had nothing more to do with the fact other
[7] than that he — that is how he organized his
[8] sector, as separate sections for mechanical,
[9] electrical, PDM —
[10]   **A:** The question is do I —
[11]   **Q:** Do you have any reason to believe that he
[12] offered you this electrical job for any reason
[13] other than that is just how he set up his
[14] organization, as separate structures, one
[15] mechanical, one electrical, et cetera?
[16]   **A:** Yes, because he showed me that he was —
[17] he talked about that it was not working well to
[18] have mechanical and electrical separate, and when
[19] he drew those two lines up on the chart and he
[20] thought they should be connected because of the
[21] hardware flow, he stated himself that he was
[22] planning on pushing them together and having them

Page 240

[1] report to me.
[2]   **Q:** You mentioned that your position at
[3] Litton was really like Doug's position plus some of
[4] what Gloria does?
[5]   **A:** Yes.
[6]   **Q:** Is it your belief that you should have
[7] been given Doug's position?
[8]   **A:** No, not actually. It was my belief
[9] that — well, I told you earlier that the job that
[10] was arranged based on these conversations with Doug
[11] early on were fine. Northrop is a much more
[12] complex company, but there was a lot of
[13] opportunities and I was willing to report to
[14] someone who was doing the job I was currently
[15] doing. I was okay with that because I saw plenty
[16] of growth. So I did not expect to have Doug's job.
[17] I expected to be integrated in a way that would be
[18] challenging, and in our original conversations,
[19] before I refused to — before I went outside of the
[20] EEOC and all the rest of that, was settled.
[21]   **Q:** When did you file your EEOC charge?
[22]   **A:** I don't remember, but it was — you will

Page 241

[1] have to look.
[2]   **MS. COX:** Would you mark this as Exhibit
[3] 14.
[4]     (Wolff Exhibit No. 14 was
[5] marked for identification.)
[6]             **BY MS. COX:**
[7]   **Q:** Ms. Jardim has handed you what has been
[8] marked as Exhibit 14. Do you recognize that?
[9]   **A:** Yes.
[10]   **Q:** And what is that?
[11]   **A:** That is the paperwork you fill out when
[12] you put in your — a grievance to the HRC.
[13]   **Q:** And if you flip to the second page of
[14] that exhibit at the top, do you see where it says
[15] "Equal Employment Opportunity Commission," the top
[16] left?
[17]   **A:** Yes.
[18]   **Q:** What is the second page?
[19]   **A:** What do you mean?
[20]   **Q:** What is this second page?
[21]   **A:** More of the same paperwork.
[22]   **Q:** And this is to the EEOC — the first page

Page 242

[1] you were looking at says "Prince George's County
[2] H.R.C."?
[3]   **A:** Yes.
[4]   **Q:** That is for Maryland's — the second
[5] page, is that the charge with EEOC?
[6]   **A:** Yes.
[7]   **Q:** Notice of Charge of Discrimination?
[8]   **A:** Right, right.
[9]   **Q:** On the Prince George's County HRC page,
[10] the first page of the exhibit, do you see your
[11] signature at the bottom of the page?
[12]   **A:** Yes.
[13]   **Q:** What is the date next to your signature?
[14]   **A:** 1/10/02.
[15]   **Q:** January 10, '02?
[16]   **A:** Yes.
[17]   **Q:** Does that refresh your recollection of
[18] when you filed your charge?
[19]   **A:** Yes.
[20]   **Q:** So it was January of 2002?
[21]   **A:** You are bringing this up because I said
[22] going outside to the EEOC, is that what —

Page 251

[1] point. Whoever he talked to, he told me there were
[2] considerations of organization changes that somehow
[3] would be related to what my group was doing, but he
[4] didn't really elaborate. So I know they had that.
[5] I don't know what conversations Charlie had, but I
[6] would imagine they had it, had some kind of
[7] conversations, because each of us were placing our
[8] people in the various organizations, so you had to
[9] talk to whoever the manager was to get your — what
[10] are these people doing and what do they slot into
[11] and all that kind of stuff. I would imagine they
[12] had some kind of conversation.
[13]    Q: But you are not aware of any conversation
[14] that John had with either Charlie or Doug about
[15] your position with Northrop?
[16]    A: I am not aware of any.
[17]    Q: Do you have any reason to believe that
[18] either John or Charlie would have told Doug that
[19] you had told them that you were planning on filing
[20] or wanting to file or thinking of filing a charge
[21] with the Human Rights Commission — do you have any
[22] reason to believe that, that they would have told

Page 252

[1] him that?
[2]    A: I know that when I was repeatedly saying
[3] I can't do my work, I have to have contact with the
[4] people that were in the meeting, the people that
[5] were with Steve, and even though it was e-mail
[6] contact, anything to get my job done, I would go to
[7] Charlie and say, "You have to get me out of this,
[8] you have to help me stop making contact."
[9]    He told me he was going to call and talk
[10] to somebody, and I thought he said Gloria, but it
[11] could have been Doug, but for some reason I think
[12] he said Gloria, and that he was going to see what
[13] he could do to straighten this out, because I think
[14] it was during that same conversation I was saying,
[15] "If you don't do this, I am going to go to EEOC
[16] because I am not being separated."
[17]    Q: Do you have any reason to believe that
[18] either one of them told Doug Norton or Gloria Flach
[19] about that you intended to or were just
[20] considering filing an EEOC charge?
[21]    A: When Charlie said he was going to contact
[22] whoever he said he was going to — the reason he

Page 253

[1] was contacting was to see if there was something
[2] that could be done to quicker split between my
[3] responsibilities with having to deal with the San
[4] Jose people and see if there was some way he could
[5] move me out sooner, and I told him probably there
[6] was no way. The whole ball had been set in motion.
[7] They weren't going to move things around because of
[8] my issues.
[9]    He had said, "I will let them know the
[10] seriousness of this." Does that mean he was going
[11] to repeat that I am going to go to the EEOC? You
[12] will have to ask him. I don't know, but they knew
[13] I wasn't kidding around, and after whatever he did,
[14] there were — he made himself much more available
[15] to try to be the middleman on things if somebody
[16] else couldn't be, and so something did improve. I
[17] didn't have to — I didn't feel as pressured to
[18] have to continue working that segment of my job.
[19]    Q: The reason Northrop Grumman was offering
[20] you a position was because LAS was being integrated
[21] into the Northrop's sort of equivalent section; is
[22] that correct — LAS was not going to exist any more

Page 254

[1] after the integration?
[2]    A: I can only go on what I was told by
[3] Gloria, which was that she valued my skills, valued
[4] my experience, and that was the reason, not — I
[5] can go just based on what she said.
[6]    Q: But the reason that you weren't staying
[7] in your specific position at Litton was because
[8] Litton was being moved into Northrop Grumman. LAS
[9] wasn't going to exist as its own entity any more?
[10]    A: Correct.
[11]    Q: Do you believe that Northrop made your
[12] working conditions intolerable by offering you this
[13] position — by asking you to take this position?
[14]    A: I think what made them intolerable was
[15] not understanding why everything was changing, the
[16] constant wonder of what the heck is going on. All
[17] these things seem to be falling in place that
[18] looked really bad, and so I just didn't — I
[19] couldn't trust them, I couldn't trust what was
[20] going on with that, whether this was — what was
[21] happening with the job. So, are you talking about
[22] the fact that the job changed? I am not sure which

Page 255

[1] part of the job offer you mean. I had very
[2] different feelings —

[3]     Q: You mentioned you were not given anything
[4] in writing following your meeting with Doug when he
[5] was describing the position possibilities on the
[6] white board, correct?

[7]     A: Yes.

[8]     Q: So when you then met with Doug and Gloria
[9] in December, as we saw and refreshed our
[10] recollection with the date from the e-mails, and
[11] you learned definitively what the position was that
[12] they were going to offer you, that they were asking
[13] you to fill at that point, was that position
[14] intolerable?

[15]     A: Was the position itself intolerable? The
[16] position was a good position, but it wasn't a
[17] comparable position at all, and I don't believe I
[18] said I learned definitively what it was. The
[19] problem was I walked out —

[20]     Q: You learned you were not going to have
[21] certain responsibilities?

[22]     A: Yes, I did learn with both of them in the

Page 256

[1] room —

[2]     Q: That was clarifying, you will not give me
[3] the mechanical duties I thought I was going to have
[4] and there were other duties, as we have reviewed —
[5] certain duties you thought you were going to have
[6] that you were no longer going to have?

[7]     A: It wasn't exactly put that way, and to me
[8] that is an important point. It was not put to me
[9] as a clarification when I talked to Doug or as a
[10] clarification when I was with Doug and Gloria
[11] together. Doug, when I first talked to him around
[12] Thanksgiving, he said he decided not to include
[13] that. That was not a "Lisa, you were confused,"
[14] and it was never part of that in the beginning.

[15]     You don't know how many times I wish he
[16] had just said that, because when you said did the
[17] position change make a difference, because he
[18] didn't say — he didn't say it was a clarification.
[19] It was a decision. And what in the heck changed
[20] his mind? What was going on?

[21]     Did it make it intolerable? Yes, because
[22] now I went from feeling harassed to feeling

Page 257

[1] retaliated against, and nobody could explain to me
[2] anything else to prove it. And to try to do it
[3] after the fact, the damage is done. You can't undo
[4] what was done. I am not confused. This was not a
[5] clarification.

[6]     Q: So his decision to not give you the
[7] mechanical duties is what was — is what was
[8] explained to you in December — he had decided not
[9] to give you those responsibilities that you two had
[10] discussed in November?

[11]     A: He didn't really explain it.

[12]     Q: He didn't explain why, but he said —

[13]     A: He is not doing it.

[14]     Q: And is there — did he give you any
[15] indication at any time that he had any knowledge
[16] that you were intending to file a charge with the
[17] EEOC — did he ever say anything to you that made
[18] you think he knew about that?

[19]     A: No, and I have to say — am I allowed to
[20] talk about something I was instructed by my lawyer?

[21]     MR. JENIFER: Just answer the question
[22] she is asking you.

Page 258

[1]     Can you read it back?

[2]     (The reporter read the requested portion
[3] of the record.)

[4]     THE WITNESS: No.

[5]     BY MS. COX:

[6]     Q: Did Doug Norton ever say anything to you
[7] that made you think that he had talked to, I
[8] believe it was Rafi, you said, who you had heard
[9] through a rumor didn't want to be working for a
[10] woman?

[11]     A: Your question is did he —

[12]     Q: Did Doug — do you have any reason to
[13] know whether Doug knew about that?

[14]     A: About the rumor?

[15]     Q: Right.

[16]     A: No. I heard the rumor long after I left.
[17] I don't know when it surfaced.

[18]     Q: Do you have any other reason to think
[19] that the reason that Doug decided not to give you
[20] the mechanical duties had to do with your being a
[21] female?

[22]     A: Other than that rumor?

Page 259

[1] **Q:** Right.

[2] **A:** No.

[3] **Q:** Do you have any reason to believe that

[4] Doug didn't offer you mechanical duties because of

[5] your having filed the internal complaint?

[6] **A:** No. I want to elaborate on the question

[7] about — the one before this.

[8] **Q:** Because you were female, whether he

[9] changed the responsibilities from what you had

[10] discussed?

[11] **A:** Yes, that one. At Thanksgiving when we

[12] talked, when Doug was stumbling around to tell me

[13] it was now different, he mentioned something, and I

[14] don't remember if he mentioned Rafi by name, but

[15] that — it was something about that the mechanical

[16] people or person or — I can't remember what it

[17] was, but that they didn't want to do it, they

[18] didn't want to make the change that he had

[19] described.

[20] **Q:** In the people in the mechanical —

[21] **A:** I don't know if he said people, person,

[22] Rafi, but I remember something about — some human

Page 260

[1] or humans associated with mechanical, the

[2] mechanical support team, did not want to do what he

[3] had described.

[4] **Q:** Was that in any way connected to your

[5] gender?

[6] **A:** No, not at that moment, but then when I

[7] heard this rumor after I left —

[8] **Q:** After mid-February?

[9] **A:** Right. I don't know when the rumor

[10] surfaced, but when I was told the rumor that the

[11] team lead did not want to get involved in my issue,

[12] or something like that, and be working with a

[13] woman, I thought to myself, maybe that is what he

[14] meant when he said the mechanical people didn't

[15] want to. I don't know when the rumor surfaced.

[16] **Q:** When you talked about the position with

[17] Doug at the various times in the fall of 2001, did

[18] he tell you that he didn't have a manager in the

[19] electrical part of the work at the time?

[20] **A:** He told me in our first meeting that he

[21] had no managers. I can't remember what he called

[22] them, but they — there was no like departments or

Page 261

[1] whatever, it was more of — it was a very informal

[2] — he had people organizing teams, but I don't know

[3] if that is the same as being recognized as an

[4] organization structure from like the Northrop HR

[5] perspective.

[6] **Q:** Do you recall his telling you that he

[7] didn't have anyone that could be a manager for the

[8] electrical department, organization, or section?

[9] **A:** Yes, I do, I remember him saying that he

[10] had tried to convince people, but nobody was

[11] interested.

[12] **Q:** That was different from mechanical and

[13] PDM, where he did have people that he felt he could

[14] put in those positions?

[15] **A:** Well, let me take it back. He had a

[16] leader for the electrical team. I can't remember

[17] who it was, but somebody was doing it. But he told

[18] me, if he made formal management positions, that —

[19] and it wasn't just electrical. He made it sound

[20] like there was nobody — people were not really

[21] interested in going into a real manager's position.

[22] It was a conversation along that line.

Page 262

[1] **Q:** Did he tell you he did have somebody in

[2] the mechanical division or section that he could

[3] put in a management position? I believe you said

[4] there were two people, you had one and he had one

[5] and there might be an issue between the two of

[6] them.

[7] **A:** Right, and when we had that discussion,

[8] he had mentioned that the person there was one of

[9] the people that really didn't have — really didn't

[10] like the pure management aspects of the job, liked

[11] to be more technical, and I had a person that liked

[12] the more management aspects of the job, so that is

[13] why we knew it was going to be an issue.

[14] **Q:** Do you believe that Northrop really did

[15] need to fill the manager position for the

[16] electrical section?

[17] **A:** I don't know if I can state what Northrop

[18] needed. I can state what Doug told me.

[19] **Q:** Do you believe that their telling you

[20] they needed somebody in that position was a lie?

[21] **A:** I don't remember them telling me they

[22] needed to put someone in that —

Page 263

[1]   Q: The position they offered you?

[2]   A: The position they offered me —

[3]   Q: Do you believe they really needed to put

[4] someone there, or do you think they were lying when

[5] they told you they needed to put someone there?

[6]   A: I am trying to find out, do you mean in

[7] the structure the way Doug described it to me —

[8]   Q: Right.

[9]   A: The way the structure Doug described to

[10] me —

[11]   Q: The position at the end that you turned

[12] down, do you believe they really did need to fill

[13] that position or do you believe that their telling

[14] you they needed to fill that position was a lie,

[15] the position you were actually offered and you

[16] turned down?

[17]   A: I don't want to say it was a lie, but —

[18] I will just say I don't believe it was a lie.

[19]   Q: Let me hand you what was marked the other

[20] day as the complaint. I am directing your

[21] attention to paragraph 60 in the complaint. The

[22] very last sentence in this paragraph states, "This

Page 264

[1] has severely strained Mr. and Mrs. Wolff's marital

[2] relationship and has forced Mr. Wolff to suffer a

[3] loss of consortium."

[4]   Is that a correct?

[5]   A: Yes.

[6]   Q: Are you bringing a claim of loss of

[7] consortium?

[8]   A: No, I am not.

[9]   Q: You mentioned earlier Karen Bartleson?

[10]   A: Yes.

[11]   Q: And you are aware that Ms. Bartleson was

[12] designated as an expert in this litigation?

[13]   A: Yes.

[14]   Q: How did you locate — were you involved

[15] in locating Ms. Bartleson?

[16]   A: Yes.

[17]   Q: And in what way were you involved?

[18]   A: I did a search to find someone who

[19] understood EDA.

[20]   Q: How did you go about that search?

[21]   A: I contacted some people who are also

[22] involved in EDA and tried to get recommendations.

Page 265

[1] I tried to — I talked to people at — please don't

[2] ask me the names because I cold called people, who

[3] could help with this, that type of thing, and her

[4] name came up and a lady named Peggy Oseanna came

[5]   up —

[6]   Q: Those two separate names suggested to

[7] you?

[8]   A: Two separate names. That is how I got

[9] Karen's name. Plus, she is just known in the

[10] industry.

[11]   Q: Did you then contact Karen directly?

[12]   A: Actually, I just started calling both of

[13] these women and Peggy returned first and Peggy also

[14] recommended Karen, so I — I then contacted Karen,

[15] and Peggy called her and said she would kind of

[16] help me, so she would take a phone call. I didn't

[17] know who these people are or they don't know me,

[18] and I guess Peggy knows Karen because of Peggy's

[19] position in the industry, so she just asked Karen

[20] to take a phone call and then stepped out of it and

[21] then I called Karen.

[22]   Q: Did you contact anybody else by phone?

Page 266

[1]   A: For an expert witness for EDA?

[2]   Q: Correct.

[3]   A: I tried to get somebody from the Gartner

[4] Group.

[5]   Q: What are they?

[6]   A: They are a consulting group, but they

[7] have EDA industry consultants that work for them,

[8] trying to find out, can you hire — I don't know

[9] how to get an expert witness, so I was trying to

[10] hire someone who knows information about EDA that

[11] could be a witness.

[12]   Q: And what happened when you contacted

[13] Gartner Group?

[14]   A: They don't get involved in any type of

[15] lawsuit situations.

[16]   Q: Anybody else that you contacted other

[17] than Peggy, Karen and the Gartner Group?

[18]   A: I don't think so.

[19]   Q: How did you know Peggy or how did you —

[20]   A: She is an EDA industry — she is now in

[21] her career — she is a writer, so she is in EDA

[22] magazine and all the different magazines.

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND
NORTHERN DIVISION
---o0o---

LISA A. WOLFF,                    )
                                 )
    Plaintiff,          )
                                 )
vs.                    )  CA No. L02-3932
                                 )
LITTON ADVANCED SYSTEMS,   )
INC. et al.,           )
                                 )
    Defendants.        )
_____)

Deposition of
STEPHEN A. MAZZO

_____

Tuesday, August 12, 2003

REPORTED BY:  JOHN WISSENBACH, CSR 6862

**2**

INDEX OF EXAMINATIONS

                                      Page
EXAMINATION BY MR. CHERRY              3
EXAMINATION BY MS. COX               159
EXAMINATION BY MR. CHERRY            160

EXHIBITS MARKED FOR IDENTIFICATION

No.  Description                     Page
1 Complaint excerpt                   43

2 Letter, Mazzo to Edwards, 9/14/01 (NG0209-   43
  (NG0210)

3 Communication, Mazzo to Edwards, 12/17/01    43
  (NG0241-NG0242)

4 Memo, Edwards to Mazz, 10/15/01     43

**3**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MARYLAND
NORTHERN DIVISION
---o0o---

LISA A. WOLFF,                    )
                                 )
    Plaintiff,          )
                                 )
vs.                    )  CA No. L02-3932
                                 )
LITTON ADVANCED SYSTEMS,   )
INC. et al.,           )
                                 )
    Defendants.        )
_____)

---o0o---

BE IT REMEMBERED that, pursuant to Notice, on
Tuesday, August 12, 2003, commencing at 9:58 thereof
a.m., at the law offices of Morgan, Lewis & Bockius LLP,
One Market, Spear Street Tower, 28th Floor, San
Francisco, California, before me, JOHN WISSENBACH, a
Certified Shorthand Reporter, personally appeared
STEPHEN A. MAZZO,
_____ called as a
witness by the plaintiff, who, having been first duly
sworn, was examined and testified as follows:
---o0o---

**4**

    LAW OFFICES OF RONALD M. CHERRY, 214 Washington
Avenue, 2nd Floor, Towson, Maryland 21204, represented
by RONALD M. CHERRY, Attorney at Law, appeared as
counsel on behalf of the plaintiff.
    MORGAN, LEWIS & BOCKIUS LLP, 1111 Pennsylvania
Avenue, NW, Washington, DC 20004, represented by
CHRISTINE B. COX, Attorney at Law, appeared as counsel
on behalf of the defendants.

---o0o---

EXAMINATION BY MR. CHERRY:

Q. Good morning.  Mr. Mazzo, good morning.

A. Good morning.

Q. My name's Ron Cherry, and I represent Lisa
Wolff, the plaintiff in this action.  I know you've
spoken to Ms. Cox about this case already, sir.  Is that
right?

A. Yes, I have.

Q. Have you ever had your deposition taken before?

A. No, sir.

Q. What I'm going to do is to ask you some
questions about the Wolff vs. Northrop Grumman case.  If
I ask you a question you don't know the answer to,

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

3 (Pages 9 to 12)

---

**9**

1    What do you -- what does Wescam do?

2    A. We build imaging systems for commercial and

3    military industries.

4    Q. When I think of imaging, I think x-rays, MRIs

5    --

6    A. I'm sorry.

7    Q. -- that type of thing.

8    A. No, sir.

9    Q. Okay.

10    A. The easiest explanation is when you turn on

11    your TV at night, watch the news, chopper 11 is hovering

12    over someplace on the BW parkway, and they're showing --

13    taking shots of -- of the traffic.

14    Q. Okay.

15    A. Okay. We build systems with TV cameras, put

16    them inside of gimbals, mount them to platforms,

17    airborne and ground --

18    Q. Okay.

19    A. -- and microwave link that information down to

20    the user.

21    Q. All right. Now, you just told me this, but

22    what's your title there, again, sir?

---

**10**

1    A. Vice president, general manager.

2    Q. And what does a vice president, general manager

3    at Wescam do?

4    A. Basically we have -- Wescam has a number of

5    facilities. The main office is in Burlington, Ontario,

6    Canada. Healdsburg is the second largest facility. And

7    I manage -- I run that entire facility.

8    Q. Hillsborough, New Jersey or Healdsburg,

9    California?

10    A. Healdsburg, California.

11    Q. Okay. And you manage the Healdsburg facility?

12    A. Healdsburg facility.

13    Q. All right. How many people do you have working

14    under you at Healdsburg?

15    A. 130.

16    Q. Where were you employed before Wescam?

17    A. I was employed for what is now known as

18    Northrop Grumman.

19    Q. Okay.

20    A. Previously -- previous to that it was called

21    Litton. It was a division of Litton Industries called

22    Litton Advanced Systems.

---

**11**

1    Q. When you started, you started with Litton?

2    A. No -- yes, when I started back there, yes, I

3    started with Litton.

4    Q. When did you begin with Litton?

5    A. Two-part question.

6    Q. Uh-huh.

7    A. Out here in California, in October of 1997.

8    Q. Okay.

9    A. Prior to that, I worked for what was then known

10    as Litton Amecom from 1982 to 1992 -- 1993, excuse me.

11    Q. A-M-O-C-O-N?

12    A. A-M-E-C-O-M.

13    Q. Amecom. Okay. All right. Would they be the

14    same -- is it the same Litton company, though?

15    A. It was the same -- Litton Industries was the

16    parent corporation.

17    Q. Okay.

18    A. These were two divisions within Litton

19    Industries.

20    Q. Okay. So you began with Litton Industries in

21    1982?

22    A. Yes, sir.

---

**12**

1    Q. All right. And when did you begin with

2    Northrop Grumman?

3    A. When Litton was acquired by Northrop Grumman, I

4    -- I became de facto a Northrop Grumman employee.

5    Q. What did you have to do to maintain your

6    employment, that is, when Northrop Grumman took over

7    Litton, what did you have to do to keep your employment

8    status, the way it was?

9    MS. COX: Objection.

10    THE WITNESS: I'm not sure --

11    MS. COX: Objection. BY MR. CHERRY:

12    Q. Let me rephrase. Okay.

13    When Northrop Grumman took over Litton -- and

14    I'm sorry. When was that, '97?

15    A. No, sir.

16    Q. When was that?

17    A. Northrop took over Litton Industries effective

18    April 1st --

19    Q. I'm sorry.

20    A. -- 2001.

21    Q. '1 or '2? I thought it was '2. It was 2001?

22    A. Hold on a second. Let me think for a moment.

---

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

4 (Pages 13 to 16)

13

1    Q. 2001. Okay.
2    A. 2001, yes.
3    Q. All right. Now, at the time of that takeover,
4  did Northrop Grumman interview you?
5    A. Interview me? I'm not quite sure I understand.
6  In the classical —
7    Q. Did they -- they -- as if it was a job
8  interview. Did they come by and talk to you about your
9  job, about what you did, about whether you wanted to
10  retain that position?
11    A. Not in the classical sense.
12    Q. Okay.
13    A. It wasn't — I mean, I — at the time, I was
14  the executive vice president and general manager for
15  what was then Litton Advanced Systems. I ran the
16  facility in San Jose.
17    Q. Okay.
18    A. The —
19    Q. The short answer to the question is, you didn't
20  have to be -- you didn't have to interview with Northrop
21  Grumman in order to retain your job? And when we say --
22    A. To —

14

1    Q. -- "interview," we're talking --
2    A. To --
3    Q. -- about the classic --
4    A. To retain a position?
5    Q. Yes, sir.
6    A. A position? I did not have to interview --
7    Q. Okay.
8    A. -- to retain a position.
9    Q. All right. Now, did you have to -- did you
10  speak with anybody at Northrop Grumman about retaining
11  the vice president's position that you had?
12    A. Yes, I did.
13    Q. Who did you -- you don't want to call it an
14  interview, do you?
15    A. No, I don't want to call it an interview.
16    Q. Okay. Who did you have this conversation with?
17    A. Mr. Bill Brackney.
18    Q. Okay. What --
19    A. Who was --
20    Q. I'm sorry. Go ahead, please. Don't let me
21  interrupt you. Keep going.
22    A. That's okay. You can if you'd like.

15

1    Q. All right.
2    A. Bill Brackney was the vice president and
3  general manager of Northrop Grumman's defensive systems
4  division.
5    Q. Okay. When did you have the conversation with
6  Mr. Brackney?
7    A. It would have been roughly May of 2001, about a
8  month after the takeover.
9    Q. Give me a spelling on Brackney, please.
10    A. I'm going to guess. I don't know the exact
11  spelling. But it would be something like B-R-A-C-K-N-
12  E-Y.
13    Q. It's good enough. And you said that discussion
14  was in May of 2001?
15    A. Yes, sir.
16    Q. All right. Where were you employed before you
17  began with Litton Industries in 1982?
18    A. Oh, 1982? I worked for what was then called
19  AIL division of Eaton Corporation.
20    Q. So the parent company would have been Eaton
21  Corporation?
22    A. Yes, sir.

16

1    Q. And how long did you work for Eaton
2  Corporation?
3    A. For ten years, from '72 to '82.
4    Q. What did you do for them?
5    A. I started as a graduate engineer and worked
6  myself up through the engineering ranks.
7    Q. What was your position when you separated from
8  Eaton Corporation?
9    A. I was called a group — group leader.
10    Q. What did a group leader do?
11    A. Group leader was the first level of management.
12  And I got to run small programs.
13    Q. What do you mean, run small programs?
14    A. We were a defense contractor for the U.S.
15  government, and I got to run a small contract, small
16  program.
17    Q. Okay. You were in charge of that contract?
18    A. For the engineering development, yes, sir.
19    Q. Okay. How many people did you have under you?
20    A. It was a matrixed organization. No one
21  reported to me in a — for — for line responsibility.
22  There were about 15 people on the program.

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 53 of 103
DEPOSITION OF STEPHEN V. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

7 (Pages 25 to 28)

---

**25**

1  general manager for Litton Advanced Systems.
2      Q. Okay. Now, wouldn't this have been subsequent
3  to the takeover, in August of 2001?
4      A. No, sir.
5      Q. Okay. And I'm -- I'm confused. I'll tell you,
6  I'm confused --
7      A. Sure. That's okay.
8      Q. -- about the date. What was the date of the
9  takeover?
10     A. The official date of the takeover was April
11  1st, 2001.
12     Q. Okay. So why wouldn't August 1st be subsequent
13  to the takeover?
14     A. I -- I'm sorry. I think I -- I said -- I
15  probably said the wrong words. Prior to the takeover. I
16  should have said prior to the takeover I was executive
17  vice president and general manager for Litton Advanced
18  Systems.
19     Q. Right. You did say that.
20     A. Yes, sir.
21     Q. Okay. And what was your title in August of
22  2001? Was it the same?

---

**26**

1      A. Unofficially --
2      Q. Okay.
3      A. -- it was director.
4      Q. Was there ever a time that it changed from
5  director to something else?
6      A. No, sir.
7      Q. And what's your -- well, you're not there now.
8  What was your position when you left Northrop Grumman?
9      A. The same.
10     Q. Director?
11     A. Yes, sir.
12     Q. Okay. Is that a -- a parallel position to vice
13  president and general manager, as far as you know?
14        MS. COX: Objection. If you could clarify the
15  question.
16        MR. CHERRY: I don't -- I don't know that I
17     Q. Is it the same -- is it the same type of
18  position? Is it the same line of position? Or is it a
19  demotion or a promotion?
20     A. It's a complex answer, mostly because Litton
21  Industries was structured in a completely different way
22  than Northrop Grumman.

---

**27**

1      Q. Let me --
2      A. If you're asking me did I retain in the short
3  term the same responsibilities that I had, yes, sir.
4  Over the course of my employment, the responsibilities
5  and duties did change.
6      Q. They decreased, diminished?
7      A. In some ways diminished, and in some ways equal
8  or better than.
9      Q. Okay. You're right; that is a complex answer.
10     A. Yes, sir.
11     Q. Did you consider the move from executive vice
12  president and general manager to director to be a
13  demotion, at the time?
14     A. Psychologically, you know, emotionally, the
15  answer would be yes. But in reality, the way their
16  company was structured, it was a lateral.
17     Q. Okay. Did you feel like you had less
18  responsibility as a director than the executive vice
19  president and general manager, initially?
20        MS. COX: Objection; asked and answered. BY MR.
21  CHERRY:
22     Q. That doesn't mean you can't answer, sir.

---

**28**

1      A. On the advice of counsel, I think I won't,
2  won't go any more.
3        MS. COX: Well, I'm not directing you not to
4  answer.
5        THE WITNESS: Okay.
6        MS. COX: I'm just making an objection.
7        THE WITNESS: I think I've -- I think I've
8  answered it. BY MR. CHERRY:
9      Q. Answer it again.
10     A. Okay. State the question again, please.
11     Q. Did you consider -- hell, I don't remember the
12  question now.
13     A. Okay.
14        (The record was read by the reporter.)
15        THE WITNESS: The types of things that were
16  diminished was signature authority on contract levels. I
17  still had the entire responsibility to manage the
18  product line, to manage the people that were assigned to
19  me, to make the profits, to make the bookings, to make
20  the cash. In the Northrop Grumman structure, signature
21  in Litton. You have less freedom in Northrop in terms
22  of signature authority. BY MR. CHERRY:

---

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

18 (Pages 69 to 72)

69

1  Gahagan about the grievance?
2      A. No, sir.
3      Q. All right. Did you talk to Bob Ossentjuk about
4  the grievance?
5      A. No, sir.
6      Q. All right. You sure?
7      A. Yes, sir.
8      Q. Larry Ashby. Did you talk to Larry Ashby about
9  the grievance?
10     A. No, sir.
11     Q. Okay. And I think next on my list is Mike
12  Gering, and we -- I think we had it straightened out by
13  then, so -- all right. Why don't we -- why don't we go
14  on and talk about the incident of August 29th, 2001. Can
15  you tell me first, generally, what -- what were the --
16  what was this call about? What were the -- what led up
17  to this conference call?
18     A. We were trying to integrate the -- the
19  engineering portion of the IT network between College
20  Park and San Jose.
21     Q. IT is -- well, what is IT?
22     A. Information technology.

70

1      Q. Okay.
2      A. We were -- we had implemented a change that --
3  that effectively made operations in San Jose very, very
4  difficult.
5      Q. Why was that; communication issues?
6      A. Electronic communication issues, not -- not
7  verbal communication issues.
8      Q. Okay. Can you explain it -- well -- yeah, and
9  remember, we're -- we're just lawyers, so --
10     A. That's good, because I don't think I can
11  explain it much better than that.
12     Q. Oh, no. Okay.
13     A. We were trying to create -- put all the
14  drawings on one network, and they would be accessible
15  from either San Jose or College Park.
16     Q. Okay.
17     A. The -- the implementation had some significant
18  issues, and those issues resulted in -- in a loss of
19  productivity in San Jose.
20     Q. Okay. Because --
21     A. That was significant.
22     Q. Because it hadn't been done yet?

71

1      A. No, it had been done.
2      Q. It had been? Okay.
3      A. It had been done. And we were over the -- over
4  the couple of months that -- from the time it was
5  implemented, up through this telephone conversation, we
6  were trying to convert back, reconvert, or correct.
7      Q. Okay. Who was -- who was directly responsible
8  for implementing the changes that you were talking
9  about?
10     A. Mike Peters would have been directly
11  responsible.
12     Q. All right. And where would Ms. Wolff have fit
13  in, in this matrix here?
14     A. Working for Mike, she would have been executing
15  -- I don't know if she executed all of it or portions of
16  it.
17     Q. Okay. Can you tell me who was in the meeting
18  in San Jose?
19     A. In San Jose?
20     Q. Yes, sir.
21     A. Myself, Lynn Gahagan, Bob Ossentjuk, Larry
22  Ashby, and Ken Peters.

72

1      Q. Why was Gahagan involved in the meeting?
2      A. Why was Gahagan involved in the meeting?
3      Q. Yes, sir.
4      A. He represented all of engineering.
5      Q. He was the -- okay.
6      A. He was the director of engineering, so all
7  engineering responsibilities came to him.
8      Q. All right. Ossentjuk, what was his
9  responsibility?
10     A. He was --
11     Q. Or why was he in the meeting?
12     A. Because he was the director of design
13  engineering, and these activities fell under him.
14     Q. Okay. And he was under Gahagan?
15     A. He's under Ossentjuk.
16     Q. No, Ossentjuk is under Gahagan.
17     A. I'm sorry, yes.
18     Q. Right. Ashby?
19     A. Larry Ashby would have been the acting -- I
20  don't think we called them department managers anymore;
21  the head of the mechanical engineering group.
22     Q. Yeah. I just wanted to know why they were in

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

19 (Pages 73 to 76)

---

73

1  the meeting.
2      A. He was the manager in the area affected.
3      Q. Right. In engineering?
4      A. In engineering, yes, sir.
5      Q. And Ken?
6      A. Ken was there because he would have been the
7  person trying to implement the technology changes on our
8  side of the interface.
9      Q. He's -- he would be the IT person --
10     A. He's --
11     Q. -- in San Jose?
12     A. Yes, sir.
13     Q. Okay. The meeting took place --
14     A. He was the person that did this portion of IT
15  in San Jose.
16     Q. Okay. This -- were there -- where did the
17  meeting take place; in your office?
18     A. In my office.
19     Q. And it was on a conference call?
20     A. Yes, sir.
21     Q. Was anyone else there?
22     A. No, sir.

---

74

1      Q. Was the meeting recorded at all?
2      A. No, sir.
3      Q. And the -- the other end of the call would have
4  been College Park?
5      A. Yes, sir.
6      Q. Who was there in College Park?
7      A. John Roth, Mike Peters, and Lisa Wolff.
8      Q. Why was Roth there?
9      A. As the -- as my delegate, my deputy there, he
10  had all engineering responsibility for engineering in
11  College Park, which we were trying to cohere. So he was
12  directly affected by -- by the -- by the process that we
13  were trying to correct.
14     Q. Peters and Wolff were the IT folks, right?
15     A. Yes, sir.
16     Q. Was anyone else at that meeting at any point
17  that you can think of?
18     A. It was certainly no one in San Jose. And I
19  cannot tell you if anyone was in College Park. No one
20  was announced.
21     Q. Okay. And if there -- I was going to ask you
22  that. If there was a time where someone came in or left

---

75

1  the meeting, was that announced --
2      A. No, sir.
3      Q. -- to others in the meeting? No?
4      A. No, sir.
5      Q. Did everyone in San Jose remain in the meeting
6  the entire time?
7      A. Yes, sir.
8      Q. Anyone leave and come back for any reason?
9      A. No, sir.
10     Q. How long was the meeting?
11     A. I don't recall the exact time.
12     Q. Less than an hour?
13     A. In the -- in the order of about a half hour,
14  maybe 45 minutes.
15     Q. Okay. Who called the meeting?
16     A. Who called the meeting? It was not me, but I
17  don't remember who exactly called the meeting.
18     Q. Let me see your -- let me direct your attention
19  to -- to Mazzo Exhibit Number 2.
20     A. Uh-huh.
21     Q. Can you identify that document for me?
22     A. This is a letter that I wrote.

---

76

1      Q. And what were the circumstances giving rise to
2  your writing that letter?
3      A. As a result of Ms. Wolff's grievance, I was --
4  I had to respond to the grievance. And I was given less
5  than 24 hours to write the letter.
6      Q. Why? Why is that? Why were you only given 24
7  hours to write the letter?
8      A. I was told that I had to have the letter in by
9  close of business Friday, September 14th.
10     Q. Who told you that?
11     A. Mr. Edwards.
12     Q. Do you know -- Tim Edwards told you that?
13     A. Yes, sir.
14     Q. Do you know when the grievance was filed?
15     A. I don't know the exact date. I received it in
16  the email the day before.
17     Q. You received the copy of the grievance?
18     A. I'm sorry. Yes, sir.
19     Q. Okay.
20     A. A copy of the grievance.
21     Q. All right. And they just wanted you -- you
22  were just asked to read -- take a look at that -- the

---

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

21 (Pages 81 to 84)

81

1  not put into place to effect a speedy transfer.  The --
2      Q.  Can you identify what things those were?
3      A.  Things like T-1 lines and -- and other kinds of
4  high-speed communication devices.
5      Q.  And who would have been responsible for -- and
6  they need to be installed, is that right, the T-1 line?
7      A.  Yes, sir.
8      Q.  Who would have been responsible for taking care
9  of that process, that installation process?
10      A.  People in College Park.
11      Q.  The IT people?
12      A.  The IT people in College Park.
13      Q.  Okay.  Keep going.
14      A.  We had been -- for months, from roughly the
15  April, May time frame, up through and including the --
16  the day in question, a number of phone calls were --
17  were attempted to correct the situation.  And in effect
18  we actually asked to go back to -- we in San Jose asked
19  to revert back to the old configuration.  A number of
20  phone calls were made at various times to various people
21  to try to resolve the situation.  And the situation was
22  not being resolved.

82

1      Q.  Who were the people that the phone calls were
2  being made to, Peters and Wolff?
3      A.  Peters, Mike Gering --
4      Q.  Okay.
5      A.  -- predominantly.  And most of the time -- at
6  my level.  And I cannot tell you who below my level, you
7  know, the -- the calls were being made from.
8      Q.  Did you have direct interaction with Ms. Wolff
9  about this process prior to August 29th, 2001?
10      A.  Prior to August 29?  Yes, sir.  When -- when
11  the system was installed and it didn't quite work out
12  the way we wanted it to work out, I had conversations
13  with both Mike Peters and Lisa Wolff.
14      Q.  How would you characterize the way those
15  conversations went?  Were they situations where you lost
16  your temper and lost control, or were they, you know,
17  regular businesslike situations that you described in
18  the beginning of this meeting?
19      A.  I don't recollect exactly, but they would
20  certainly have been businesslike.
21      Q.  Okay.  Keep going.  So you were having problems
22  getting the T-1 lines and other lines installed?

83

1      A.  Well, there was a lot of different problems.  We
2  could -- we could not go back, because they had handed
3  in all the licenses that we had had in San Jose.  So we
4  couldn't go back.  And we couldn't go forward.  And so
5  there was a general sense of frustration by all the --
6  by the engineering people in San Jose as to the kind of
7  work loss that -- work efficiency and downtime that we
8  were exhibiting.
9      Q.  How would this affect the engineering people in
10  College Park; the same way?
11      A.  They were not affected at all.
12      Q.  Because they had the data right there in
13  College Park?
14      A.  Because the data was right there in front of
15  them.
16      Q.  Okay.  There came a point that -- who was it
17  that was -- who took over the meeting initially?
18      A.  Wow.
19      Q.  If you don't remember, you don't remember.  It's
20  not that important.
21      A.  Yeah, I don't remember.
22      Q.  Okay.

84

1      A.  I mean, in the beginning of the -- in the
2  beginning of the meeting, it was a dialogue that
3  included a -- you know, many of the members on both
4  sides of the telephone conversation, because we were
5  trying to uncover -- get out -- get through history, and
6  back up as to how the problem occurred, what could have
7  been done, what should have been done, what can be done.
8      Q.  Okay.  And there came a time that the meeting
9  deteriorated into something less than a businesslike
10  meeting?
11      A.  Yes, sir.
12      Q.  What -- how did that happen?  What happened?
13      A.  The level of frustration in the room that I was
14  in kept on increasing, because every time we'd ask to do
15  something, the answer was, "No, we can't do it"; things
16  -- that general kind of discussion.  A number of the
17  other people started getting a little antsy and -- and
18  questioned -- you know, there were a lot of -- the
19  tension started being raised within -- within the
20  meeting.
21      Q.  Within the San Jose office?
22      A.  Certainly within the San Jose office.  I can't

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 57 of 103
DEPOSITION OF STEPHEN V. MARZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

22 (Pages 85 to 88)

85

1    tell you what was happening on -- on the other side.
2       Q.  How could you tell that the tensions were being
3    raised in the San Jose office?  Were the -- were Gahagan
4    and Ossentjuk and -- I forgot who else was there.  But
5    were the gentlemen there saying something to you or was
6    it because of conversations that they had in the
7    conference call?
8       A.  They didn't say anything to me that I can
9    recall specifically.  Because, as I said, this was a
10   joint conference call, so everyone was allowed to
11   participate freely.  So --
12      Q.  There was no pressing down the mute button and
13   having separate conversations or that type of thing?
14      A.  We had a mute button, and I probably hit the
15   mute button to tell them to calm down a little bit.
16      Q.  Okay.
17      A.  Or things like that.
18      Q.  All right.  Were there notes passed around or
19   memos passed around on the San Jose end, that you can
20   recall, during the course of the meeting?
21      A.  I can't recall.  But I would imagine that any
22   of the -- the schedules or details might have been part

86

1    of the meeting.
2       Q.  At any time, did -- did -- was the mute button,
3    you know -- I guess you can activate a mute button.  Was
4    it activated when Mr. Ossentjuk complained to you
5    directly about something specific that was happening in
6    the meeting?
7       A.  I don't recall.
8       Q.  All right.  So we're at the point now -- and
9    sorry I keep interrupting you --
10      A.  Uh-huh.
11      Q.  -- but I'm trying to get this through.  So
12   we're at the point now where frustrations are high in
13   San Jose.
14      A.  Right.
15      Q.  Okay.  What happens then?
16      A.  At that point I decided to -- to stop the
17   employees from asking the questions and started to take
18   over the direct conversation with the meeting myself.
19      Q.  Do you -- employees?  By that you mean the San
20   Jose employees?
21      A.  I'm sorry, the San Jose employees.
22      Q.  Okay.  And what happened?

87

1       A.  We were still not getting satisfactory results
2    to the -- to the issues at hand.  I asked that certain,
3    you know, things be done, and getting a lot of
4    reluctance and resistance on the part of the various
5    members of the -- of the College Park group.
6       Q.  Who in particular?
7       A.  In effect all of them, but since Lisa was the
8    one that was responsible for putting together a -- a
9    recovery schedule, you know, she had taken the lead in
10   that area, and -- and -- and both Mike and John kind of
11   backed off a little bit.
12      Q.  Okay.  Can you give me an idea about what types
13   of things she was reluctant to do?
14      A.  She wanted to -- we were requesting that
15   changes be made to effect a better efficiency.  And she
16   was reluctant to do that.  She was reluctant to take
17   responsibility.  And I told her she didn't have to take
18   responsibility.  And -- and that's what in effect -- the
19   -- the conversation that -- emotions ran -- you know,
20   changed or the context of the -- of the meeting changed
21   just around that point.
22      Q.  Okay.  Were you her -- "superior" is a

88

1    difficult word.  But were you higher up in rank than
2    Lisa at that point?
3       A.  Yes, sir.
4       Q.  Okay.  Would it be fair to say you were her
5    boss?
6       A.  No, sir.
7       Q.  You weren't her direct contact?
8       A.  That's correct.
9       Q.  But you were above her direct contact, right?
10      A.  I was equal to her direct contact.
11      Q.  You were equal to -- her direct contact I
12   thought was Mike.
13      A.  Mike Peters; that's correct.
14      Q.  You were equal to Mike?
15      A.  Yes, sir.
16      Q.  And John -- then John would not have been equal
17   to Mike?
18      A.  It -- if you go back into the testimony, I said
19   it was -- it was not exactly equal, but it was.
20      Q.  Okay.
21      A.  John Roth, being my deputy, sat in, in my
22   stead, at a -- at a staff meeting that Mike Gering would

Case 1:02-cv-03932-WDQ   Document 31-5   Filed 09/25/2003   Page 58 of 103
DEPOSITION OF STEPHEN MAZZON
CONDUCTED ON TUESDAY, AUGUST 12, 2003

23 (Pages 89 to 92)

89

1  have held.  And John was treated similarly, with the
2  same level of responsibility as I would have had.
3      Q.  But if the two of you were in the room, you
4  would have been -- he would not have been equal; he
5  would have reported to you?
6      A.  That's correct.
7      Q.  Got it.  Okay.  I got it now.
8          The -- so when -- when it got to the point, at
9  least in your estimation, that Lisa was reluctant to --
10  to pull the trigger, to take responsibility for making
11  changes, things got a little more heated?
12      A.  Yes, sir.
13      Q.  Were you still the only one at San Jose talking
14  at that point?
15      A.  I believe so, by that point.  I believe so.  But
16  I can't remember.
17      Q.  Did -- did Mr. Ossentjuk or any of the other
18  people in San Jose offer any input in any form at that
19  point, after things started to get a little more heated?
20      A.  I can't remember.
21      Q.  All right.  So take me from that point, then,
22  when things started to get heated.  What happened?

90

1      A.  I had asked that certain changes be made.  And
2  those changes involved a certain amount of risk.  There
3  was concern by the people in College Park that -- that
4  -- who would be responsible for the risk.  Okay.  And I
5  said I would.  And how the -- the -- with regard to the
6  -- to the one area that I wrote in my response, I had
7  asked that certain things be done.
8      Q.  What area?
9      A.  The "cover your ass" memo.
10      Q.  Ah, that's a -- the -- what, it would be one,
11  two -- the fourth paragraph?  It starts -- it's on the
12  second page?
13      A.  Fourth paragraph, second page.
14      Q.  Okay.
15      A.  Okay.  I had asked that the changes be made.  I
16  was getting resistance from the people in San -- in
17  College Park.  I asked that it be made two and three
18  times.  And in specific Ms. Wolff said that she could
19  not be held responsible.  And I told her I would not
20  hold her responsible, that I'd take full responsibility.
21  And I stated that in front of everyone there.  And
22  that's when she still, you know, continued that she

91

1  didn't want to do it, because she didn't want to be held
2  responsible.  And that's when I made the unfortunate
3  comment.
4      Q.  That you would write "a fucking cover your ass
5  memo"?
6      A.  Yes, sir.
7      Q.  Okay.  And I don't want to get too much into
8  the technical aspect, because, quite frankly, I wouldn't
9  understand it.  But what was the -- what was the risk
10  that you were asking for, that they were reluctant to
11  take?
12      A.  We were trying to get certain pieces of data --
13  okay.  We had a computer system in San Jose.  We had a
14  computer in College Park.  When we started this process,
15  the idea was to take all the data that resided in San
16  Jose and put it on one computer server, if you will, in
17  College Park.
18      Q.  Right.
19      A.  And then we would -- both people in College
20  Park and people in San Jose would be able to access that
21  database at the same time.  That was the -- that was the
22  original scheme.  Okay.

92

1          We -- we were having a very, very difficult
2  time accessing the data that was, you know, generated in
3  San Jose originally, difficulty getting at that data.  So
4  the plan was to take all the -- the San Jose data and
5  copy it, if you will, into -- I'm sorry, take all the --
6  yeah, take all the San Jose data that resided in College
7  Park and to recopy it back into San Jose so that we
8  would then have local access to the data.
9      Q.  Okay.  You didn't retain a copy of the San Jose
10  data when you sent it to College Park?
11      A.  No, we lost -- we lost it all.
12      Q.  What's the risk in that plan?
13      A.  The risk, as we stated, was that data could
14  have been -- could -- there could have been errors in
15  the data transition -- data transfer, excuse me --
16      Q.  Right.
17      A.  -- from -- from San -- from College Park into
18  San Jose.
19      Q.  Okay.
20      A.  Okay.  And certain parts, certain pieces of
21  data, could have been potentially corrupted.
22      Q.  I understand.  All right.  Okay.  So because we

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

24 (Pages 93 to 96)

93

1  got to the "cover your ass" situation, I take it that
2  the tone of the meeting even degenerated further?
3      **A. Yes, sir.**
4      Q. Okay. And what -- can you tell me what
5  happened, what words were used, by whom, besides the --
6  you know, what you wrote in the -- in Exhibit 2,
7  "fucking cover your ass"?
8      **A. If you go to her original grievance, she had**
9  **counted up 17 times that I used the work "fuck" or**
10 **"fucking."**
11     Q. Okay. And we are going to --
12     **A. Okay.**
13     Q. We are going to go through hers, but --
14     **A. I understand that.**
15     Q. Yeah. But I would prefer you tell me what you
16 remember.
17     **A. To be honest with you, you know, from that**
18 **point on I had lost control of my emotions, and so**
19 **recollecting a lot of the details is going to be very**
20 **difficult.**
21     Q. You don't -- I won't ask you to admit anything,
22 but you don't deny that you used the word "fucking"?

94

1      **A. No, sir, I do not.**
2      Q. And more than once?
3      **A. Yes, sir.**
4      Q. And that you used the word "fuck" more than
5  once?
6      **A. Yes, sir.**
7      Q. All right. Do you recall whether anyone else
8  in the meeting used that word, used "fuck" or "fucking"
9  or anything else, any variation thereof?
10     **A. I don't recall.**
11     Q. Okay. Do you specifically recall whether Lisa
12 Wolff ever used the work "fuck" or "fucking" in the
13 meeting?
14     **A. I don't think she did, but I don't recall.**
15     Q. Okay. I understand -- we're going to take a
16 break after we -- in ten minutes; not even.
17         I understand that there were several -- that
18 you contend that there were several factors that
19 contributed to what happened on August 29th, not the
20 least of which being your frustration that this system
21 wasn't to where you wanted it to be, right?
22     **A. Yes, sir.**

95

1      Q. Okay. You also said your mother passed away?
2      **A. Yes, sir.**
3      Q. When was that?
4      **A. August 17th.**
5      Q. She had just passed away?
6      **A. Yes, sir.**
7      Q. Did the people in College Park end know that --
8  that that had been the case?
9      **A. I can't -- I don't know if they knew or not.**
10 **Certainly everyone in San Jose did.**
11         MR. CHERRY: Do you mind if we do that break
12 thing now?
13         MS. COX: That's fine.
14         (Recess taken.) BY MR. CHERRY:
15     Q. Okay. Let's go on. Okay. I think where we
16 left off was that there were some factors, at least in
17 your mind, that contributed to the -- the tone of the
18 meeting. One of the things you mentioned in your -- in
19 Exhibit 2 was loss of the PLAID, P-L-A-I-D, competition.
20     **A. Uh-huh.**
21     Q. What's that, sir?
22     **A. This was a proposal for a piece of equipment**

96

1  **that San Jose had been involved for well over a year in**
2  **trying to win. It was probably the biggest contract**
3  **that we would have had.**
4      Q. Okay.
5      **A. And the loss was a significant emotional blow**
6  **to everybody there, who had put in long hours. I mean,**
7  **there were plenty of very late days, weekends, that**
8  **extended beyond the normal time that these things**
9  **happened.**
10     Q. Was this loss a direct result of the -- the
11 communication problem --
12     **A. No, sir.**
13     Q. -- between College Park --
14     **A. No, sir.**
15     Q. All right. You indicated that -- well, you
16 said morale was high and -- morale was low and emotions
17 were high. But that had to do with the PLAID
18 competition also?
19     **A. Yes, sir.**
20     Q. All right. You indicated that the relationship
21 between San Jose and College Park had deteriorated. Can
22 you tell me a little bit about that, what that was

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 60 of 103
DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

25 (Pages 97 to 100)

97

1  about?
2      A. In the letter?
3      Q. Yes, sir.
4      A. Can we just go back and review it?
5      Q. Let me find where that is.
6      A. Okay.
7      Q. It's in that same paragraph.
8      A. Okay.
9          Okay. In general, the -- the particular issue
10  that -- the particular technical problem that I
11  described was one of many different kinds of problems
12  that were occurring between San Jose and -- and College
13  Park.
14      Q. Okay.
15      A. And it affected just about every operating
16  function within the company.
17      Q. Was Ms. Wolff involved in those other problems
18  also?
19      A. Well, it -- yes and no, sir. I mean --
20      Q. Some yes, some no?
21      A. Those that -- those that affected IT, she was.
22  Those that were outside of her functional

98

1  responsibilities, she was not.
2      Q. Okay. You -- wait a minute. Where the heck is
3  that?
4          I have a note here that you mentioned SBU. What
5  is that?
6          MS. COX: That's in the same -- it's in the
7  same letter. BY MR. CHERRY:
8      Q. Is that the same paragraph?
9      A. Yeah.
10      Q. What's SBU?
11      A. My business unit.
12      Q. Oh, I got it.
13      A. The -- where we talked earlier about EC and
14  coms and spaces being the business units, electronic
15  combat was my business unit.
16      Q. And you indicated that you believed that the
17  phone call represented a challenge to your request. Can
18  you explain that for me?
19      A. We had -- as I mentioned earlier, we were
20  trying to get to a resolution where the people in San
21  Jose could -- could resume with a level of -- of
22  efficiency that was closer to what we had -- had

99

1  earlier, before the change-over, before the -- before
2  the new system was put in.
3      Q. Well, let me stop you there. Do you believe
4  you've answered this question already? Because you said
5  "as I said earlier."
6      A. I think I have.
7      Q. Okay. All right. Well, maybe the part that I
8  don't -- that I need clarification on is this.
9          Oh, I think I see why you think you answered.
10  When you say challenged your request, you would ask for
11  something; they would give you some excuse or some
12  reason why they couldn't do it? Is that what we're
13  talking about challenging your request?
14      A. Well, that's -- I think what you're referring
15  to --
16      Q. Yes, sir.
17      A. You know -- you know, I had asked them to -- as
18  I described to you earlier, I wanted them to put the
19  data back into the computers in San Jose. And they were
20  effectively telling me no.
21      Q. Right.
22      A. And over and over again.

100

1      Q. And that's what you meant by challenging every
2  request?
3      A. Yes, sir.
4      Q. Okay. When you say you lost control, can you
5  expound on that at all? How did you lose control? What
6  did you do?
7      A. I became very angry. The level of my -- the
8  volume of my voice was raised. My speech would have
9  been more emotionally charged. And there was a
10  significant increase in the use of profanity.
11      Q. Okay. Who was the -- who was the bulk of your
12  -- your conversation with; who on the College Park end?
13      A. The bulk?
14      Q. Uh-huh.
15      A. The questions were aimed at the group in
16  general, because everyone had it. Lisa tended to answer
17  the questions.
18      Q. Okay.
19      A. Okay. But the questions in general were, you
20  know: "Tell me how we're going to do this."
21      Q. Okay. So if Lisa answered the questions and
22  you responded, the response would be directly to Lisa?

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

26 (Pages 101 to 104)

---

101

1    A.  Depending upon the type of question, it would
2    -- it could have been.
3    Q.  Okay.  You indicated that the individuals in
4    the meeting provoked you into losing control.  Have you
5    explained already how that was done?
6    A.  I believe I have.
7    Q.  And when you -- when you call it "passive
8    aggressive actions," would that -- have you already
9    explained that, too; that is, that they would not -- or
10   did not seem to be willing to do what you wanted them to
11   do to alleviate the problem?
12   A.  Yes, sir.
13   Q.  Okay.  You -- this is not the first meeting
14   that you -- that you've used profanity in, is it?
15   A.  No, sir.
16   Q.  Can you -- can you think of anything different
17   in the use of profanity in this meeting than what
18   occurred in previous meetings?
19   A.  No, sir.
20   Q.  Would Lisa Wolff have been present at the other
21   meetings, either by telephone or in person, where you
22   used profanity?

---

102

1    A.  I don't know.
2    Q.  Has Ms. Wolff ever indicated to you that she
3    wished you would not use any profanity in front of her?
4    A.  She may have.  I don't recall.
5    Q.  Do you recall a situation where Ms. Wolff was
6    working in San Jose and she asked you, in some form or
7    another, not to touch her?
8    A.  I don't, but it is possible.
9    Q.  Why would it be -- I mean, anything's possible.
10   A.  Sure.
11   Q.  I mean, but do you recall some -- is there
12   something that leads you to think that this event may
13   have happened?
14       Do you want to talk to your attorney?
15   A.  Can I?  Or I guess I can't take a break.
16   Q.  We'll withdraw the question, and then you can
17   talk to her.  I don't like for you to talk while there's
18   a question pending.
19   A.  I understand that.  That's why --
20   Q.  But if you have a question, I'll withdraw the
21   question.  Then you can talk to her.
22       (Break taken by the witness and counsel.) BY

---

103

1    MR. CHERRY:
2    Q.  Do you recall a situation where Ms. Wolff was
3    here in -- not here but was in San Jose and asked you
4    not to touch her?
5    A.  It's been --
6       MS. COX:  I just want to direct you to listen
7    to what his question was.
8       Could you just repeat it back. BY MR. CHERRY:
9    Q.  Do you recall a situation that occurred where
10   Ms. Wolff was present in San Jose, or one of the
11   California offices, and asked you not to touch her?
12   A.  No, I do not recall.
13   Q.  Do you recall a situation where she told you
14   that touching her made her feel uncomfortable?
15   A.  No, sir, I do not recall.
16   Q.  Do you recall any situations where Ms. Wolff
17   worked here in San Jose?
18   A.  Yes, sir.
19   Q.  Okay.  And do you recall having any discussions
20   with Ms. Wolff about conduct of yours that she was
21   uncomfortable with?
22   A.  No, sir, I do not.

---

104

1    Q.  Okay.  Have you reviewed anything, any
2    complaints or grievances or anything else, where that
3    issue -- where that has been made an issue, that is,
4    that Ms. Wolff had complained about prior conduct of
5    yours?
6    A.  I have been made aware of a -- of a complaint
7    or a situation where she talked of me touching her.
8    Q.  But you -- you're saying you don't recall that
9    ever happening?
10   A.  No, sir.
11   Q.  All right.  And that's why we had the meeting,
12   because I don't want you talking about what you read; I
13   want you talking about what you remember.
14   A.  That's correct.
15   Q.  And your response is you don't recall that
16   situation ever happening?
17   A.  I don't recall it.
18   Q.  Okay.
19   A.  Okay.
20   Q.  All right.  I want you to take a look -- are we
21   good?
22       MS. COX:  Yeah. BY MR. CHERRY:

---

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 62 of 103
DEPOSITION OF STEPHEN V. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

27 (Pages 105 to 108)

105

1    Q. Take a look at Exhibit 1, and I'm going to
2  direct your attention to paragraph -- I'm going to
3  direct your attention, sir, to paragraph 33.
4    A. Paragraph 33.
5    Q. Let me know when you --
6    A. Okay.
7    Q. In that paragraph -- and these are allegations
8  in the complaint.
9    A. Uh-huh.
10   Q. In that paragraph, Ms. Wolff indicates that
11 when you spoke with Mr. Peters about the system, you
12 would -- you spoke to him in a manner differently than
13 you -- what you would have said to Ms. Wolff. Do you
14 see that in the paragraph?
15   A. I can see how she's written that, yes, sir.
16   Q. Do you agree with that statement?
17   A. No, sir.
18   Q. Do you ever recall telling Mr. Peters that the
19 system is fucked up?
20   A. I will -- I probably did, yes, sir.
21   Q. And do you recall telling Ms. Wolff -- saying
22 something to the effect of "you fucked me when you put

106

1  this system in?
2    A. In general I think the words are relatively
3  correct. I will -- I'm not sure if -- it's certainly
4  not the context or the exact wording is as it would have
5  been. I would find it very hard to have remembered all
6  of that in my stage of --
7    Q. I understand.
8    A. -- of -- of anger.
9    Q. But it's possible, and not -- indeed, not
10 improbable, that you may have said, "You fucked all of
11 these guys; what were you thinking"?
12   A. Oh, certainly.
13   Q. All right. Now, your position would be, even
14 if you said these -- said the things that they -- that
15 Ms. Wolff has alleged that you said, you did not mean it
16 in a sexual content?
17   A. That's correct.
18   Q. But you don't -- you don't specifically deny
19 saying the -- using the terms that she described in her
20 complaint?
21   A. Generally I do not.
22   Q. Do you recall -- did anyone in the San Jose

107

1  office say anything to you about the language you were
2  using or why you were using it?
3    A. No, sir.
4    Q. Do you recall -- did Mr. Peters say any -- Ken
5  Peters say anything to you about -- about feeling
6  uncomfortable during the meeting or during -- about the
7  way you were talking to Ms. Wolff?
8    A. Clearly, you know, the -- the -- in the general
9  context of paragraph 33, Mike did step in, in the end,
10 and say, you know, "Hey, we've got to stop," or words
11 like that.
12   Q. Yeah. I'm talking about Ken.
13   A. Oh, Ken Peters?
14   Q. Yes.
15   A. I'm sorry. I apologize.
16   Q. That's okay.
17   A. No, sir.
18   Q. Okay. What about Mr. Ossentjuk? What was his
19 -- what was he doing during the course of this meeting,
20 especially when things had deteriorated to the point
21 they had?
22   A. To be honest with you, by the time we got to

108

1  this stage of the meeting, I was seated at my desk. The
2  -- we had a -- my telephone has a conferencing
3  capability. And the other gentlemen were seated further
4  away than you are, you know, in and around my office.
5    Q. Okay.
6    A. And at that point I almost didn't look up
7  anymore. My eyes were -- you know, I had a piece of --
8  my notepad in front of me, and -- and I was talking
9  directly into the -- into the telephone. So I don't
10 remember even looking up. And if I did, it wasn't with
11 any kind of consciousness.
12   Q. Okay. And for the record, I'm sitting about
13 three feet away from you, right?
14   A. Three to four feet, yes, sir.
15   Q. Okay. Do you recall having any conversation
16 with Mr. Ossentjuk immediately after the August 29th
17 conference call?
18   A. No, sir. As -- at the end of the conference
19 call, I was very emotional, and I told them all, "Get
20 out of my office and leave me alone for a while."
21   Q. And did they all do that?
22   A. Yes, sir.

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

28 (Pages 109 to 112)

109

1      Q.  Did anyone come back into your office that day,
2  that you can recall, about the -- to talk about the
3  August 29th meeting?
4      A.  I didn't allow anybody in my office for the --
5  I don't recall allowing anybody in my office for the
6  rest of the day.
7      Q.  Okay.  Was there ever a time that you can
8  recall Mr. Gahagan or Ossentjuk or Ken Peters or anybody
9  mentioning to you that he believed that the College Park
10  people were being insubordinate to you?
11      A.  Yes, sir.
12      Q.  And when was that, sir?
13      A.  It was probably post the -- post -- subsequent
14  to this phone call.
15      Q.  Who was it that made that observation?
16      A.  I don't remember.
17      Q.  Did you -- was it your take during the course
18  of that meeting that anyone was trying to be
19  insubordinate to you?
20      A.  The answer's yes.  I mean, in the end, when the
21  -- when my emotions got out of hand, it was that I had
22  given, you know, in my opinion, a direct order for

110

1  something to be done.  I was willing to accept all the
2  responsibility.  And I was still being told no.
3      Q.  And this was from Mr. Peters or Mr. Wolff, or
4  both -- Ms. Wolff, or both?
5      A.  All three of them.
6      Q.  Do you recall directing any comments directly
7  to Ms. -- Ms. Wolff, as she alleged in paragraph 33?
8      A.  Certainly when we got into the issue of a
9  schedule, okay, which -- which, by the time we got to
10  the schedule issue is when the meeting got out of hand
11  and we stopped it.  Certainly she was being the person
12  who was trying to generate the schedule.
13      Q.  Okay.
14      A.  And so the comments would have been directed at
15  her.
16      Q.  Including the -- some of the "fuck" comments?
17      A.  Including the use of the -- including the use
18  of the profanity.
19      Q.  You indicate that Mike Peters at some point
20  stepped in and said something about -- about your
21  conduct during the meeting?
22      A.  I -- the exact term -- the exact sequence of

111

1  events I can't, you know, recall exactly, but I do
2  remember Mike stepping in, trying to say something.  I
3  probably blew up at him.  And then in the end, John Roth
4  -- you know, we said, okay, that's enough.  And I had
5  realized, you know, that -- that we'd lost all sense of
6  -- of -- of any kind of a business conduct.
7      Q.  Had you ever been involved in a meeting like
8  that, one that had deteriorated to the point that it was
9  just stopped, prior to this occurrence, and specifically
10  involving Ms. Wolff?
11      A.  Repeat it again.
12      Q.  Have you ever been involved -- this was a
13  meeting that deteriorated to the point --
14      A.  Right.
15      Q.  -- it just had to be stopped, right?
16      A.  Uh-huh.
17      Q.  Had you ever been involved in a meeting similar
18  to that where Ms. Wolff was also involved?
19      A.  Not to this level.  I mean, I've been involved
20  with meetings with Ms. Wolff, but nothing like this.
21      Q.  Okay.  What was the next -- when was the next
22  time you spoke with any of the College Park participants

112

1  -- and that would be, if I remember, Mike Peters, John
2  Roth, and Ms. Wolff -- after the August 29th meeting?
3      A.  Certainly not with Ms. Wolff at all.  And I --
4  it would have been within the next -- within the next
5  seven days.
6      Q.  Okay.  In that --
7      A.  Again, as I mentioned earlier, in the normal
8  course of business.
9      Q.  Is that the conversation you described with Mr.
10  Peters?
11      A.  Yes, sir.
12      Q.  Any conversation with Mr. Roth at all?
13      A.  I can't remember.  But I -- we certainly would
14  have had contact in our normal, you know, almost daily
15  or every-other-day conversations.
16      Q.  Anything about this particular meeting now or
17  --
18      A.  No, sir.
19      Q.  -- how the meeting went down?
20      A.  Only in that, you know, again, not being
21  comfortable with it, being sorry that it had gotten to
22  the level that it did, but not discussing specifics.

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 64 of 103
DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

29 (Pages 113 to 116)

113

1    Q. Okay. What number is that -- is the complaint?
2  Is that 1?
3       MS. COX: That's Exhibit 1.
4       THE WITNESS: 1, uh-huh. BY MR. CHERRY:
5    Q. Okay. Thanks.
6       Now, there came a time -- how you doing? You
7  all right?
8    A. I'm okay.
9    Q. There came a time shortly -- fairly shortly
10  after the meeting that you were contacted by Mr.
11  Edwards, right?
12   A. Yes, sir.
13   Q. And we've discussed -- we discussed that
14  previously. Mr. Edwards sent you an email and asked you
15  to write something?
16   A. That's correct.
17   Q. And that generated Exhibit 2?
18   A. Exhibit 2, yes, sir.
19   Q. Okay. Do you recall ever sending a letter of
20  apology to Ms. Wolff?
21   A. I don't remember it. I -- I think I offered it
22  in talking with Mike -- Mike Gering.

114

1    Q. Okay.
2    A. Okay. But I don't remember writing it.
3    Q. Did Mr. Gering ever instruct you to send a
4  letter of apology to Ms. Wolff?
5    A. I don't recall. I -- I don't recall.
6    Q. Okay. Do you recall -- were you ever
7  suspended?
8    A. No, sir.
9    Q. No time without pay or anything like that?
10   A. No, sir.
11   Q. All right. Did you ever review a sexual
12  harassment film section as a direct result of what
13  happened on August 29th, 2001?
14   A. No, sir.
15   Q. Okay. Do you know what recommendations Mr.
16  Edwards had -- strike that. I'll go somewhere else.
17       Do you ever recall attending any anger
18  management course?
19   A. As a result of -- of these actions?
20   Q. The August 29th, 2001 meeting.
21   A. I'm sorry, yes. I was -- I had -- I was asked
22  to -- to go to classes, yes, sir.

115

1    Q. And did you attend an anger management course?
2    A. It was a -- yes. And the way it was done was
3  with a therapist, because the courses prescribed were at
4  -- too far away from the -- from the time constraints
5  put on me to get them done.
6    Q. Did you -- where was the -- when did you attend
7  the -- the -- we'll still call it a course.
8    A. Okay.
9    Q. When did you attend the anger management
10  course?
11   A. Can I look at this?
12       MS. COX: Sure. BY MR. CHERRY:
13   Q. Sure.
14       Tell me what you're looking at, but, yeah, you
15  can look at any of that stuff.
16   A. I'm looking at Exhibits 1 through 4.
17       Let me see. I signed this letter on October
18  15th.
19   Q. 15th.
20       MS. COX: "This letter" being Exhibit 4.
21       THE WITNESS: I'm sorry. Excuse me, Exhibit 4.
22  I signed this letter, Exhibit 4. And as a result of

116

1  this letter, you know, I was asked to go to the anger
2  management classes. The anger management classes
3  started somewhere mid-November. BY MR. CHERRY:
4    Q. Of 2001?
5    A. I'm sorry, of 2001, yes.
6    Q. Okay. Good. And "this letter" was Exhibit 4
7  still?
8    A. Yes, sir.
9    Q. What other -- if we call that a sanction, what
10  other sanctions did you receive as a result of the
11  August 29, 2001 incident?
12   A. Other sanctions? I think everything that I --
13  any sanctions were -- were spelled out in this letter.
14   Q. In Exhibit 4?
15   A. In Exhibit 4 --
16   Q. Good.
17   A. -- yes, sir.
18   Q. All right. Had you ever attended any anger
19  management courses before August 29th, 2001?
20   A. No, sir.
21   Q. Had you seen a therapist for any reason before
22  August 29, 2001?

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

30 (Pages 117 to 120)

117

1      A.  Do I have to answer that?
2      Q.  Yes.
3          THE WITNESS:  Do I have to answer it?
4      MS. COX:  Before August 29th.
5          THE WITNESS:  Do I have to answer that?
6      MS. COX:  Yes.
7          THE WITNESS:  Okay.  The answer is yes. BY MR.
8  CHERRY:
9      Q.  All right.  Had -- what did I ask you, a
10  therapist?
11     A.  I forget now.
12         MS. COX:  Yes. BY MR. CHERRY:
13     Q.  Had you seen any psychiatrist or psychologist
14  at any point before August 29, 2001?
15     A.  No, sir.
16     Q.  All right.  I know you don't want to talk about
17  the therapist thing, but I have to ask you about that in
18  order to do a complete job.
19     A.  Sure.
20     Q.  Do you want a moment to talk to your lawyer
21  before I ask you about that?
22     A.  Yes, I'd like to.

118

1      Q.  Okay.
2      A.  Yeah.
3      (Break taken by the witness and counsel.)
4      MR. CHERRY:  Okay.  Back on the record.
5          Okay.  I had received a proffer regarding the
6  counseling issue, and I'm -- I'm fine with it.  It's not
7  related.  Let's keep going.
8      Q.  All right.  What am I asking you now?
9          Okay.  This brings us now to the conference of
10  October 15th.  And was that a conference call, or it was
11  a meeting in person, or what?  That's Exhibit 4, in
12  front of you.
13         MS. COX:  Objection only to the extent that the
14  witness hasn't testified to any sort of conference.
15         MR. CHERRY:  Yeah.  Well --
16         MS. COX:  He received a letter.
17         But -- but you can go on and respond. BY MR.
18  CHERRY:
19     Q.  And that's what I'm asking.  Tell me about
20  Exhibit 4.  Was this -- was this in response to a
21  conference call or meeting, or what?
22     A.  If I can recollect -- yes, okay.  Just prior to

119

1  the issuance of this memo, Exhibit 4, in the presence of
2  Jack Kuenzel, I was brought down, you know, to the HR
3  department, and I had the conversation with Tim Edwards
4  telling me that these things were going to come in a
5  memo form that I had to read and sign and date and get
6  back to him.
7      Q.  Okay.  Was there -- did you have any contact
8  with Jack Kuenzel or Tim Edwards between September 14th
9  or 15th, when you wrote your -- your letter, which was
10  Exhibit 2, I believe, and the time you spoke with
11  Edwards in front of Jack Kuenzel in October?
12     A.  Specifically related to this grievance,
13  complaint?
14     Q.  Yes, sir.
15     A.  The answer's, I probably did.
16     Q.  Okay.  Who would you have -- you've already
17  told me --
18     A.  I would have talked -- in general the only
19  people who were kept -- that this was kept between was
20  Jack Kuenzel, Tim Edwards, and myself, with regard to my
21  knowledge.
22     Q.  Okay.

120

1      A.  Any other things that occurred I have no
2  knowledge of.
3      Q.  Okay.  And you've already told me you didn't
4  discuss the grievance issue or the grievance procedure
5  with Mr. Ossentjuk or -- or Mr. Peters, Ken Peters, or
6  even Mike Peters, right?
7      A.  That's correct.
8      Q.  Or -- and Mr. Gahagan?
9      A.  That's correct.
10     Q.  You didn't discuss it with him, either?  All
11  right.
12         Can you tell me about any of the other
13  conversations, then, you had with Mr. Edwards between
14  September 14th, 2001 and October 15, 2001 besides what
15  you've already told me?
16     A.  No, I can't remember.
17     Q.  But you know there were conversations, but you
18  don't remember?
19     A.  Yes.
20     Q.  Okay.
21     A.  And they would have been on the -- on the "Did
22  you get my" -- and did I get the letter?"  "Yes, I got

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

121

1    the letter." "What's going on?" You know -- you know,
2    "Don't know yet"; those kinds of things.
3        Q. Were there any discussions about potential
4    sanctions, possible sanctions?
5        A. No, sir.
6        Q. Possible punishments, for lack of a better
7    word?
8        A. Obviously I knew that the grievance procedure,
9    you know, would -- would require something; but no.
10       Q. Okay. And you -- I believe you've testified
11   that you've never had to go through this grievance
12   procedure as a result of a complaint from any other
13   employee?
14       A. That's correct.
15       Q. All right. I asked you about Mr. Edwards. Do
16   you recall having any conversations with Mr. Kuenzel
17   between September 14th and October 15th about this
18   grievance?
19       A. I would have -- you know, being the local HR
20   representative on my staff, I would have told him what
21   went on, you know, that it happened.
22       Q. Okay.

122

1        A. And then certainly, you know, he would have
2    been talked to by Tim. The -- actual discussions I
3    don't know.
4        Q. Okay.
5        A. Okay. And, you know -- so he had to be brought
6    into it, because someone in San Jose needed to be
7    tracking things --
8        Q. Right.
9        A. -- from the San Jose end.
10       Q. Besides Edwards and Kuenzel, did you discuss --
11   have any discussions about the grievance procedure or
12   what was going on, or the grievance itself, between
13   September 14th and October 15th, 2001?
14       A. Repeat it again, please.
15       Q. Besides -- besides what you've told me in
16   regards to Edwards and Kuenzel --
17       A. Okay.
18       Q. -- have you had any conversation -- had you had
19   any conversations with anyone at all from September 14th
20   until October 15th, 2001?
21       A. September 14th was -- okay.
22       Q. That was the day you were asked to write the

123

1    letter, or that you wrote the letter.
2        A. The answer is no.
3        Q. Okay.
4        A. Not that I can recall.
5        Q. Were you asked by Mr. Edwards to do anything
6    that is not represented in Exhibit 4?
7        A. Yes, I was.
8        Q. What was that, sir?
9        A. I was told that -- that I needed to notify
10   people in College Park when I was going to College Park
11   ahead of -- notify in advance, excuse me, of my travel
12   to College Park what days and what buildings I would be
13   visiting.
14       Q. Okay. Anything else?
15       A. And basically that's it, what I had to do.
16       Q. Is there anything that you volunteered to do
17   regarding the grievance?
18       A. Anything that I volunteered to do?
19       Q. And the only reason I ask that is because you
20   put emphasis on the word "had" last time.
21       A. No.
22       Q. Okay. In the October -- I mean in Exhibit 4,

124

1    it indicates that you were to notify Mr. Edwards of your
2    completion of the -- of the anger management counseling.
3    Did you notify him of that?
4        A. My therapist did.
5        Q. Okay. How do you know that, the therapist told
6    him?
7        A. Because I -- I told her to call him.
8        Q. Okay.
9        A. And then I validated with her that she had
10   called him.
11       Q. Was this a company therapist or was this
12   somebody you had used privately?
13       A. This was part of the -- it was -- we have an
14   employee assistance program.
15       Q. Yes, sir.
16       A. And -- and this lady was -- came out of the
17   service provider of the employee assistance program.
18       Q. So you think -- you believe he was notified,
19   and that would have been by telephone?
20       A. Yes, sir.
21       Q. Okay. Great. On Exhibit 3, why don't you take
22   a moment and look at that. I want to ask you a few

125

1  questions about that.
2      A. Okay.
3      Q. Okay. Do you recall meeting with Ms. Wolff on
4  November 30th, 2001?
5      A. Yes, I do.
6      Q. How did that meeting come about? Who set that
7  up?
8      A. Tim Edwards set it up.
9      Q. At whose request; do you know?
10     A. He said to me at Lisa's request.
11     Q. Okay.
12     A. At Ms. Wolff's request, excuse me.
13     Q. It doesn't matter. We know who you're talking
14  about.
15         Okay. And did he -- where were you when he set
16  this up?
17     A. In San Jose.
18     Q. And you were going to be visiting College Park?
19     A. We arranged it so it would be concurrent with
20  my normal -- my regular visits to College Park.
21     Q. When were your regular visits to College Park?
22     A. Prior to the incident in hand, on the average

126

1  of twice a month.
2      Q. Twice a month? Okay.
3      A. Yes, sir.
4      Q. And did your visits diminish at all in
5  frequency after this incident?
6      A. Yes, for two reasons. Number one, obviously it
7  was an uncomfortable situation; didn't want to put
8  anybody else in -- in the middle of anything like this.
9  And number two, I did a significant amount of
10  international travel during that time period for the
11  company, so I was -- I was away for -- you know, I was
12  traveling at least one week a month internationally.
13     Q. Okay.
14     A. And so to try to make too many more trips was
15  difficult.
16     Q. Did Ms. Wolff travel with you internationally
17  at all?
18     A. No, sir.
19     Q. Did she ever travel with you?
20     A. No, sir.
21     Q. All right. Okay. So at Ms. Wolff's request it
22  was a meeting on or about November 30th, 2001, right?

127

1      A. Yes, sir.
2      Q. Can you tell me about that meeting, who was
3  there?
4      A. The meeting started --
5      Q. Can I -- can I -- you know, I should have done
6  this before. May I run -- off the record.
7         (Recess taken.) BY MR. CHERRY:
8      Q. Okay. I apologize for that. You were telling
9  me about the meeting on November 30, 2001.
10     A. The meeting started with Tim and I just kind of
11  setting up what -- what the expectation of the meeting
12  was. Then Lisa joined us. And Tim kind of was the
13  facilitator, if you will, of the meeting, gave the --
14  you know, if you will, the preambles, the introductions,
15  and then left after about ten minutes or so.
16     Q. What were the expectations of the meeting that
17  you and Tim discussed?
18     A. Both in trying to set up the meeting, and then
19  repeated at the meeting, the reason for the meeting was
20  because of my -- the restrictions that I had to call
21  ahead and -- and let people know where I was going to
22  be, what buildings, what times, that Lisa had said to --

128

1  to Tim that over the course of -- of this amount of
2  time, you know, from -- from roughly the September time
3  frame to the November time frame, that her job was
4  getting more difficult to do.
5         Clearly I had backed away from making decisions
6  that I should not have been making anyway. Most of the
7  decisions should have been made one level below me.
8  Okay. And so I redelegated all my activities, with
9  regard to most of the business, to the subordinate
10  managers, people like Bob Ossentjuk, people like Lynn
11  Gahagan, Ken Peters, Larry Ashby, those kinds of people.
12     Q. Okay. And this would have been in order to
13  minimize the contact with Ms. Wolff?
14     A. Yes, sir.
15     Q. Okay. But she had -- she had complained that
16  her job had gotten more difficult because of that?
17     A. I wouldn't use the word "complained," sir. She
18  had at least indicated that her job got more difficult.
19     Q. Okay.
20     A. Because my involvement was not there.
21     Q. All right.
22     A. And so she -- she asked that the meeting be

Case 1:02-cv-03932-WDQ   Document 31-5   Filed 09/25/2003   Page 68 of 103
DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

33 (Pages 129 to 132)

---

129

1   called to see if there would be a way forward that would
2   allow us to participate with each other and try to
3   improve the working condition that was set in front of
4   us.
5       Q. Did she also indicate that her therapist had
6   recommended that -- that she had this meeting in order
7   to bring closure to things?
8       A. No, sir. As a -- prior to the meeting, I had
9   no knowledge of what Ms. Wolff was doing at all.
10      Q. Okay.
11      A. And during the rest of the discussion, she
12  didn't indicate to me that this meeting was a result of
13  her therapist.
14      Q. She did indicate that?
15      A. She did not.
16      Q. Okay.
17      A. That I can recollect.
18      Q. What other expectations were there that Mr.
19  Edwards talked about?
20      A. Primarily that we would be able to show unity,
21  you know, between the parties, both San Jose and --
22      Q. College Park?

---

130

1       A. -- and College Park.
2       Q. All right. And what was the preamble? What
3   did he say in the beginning of the meeting?
4       A. Wow. I can't --
5       Q. Paraphrase this.
6       A. Then I -- then I've said to you everything that
7   he said.
8       Q. Okay. All right. Now tell me how it went
9   after Mr. Edwards left.
10      A. Mr. Edwards left, and a very uncomfortable
11  situation, obviously, knowing what the -- what the
12  grievance was.
13      Q. Uh-huh.
14      A. You know, I tried to -- to express to Lisa my
15  apologies, you know, and how sorry I was that the whole
16  thing happened. And she started to describe what this
17  all meant to her and how this has affected her, for
18  quite some time.
19      Q. She talked about it for a long time?
20      A. I would say about ten -- we had a discussion
21  that probably lasted the better part of ten, 15 minutes
22  about all that she had -- things that -- in her life

---

131

1   leading up to this incident and then the incident, and
2   then, you know, how it's affected her post-incident.
3       Q. Can you tell me anything that you can recall
4   about the -- what she said about the things in her life
5   leading up to the incident --
6       A. Yes, sir.
7       Q. -- that were relevant?
8       Please do.
9       A. Okay. She talked about her being a cancer
10  survivor.
11      Q. Uh-huh.
12      A. She talked about the fact that -- and I can't
13  remember the exact dates, but that she had had some kind
14  of cancer, that it was in remission. She talked about
15  the fact that in general, being a woman in our industry,
16  which is a -- a predominantly male industry, you know,
17  that she worked hard, you know, to get to where she was.
18      Q. Okay.
19      A. You know, to get to where she was.
20      Q. Anything else you can recall?
21      A. Well, certainly that this incident, you know,
22  cast some dispersions (sic) -- or cast some doubts,

---

132

1   excuse me, in -- in other people's minds as to whether,
2   you know, she was capable of doing the job in front of
3   her or not.
4       Q. Anything about her family situation?
5       A. Well, we then -- we then -- we then
6   transitioned to the next -- I don't know whether you
7   want to call it a phase, if you will, but the next part
8   of the discussion was where she talked about how my
9   words affected her, you know, how that meeting affected
10  -- how the telephone conversation meeting affected her,
11  how she -- how she felt about it, what it did to her,
12  about the fact that she felt she was being verbally
13  raped, you know, over the phone.
14      And she talked about the fact that -- you know,
15  that -- I believe she said she was in counseling as a
16  result of it, and I believe she said that other members
17  of her family. I think she said her kids, and I think
18  she said her husband. Again, a lot of it is difficult,
19  because it was a very emotional -- certainly having to
20  hear it was in no way as emotional as her having to live
21  it, but it certainly was a very emotional thing to have
22  to listen to how my words affected her.

Case 1:02-cv-03932-WDQ   Document 31-5   Filed 09/25/2003   Page 69 of 103
DEPOSITION OF STEPHEN A. MAZZIO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

35 (Pages 137 to 140)

137

1  men and having to listen to that was, you know,
2  something she didn't expect.
3      Q. Did you come to an understanding during the
4  course of this meeting as to why it was that she was
5  affected the way she was?
6      A. No, sir.
7      Q. After she finished this discourse, did you --
8  what happened then?
9      A. The meeting continued then what I would call
10 into the third phase.
11     Q. The first phase is when Edwards was there?
12     A. The first phase being the discussion about --
13 no. Okay. I'm sorry.
14     Q. Okay.
15     A. The three phases with her, the first phase
16 being when she talked about, you know, being a cancer
17 survivor, talked about how hard she had to work in her
18 career, you know, to get to where she was and what she
19 did; the second phase being her -- her talking about how
20 my words affected her and what it had done to her and
21 her family.
22     Q. Okay.

138

1      A. The third phase then being, you know, how do we
2  move forward.
3      Q. Okay.
4      A. You know, it was -- there was nothing that I
5  could say -- there was no apologies that -- that could
6  be expressed at that point that were going to change
7  anything, even though I had tried a number of times to
8  -- to tell her how sorry I was and how, you know, that
9  -- that I don't treat people that way. I mean, I may be
10 angry, I may use profanity, but in no way did I ever
11 mean for her to be taken in a -- in the -- in the kind
12 of way that she did.
13     We moved past all of that into the third phase,
14 which was, okay, how do we create a working relationship
15 so we could go forward and minimize the -- the effect
16 that this -- this distance keeping had -- had put on --
17 on everyone.
18     Q. How did that go?
19     A. I think it went real well. I mean, you know,
20 it obviously started slow, because we were moving away
21 from one very difficult subject into something
22 different. But it went well. We talked about the kinds

139

1  of things that I could do on my part, the kinds of
2  things that she could do on her part, how do we -- how
3  do we show a unity, you know, between the -- between the
4  two groups, think of it that way, but certainly between
5  me and her, and that would be translated, you know, into
6  the two facilities.
7      It went quite well. You know, we had reached a
8  reasonable working thing. And that's when Mike Peters
9  was allowed to enter the room.
10     Q. And when Mike Peters came into the room, was
11 there more discussion about how you were going to move
12 forward?
13     A. Yeah. What -- what we did was in effect Lisa
14 and I had come to a -- a reasonable understanding of how
15 we were going to move forward. And then when Mike
16 Peters came in, we kind of brought him into the
17 situation, talked about a lot of what Lisa and I --
18 pardon me -- talked -- talked about, the third phase of
19 our conversation. Obviously anything that had to do
20 with, you know, the preliminaries might -- was not, but
21 how we were going to normalize the relationship -- you
22 know, the relationship between -- between San Jose and

140

1  College Park.
2      We brought him into the -- into the
3  conversation as a three-way. We talked about the kinds
4  of things that we would do to move forward.
5      Q. Okay. And then that would have led to the end
6  of the meeting?
7      A. Yes, sir.
8      Q. Okay. And what did you do after that, after
9  the meeting was over?
10     A. I had some more business to take care of. That
11 was the last day of my -- of my trip. I called up Tim
12 Edwards to let him know, you know, that -- that -- from
13 my perspective how the meeting was, you know, told him
14 that I thought while very, very emotional in one part,
15 that in the end that we had come to a -- a -- a good
16 working relationship.
17     Q. Uh-huh.
18     A. And that I thought the meeting was, you know,
19 good. And I asked him had he heard, you know, from
20 Lisa. And he said he had not heard from her at that
21 time.
22     Q. Okay. According to Exhibit 3 --

141

1     A. 3.
2     Q. -- there -- 3 is two pages, right?  Right?
3     A. Yes, sir.
4     Q. According to Exhibit 3, you indicated there was
5   no profanity used during the course of that meeting?
6     A. That's correct.
7     Q. And you were very careful with the language
8   that you used right?
9     A. Yes, sir.
10    Q. And I may have asked you this before, and if I
11  did, I apologize.  But was there a time prior to August
12  29th that Lisa had indicated to you that she was not
13  comfortable with the use of profanity during meetings?
14    A. You -- you asked that question, and I think I
15  replied I don't recall.
16    Q. Okay.  Do you recall Lisa using profanity --
17  and you already said you don't recall her using
18  profanity in August 29th, but do you recall her using
19  profanity during other meetings?
20    A. Do I recall her use of profanity?
21    Q. Yes.
22    A. No, sir.

142

1     Q. Had you discussed this -- this entire incident,
2   the August 29th incident, with your wife prior to the
3   November 30th meeting?
4     A. Prior to the November 30th meeting?  Certainly
5   when I got -- starting with August 27th, you know, the
6   actual date of the incident --
7     Q. 29th.
8     A. Excuse me, 29th, you know, I talked to my wife
9   that night.  I mean, I was visibly shaken.  Certainly as
10  each --
11    Q. But not about the -- about Lisa's grievance,
12  obviously?
13    A. Didn't know with Lisa's grievance.
14    Q. Right.  Okay.
15    A. Didn't know about Lisa's grievance until --
16  until I was asked to write, you know, the letter.
17    Q. Of September 14th?
18    A. Exhibit 2, on September 14th.
19    Q. Okay.  So what did you talk to your wife about
20  the evening of August 29?
21    A. Well, that the incident had happened, what kind
22  of went on, that I kind of lost my temper, that I was,

143

1   you know, not happy with my -- with the way things had
2   -- you know --
3     Q. Okay.
4     A. -- had transpired.
5     Q. What did your wife say about that?
6     A. She was not happy.  I mean, she was sorry.  I
7   mean, you know, it wasn't a -- she lectured me, you
8   know, which --
9     Q. About losing your temper?
10    A. About losing my temper.
11    Q. Did she lecture you about anything else with
12  regards to Ms. Wolff?
13    A. No, sir.
14    Q. Okay.
15    A. She does not know Ms. Wolff.
16    Q. Did you speak with her again at any point after
17  you found out about the grievance filed by Ms. Wolff?
18  With your wife.
19    A. Throughout -- so we can maybe curtail some of
20  the questions, throughout the whole process, as each
21  particular item came up, I would let my wife know what
22  was going on.

144

1     Q. Okay.
2     A. What had transpired on the day, or any
3   subsequent phone calls or issues, and things like that.
4     Q. Okay.  And you did curtail a lot of questions
5   by doing that.  That's good.
6        Do you recall, during the November 30th
7   meeting, discussing with Ms. Wolff the fact that you had
8   spoken to your wife and what your wife's response was?
9     A. I probably did.  But I don't remember.
10    Q. Okay.  Do you recall, during the November 30th
11  meeting, telling Ms. Wolff that you -- you knew what you
12  were doing when you used the words the way you did,
13  because you wanted to get her out of the -- out of the
14  room; you wanted her to leave?
15    A. No, sir.
16    Q. You don't -- you specifically do not recall
17  saying that?
18    A. Yes, sir, I specifically do not recall saying
19  that.
20    Q. Now, because we lawyers --
21    A. And let me do it a little bit different.
22    Q. Let's try it again.

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 71 of 103
DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

37 (Pages 145 to 148)

145

1    A. I specifically did not say that.

2    Q. That's -- that's what I wanted. Okay.

3    A. Yeah. I specifically did not say that.

4    Q. Okay. You did not say that during the November

5    30th meeting?

6    A. That's correct, sir.

7    Q. And that was not your intent during the August

8    29th meeting?

9    A. That was not my intent, sir.

10   Q. Did you want her to leave the room because you

11   thought you could get more done with Mr. Peters, during

12   the August 29th meeting?

13   A. The answer is: No. I didn't expect her to

14   leave the room. My behavior was not meant for her to

15   leave the room. Your question kind of sounds like it

16   was something that was predisposed in my mind to do

17   that.

18   Q. That's what I'm asking.

19   A. It was not predisposed.

20   Q. Okay.

21   A. And I did not expect her to leave the room.

22   Q. All right. And you never said this to --

146

1    A. Nor did I desire for her to leave the room.

2    Q. And you didn't tell Ms. Wolff this on November

3    30th, 2001?

4    A. That is correct. I did not tell her that.

5    Q. Besides what you have told me, did you tell Ms.

6    Wolff anything else on November 30th, 2001?

7    A. Did I tell her anything else?

8    Q. Right. Did you say anything else to her during

9    that meeting besides what you've already told me: one,

10   that you were sorry; two, how you were going to move

11   forward, that type of thing?

12   A. Oh, we talked about -- I talked about how --

13   how I had to go to counseling.

14   Q. Okay.

15   A. Anger management classes. I told her I was

16   taking the classes. I told her how sorry I was. I told

17   her, you know, again, that I never meant for my words to

18   be taken the way that they were taken, and I was trying

19   to work to clean up my act.

20   Q. Okay. Apparently on December -- Exhibit 3, on

21   December 17th you sent a memo to Tim Edwards regarding

22   that November 30th meeting. Why did you do that?

147

1    A. I was requested by Tim that I document the

2    meeting. If we go back to my previous testimony, I had

3    mentioned to you at the conclusion of the -- on the --

4    the conclusion of the day on November 30th, after the

5    meeting I had other work to do. I did that work. And I

6    called up Tim Edwards to let him know that the meeting

7    had gone.

8    Q. Right.

9    A. You know, how I felt about it, and did he hear

10   anything back. I called him again on the next week, I

11   believe on the Monday, and his reply was that he had not

12   spoken to Lisa yet about her take on the meeting, he had

13   spoken to Mike Peters, and that Mike Peters, for his

14   portion of the meeting, thought the meeting went well,

15   congenial, everybody was happy, everybody was working

16   well together.

17   A little bit later, Tim did tell me that Lisa

18   came in and told him that the meeting went fine. And

19   then the exact time -- and it had to be certainly around

20   the time of the 17th, or the day before, Tim came back

21   and told me that Lisa came back into his office. And if

22   I recollect, it was about a week after the first -- a

148

1    week after Tim's first post-meeting discussion with Lisa

2    that she came back and -- and started -- she told him

3    other things that she had not said in the first meeting.

4    Q. Did he tell you what those other things were?

5    A. The things like that I had cursed in the

6    meeting, that I'd used profanity, and that -- pretty

7    much that I'd used profanity. Okay. And I denied it.

8    Q. Okay.

9    A. And I can't -- I do not believe he said

10   anything else. And I'm having -- I have read the

11   complaint, so I know what else she said in the

12   complaint. But none of those other things, to my

13   recollection, were said between Tim and I. Okay.

14   Q. Let me just see if there's in Exhibit 1 -- bear

15   with me one second. It's paragraph -- it starts on

16   paragraph 35. But it's not completely part of Exhibit

17   1.

18   MS. COX: I may have some extra copies of it

19   here if you want.

20   MR. CHERRY: Hmm?

21   MS. COX: I might have some extra copies of it

22   here if you don't.

DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

38 (Pages 149 to 152)

149

1    MR. CHERRY: Okay. I have the rest of that
2  paragraph.
3    MS. COX: Okay.
4    MR. CHERRY: I'm going to -- unless you object,
5  I'm going to add --
6    MS. COX: If I could just see it first.
7    MR. CHERRY: I'm going to add that paragraph --
8  the rest of 35 to Exhibit 1, and we'll make that part of
9  Exhibit 1.
10    MS. COX: That's fine. I have no objection to
11  that. BY MR. CHERRY:
12    Q. Okay. Take a look, sir, at paragraph 35.
13    A. 35.
14    Okay. I've read it.
15    Q. Okay. You see in paragraph 35, Ms. Wolff makes
16  other allegations relating to the November 30th meeting.
17  Are you saying that this is the paragraph that you
18  reviewed regarding that meeting?
19    A. I -- yes.
20    Q. Do you disagree or deny the allegations made in
21  paragraph 35?
22    A. I -- I disagree and deny.

150

1    Q. Are there any -- you want to do both?
2    Are there any of the allegations made in
3  paragraph 35 that you acknowledge happened?
4    A. The first sentence I -- I deny, having put it
5  in that way. Okay.
6    MS. COX: Just so the record's clear.
7    THE WITNESS: Okay.
8    MS. COX: Do we want to go read the sentence
9  into the record, so -- if he's going to do it that way?
10  BY MR. CHERRY:
11    Q. I think you should.
12    A. Do you want to do it that way? Sure. Okay.
13    Q. I think you --
14    A. Paragraph 35. "Mr. Mazzo spoke this way to Ms.
15  Wolff because she is a female." No, sir. That is -- I
16  deny that.
17    Q. Okay. Slow down a little bit.
18    MS. COX: When you read, read a little slower.
19    THE WITNESS: I'm sorry. I forgot. I'm sorry.
20    MS. COX: That's okay. Just when you read it.
21  BY MR. CHERRY:
22    Q. Okay. Let's --

151

1    A. I apologize. Do you want me to do it over
2  again?
3    (Discussion off the record.) BY MR. CHERRY:
4    Q. And I actually don't -- I'm not requiring you
5  to go through it sentence by sentence.
6    A. Okay.
7    Q. If --
8    A. Then this is all. I did not say this --
9    Q. Okay.
10    A. -- at all.
11    Q. All right. Let me just take a quick look at
12  it.
13    A. Sure.
14    MS. COX: If you want, Ron -- BY MR. CHERRY:
15    Q. The main -- okay. Just give me one second.
16    MS. COX: Okay. BY MR. CHERRY:
17    Q. The main thing I want to direct your attention
18  to is, I guess, the sentence that starts -- it would be,
19  I would think, the third sentence.
20    "Mr. Mazzo confirmed this fact in a November
21  30th, 2001 meeting with Ms. Wolff." Actually, the
22  fourth sentence. "Mr. Mazzo stated to Ms. Wolff that he

152

1  chose to depict her involved in sexual acts with him
2  because he was angry and he knew Ms. Wolff would object
3  and ultimately leave the August 29th meeting."
4    A. I did not say that to the lady.
5    Q. Did you say anything? If you didn't use those
6  exact words, did you say anything to -- in an attempt to
7  lead her to that conclusion?
8    A. No, sir, I did not.
9    Q. Do you -- put it away.
10    At the time you wrote the memo to Mr. Wolff --
11  I mean to Mr. Edwards of December 17th, 2001, had you
12  been advised that Ms. -- Exhibit 3. Had you been
13  advised that Ms. Wolff had made these allegations
14  against you?
15    A. What -- what the allegation -- what Mr. Edwards
16  said, which -- which led to my memo of December 17th,
17  was that she said at the meeting that I'd used
18  profanity.
19    Q. Okay.
20    A. Okay. And that was it.
21    Q. What about the statement from the complaint
22  that I just read?

Case 1:02-cv-03932-WDQ    Document 31-5    Filed 09/25/2003    Page 73 of 103
DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

39 (Pages 153 to 156)

153

1    A. No, sir, he did not mention that to me.
2    Q. Okay. Well, you end up in that memo, on the
3    second page of Exhibit 3, saying, "If there is any
4    discrepancy with this, I need to know this immediately."
5    You expected there to be a discrepancy?
6    A. Well, obviously he told -- Mr. Edwards told me
7    that Lisa had made this accusation, I guess is the right
8    word.
9    Q. Regarding profanity?
10    A. Regarding the use of profanity during the
11    November 30th meeting. I told him that I did not. And
12    -- and my use of the words are: Any -- if there's any
13    discrepancy, I need to know this immediately. I want to
14    know, you know, where we're going with this. Where is
15    this all going to take us?
16    Q. Hadn't he already told you there was a
17    discrepancy, with -- with that part of it, at least?
18    A. Okay. Yes.
19    Q. Okay. And I think I understand why you said
20    you need to know it immediately. You wanted to know
21    where we were going.
22    A. Right.

154

1    Q. You thought this was resolved?
2    A. Well, I need to know -- well, obviously prior
3    to this letter --
4    Q. Don't work too hard. You thought it had been
5    resolved?
6    A. I had thought it had been resolved, yes.
7    Q. All right. Do you have any knowledge at all as
8    to the -- the nature of the working relationship between
9    Ms. Wolff and Mr. Gahagan? Were they able to work
10    together? Were there problems in that relationship?
11    A. As I mentioned to you earlier, you know, there
12    was -- you know, leading up to the August 29th phone
13    call --
14    Q. The frustration?
15    A. -- the frustrations levels, you know, were
16    growing, and -- and certainly the -- those -- the people
17    most involved on a daily basis were the types of people
18    that were involved in the phone conversation: Mr.
19    Gahagan, Mr. Ossentjuk, Mr. Peters, Mr. Ashby.
20    Q. Beyond that, what you've already talked about
21    before, and perhaps even beginning subsequent to August
22    29th, 2001, are you aware of any problems in the working

155

1    relationship between Mr. Gahagan and Ms. Wolff?
2    A. Subsequent to August 29th, aware of any
3    problems in the working relationship between Mr. Gahagan
4    and Mrs. Wolff?
5    Q. Something different than what you've already
6    told me.
7    A. No.
8    Q. Okay. Did Mr. Gahagan ever come to you and --
9    to say that he had problems with Ms. Wolff that were not
10    borne of the frustrations that we've talked about
11    before?
12    A. Repeat it again a couple --
13    Q. Did Mr. Gahagan ever come to you after August
14    29th and tell you he had problems with Ms. Wolff that
15    were not borne of the frustrations that we talked about
16    before?
17    A. That were not borne of the frustrations?
18    Q. Right.
19    A. No, any -- any time that -- that Mr. Gahagan or
20    Mr. Ossentjuk or any of the others, it was typically the
21    frustrations that -- that were prior to August 29th, not
22    as a result of August 29th.

156

1    Q. The same questions I asked about Mr. Gahagan, I
2    need to know for Mr. Ossentjuk.
3    A. Mr. -- it's the exact same answer.
4    Q. Okay.
5    A. And Mr. Ashby. And I really did not converse
6    with Mr. Peters -- Mr. Mike Peters --
7    Q. Ken.
8    A. Excuse me, Ken Peters, on this issue.
9    Q. Did you notice any deterioration in the working
10    relationship between Ms. Wolff and Mr. Ossentjuk after
11    August 29th?
12    A. Certainly things became more difficult. The
13    meeting was not without -- everyone was emotionally
14    affected by the meeting. Okay. So certainly there --
15    there were still issues that were unresolved from a
16    technical standpoint. And so I can't tell you, because
17    I kind of extricated myself. Okay. And as a matter of
18    fact, I told them, you know, I shouldn't have -- I
19    should not have been involved at the level that I was. I
20    mean that should have been, you know, director to
21    director kind of thing.
22    Q. Right.

Case 1:02-cv-03932-WDQ   Document 31-5   Filed 02/25/2003   Page 74 of 103
DEPOSITION OF STEPHEN A. MAZZO
CONDUCTED ON TUESDAY, AUGUST 12, 2003

40 (Pages 157 to 160)

157

1    A. And I -- you know, trying to keep my distance
2 and not -- not further taint anything that would be
3 going on, I extricated myself and said, you know, "You
4 guys have to just go deal with it."
5    Q. After September 14th, when you delegated more
6 responsibility to Ossentjuk and Gahagan in dealing with
7 the College Park IT people, did you tell them why you
8 were --
9    A. I --
10    Q. -- you wanted them to --
11    A. The first --
12    Q. -- handle it, why you wanted to keep hands off?
13    A. The first part is, I didn't delegate more
14 responsibility. I informed them of what their
15 originally delegated responsibility was.
16    Q. And told them to go do their job?
17    A. And told them to go do their job. You know,
18 they did know something was going on. And I told them,
19 "Stay out of it. Leave me alone, and you just go do
20 your job."
21    Q. Did Mr. Ossentjuk discuss what was going on
22 with you after September 14th?

158

1    A. He knew that there was some kind of a, I'll use
2 the word grievance.
3    Q. Did he discuss it with you?
4    A. Did he discuss it with me?
5    Q. Yes, sir.
6    A. No.
7    Q. Do you know of an incident where Mr. Ossentjuk
8 -- I don't want to use the word "threatened" -- informed
9 Ms. Wolff that she was going to -- he was going to put
10 you on the line if they couldn't get their issues
11 straightened out?
12    A. Say that again, please.
13    Q. Do you know of a situation where Mr. Ossentjuk
14 informed Ms. Wolff that he was going to put you on --
15 get you on the telephone line when -- if the two of them
16 couldn't get their -- their issues straightened out?
17    A. Well -- well, clearly the telephone call on
18 August 29th was as a result of the people at the lower
19 levels not being --
20    Q. I'm sorry, after August 29.
21    A. Oh. No, sir.
22    Q. All right. Take a deep breath. Let me check

159

1 my notes.
2    Back.
3    Do you, today, have questions about Ms. Wolff's
4 competency in her role -- in the role she played on
5 August 29th, 2001?
6    A. Competency, no. Disagreements as to execution
7 or things like that, certainly. We all have
8 disagreements.
9    Q. Okay. One more thing I wanted to ask you. I'll
10 remember it as soon as I get back to my room, I'm sure.
11    Oh. I don't recall whether I asked you this.
12 And I may have. Why did you leave Northrop Grumman?
13    A. I chose to leave for a better opportunity.
14    Q. Okay. That's good. All right. Thanks.
15    A. Okay.
16    MS. COX: I have just a couple quick questions.
17    MR. CHERRY: Okay.
18    EXAMINATION BY MS. COX:
19    Q. You testified earlier, Mr. Mazzo, that you
20 notified -- notified people when you came to the College
21 Park or Maryland facilities; is that correct?
22    A. Yes.

160

1    Q. Okay. To the best of your recollection, did
2 you ever come to any of the Maryland facility -- or I
3 guess it was the College Park facility and not notify
4 Tim Edwards or someone else --
5    A. No.
6    Q. -- that you were coming?
7    A. No. And there were two different facilities,
8 one located in College Park, Maryland; one in Green --
9 one in College Park, Maryland; the other in a place that
10 was called Greenbelt. They sometimes referred to it as
11 the aerospace facility.
12    And so I had to tell them not only what days
13 was I coming to Maryland but which of the facilities I
14 was going to be in on which days and what people I was
15 going to visit, what parts of the building I was going
16 to be in.
17    Q. In the November 30th tele -- I'm sorry,
18 "teleconference." In the November 30th meeting with Ms.
19 Wolff, did you use any sexually oriented language?
20    A. No. I did not.
21    MS. COX: I have no further questions.
22    EXAMINATION BY MR. CHERRY:

161

1    Q.  How long did this -- your having to notify the
2  security in Maryland what building you were coming into
3  and when you were coming -- when you were coming, how
4  long did that last?
5    **A.  Basically until the -- the meeting of November**
6  **30th.**
7    Q.  And that requirement was lifted after --
8    **A.  November -- yeah, November 30th.  I'm sorry.**
9    Q.  And that requirement was lifted after the
10  November 30th meeting?
11   **A.  Yes, sir.**
12   Q.  Okay.  And any idea how many times you visited
13  Maryland from August -- say, September 14th until then?
14   **A.  Because of my international travel, it was**
15  **probably down to once a month.  I -- it would have been**
16  **prior to the -- up through November 30th.  We were**
17
18
19
20
21
22

162

1  restricted somewhat, because you're talking about
2  post-September 11th.  And so the company had restricted
3  travel altogether for -- for the whole month of
4  September.  So we're talking about basically the months
5  of October and November where the travel restrictions
6  domestically were -- were somewhat loosened.  So we're
7  probably -- considering my international travel,
8  probably two to maybe three times.
9    MR. CHERRY:  Okay.  All right.  Thanks.
10   (Whereupon, the deposition was adjourned at
11  1:08 p.m.)
12   ---oOo---
13   I declare under penalty of perjury that the
14  foregoing is true and correct.  Subscribed at
15  _____, California, this _____ day of
16  _____, 2003.
17
18   _____
19   Signature of the witness
20
21
22

1  STATE OF CALIFORNIA        )
2                             )  ss.
3  COUNTY OF SAN FRANCISCO  )
4
5    I, JOHN WISSENBACH, hereby certify that the
6  witness in the foregoing deposition was by me duly sworn
7  to testify the truth, the whole truth, and nothing but
8  the truth in the within-entitled cause; that said
9  deposition was taken at the time and place therein
10  stated; that the testimony of said witness was reported
11  by me, a Certified Shorthand Reporter and disinterested
12  person, and was thereafter transcribed into typewriting,
13  and that the pertinent provisions of the applicable code
14  or rules of civil procedure relating to the notification
15  of the witness and counsel for the parties hereto of the
16  availability of the original transcript of the
17  deposition for reading, correcting, and signing have
18  been met.
19   And I further certify that I am not of counsel or
20  attorney for either or any of the parties to said
21  deposition, nor in any way interested in the outcome of
22  the cause named in said caption.
23   DATED:
24
25   JOHN WISSENBACH, CSR No. 6862

DEPOSITION OF BOB W. OSSENTJUK
CONDUCTED ON WEDNESDAY, AUGUST 13, 2003

1 (Pages 1 to 4)

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MARYLAND
 3                (Northern Division)
 4
 5   LISA A. WOLFF,              )
                                 )
 6        Plaintiff,             )
                                 )
 7   vs.                         )  CA No. L02-3932
                                 )
 8   LITTON ADVANCED SYSTEMS,    )
     INC., et al.,               )
 9                               )
          Defendants.            )
10                               )
11
12
13            DEPOSITION OF
14            BOB W. OSSENTJUK
15   -------------------------------
16            August 13, 2003
17
18
19
20
21
22
23
24   REPORTED BY:  JANIS L. JENNINGS CSR NO. 3942
25   JOB No. 1-20678
```

---

**Page 3**

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4      BY:  RONALD M. CHERRY, ATTORNEY AT LAW
 5      214 Washington Avenue, 2nd Floor
 6      Baltimore, Maryland  21204-4718
 7      (410) 494-4954
 8
 9   FOR THE DEFENDANTS:
10      MORGAN, LEWIS & BOCKIUS LLP
11      BY:  CHRISTINE B. COX, ATTORNEY AT LAW
12      1111 Pennsylvania Avenue, N.W.
13      Washington, D.C.  20004
14      (202) 739-5828
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MARYLAND
 3                (Northern Division)
 4
 5   LISA A. WOLFF,              )
                                 )
 6        Plaintiff,             )
                                 )
 7   vs.                         )  CA No. L02-3932
                                 )
 8   LITTON ADVANCED SYSTEMS,    )
     INC., et al.,               )
 9                               )
          Defendants.            )
10                               )
11
12
13        BE IT REMEMBERED that, pursuant to Notice,
14   and on Wednesday, August 13, 2003, commencing at the
15   hour of 9:50 a.m., at MORGAN, LEWIS & BOCKIUS LLP, Two
16   Palo Alto Square, Palo Alto, California, before me,
17   JANIS L. JENNINGS, a Certified Shorthand Reporter,
18   License No. 3942, State of California, personally
19   appeared
20            BOB W. OSSENTJUK
21
22   called as a witness by Plaintiff, who, having been first
23   duly sworn, was examined and testified as follows:
24            --oOo--
25
```

---

**Page 4**

```
 1                I N D E X
 2
 3            INDEX OF EXAMINATIONS
 4   EXAMINATION BY MR. CHERRY  . . . . . . . . . . . . 5
 5
 6
 7        EXHIBITS MARKED FOR IDENTIFICATION
 8   Exhibit No.    Description          Page
 9   1     Bates Nos. NG0196 through 97       17
10   2     Bates No. NG0213           17
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**37**

1    Q.   Okay.  Did you ask any questions during the
2  course of this meeting?
3    A.   No.
4    Q.   You didn't say anything at all during the
5  course of the meeting?
6    A.   I may have but I don't recall anything
7  specific.
8    Q.   Do you recall Mr. Mazzo addressing any
9  questions directly to Miss Wolff?
10    A.   Yes.
11    Q.   Do you recall what those questions were?
12    A.   They had to do with trying to understand the
13  time frame in which she would return Work Manager to San
14  Jose.
15    Q.   How could you tell they were questions
16  directed to Miss Wolff?
17    A.   We generally talked about plans she worked on
18  to move Work Manager back to San Jose and she developed
19  two or three options to moving it back so I think it
20  were questions addressed to her plan.
21    Q.   Did he start out by saying, "Lisa, how about
22  this?" Or "Miss Wolff, how about this?"
23    A.   Again I would say I'm speculating.
24    Q.   You don't have to speculate.  Did there come a
25  point that Mr. Mazzo lost control during the course of

---

**38**

1  the meeting?  Lost his temper?
2    A.   Yes.
3    Q.   And did you say anything to him at that point?
4    A.   I don't believe so.
5    Q.   Why not?
6    A.   It wasn't my meeting.  I was a subordinate
7  member of the group.
8    Q.   Why were you in the meeting?
9    A.   Because the Work Manager issue was
10  specifically an issue I had responsibility for in San
11  Jose.  So I was there to hear whatever Mr. Mazzo was
12  going to discuss with Lisa Wolff.
13    Q.   I thought I might have this wrong.  I thought
14  Mr. Ashby had responsibility for that.  You would have
15  had responsibility for the Work Manager issue.
16    A.   I had responsibility for Mr. Ashby.
17    Q.   Okay.  Whose direct responsibility was the
18  Work Manager?  I'm not talking about oversight or dotted
19  line or anything like that.  Whose direct responsibility
20  was it?  Was it yours?
21    A.   Probably mine.
22    Q.   During the course of the meeting do you recall
23  Mr. Mazzo using profanity?
24    A.   Yes.
25    Q.   Do you know specifically what words were used?

---

**39**

1    A.   No.
2    Q.   You don't?
3    A.   Again, not that I don't remember what specific
4  words he may have used.  I know he used off-colored
5  words of numerous kinds.
6    Q.   Do you recall hearing Mr. Mazzo use the word
7  "fuck" when talking to Lisa?
8    A.   Again, not specifically.
9    Q.   Okay.  Do you recall hearing Mr. Mazzo use the
10  word "fucking" when talking to Lisa?
11    A.   Not specifically.
12    Q.   Your testimony is that you don't recall it or
13  you didn't use it or you don't recall him using it?
14    A.   I don't remember his specific words.  I just
15  remember he used profanity.
16    Q.   Was there ever a time you left the meeting?
17    A.   Yes.
18    Q.   Why did you leave the meeting?
19    A.   Somebody wanted to tell me something that they
20  thought was relevant towards what was going on.
21    Q.   And did you come back in and relay this
22  information to Mr. Mazzo?
23    A.   No.  I came back in but I didn't relay the
24  information.
25    Q.   Do you know whether anybody else left the

---

**40**

1  meeting besides yourself?
2    A.   I don't really remember.
3    Q.   Let's take a look at Exhibit 2.
4        First off I want you to identify for me what
5  Exhibit 2 is.
6    A.   It is a memo written to Tim Edwards regarding
7  Mazzo Work Manager meeting.
8    Q.   And what is the date of that memo?
9    A.   September 14th.
10    Q.   When were you advised that you needed to write
11  a memo?
12    A.   I don't remember.
13    Q.   Could it have been the same day or the day
14  before?
15    A.   It may have been, but I don't really remember.
16    Q.   Were you given a certain time period to get
17  the memo done?
18    A.   I don't remember.
19    Q.   You don't remember?
20    A.   No.
21        MR. CHERRY:  Off the record.
22        (Off the record.)
23        MR. CHERRY:  Back on.
24  BY MR. CHERRY:
25    Q.   Prior to sending the memo to Mr. Edwards, did

41

1  you show it to Mr. Mazzo?
2      A.  I don't remember.  I don't think so but I
3  don't remember.
4      Q.  Did you show it to Mr. Gahagan?
5      A.  I don't think so.
6      Q.  How about Mr. Kuenzel?
7      A.  I don't think so.
8      Q.  Have you spoken to Mr. Edwards at any point
9  about the August 29th phone call prior to September
10  14th, 2001?
11      A.  I don't actually remember.
12      Q.  You don't remember?  Did Mr. Edwards advise
13  you why it was necessary for you to write this memo?
14      A.  Again, I don't remember.
15      Q.  Were you given any specific questions that you
16  needed to answer?
17      A.  Not that I recall.
18      Q.  If we go down to your memo there is a
19  paragraph that begins, "So as I recall."
20      A.  Okay.
21      Q.  Okay.  You indicate in that paragraph that
22  some of the folks at College Park became irritated.  You
23  say Steve became irritated.  This is four lines down.
24  "Steve became irritated as did some of the folks at
25  College Park."  Who at College Park became irritated?

42

1      A.  I don't recall.
2      Q.  You don't recall why they became irritated?
3      A.  I think generally the meeting was escalating
4  in agitation on both sides.
5      Q.  Including yourself?
6      A.  No.  In a Steve Mazzo meeting Steve Mazzo was
7  the center piece of the meeting and doing all the
8  talking on the San Jose side.  I think everybody on the
9  San Jose side except with the exception of Mr. Gahagan
10  was pretty silent.
11      Q.  Did Mr. Gahagan speak during this meeting?
12      A.  I think I recall he did.
13      Q.  In the same line you said, "Steve became
14  irritated," and you said, "the conversation included
15  some off-color language," and then in parens you said,
16  "none that I haven't heard said by most all of the
17  members of the meeting."
18          We already talked about that you don't
19  remember him using the word "fuck" or "fucking"
20  specifically.
21      A.  I don't remember what words he used.
22      Q.  Do you remember he used words other than
23  those?
24      A.  All I can tell you I remember profanity being
25  used.

43

1      Q.  Do most of the meetings that Mazzo is involved
2  in use language like that?
3      A.  I don't think I'm qualified to make a
4  statement on the language used during Mr. Mazzo.
5      Q.  How about the meetings you have been involved
6  with Mr. Mazzo?
7      A.  On occasion.  If he became agitated he would
8  use some level of profanity.
9      Q.  Sometimes he did and sometimes he didn't?
10      A.  Right.
11      Q.  Did you ever hear him use the word "fuck" or
12  "fucking" in those meetings?
13      A.  I heard him use it to me.
14      Q.  Have you ever heard him use it when women were
15  involved in the meetings also?
16      A.  Probably not because we don't have many women.
17      Q.  You said you "none that I haven't heard said
18  by most of the members of the meeting."  Do you ever
19  recall Mike Peters using the same type of language in
20  any meetings he was involved in?
21      A.  In meetings with me, I believe so.
22      Q.  How about John Ross?
23      A.  I generally didn't have meetings with Ross,
24  probably not.
25      Q.  Lisa Wolff?

44

1      A.  I don't really recall.
2      Q.  You recall having meetings with Miss Wolff?
3      A.  On occasion, yes.
4      Q.  Do you recall her using that type of language
5  in the meetings?
6      A.  Not there I recall.
7      Q.  Is this language that you generally use in
8  your professional dealings in your meetings?
9      A.  Me personally?
10      Q.  Yes, sir.
11      A.  I don't think so.
12      Q.  Language that you ever used in front of women?
13      A.  Probably.
14      Q.  In your meetings?  Professional meetings?
15      A.  I don't think so.  Again, I don't have
16  occasion to have many women in meetings with me.
17      Q.  Do you have any women subordinates at all or
18  did you in 2001?
19      A.  Maybe a couple.  I don't really remember.  No
20  significant number of women in the work environment
21  where I was at the time.
22      Q.  Do you recall things being said in the meeting
23  about the College Park's continued existence now that
24  Northrop Grumman took over?
25      A.  I think so.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MARYLAND

NORTHERN DIVISION

LISA WOLFF,                    )
                              )
            Plaintiff,        )
                              )
        vs.                   )        CA No. L02-3932
                              )
LITTON ADVANCED SYSTEMS,      )
INC., et al.,                 )
                              )
            Defendants.       )
_____)

DEPOSITION OF MICHAEL S. GERING

August 29, 2003

Tucson, Arizona

(Confidential portion extracted)



Reported by:
Steven J. Haight
CCR NO. 50280
_____
KATHY FINK & ASSOCIATES
2819 East 22nd Street
Tucson,  Arizona  85713
(520) 624-8644

1       A.      No, I can't put that date down.  I just don't

2   know.

3       Q.      We'll come back to that.

4           MR. CHERRY:  Steve, we are just going to go in

5   order from here, so 215 would be 6?  And you can do that

6   whenever you get around to it.

7   BY MR. CHERRY:

8       Q.      Go to 226, Mike?

9       A.      Got it.

10      Q.      This looks like some doctor wrote this.

11      A.      Well, that doctor is me, except the signature is

12  not mine.

13      Q.      The signature is not yours?

14      A.      No.

15      Q.      Who signed it?

16      A.      I'm guessing.

17          MS. COX:  I would just like to make an objection

18  on the record.  I believe it's not necessarily a signature.

19  Are you referring to where it says your name?

20          MR. CHERRY:  It says M. Gering.  It's actually

21  printed, Michael.  Somebody wrote that on to identify whose

22  document that was.

23          THE WITNESS:  I know the handwriting.  I would

24  say it's Tim Edwards that wrote M. Gering and he probably

25  was documenting where the hell it came from.

1    BY MR. CHERRY:

2        Q.    That makes sense.  What is this document?

3        A.    I'm going to read it again.

4        Q.    I hate to do this to you, but I do need you to

5    read this one out loud for me because --

6        A.    It's an MFR, memorandum for the record, relative

7    to the case of the grievance filed by Lisa Wolff against

8    Steve Mazzo.

9            "After a thorough investigation conducted by Tim

10    Edwards I ascertained that the facts as contained in

11    Ms. Wolff's statement were ratified by Mrrs. Peters and

12    Roth.  I determined a satisfactory action was as follows:

13    One week off without pay, mandatory attendance with an

14    anger management course, a full letter of apology from

15    Mazzo to Wolff, a letter in Mazzo's jacket stating any

16    events such as this in the future will result in

17    termination.

18            "While the director of HR had concurred in these

19    recommendations, he originally recommended two weeks

20    without pay."

21            Okay.  I didn't think I was supposed to talk

22    about what the attorneys did, but it says, Cathy Voit, the

23    ESS HR attorney, concurred in my recommendation as

24    appropriate.

25            "When I presented the recommendation to John

1    Chino for ratification, his reaction was that it was too

2    much and changed it to anger management course and a verbal

3    discussion with Mazzo."

4         Q.    Thank you.  Cathy Voit, you said that you

5    discussed -- a little while ago you said you discussed --

6    when a report came in you talked about it with your

7    attorney and your HR  person.  Was Cathy your HR attorney?

8         A.    No.

9         Q.    Who would that have been?

10        A.    Ron Shingler.

11        Q.    All right.  Even though this may have been

12    Mr. Edwards writing your name here, these are your notes,

13    correct?

14        A.    Yeah, this is my writing.

15        Q.    And do you know when it was you authored this

16    document?

17        A.    The date, no, I don't.  It would have been after

18    all of the discussions that I needed had taken place.

19        Q.    Is there any reason to believe that it would

20    have been September 28th, '01?

21        A.    I would suspect that it was September 28th based

22    on the fact that that's what Tim Edwards dated it as.

23        Q.    And you believe that a thorough investigation

24    had been conducted in this case?

25        A.    Yes, I do.

1      Q.    Did you have to have any conversation with

2  Mr. Edwards at any point to jump start the investigation or

3  get it completed or speed it up or anything of this nature?

4      A.    I think you're probably referring to the fact

5  that Lisa was distressed over the fact that there weren't

6  statements from virtually everybody that might have been a

7  witness to the thing.

8      Q.    Anybody who took part in the meeting?

9      A.    To whoever was involved in the telephonic -- I

10  believe it was a telephonic meeting, that everybody was in

11  there.  And I do remember telling Tim, go back and see if

12  you can -- or not go back and see, go back and get some

13  more documentation.

14      Q.    Do you know when that was?

15      A.    No.  It was certainly after he came forward with

16  the recommendation.

17      Q.    Did you actually have a conversation with Lisa,

18  did you receive a memo from Lisa that she was upset about

19  this?

20      A.    Is Lisa sitting there?

21      Q.    No.  I should have said that.  There is no one

22  in this room but me.

23      A.    Well, you know no Lisa.  And Lisa was extremely

24  upset about this whole occurrence and very emotional about

25  it and she came to my office on more than one occasion, but

1    I can't tell you how many.  Her position was that the

2    investigation wasn't thorough.  A position quite frankly

3    that I didn't share, but I did accommodate her concern

4    about it by sending Edwards back to get more information if

5    it was available from other people.

6        Q.    At the time Lisa expressed these concerns to

7    you, do you know whether Mr. Mazzo's statement had been

8    taken?

9        A.    Oh, I have to believe it was, but that's just

10   conjecture.

11       Q.    Do you have any --

12       A.    If she came roaring in there to voice some

13   concern about the lack of a complete investigation, it

14   would have had to have been sometime after investigation I

15   would think.  I'm just guessing.

16       Q.    Well, after the investigation would have

17   commenced you mean?

18       A.    No, I meant after the investigation was

19   complete.  That's what I'm guessing.

20       Q.    And she would have come in and said, "This

21   investigation they say is complete, but I don't think it's

22   complete and more needs to be done"?

23       A.    That would be my guess, yeah.

24       Q.    Do you recall her asking for anything else other

25   than interviews with everyone who took part in that

1   telephone conversation?

2        A.    As far as an investigation is concerned?

3        Q.    Yes, sir.

4        A.    No, I don't recall anything else that she asked

5   for.

6              MR. CHERRY:  Christine, are you in the room by

7   yourself?

8              MS. COX:  I meant to jump in and tell you that

9   I'm in the room all by myself.

10  BY MR. CHERRY:

11       Q.    We are supposed to that earlier, Mike, I'm glad

12  you reminded us.

13       A.    I just didn't want her crying on your shoulder

14  if I said something that offended her.

15             MR. CHERRY:  Off the record.

16             (Discussion off the record.)

17  BY MR. CHERRY:

18       Q.    Let's go to 227.

19       A.    Got it.

20       Q.    Identify that one for me.

21       A.    It's a memo without any heading or anything on

22  it to Lisa from me.  That's it.

23       Q.    There is no date on it also?

24       A.    No, there is no date, no heading, nothing.  It's

25  just Dear Lisa, sincerely Michael and it's not signed, but

1   Q. You don't understand this retirement concept

2 very well, do you, Mike?

3   A. No, I don't.

4   Q. Give me that name again, Global...

5   A. I'm the President of Global Solar Energy,

6 Incorporated.

7   Q. Do you do any work for Northrop Gramman?

8   A. We just last week -- my marketing manager met

9 with a marketing guy from Northrop Gramman on a potential

10 opportunity last week, but I have no contracts, I haven't

11 had any interface with them or anything, but that one

12 contact has been made last week.

13   Q. That would have been No. 9 that we just

14 finished, right?

15   A. Right.

16   Q. This is 233?

17   A. Okay.

18   Q. Actually 233 appears to be a typed-up version of

19 226; is that right?

20   A. That's what is it looks to be like.  I would

21 agree with that.

22   Q. And that's your signature?

23   A. Yes.

24   Q. And it's dated October 1st, 2001?

25   A. Right.

1      Q.    Is there anything -- take a quick look at it,

2    anything in that memo that's not consistent with 226?

3      A.    The only thing that's different is that the last

4    sentence in there, "To date, my final date of unemployment

5    at Northrop Gramman, I am unaware of actions taken by the

6    sector with regards to Mr. Mazzo."  That is the only

7    difference in the two that I can see.

8      Q.    Since your retirement, such as it was, have you

9    heard anything else, have you found out anything else about

10   what measures were taken against Mr. Mazzo?

11     A.    No.

12     Q.    I see at least three different recommendations

13   regarding Mr. Mazzo.  Do you have any idea whether any of

14   those recommendations were taken?

15     A.    I understand that he did go to charm school, to

16   anger management course.  I understand he did go.  I don't

17   know.  That's the only thing I have heard.

18     Q.    You want to mark that one for me?

19     A.    It's 10.

20     Q.    I think that's going to be it for identifying

21   the documents.  We may have to go back to them later.

22          I'll tell you the way we will do this, Mike, we

23   are going to go through Exhibit 1 and could very well be

24   that going through Exhibit 1 will take us to some of the

25   other questions I had.  Again, this may be a time-cutting

1    were on the phone conversation.  I just accepted this as

2    fact from Lisa.

3         Q.    Your next sentence, "It is this situation and

4    the subsequent actions of Litton/Northrop Gramman staff

5    that prompts me to honor a request to write this

6    statement."  The request obviously came from Ms. Wolff?

7         A.    Yes.

8         Q.    And what subsequent actions are we referring to?

9         A.    You know, that's an unfortunate choice of words.

10   Again, I probably shouldn't have allowed that to stand.  I

11   wrote this statement or modified it and sent it back based

12   on Lisa's request that I do so.

13        Q.    What I'm trying to do now, Mike, is to give you

14   a chance to give me something you are a little more

15   comfortable with?

16        A.    Then I would modify that statement to say that

17   based on Lisa's initial accusation against Mazzo, you know,

18   based on that I'm writing this statement.  I wouldn't say

19   anything about the staff at Northrop Gramman.  I don't know

20   what the hell that even means.

21        Q.    That's why we are doing what we are doing.

22        A.    I did it for Lisa.

23        Q.    I'm not going to go line by line I assure you.

24              In the second paragraph you talk about Lisa

25   using the Litton grievance procedure, which involved three

1    levels of review?

2         A.    Right.

3         Q.    Do you still recall what that procedure is and

4    what the levels are?

5         A.    The levels of review, as I understand it, were

6    HR, and then HR and the lawyer gathering all the

7    information and then my final review.

8         Q.    So HR, that would be Mr. Edwards, Tim Edwards,

9    right?

10        A.    Correct.

11        Q.    And then Edwards and Ron Shingler, that would be

12   the second level?

13        A.    Yeah.

14        Q.    Can you bear with me one second?

15        A.    Sure.

16        Q.    The second level I think we were talking about

17   would be Tim Edwards and Ron Shingler?

18        A.    Yeah, and the information that they gather,

19   right.

20        Q.    And then the third level would be your level?

21        A.    Where they bring the information and a

22   recommendation and we have a discussion about it and I make

23   a determination what to do.

24        Q.    Is there an actual meeting at the third level?

25        A.    A meeting in the sense that they come in my

1  office, sit down and close the door and we thrash out what

2  they have determined, what's happened, their

3  recommendations, et cetera.

4      Q.    The people involved in that meeting would just

5  be you and Mr. Edwards and Ron?

6      A.    Generally, but we can bring in people as we see

7  fit.

8      Q.    Do you know if anyone else was brought in at the

9  third level meeting in this case?

10      A.    Well, Lisa asked and we allowed her to come in

11  where she asked questions about the investigation.

12      Q.    During the third level meeting?

13      A.    Yeah.

14      Q.    Is this a usual procedure?

15      A.    No.

16      Q.    Why was the accommodation made in this case?

17      A.    How well do you know Lisa?  She was very

18  emotional and I was trying to stem that.

19      Q.    I understand.  At the time of the third level

20  meeting is it accurate that the package that you were

21  presented with included statements -- still in the second

22  paragraph -- statements from Lisa, from Mike, John Roth,

23  Mike Peters and John Roth?

24      A.    Do you know I couldn't tell you if it contained

25  statements from those two or not in terms of my memory.  I

1    just don't know.  Ron Shingler and Tim Edwards presented

2    the conclusions that they had come forward with.  Whether I

3    saw those statements or not I don't know.

4         Q.   Do you have any recall of when that third level

5    meeting took place?

6         A.   You mean a date?  No, I don't.

7         Q.   Were there any notes taken during that meeting?

8         A.   Tim Edwards would have taken notes.

9         Q.   Do you know whether he would have placed this in

10    any particular file?

11         A.   I would assume that he had a file on every case

12    that he had to investigate, but I don't know where he kept

13    them.

14         Q.   Am I correct in saying that this meeting would

15    not have been electronically recorded in any manner?

16         A.   That's correct.

17         Q.   Do you have any reason to believe that the

18    package that you were presented contained anything in

19    addition to, assuming that the Peters and Roth statements

20    were there, anything in addition to what Ms. Wolff wrote

21    and the Peters and Roth statements?

22         A.   No, I don't recall anything.

23         Q.   Let's go down to the third paragraph and you'll

24    see -- you have read this, right?

25         A.   Yes.

1    Q.    You you'll see that it says Ms. Wolff requested

2    to read statements from the other gentlemen who were at the

3    meeting and you learned then that Mr. Edwards had not

4    requested those statements?

5    A.    I can recall this like in my memory now.

6    Q.    What do you recall about the situation?

7    A.    What I recall is that Lisa knew the answer to

8    the question.  In other words, she knew that those

9    statements had not been made and she was using it to make a

10   point.

11   Q.    How would she have known that?

12   A.    I don't know unless she asked people if they had

13   written statements or maybe she had already asked Edwards

14   or something, but you know how you can tell when somebody

15   asks a question that they know the answer to?

16   Q.    I know.

17   A.    But that's what that was, but at the same token

18   it didn't seem unreasonable to me that we could get those

19   statements from other people.

20   Q.    Would you agree that a complete investigation

21   would have required the taking of statements of everybody

22   on the conference call?

23   A.    No, I'm afraid I'm not going to agree with that.

24   Maybe in this case because of Lisa in particular, but I

25   wouldn't think that that would be necessary as a matter of

1    course.

2        Q.    Would you agree that a complete investigation

3    would have at least included a statement from Mr. Mazzo?

4        A.    I would agree with that.

5        Q.    Now, I understand you think Lisa knew that

6    statements weren't taken, she asked to see copies and you

7    then found out that Mr. Edwards hadn't the requested the

8    statements, right?

9        A.    Right.

10       Q.    Would she have been allowed to see the copies of

11   those statements?

12       A.    No.  And understand, when these investigations

13   take place, the way this works is, Edwards would walk in

14   and say, "Lisa Wolff has filed a sexual harassment

15   grievance and we are conducting an investigation."  Fine.

16   And I don't know anything more about it until either he and

17   Ron Shingler come in and say, we have run into this

18   particular problem or they come and we sit down and they

19   say, okay, here are the results of the investigation.

20       Q.    We are still in the position where most of the

21   language describing what happened during the level three

22   discussion is candidate language or was this language that

23   was substantially modified by you?

24       A.    In paragraph three here?

25       Q.    You can even go down to the next paragraph,

1   four.

2       A.    Yeah, I think that those things can stand, at

3   least based on information that Lisa gave me about how she

4   was being treated and stuff, yeah.

5           MS. COX:  Could I just interject.  Ron, do you

6   want to repeat your question?

7           MR. CHERRY:  I'll do that.  Then I'm going to

8   ask the next question, which I'm not going to like the

9   answer to.

10  BY MR. CHERRY:

11      Q.    My first question, Mike, was the language in

12  paragraphs 3 and 4, would this be more candidate language

13  or is it more language that you substantially modified from

14  the candidate letter?

15      A.    No, this I think probably is language that was

16  in the candidate letter and I allowed to stand because it

17  appeared to represent what I believed happened.

18      Q.    Would it also be fair to say that it's language

19  that you don't really have -- strike that.

20          You were in the meeting so you would have

21  personal knowledge as to what happened during the level

22  three meeting, right?

23      A.    The only thing that I don't have personal

24  knowledge of are some of the things where she described

25  problems.  I can't tell you that the problems were real.  I

1   can only tell you that she described them, that kind of

2   stuff.

3        Q.    And that's near the end of paragraph 4?

4        A.    Yeah.

5        Q.    During these level three discussions you again

6   let Ms. Wolff describe what happened and how she felt about

7   it?

8        A.    Yeah.

9        Q.    Is that a deviation from protocol in level three

10  meetings, also?

11       A.    I don't know what you mean by deviation from

12  protocol.  I figured as the President of the company I have

13  got a lot of latitude on how I handle personnel issues.

14       Q.    That's the colonel coming out.

15       A.    There you go.  And the fact of the matter is

16  that what I was trying to do was to satisfy Lisa and make

17  sure that this issue was resolved fairly and properly.

18       Q.    You might be the president, isn't there some

19  kind of set protocol or procedure for the handling of level

20  three meetings?

21       A.    No, there is no protocol that says this meeting

22  will be conducted within one week after and it will be done

23  a certain way and only these people can attend, no.

24       Q.    As the president did you take an active part, as

25  you did in this case, in all of level three meetings for

1  these types of claims?

2      A.    Yes.

3      Q.    Any idea, can you give me any estimate as to how

4  many you handled before Wolff's?

5      A.    Any allegation of mistreatment, racial, sexual,

6  any of that kind of stuff, follows the procedure and I was

7  the guy that made the final decision as to what we were

8  going to do about it, you know, theft, all of those kind of

9  things.

10     Q.    How are we doing on time?

11     A.    I'm fine.  Nobody showed up.  Maybe we can even

12  finish.

13     Q.    Let's keep going then, paragraph 4.  Forget

14  about paragraph 4.

15          As a result of Ms. Wolff's pointing out that

16  their statements had not been taken, did you give

17  Mr. Edwards any instructions?

18     A.    I told him to go and get statements from other

19  people and let's see if it changed the conclusions that

20  were already on the table.

21     Q.    I recall reading somewhere that you were

22  somewhat displeased with the fact that this wasn't done and

23  you communicated this displeasure to Mr. Edwards.  Do you

24  remember that, sir?

25     A.    I think that may have been in the first

1    candidate statement that Lisa sent me.  There were words

2    that were pretty strong that probably were a little too

3    strong.

4         Q.    So you were not upset with Mr. Edwards and you

5    did not communicate --

6         A.    I stayed upset with Tim Edwards about

7    three-quarters of the time.  If you knew Tim you would

8    understand what I mean by that.  Tim was a brash, very

9    competent, probably the best human resource person I have

10   ever seen, but not everybody agreed with him.  And somebody

11   like Lisa, you know, if she didn't get her way would not

12   agree with Tim.

13        Q.    After the level three discussion do you recall

14   having a private meeting with Lisa?

15        A.    Yeah.

16        Q.    Can you tell me what happened during that

17   private meeting?

18        A.    I will tell you and then I will answer your

19   question.

20             I will tell you that it was very private to Lisa

21   and it was information that she felt would never come out.

22             Now, do you want me to answer it anyway?

23             MR. CHERRY:  Let's go off the record.

24             (Discussion off the record.)

25   / / /

1   (The following testimony was designated confidential and

2   extracted from this transcript.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MARYLAND

NORTHERN DIVISION

LISA WOLFF,                    )
                              )
            Plaintiff,        )
                              )
        vs.                   )    CA No. L02-3932
                              )
LITTON ADVANCED SYSTEMS,      )
INC., et al.,                 )
                              )
            Defendants.       )
_____ )

DEPOSITION OF MICHAEL S. GERING

August 29, 2003

Tucson, Arizona

(Transcript of confidential portions only.)

Reported by:
Steven J. Haight
CCR NO. 50280
----------------------------------------------------------
KATHY FINK & ASSOCIATES
2819 East 22nd Street
Tucson,  Arizona  85713
(520) 624-8644

BY MR. CHERRY:

    Q.    I do need to know the answer to that question.

    A.    She told me that the reason that this was so upsetting to her was that her husband was impotent, had been for some long period of time and that she hadn't had any sexual relations with him over a long period of time and when somebody made remarks that Steve made that she took them -- it was particularly upsetting because of that.

          And quite frankly, that told me that when somebody used the F word, for her to convert it to a sexual harassment thing gave it a little more understanding in my mind, but didn't qualify as sexual harassment.  And I told her that, you know, I was sorry about it and that maybe counseling was the kind of stuff that could better deal with it.  You know, I learned a long time ago that I very seldom let women into my office and close the door in emotional situations.  I try to not do that.  And on this particular one, you know, when that hit, I can remember moving to the door, thinking, I hope Diane is out there, my administrative assistant, because I didn't want this one to go crazy on me.

    Q.    I understand.  Do you recall anything else about that meeting?

    A.    That was all that was said in that meeting and it was very tearful and very emotional.

1    heard that Steve went to charm school, but that's all I

2    heard.

3        Q.    Was there ever any indication at any point that

4    Dr. Chino was going to have any conversation with Ms. Wolff

5    about what happened?

6        A.    No, there was no indication of that that I

7    recall at all.

8        Q.    And what's written here in the grievance on page

9    2 of the Exhibit 1, would this represent the extent of your

10   involvement in the investigation of her complaint?

11       A.    Yeah, I think, if what you mean by that, my

12   getting the investigation, having an interview with Tim

13   Edwards and Shingler, Lisa, sending him back, getting the

14   final thing, making a recommendation, having conversations

15   with the HR attorney and then having a conversation with

16   Chino, if that's what you meant, yes.

17       Q.    Can you take me one more time through what your

18   actual recommendation was?

19       A.    Well, the recommendation that was presented to

20   me from by Tim Edwards involved two weeks of suspension

21   with pay.

22           Can I talk about -- since we have already talked

23   about the HR attorney, can I talk about that conversation?

24           MR. CHERRY:  Sure.

25           MS. COX:  I would counsel you not to disclose

1   any communications you had with her.  The question pending

2   I believe asks for what your recommendation was as a result

3   of this incident.

4   BY MR. CHERRY:

5       Q.    Let's do it this way, because you always have to

6   be careful about the conversation with the attorneys.

7              But I think what you're going to do is reiterate

8   that you had conversations with Cathy that indicated that

9   she agreed with what your recommendation was as opposed to

10  what someone else's was.  If we already have it out here or

11  it's in the documents, that's okay.  I just caution you

12  against telling me what some other attorney may have told

13  you.

14      A.    I think I can deal with it.

15             My recollection is that Tim came to me with two

16  weeks.  Conversation with Cathy resulted in one week and

17  that's what was forwarded to Chino, the four

18  recommendations, one week without pay, charm school,

19  apology and a letter in his jacket.  I think that's what

20  the four were.

21      Q.    That's good.  Out of those four things, which of

22  those four things was consistent with your recommendation?

23      A.    Well, they all became my recommendation.

24      Q.    I mean with your initial recommendation?

25      A.    My initial recommendation was that in my

1    discussion -- I accepted Tim Edwards' initial of two weeks

2    and in the discussion I had with HR attorney --

3        Q.    It was changed to one week?

4        A.    It was changed to one.

5        Q.    Other than that, everything else was the same?

6        A.    Yeah.

7        Q.    You don't know at this point what, if any, part

8    of this recommendation was carried out by Chino?

9        A.    The only thing that I have heard rumors, don't

10   know directly, that he went to anger management school.

11   That's what I call charm school.

12       Q.    That's fine.

13             I don't want to hammer this point down, but just

14   to make sure I have this etched in stone here, is that you

15   never made a recommendation that Mr. Mazzo be immediately

16   terminated as a result of this incident?

17       A.    No.  I keep going back to the conversation I

18   had.  And those words that I put in this statement and I

19   signed this statement, I sent this statement back.

20   Unfortunate the way they are couched because it makes it

21   appear like that was the fifth recommendation or something,

22   but what my conversation was, as I described it, when I had

23   with Chino is that this guy is a Bozo kind of thing and

24   you're going to have to get rid of him in the sense of

25   counsel to Chino, not part of the recommendation.