**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

|  |  |  |
|---|---|---|
| | * | |
| LISA A. WOLFF, | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | CA No. 1:02-3932 |
| | * | |
| LITTON ADVANCED SYSTEMS, | | |
| INC. *et al* | * | |
| | | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF LISA WOLFF'S MEMORANDUM IN SUPPORT OF**
**HER RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Ronald M. Cherry (Bar No. 07927)
214 Washington Avenue
2nd Floor
Baltimore, Maryland 21204-4718
(410) 494-4954
(410) 494-4952 (facsimile)
ron.cherry@verizon.net
Counsel for Plaintiff
 LISA WOLFF

Dated:  October ___, 2003

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

LISA A. WOLFF,               *

     Plaintiff,            *

          v.            *        CA No. L02-3932

LITTON ADVANCED SYSTEMS,  *
     INC. *et al*

     Defendants.      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## PLAINTIFF LISA WOLFF'S MEMORANDUM IN SUPPORT OF HER RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 105 of the Local Rules of the District Court of Maryland, Plaintiff, Lisa Wolff ("Wolff" or "Plaintiff"), through her undersigned counsel, hereby respectfully submits this Memorandum of Law in support of her response to Defendants' Motion for Summary Judgment.

For the reasons stated below, Wolff establishes all of her claims both factually and as a matter of law and, therefore, summary judgment in Defendants' favor should be denied. In addition there are several disputes of material fact that would mandate the denial of Defendants' Motion for Summary Judgment.

**DISCUSSION**

**A.    Summary Judgment Standards.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus a grant of summary judgment is appropriate where a two-fold test is met. The movant for summary judgment must (1) clearly demonstrate the absence of any genuine issue of material fact, and, (2) demonstrate that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it might affect the outcome of the case. *Anderson*, 477 U.S. at 248. A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict if favor of the non-moving party. *Id. See also Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, "credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, when ruling on a motion for summary judgment. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Courts must take special care when considering a motion for summary judgment in a discrimination case because motive and intent are often critical issues. *Evans v Technologies Applications & Service Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

**Response to Statement of "Undisputed" Facts**

Defendants' statement of undisputed facts does not accurately reflect the facts of this controversy.

While Plaintiff would agree in major part with the rendition of the facts included in sections I and II of Defendants' <u>Memorandum in Support of Its Motion for Summary Judgment</u>, the rest of the recital of "undisputed" facts is woefully lacking in accuracy. Of paramount importance for immediate purposes are the events of August and November, 2001 and the language and conduct of Steven Mazzo ("Mazzo"). Plaintiff will address these incidents; pointing out where necessary those facts that remain in dispute or that were omitted from Defendants' Memorandum.

## ARGUMENT

Defendants are unable to show through pleadings, depositions, answers to interrogatories, admissions on file or affidavits that there is no genuine issue as to material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Plaintiff, Lisa Wolff is able to demonstrate, through depositions and affidavits, that there are specific facts showing a genuine issue for trial for every element of her claim. Fed. R. Civ. P. 56(e).

Lisa Wolff has brought a claim of sexual harassment under Title VII of the Civil Rights Act. To establish a Title VII claim for sexual harassment in the work place, a female plaintiff must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment and (4) was imputable to her

employer. *Spicer v. Virginia Dep't of Correction*, 66 F.3d 705, 7110 (4th Cir. 1995).

Sexual harassment in the workplace is defined as follows:

"[u]nwelcome sexual advances, requests for sexual favors, and other

verbal or physical conduct of a sexual nature …..when:

(1)    submission to such conduct is made either explicitly or implicitly a term or

condition of an individuals employment,

(2)    submission to or rejection of such conduct by an individual is used as the

basis for employment decisions affecting such individual, OR

(3)    such conduct has the purpose or effect of unreasonably interfering with an

individual's work performance or creating an intimidating, hostile, or offensive working

environment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (quoting *29 C.F.R. §*

*1604.11(a)-(b)* (1989)).

Defendants, in their Motion for Summary Judgment, do not dispute the first

element, that the offending conduct was unwelcome.  However, Defendants do argue that

the other three elements have not been satisfied.  In fact, Wolff is able to show that there

are material facts to support her claim of sexual harassment.

### A.  The Offensive Conduct in Question was Based of Plaintiff's Gender

The second element of a claim for sexual harassment requires proof that the

offending conduct was based on the plaintiff's sex.  *Ocheltree v. Scollon Productions,*

*Inc.* 335 F3d 325, 331 (2003).  "A woman may prove sex-based discrimination even

though she is not subjected to sexual advances or propositions." *Ocheltree*, 335 F.3d at

325 (citing *Smith v. First Union National Bank*, 202 F.3d 234, 242 (4th Cir. 2000), and

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998)).  "A trier of fact

5

may reasonably find discrimination, for example, when a woman is the individual target of open hostility because of her sex, *Smith*, 202 F.3d at 242-43, or when 'a female victim is harassed in such sex-specific and derogatory terms … as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace'. *Ocheltree,* 335 F.3d at 331-332 (quoting *Oncale*, 523 U.S. at 80). In *Ward v. Johns Hopkins Univ.*, 861 F. Supp. 367 (D. Md. 1994), the court stated that conduct need not be accompanied by explicit sexual comments in order for a finder of fact to determine that it is sexual in nature.  The trial court in *Ward* declined to grant defendant's motion for summary judgment, stating that whether brushing up against the plaintiff, whispering in her ear, and touching her lower back was conduct based on sex is a question to be determined by the jury. *Ward*, 861 F. Supp. At 375.

There are sufficient facts upon which a reasonable jury could base a finding that Lisa Wolff was harassed in her workplace by Steven Mazzo ("Mazzo") because of her gender.  Contrary to Defendants' representations in their statement of undisputed facts, Plaintiff was the only woman present at the August 21, 2001 meeting.  (Plaintiff's Exh. 9.)  Mazzo used the word "fuck" throughout this meeting while speaking to the men in attendance. (Plaintiff's Exh. 1 at pp.33-40.)  However, when he spoke to Wolff, Mazzo used the word "fuck" in a sexually active manner because of her gender. (Plaintiff's Exh. 1 at pp.35-40.)  These words when directed to Wolff were intended to be more than merely vulgar and offensive language.  For example, Mazzo when talking directly to Wolff used phrases, such as:  "I won't give you a fuck if you want to cover your fucking ass"; "Lisa fuck me, fuck me, fuck me"; "I wouldn't give you a fuck if you want to"; "[Do you] like fucking me"; "I am not going to give you one fuck for that"; "I am not

giving you three fucks for that". (Plaintiff's Exh. 1 at pp.35-40.)[1]  Mazzo does not deny

addressing Wolff in the manner she describes.  (Plaintiff's Exh. 2 at p.106.)

Mazzo spoke to Wolff in a manner he did not and would not have spoken to the

male participants.  Mazzo spoke to Wolff in a manner that any woman would find

offensive. This is especially so when, as in this case, she was the only woman there.

Clearly Mazzo's conduct was not merely tinged with offensive sexual connotations, but

actually constituted gender based discrimination.

**B.  Mazzo's Conduct Does Approach the Level of "Severe and Pervasive"**
**Harassment Required To Create An Abusive Work Environment**

Title VII is violated when an employee suffers sexual harassment that is

"sufficiently severe or pervasive to alter the conditions of . . . employment and create an

abusive working environment".  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67

(1986). *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 192 (4th Cir. 2000).  The

Supreme Court in *Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21 (1993), held "that: (1)

to be actionable under Title VII as 'abusive work environment' harassment, the conduct

need not seriously affect an employee's psychological well-being or lead the employee to

suffer injury; (2) the *Meritor* standard requires an objectively hostile or abusive

environment as well as the victim's subjective perception that the environment is abusive;

and (3) whether an environment is sufficiently hostile or abusive to be actionable requires

consideration of all the circumstances, not any one factor."  "When the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe

or pervasive to alter the conditions of the victim's employment and created an abusive

---

[1] *The American Heritage Dictionary* defines the word "fuck" as follows: "to have sexual intercourse with
or to engage in sexual intercourse."

7

working environment, Title VII is violated." *Harris,* 510 U.S. at 21. A determination of

whether the conduct in question is sufficiently severe or pervasive to alter the employee's

conditions of employment and to create an abusive work environment includes both

objective and subjective components." *Anderson v. GDC, Inc.,* 281 F.3d 452 (4th Cir.

2002) (citing *Harris,* 510 U.S. at 21). The subjective component looks at the evidence

from the point of view of the victim. The effect on the employee's psychological well-

being is relevant in determining whether the plaintiff actually found the environment

abusive. *Harris*, 510 U.S. at 17. "In assessing whether a work environment is objectively

hostile, a court must consider 'all the circumstances,' including 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employees

work performance.'" *Anderson*, 281 F.3d at 459, (citing *Harris*, 510 U.S. at 23). The

Court in *Anderson* went on to say that "no single factor is determinative". Id. "In

assessing whether the environment is objectively hostile, a reviewing court must bear in

mind that Title VII is 'designed to protect working women from the kind of male

attentions that can make the workplace hellish for women'. *Baskerville v. Culligan Int'l

Co.* 50 F.3d 428, 430 (7th Cir. 1995)."

    "[T]he objective severity of harassment should be judged from the perspective of

a reasonable person in the plaintiff's position, considering 'all the circumstances'."

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 81-82 (2003) (citing Harris, 510

U.S. at 23). "The real social impact of workplace behavior often depends on a

constellation of surrounding circumstances, expectations, and relationships, which are not

fully captured by simple recitation of the words used…." *Oncale*, 523 U.S. at 82. In

*Paroline v. Unisys Corp.,* 879 F2d 100 (4th Cir. 1989) the plaintiff asserted a claim that her supervisor sexually harassed her and created a hostile work environment under Title VII. The court concluded that summary judgment is inappropriate where "reasonable minds could differ" as to whether defendant's behavior created a hostile work environment. *Id*. at 105. Furthermore, the court in *Paroline* determined that the fact that the defendant was in a supervisory capacity over plaintiff was an important factor when determining whether a reasonable person would be affected under like circumstances. *Id.* at 106.

Lisa Wolff can present evidence containing both objective and subjective components to show that Mazzo's conduct reaches the level of "severe and pervasive" harassment, creating an abusive work environment. The words used by Mazzo in the August 29, 2001 meeting combined with the statements he made in the November, 2001 meeting created a subjectively hostile work environment for Wolff. In Plaintiff's Answer to Interrogatories, Response to Interrogatory Number Nine, Wolff she states that in the August 29, 2001 meeting Mazzo spoke to her "in a manner that suggested that she had engaged in sexual intercourse with him and the other male participants in the meeting." (Plaintiff's Exh. 5.) Wolff continues her answer by saying "[i]n Plaintiff's estimation, the sexual remarks were demeaning and humiliating and caused her extreme embarrassment in front of her peers." She further "describes it as having to endure a verbal rape." (Plaintiff's Exhs. 5 and 11.)

Wolff considered Mazzo's conduct at the August, 2001 and the November, 2001 meetings to be threatening to her. Mazzo was, at all relevant times, in a supervisory position over Plaintiff. (Plaintiff's Exh. 1 at pp.41-42 and Exh. 11.) During the August,

2001 meeting when Wolff realized she was in the middle of sexual harassment, she couldn't talk or swallow and she could barely breathe. (Plaintiff's Exh. 1 at p.43.) Plaintiff felt like her legs were lead and she couldn't stand up. (Plaintiff's Exh. 1 at p.43.) In the months to follow, Wolff had difficulty performing her work.  Mazzo's abusive conduct was so humiliating and embarrassing that Wolff had difficulty communicating with the other people in the meeting. Plaintiff's (Exh. 1 at p.51.)  Wolff's e-mails and telephone calls were not being returned and as a result she had to do more on her own and it became inefficient for her to do her job.  (Plaintiff's Exh. 1 at pp.52-54.)  In addition, Wolff had to reassign people on her staff to insulate herself from Mazzo so she didn't have to directly deal with Mazzo. (Plaintiff's Exh. 1 at p.55.)  In addition, after she filed her initial complaint, those co-workers loyal to Mazzo made it increasingly difficult for Wolff to perform her daily functions.  For example, one particularly obnoxious individual, Bob Ossentjuk, after being advised that there was to be no direct contact between Wolff and Mazzo, threatened to get Mazzo on the telephone during a conference call in order to settle a dispute between Ossentjuk and Wolff.

Finally, Wolff received a phone call from a female employee in San Jose to tell Wolff that she was the butt of jokes in the California office because there was a carton outside of Bob Ossentjuk office showing Lisa having sex with different men.  (Plaintiff's Exh. 1 at pp. 26-27.)

John Roth and Michael Peters were present in the room with Wolff during the August, 2001 meeting. According to both Wolff was "very upset" and "visibly shaken" by the way Mazzo was talking to her.  (Plaintiff's Exhs. 8 and 9.)  Ken Peters, a San Jose based participant in the meeting confirmed that the majority of Mazzo's profanities were

directed towards Wolff. (Plaintiff's Exh. 10.) At the November, 2001 meeting with

Mazzo, Wolff was once again subjected to a hostile work environment when Mazzo said

to her "you aren't the only one who got fucked" and "you better get used to it, if you

haven't noticed, I am here.  You are the one that is getting fucked". (Plaintiff's Exh. 1 at

pp.87-89.) Additionally, in this November meeting Mazzo admitted to Wolff that he

intended for her to interpret, in a sexual way,  the words he used when addressing her in

the August, 2001 meeting.  Mazzo also said that he knew the other men in the meeting

would not pick up on what he was doing. (Plaintiff's Exh. 4.)

     Finally, Wolff's psychological well-being was affected by Mazzo's abusive

conduct.  Wolff saw her family physician because she couldn't sleep, she was having

headaches and chest pains and her heart was racing.(Plaintiff's Exh.1 at p.276.)  Wolff

also began seeing William Charmak, Ph.D. because of the psychological effects of these

two meetings.  Dr. Charmak diagnosed Plaintiff with Acute Stress Disorder in

September, 2001 and later with Posttraumatic Stress Disorder. (Plaintiff's Exh. 11.)

Wolff is still under Dr. Charmaks's care for Posttraumatic Stress Disorder. (Plaintiff's

Exh. 11.)

     The harassment that Wolff was subjected to by Mazzo interfered with her work

performance and significantly affected her psychological well-being.   A fact finder could

reasonably conclude that Mazzo's behavior created a hostile and abusive work

environment from the perspective of a reasonable person, especially when considering

the fact the Mazzo was in a supervisory position over Wolff.  Wolff has raised a genuine

issue of fact as to whether Mazzo's conduct interfered with her work performance or

significantly interfered with her psychological well-being.  It cannot be maintained, as a

matter of law, that the abusive conduct was insufficiently severe or pervasive to support a sex discrimination claim under Title VII.

Finally, Defendants seem to believe it dispositive that the incident of August 29, 2001 was a "single incident". This court has previously found however that a single incident situation can be found severe enough to constitute a hostile work environment. In *Rohan v. Networks Presentation, LLC,* 192 F. Supp. 2d 434 (2002), the plaintiff brought suit following a single incident wherein her employer forced her to divulge before a crowd of several co-workers intimate personal details about her past including, incest, sexual abuse and mental disorders. This Court found that this single incident, taken in the light most favorable to the plaintiff, could be found to be severe enough to support her claim that the terms and conditions of her employment were altered. The court considered the unusually intimate and personal subject matter, the number of people she was forced to reveal these intimacies to and the role of management in the incident. *Id.* at 438.

In the instant case, Plaintiff has referred to this single incident as being tantamount to a verbal rape. She has spoken of extreme humiliation and has had to undergo extensive professional counseling as a result. It is not at all inconceivable that a jury could find this single incident to be so egregious that it would rise to the level of the severity noted in *Rohan*.

### C.  Liability Can Be Imputed to Northrop Grumman

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate or higher authority over the employee.  *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). In

*Spicer v. Virginia Dep't of Corrections,* 66 F.3d 705, 711 (4th Cir. 1995), the court held

that employers should be held to a standard of reasonable action and that an employer is

liable if no adequate remedial action is taken.  In *Spicer* the court looked at the actions

taken by the employer, including its investigation, its counseling of those involved, and

its training sessions and concluded the remedial action was adequate. The affirmative

defenses of *Faragher,* 524 U.S. at 808, and *Burlington Industries, Inc. v. Ellerth*, 524

U.S. 742, 765 (1998), allow an employer to avoid strict liability for a supervisor's sexual

harassment of an employee if no tangible employment action was taken against the

employee. *Cf. Matvia v. Bald Head Island Management, Inc.,* 259 F.3d 261, 266 (2001).

The court in *Matvia* stated "[e]xamples of tangible employment action include

'discharge, demotion, or undesirable reassignment'.  Id. See also *Faragher*, 524 U.S. at

807, and *Ellerth*, 524 U.S. at 765.

      The Defendant in the present case cannot raise as an affirmative defense because

it did take tangible employment action against Wolff when she was reassigned to an

undesirable position.  As a result of the merger of Northrop Grumman and Litton

Advanced Systems Wolff's position was restructured.  After filing her grievance and

retaining an attorney sometime in October, 2001 Wolff met with Gloria Flach ("Flach"),

the Director of Software Engineering and Design Automation and Douglas Norton

("Norton"), the Manager of Process and Tool Development Support to discuss her new

position in Northrup-Grumman.(Plaintiff's Exh. 1 at pp.173-174. ) Norton and Wolff

agreed that she would be the director of the electrical and mechanical divisions, which is

a position Wolff was satisfied with because of the growth opportunities. (Plaintiff's Exh.1

at pp.178-182).  In late November 2001 however, Wolff found out indirectly that she

would only be responsible for the electrical division. (Plaintiff's Exh. 1 at pp.188-190). This was a demotion for Wolff because it was a position with much less responsibility. Wolff considered it comparable to a position she had held ten years prior. (Plaintiff's Exh. 1 at p.164 and Exh. 4.) Thus, the Defendant took a tangible employment action against Wolff by demoting her to a position with much less responsibility.

In *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir. 1989), the Circuit Court reversed the District Court's grant of summary judgment because even though the employer took disciplinary action against the offending supervisor, the discipline imposed by the employer arguably was not adequate under the circumstances. In that case liability could be imputed on defendant employer under two theories: (1) the company failed to take adequate remedial actions after plaintiff complained about her supervisor and (2) the supervisors conduct towards other employees should have alerted Unisys to the likelihood that he would try to harass plaintiff. *Id.* at 106. The court found that "[b]oth theories represent valid means of imputing Title VII liability to an employer in sexual harassment case involving a hostile work environment.

In the instant case, the remedial action taken against Mazzo was minimal at best. After Wolff reported the events of the August 29th meeting to Human Resources, a cursory investigation was done, that initially did not even involve the taking of Mazzo's statement. Two weeks after she reported the incident and after inquiring about the status of her complaint, Mazzo's statement was taken. In short, Defendants did not make a serious inquiry into Wolff's case. Indeed at one point, Tim Edwards offered to bet Gering $100 that nothing would come of Wolff's claim. (Plaintiff's Exh.3 at p.74.)

After the investigation was completed Gering recommended that Mazzo be terminated if it ever occurred again (Plaintiff's Exh.3 at p.65) According to Gering, the reaction of the incoming President, John Chino was "…I think maybe I would just rather talk to him" (Plaintiff's Exh.3 at p.65) Gering and Edwards recommended two weeks suspension with pay, a letter in his "jacket" (personnel file) an apology and "charm school" (anger management school) (Plaintiff's Exh.3 at p.68).  According to Mazzo, he did not recall sending a letter of apology to Wolff, he was never suspended, and never asked to review a sexual harassment film (Plaintiff's Exh.3 at p.113, 114).  He went to local therapist because it was too inconvenient to attend anger management school. (Plaintiff's Exh.3 at p.115).

It is without question that the Defendant failed to take adequate remedial measures against Mazzo.

As to the second *Paroline* theory; Mazzo had demonstrated similarly abusive conduct towards other employees and specifically a penchant for abuse.  Michael Gering ("Gering"), who was, at that time, the President of Defendant Litton, in speaking to the incoming President John Chino, noted the following about Mazzo;

"…you have a problem with this guy.  This guy is a time bomb and you're gonna have to get rid of him." (Plaintiff's Exh.3 at p.65, 69).

Gering also stated that he was aware of at least two other complaints made against Mazzo involving discrimination.  (Plaintiff's Exh.3 at p.72)   It was not uncommon for Mazzo to lose his temper during a meeting and use profanities.  (Plaintiff's Exh.3 at p. 71, 72) Mazzo's prior displays of anger and cursing at other employees should have

alerted Northrop Grumman to the likelihood of Mazzo harassing Wolff in the manner he did at the August, 2001 meeting.

**Plaintiff Can Present a Prima Facie Case of Constructive Discharge**

Defendant's position on the issue of Constructive Discharge as it relates to the adverse employment action taken against Plaintiff is somewhat unclear.  Plaintiff has consistently maintained that as a direct result of her filing a claim against Mazzo and pursuing it through the EEOC, Defendant declined to offer her a comparable position. Despite Defendant's protestations to the contrary this decision had nothing to do with restructuring or the Northrup-Grumman takeover.

When Wolff initially spoke with Norton concerning her position with Northrup Grumman after the takeover of Litton she was described a position that was markedly similar to the position she held at Litton.

After her November 2001 meeting with Mazzo, wherein she indicated that the matter had not been resolved, the position offered to her suddenly changed.  Plaintiff was not even directly advised of the change. (Plaintiff's Exh.4).  The result of the change was to place Plaintiff in a position she had held 10 years earlier and with much less responsibility than she currently had.  When Plaintiff balked at taking that position, Defendants offered to have her "voluntarily terminated" pursuant to an Agreement to Stay. (Plaintiff's Exh.4)

Constructive Discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit her job. *Bristow v The Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985)

In the instant case Wolff was efficiently and effectively ushered out of Northrup-Grumman after it became apparent that she intended to pursue her Human Relations Commission claim against the company.  Although Mr. Edwards declared after the November 2001 meeting with Mazzo that the issue was resolved, Wolff quickly and immediately pointed out that it was not resolved. (Plaintiff's Exh.1 at p.93).  Wolff had been speaking with Flachs and Norton about a comparable position prior to the Mazzo meeting but that position was suddenly, inexplicably and unilaterally altered by Defendant.  To blame the change in positions on restructuring is clearly pretext considering the fact that a) the position as initially offered existed even after restructuring had been discussed and the takeover had begun and b) Wolff was offered a buyout under the terms of the Agreement to Stay if she would waive her rights to pursuing the discrimination claims against the Defendants.

IV. **Plaintiff Can and Should Prevail on her Claim of Retaliation Under Title VII**

   **a. Plaintiff engaged in a protected activity**

In order to establish a prima facie case under her Retaliation claim Wolff need only establish:

1.    She engaged in a protected activity,

2.    Defendants took an adverse employment action against her,

3.    A causal connection existed between the protected activity and the asserted adverse actions.

*Von Guten v Maryland,* 243 F.3d 858 (4th Cir. 2001)

Defendants, quite predictably maintain that Plaintiff cannot establish a prima facie case of retaliation in that, they allege, she cannot establish that she engaged in a protected

activity. They further maintain that Wolff can show neither an adverse employment action nor a causal connection. (Defendants' Memorandum p.37).

Defendants base this position on their "finding" that Mazzo's actions were not discriminatory. As shown previously Defendants are mistaken in their assumption that they and not a jury should be the arbiter of whether Mazzo's conduct represented sexual harassment. Mazzo has admitted making the statements that Wolff found to be sexually charged and highly offensive. (Plaintiff's Exh. 2 pp. 93, 94) Wolff has testified that the wording and delivery of the statements was what made them particularly alarming to her. (Plaintiff's Exh. 1 at pp. 33-39) While Defendants seem to believe it persuasive that "No other person in the August 29th telephone conference regarded Mr. Mazzo's language to be sexual…" a jury could well find that statements inherently offensive to women may indeed not be offensive to men. Indeed at least one of the men in the meeting felt so aggrieved by the statements made that were aimed directly at Wolff that he attempted curtail the barrage. (Plaintiff's Exh. 9 and Exh. 2 at pp.67, 68) It is ludicrous to represent to this Court that the statements in and of themselves weren't inherently offensive and particularly so to a married woman who was asked in front of her peers and superiors whether she enjoyed "fucking" a higher ranking executive.

Even if this conduct was not found to be sexually harassing and subject to Title VII protection, it cannot be seriously maintained that Wolff did not possess at the time she made her complaint, a reasonable, good faith belief that she had been subject to particularized treatment solely based upon her sex. As Wolff has testified, when Mazzo spoke or in fact yelled at men in the meeting he would couch his tirades in "generic" terminology, e.g. "I don't give a fuck". When he spoke to the only female in the

meeting however, he would say instead "I wouldn't give you a good fucking…"

According to Wolff, at one point in the meeting, she realized that whenever Mazzo

spoke to her, his statements went beyond cursing; "…he was making it sound like we

were having sex" (Plaintiff's Exh.1.)  Michael Gering, Litton's past president had this

take on the situation:

> … given the language as described by Lisa and the way it
> was employed, the fact that she was the only woman on the call.
> I cannot imagine why a guy would say it if it wasn't to upset
> or offend the person most likely to be offended.  If we had five guys
> sitting there to use that language isn't going to offend them, but to
> have Lisa sitting there and continually use it, I would think that it was
> intentional.
>
> (Plaintiff's Exh. 3 at p.64.)

Rightly or wrongly, Wolff had a reasonable good faith belief that she was being singled

out because of her sex.  Accordingly she had a reasonable good faith belief that when

she opposed Mazzo's improprieties; she was opposing a practice that was violative of

Title VII. *See Adams v. Giant Food Inc.,* 25 F. Supp.2d 600 (2002).

   Wolff's suspicions about the sexual nature and intent of Mazzo's comments are

borne out by her November 2001 meeting/conversation with him.  During that meeting,

Mazzo confirmed that another woman to whom he had described the event of August

29, 2002, thought that what he had done to Wolff was …"disgusting…"  (Plaintiff's

Exh. 1 at p.86)  Mazzo went on to acknowledge that he knew what he was doing and

that he did it on purpose.  (Plaintiff's Exh. 4 and Exh. 1 at p.90) No matter how much

Defendants want to whitewash Mazzo's actions, one cannot, in good faith, seriously

maintain that statements such as, "I won't give you one good fucking; I won't give you

a fuck if you want to cover your ass; Lisa, fuck me, fuck me, fuck me; It is not enough

that you fucked me.  Now you have to fuck every one of these guys; and Lisa you really fucked me on this one.  You like fucking me?", when addressed to the lone female in a meeting and when these were the only personalized comments made in the meeting are not "sexual". (Plaintiff's Exh. 1 at pp.33-39) Defendants' representations to this Court that Mazzo used "the same terms with men as he did with Plaintiff" (Defendant's Memorandum at p. 37) is incorrect.  (See also Plaintiff's Exh. 2 at pp.105, 106)

Finally, notwithstanding all of the above, the protected activity in question was the reporting of Mazzo's abusive and gender based behavior.  See *Anderson v G.D.C. Inc.*, 281 F.3d 452, 458 (4th Cir. 2002).  Clearly Plaintiff can adequately satisfy the first prong of the *Von Guten* trilogy.

**b.    Defendants' took adverse actions against Plaintiff**

Defendants next allege that there was no adverse action taken against Wolff. Defendants appear to rely here solely upon their unilateral decision that Wolff was not constructively discharged and that the alleged retaliatory actions taken against Wolff's daughter and nephew were not contemporaneous with the filing of her internal complaint.

As previously shown Wolff was indeed constructively discharged.  Wolff will not restate that entire argument here, but it is clearly relevant to the issue of retaliation.  As to the issue of retaliation against Wolff's family members, Defendants' reliance on the issue of contemporaneousness is misplaced and inapplicable.

The issue of Ms. Wolff's pursuit of her claim against the Defendants was far from settled at the time Defendants took the adverse actions against Christine Wolff and David Demay.

20

Both Christine Wolff and David Demay had received every indication that they would remain long term viable employees of the Defendants. Each was the subject of not too subtle adverse actions involving their employment status and/or responsibilities. The reasons given to both Christine Wolff and Demay were transparently pretext since their conditions had not changed in any respect from the way they were prior to the incident. (Plaintiff's Exh. 6 and Exh. 7)

The only common denominator in each case is the fact that Wolff had an ongoing claim against the Defendants for sexual harassment/discrimination.

CONCLUSION

For the reasons stated above and to be amplified and explained more completely at the time of oral argument if any, Plaintiff respectfully requests that defendants Motion for Summary Judgment be denied as Plaintiff has demonstrated that there remain several genuine issues of material facts in dispute and that taking the evidence presented in the light most favorable to her, she is likely to prevail at trial before jury.

_____/s/_____
Ronald M. Cherry (Bar No. 07927)
214 Washington Avenue
2nd Floor
Baltimore, Maryland 21204-4718
(410) 494-4954
(410) 494-4952 (facsimile)
ron.cherry@verizon.net
Counsel for Plaintiff
 LISA WOLFF